UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHILIPS NORTH AMERICA LLC,

                Plaintiff,

     v.

FITBIT, INC.,

                Defendant.

Civil Action No. 1:19-cv-11586-IT

Leave to file excess pages granted
on December 10, 2019

**DEFENDANT FITBIT INC.'S MEMORANDUM IN SUPPORT OF ITS RENEWED
RULE 12(b)(6) MOTION TO DISMISS PLAINTIFF PHILIPS NORTH AMERICA
LLC'S FIRST AMENDED COMPLAINT UNDER 35 U.S.C. § 101**

# TABLE OF CONTENTS

**Page**

I.  LEGAL STANDARDS ........................................................................... 1

    A.  Rule 12(b)(6) motions to dismiss under section 101 ............................ 1

    B.  Patent eligibility under 35 U.S.C. § 101 ......................................... 2

II. ARGUMENT ..................................................................................... 4

    A.  The '233 patent is invalid as patent ineligible ................................. 4

        1.  The '233 patent is directed to the abstract idea of secure data transfer between devices ....................................................... 4

            a.  The claims recite generic devices ................................... 4

            b.  "Security mechanism" is a result, not a particular way of achieving the result ......................................................... 5

            c.  Federal Circuit has determined similar claims to be directed to abstract ideas ........................................................... 6

            d.  Result-oriented mobile device functionality does not save claims from § 101 abstraction ......................................... 7

        2.  The '233 patent recites no inventive concept ............................ 8

        3.  Claim 1 of the '233 patent is representative ............................ 9

    B.  The '377 patent is invalid as patent ineligible ................................. 10

        1.  The '377 patent is directed to the abstract idea of collecting and analyzing exercise data, and presenting that data to a user ..................... 10

            a.  Claims are directed to the abstract idea of data collection, analysis, and presentation ........................................... 11

            b.  Claims recite no improvements to technology or methods for exercise monitoring ............................................... 12

            c.  Claims recite no improvements to mobile phone technology...... 13

            d.  The Federal Circuit has determined similar claims to collection, analysis, and display of physiological data to be patent-ineligible ........................................................... 14

        2.  The '377 patent recites no inventive concept ............................ 14

        3.  Claim 1 of the '377 patent is representative ............................ 16

    C.  The '958 patent is invalid as patent ineligible ................................. 16

        1.  The '958 patent is directed to the abstract idea of collecting and storing health data so it is not lost during a wireless connection interruption................................................................... 17

            a.  Collecting and storing data is an abstract concept ..................... 17

# TABLE OF CONTENTS
(continued)

Page

b.    Claims recite the abstract idea in a generic mobile environment ................................................................ 18

c.    Recited storing of health data is a result, not a specific improvement or solution ............................................ 18

2.    The '958 patent recites no inventive concept ......................... 19

3.    Claim 16 of the '958 patent is representative ......................... 20

D.    The '007 patent is invalid as patent ineligible .................................... 20

1.    The '007 patent is directed to the abstract idea of collecting and analyzing exercise data to track an athlete's performance ...................... 21

a.    Reciting generic physical components is immaterial to whether a claim is "abstract" under § 101 ................................. 21

b.    Claims do not recite improvements to GPS, networking, or exercise monitoring technology .................................................. 22

c.    Claims do not recite improvements to athletic feedback data analysis ................................................................... 23

d.    Claims recite no improvements to presentation or comparing of athletic performance data ..................................... 23

2.    The '007 patent recites no inventive concept ......................... 23

3.    Claim 21 of the '007 patent is representative and Fitbit's motion should be granted even under Philips' constructions ............................. 24

III.    CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)................................................................2, 8, 25

*Affinity Labs of Texas, LLC v. Amazon.com, Inc.*,
    838 F.3d 1266 (Fed. Cir. 2016)....................................................................7, 8

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014)...............................................................................1, 2, 3, 8

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*,
    939 F.3d 1355 (Fed. Cir. 2019)..........................................................3, 4, 21, 23

*Am. Well Corp. v. Teladoc, Inc.*,
    191 F. Supp. 3d 135 (D. Mass. 2016) .................................................................15

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.*,
    788 F.3d 1371 (Fed. Cir. 2015)...........................................................................3

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
    521 F.3d 1328 (Fed. Cir. 2008)..........................................................................25

*Athena Diagnostics Inc. v. Mayo Collab. Servs. LLC*,
    915 F.3d 743 (Fed. Cir. 2019)............................................................................2

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...........................................................................................1

*Berkheimer v. HP, Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018)........................................................................2, 8

*Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*,
    778 F. App'x 882 (Fed. Cir. 2019) .....................................................................3

*British Telecom. PLC v. IAC/InterActiveCorp*,
    381 F. Supp. 3d 293 (D. Del. 2019)...................................................8, 16, 20, 24

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)............................................................. *passim*

*CardioNet, LLC v. InfoBionic, Inc.*,
    348 F. Supp. 3d 87 (D. Mass. 2018) ................................................................1, 8

*CardioNet, LLC v. InfoBionic, Inc.*,
    No. 15-CV-11803, 2017 WL 1788650 (D. Mass. May 4, 2017)...........................25

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
    927 F.3d 1306 (Fed. Cir. 2019)...............................................................9

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
    935 F.3d 1341 (Fed. Cir. 2019)...............................................................8

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019)....................................................... *passim*

*Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*,
    776 F.3d 1343 (Fed. Cir. 2014)...............................................8, 17, 18

*Elec. Power Grp, LLC v. Alstom, S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)....................................................... *passim*

*First-Class Monitoring, LLC v. United Parcel Serv. of Am., Inc.*,
    389 F. Supp. 3d 456 (E.D. Tex. 2019)......................................................2

*Hyper Search LLC v. Facebook Inc.*,
    No. 17-1387, 2018 WL 6617143 (D. Del. Dec. 17, 2018) .....................25

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017)...............................................................11

*Intellectual Ventures I LLC v. Symantec Corp.*,
    838 F.3d 1307 (Fed. Cir. 2016)...............................................................9

*Interval Licensing LLC v. AOL, Inc.*,
    896 F.3d 1335 (Fed. Cir. 2018)...........................................................3, 4

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012).................................................................................2

*Prism Techs. LLC v. T-Mobile USA, Inc.*,
    696 F. App'x 1014 (Fed. Cir. 2017) .........................................................6

*Return Mail, Inc. v. U.S. Postal Serv.*,
    868 F.3d 1350 (Fed. Cir. 2017)...............................................................4

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018)...........................................................2, 6

*Secured Mail Sols. LLC v. Universal Wilde, Inc.*,
    873 F.3d 905 (Fed. Cir. 2017).................................................................2

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Smart Sys. Innovations, LLC v. Chicago Transit Auth.*,
    873 F.3d 1364 (Fed. Cir. 2017)............................................................................7, 22

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F.3d 1138 (Fed. Cir. 2016)....................................................................................2

*The Cleveland Clinic Found. v. True Health Diag. LLC*,
    859 F.3d 1352 (Fed. Cir. 2017)....................................................................................2

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)........................................................................... *passim*

*Two-Way Media v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)...............................................................................6, 15

*Uniloc USA, Inc. v. ADP, LLC*,
    772 F. App'x 890 (Fed. Cir. 2019) ...............................................................................9

*Univ. of Fl. Res. Found. v. GE Co.*,
    916 F.3d 1363 (Fed. Cir. 2019)..................................................................................14

**Statutes**

35 U.S.C. § 101........................................................................................... *passim*

35 U.S.C. § 112 ¶ 6...........................................................................................25

**Other Authorities**

Fed. R. Civ. Proc. 12(b)(6) ...............................................................................1, 2

Fitbit, Inc. ("Fitbit") files this renewed motion to dismiss Philips North America, LLC's ("Philips") first amended complaint (Dkt. 25) with prejudice. In response to Fitbit's first motion to dismiss (Dkt. 19–20), Philips added 24 paragraphs in an attempt to save its complaint and U.S. Patent Nos. 6,013,007 ("the '007 patent"), 6,976,958 ("the '958 patent"), 7,088,233 ("the '233 patent"), and 8,277,377 ("the '377 patent") ("the Asserted Patents") from dismissal. But Philips' new allegations cannot rewrite the claims or specifications. The Asserted Patents issued before *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 223 (2014), and their claims reflect an attempt to capture abstract concepts relating to the collection of health data in a generic mobile phone environment, the type of result-oriented, "do-it-on-a-computer" claims the Supreme Court instructed are not patent-eligible under 35 U.S.C. § 101. Philips' new allegations are inconsistent with the specifications, not captured by the claims, or immaterial to the § 101 inquiry.

At their core, the Asserted Patents take known, generic components and use them in conventional ways to collect, analyze, transfer, and present data. The specifications admit the patents do not improve GPS, physiological monitoring, or wireless technology. The claims are result-oriented and do not recite particular solutions, but the desired results of data collection and analysis in a generic mobile environment. None of claims recite use of anything other than conventional technology to achieve these desired results, "a frequent feature of claims held ineligible under § 101." *Elec. Power Grp, LLC v. Alstom, S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). Indeed, these claims are similar to claims this Court has held ineligible in *CardioNet* and *American Well*. Dismissal of Philips' amended complaint with prejudice is warranted.

## I.    LEGAL STANDARDS

### A.    Rule 12(b)(6) motions to dismiss under section 101

To survive a motion to dismiss, a plaintiff must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Patent eligibility under § 101 is a

question of law based on underlying facts and "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion." *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018). "District courts have frequently decided section 101 issues on motions to dismiss, and the Federal Circuit has approved of that procedure on numerous occasions, including in cases post-dating the decisions in *Aatrix* and *Berkheimer*." *First-Class Monitoring, LLC v. United Parcel Serv. of Am., Inc.*, 389 F. Supp. 3d 456, 471 (E.D. Tex. 2019) (Bryson, J., Circuit Judge) (collecting cases); *The Cleveland Clinic Found. v. True Health Diag. LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017) (The Federal Circuit "ha[s] repeatedly affirmed § 101 rejections at the motion to dismiss stage, before claim construction or significant discovery."). District courts are "not obliged to accept" allegations as true that are "inconsistent with the [] patent." *See Athena Diagnostics Inc. v. Mayo Collab. Servs. LLC*, 915 F.3d 743, 756 (Fed. Cir. 2019); *see also Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) ("[C]ourt[s] need not accept as true allegations that contradict . . . the claims and the patent specification.")

## B. <u>Patent eligibility under 35 U.S.C. § 101</u>

Patent eligibility under § 101 is determined using a two-step analysis expressed in *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012), and further delineated in *Alice*, 573 U.S. at 217–18. At step one, the Court must first determine whether the claims are "directed to" a patent-ineligible concept. *Alice*, 573 U.S. at 217. The step one inquiry involves looking at the "focus" of the claims. *Elec. Power*, 830 F.3d at 1353. Limitations that render the scope of the claims "narrower than th[e] abstract idea," do not change what those claims are "directed to." *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 (Fed. Cir. 2018).

*Mayo/Alice* step one is a legal determination that "must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016). Any "reliance on the specification must always yield to the claim language."

*ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). The specification cannot be used to import details "if those details are not claimed." *Id.* at 769.

Claims are not saved from abstraction because they recite components more specific than a generic computer. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612–13 (Fed. Cir. 2016). The "focus of the claims" must be on a "specific asserted improvement in computer capabilities," not an abstract concept "for which computers are invoked merely as a tool." *BSG Tech*, 899 F.3d at 1286. Step one requires that "a claimed invention must embody a concrete solution to a problem having 'the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it.'" *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018); *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 939 F.3d 1355, 1363 (Fed. Cir. 2019) (claims must recite "mechanisms for achieving [a] desired result"); "[M]inimal narrowing" does not satisfy step one, as "a claim is not patent eligible merely because it applies an abstract idea in a narrow way." *BSG Tech.*, 899 F.3d at 1287.

At *Mayo/Alice* step two, the Court must consider whether claim limitations, individually and in combination, "transform the nature of the claim" into a patent-eligible application. *Alice*, 573 U.S. at 217. The claims must supply an "inventive concept" that ensures the patent is "significantly more than a patent upon the [ineligible concept] itself." *Id.* at 217–18. Reciting "conventional, routine and well understood applications in the art" does not supply an "inventive concept." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015). Adding "novel or non-routine components is not necessarily enough to survive a § 101 challenge." *ChargePoint*, 920 F.3d at 773; *see also Bridge & Post, Inc. v. Verizon Commc'ns, Inc.*, 778 F. App'x 882, 894 (Fed. Cir. 2019) ("[Court] not required to accept [the patentee's] legal conclusions as true, even if couched as factual allegations," including the patentee's "repeated characterization of its inventions as 'technical innovations.'").

## II.    ARGUMENT

### A.    The '233 patent is invalid as patent ineligible

The '233 patent claims recite three generic components: a "first personal device" with a "detector input" (1.(a));  a second device that communicates wirelessly with the "first personal device" (1.(b)); and a "security mechanism" that "govern[s] information transmitted between" the two devices (1.(c)). Philips alleges infringement of claim 9, which depends from claims 7, 8, and independent claim 1, all which are reproduced and color-coded in **Appendix A-1**. These claims are directed to connecting existing personal medical devices to the Internet, "employ[ing] standard network communication systems." '233 patent, 2:24–27.

### 1.    The '233 patent is directed to the abstract idea of secure data transfer between devices

The focus of the '233 patent claims is a desired result—secure transfer of data between two devices—with no specificity on how to achieve it. The claims recite generic devices, known wireless technology, and a result-focused "security mechanism," providing no improvement to those devices or network components, or to how the transmitted data is secured. Like the ineligible *Interval Licensing* claims, the '233 patent's claims do not "embody a concrete solution to a problem having 'the specificity require to transform a claim from one claiming only a result to one claiming a way of achieving it.'" 896 F.3d at 1343; *Am. Axle*, 939 F.3d at 1364 ("distinction between results and means is fundamental to the step 1 eligibility analysis").[1]

#### a.    *The claims recite generic devices*

Neither the spec nor claims purport to improve the recited devices or their components.

---

[1] Philips' allegation the Asserted Patents "do not pre-empt any field" is immaterial to the § 101 inquiry. "[C]laims that are otherwise directed to patent-ineligible subject matter cannot be saved by arguing the absence of complete preemption." *Return Mail, Inc. v. U.S. Postal Serv.*, 868 F.3d 1350, 1370 (Fed. Cir. 2017) (collecting cases).

The first personal device can "take many forms," including "well known in the art" pacemakers. '233 patent, 1:63, 11:50–53. The first or second device can be known PDAs or phones like "the Motorola PageWriter$^{TM}$ 2000" or "Nokia$^{TM}$ 9000," or generic "cellular telephone[s]" that can use "any of the various technologies employed by the cell phone industry." *Id.* at 7:66–8:11.

The detector input includes conventional interfaces like "serial, parallel, USB, etc." *Id.* at 3:47–49. The detector "may be any sensor of bodily or physiological parameters." *Id.* at 3:29–33. The "detected" physiological parameters—e.g., "temperature, motion, respiration" are well-understood measurements that are not used in a new way: the spec provides no detail on their collection other than the sensor is "not limited to" detecting those parameters. *Id.* at 3:29–33.

The communication between devices uses "bi-directional wireless communications modules" that employ known short- and long-range communication protocols. The "short-range" communication can be "[a]ny suitable RF system," such as the "BLUETOOTH standard." *Id.* at 4:47–56. But "other suitable wireless communication standards and methods *now existing or developed in the future* are contemplated," and examples in the spec are "not to be construed as limitations." *Id.* at 4:60–63 (emphasis added), 6:14–16. "Long-range" communication can include "any consumer or proprietary network designed to serve users," such as conventional "cellular network[s] . . . or other wireless communication network[s]," but "[c]ombinations of such networks and other embodiments may be substituted" as well. *Id.* at 6:23–28, 6:49–51.

> b. *"Security mechanism" is a result, not a particular way of achieving the result*

The security mechanism is a mere result to be achieved by some method—it requires no particular implementation and is no improvement to security technology. *See id.* at 13:41–42 (disclosed "embodiments of security" are all "possible" and "not meant to be exclusive"). For example, it can include "standard encryption algorithms," and human behavior, such as a request for access to "a responsible third party." *Id.* at 13:43–44, 14:7–8. All 'mechanisms' are described

by their function and result, not as specific improvements to existing security methods.

### c. *Federal Circuit has determined similar claims to be directed to abstract ideas*

Given their lack of specificity, the '233 patent's claims share commonalities with claims related to the delivery and transfer of information over networks that have been deemed abstract. In *Two-Way Media v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1340 (Fed. Cir. 2017), claims directed to "the abstract idea of monitoring the delivery of real-time information to a user or users" were patent-ineligible. Like the '233 patent, the *Two-Way Media* claims recited only "conventional computer components" and "functional results" rather than "sufficiently describ[ing] how to achieve these results in a non-abstract way." *Id.* at 1337. In *Prism Techs. LLC v. T-Mobile USA, Inc.*, 696 F. App'x 1014, 1017 (Fed. Cir. 2017), claims directed to "providing restricted access to resources" over the Internet were determined to be abstract. While the *Prism* claims recited more detail than the '233 patent's "security mechanism," the claims were still deemed abstract as they did not require a "concrete, specific solution." *Id.*

Nor does limiting the type of data being transferred to physiologic data change the analysis. *See SAP Am. Inc.*, 898 F.3d at 1169 ("limitation of the claims to a particular field of information . . . does not move the claims out of the realm of abstract ideas"). In particular, dependent claims limit the data transfer to physiological data, but this is immaterial to the § 101 inquiry. *See Elec. Power*, 830 F.3d at 1353 ("collecting information, including when limited to particular content (which does not change its character as information)," is "within the realm of abstract ideas"). Save for their informational content, the claims recite only desired functions and results—devices "communicating," data "detected," a security mechanism "governing"—in a generic mobile environment. The "essentially result-focused, functional character" of the claims is "a frequent feature of claims held ineligible under § 101." *Id.* at 1356.

d. _Result-oriented mobile device functionality does not save claims from § 101_
_abstraction_

That the '233 patent recites functional capabilities of mobile devices and wireless

communication does not confer eligibility. In _Affinity Labs of Texas, LLC v. Amazon.com, Inc._,

838 F.3d 1266, 1269 (Fed. Cir. 2016), claims directed to "delivering user-selected media content

to portable devices" were determined ineligible. Reciting "physical components such as a

telephone unit and a server" did not save claims where those components "merely provide[d] a

generic environment in which to carry out the abstract idea." _Id._ The Federal Circuit rejected the

argument that "wirelessly streaming content to a handheld device" was a "concrete technological

innovation" because it was not conventional by the early 2000 priority date, explaining that the

claims only "describe[d] the **_function_** of streaming content to a wireless device," not "**_a specific_**

**_means_** for performing that function." _Id._ (emphases added). "At that level of generality, the

claims d[id] no more than describe a desired function or outcome, without providing any limiting

detail that confines the claim to a particular solution to an identified problem." _Id._

The Federal Circuit has repeatedly instructed that claims involving new devices are still

patent ineligible under § 101 if the claims do not recite improvements to those devices. In

_ChargePoint_, claims to networked electric vehicle charging stations the patentee alleged were

"paradigm-shifting" and the "first" to be patented, 920 F.3d at 774, were determined to be

abstract because the _claims_ did not recite improvements to the charging devices themselves, _id._

at 772. While the claims on their face recited "a physical machine that is quite tangible," _for the_

_purpose of § 101_ their focus was "the abstract idea of communication over a network for

interacting with a device, applied to the context of electric vehicle charging stations." _Id._ at 768;

_see Smart Sys. Innovations, LLC v. Chicago Transit Auth._, 873 F.3d 1364, 1373 (Fed. Cir. 2017)

(claims involving physical mass transit systems nevertheless abstract for purposes of § 101). The

'233 patent claims offer no specific technological improvements to recited mobile devices and thus have the same flaws as those determined to be ineligible in *Affinity Labs* and *ChargePoint*.

### 2.      The '233 patent recites no inventive concept

Nor do the '233 patent's claims recite an inventive concept. The recited devices are generic, the "security mechanism" is result-oriented and encompasses known security methods, and the wireless communication between devices is conventional. *See* section II.A.1. Indeed, the '233 patent claims are ineligible for the same reason as those in *CardioNet, LLC v. InfoBionic, Inc.,* 348 F. Supp. 3d 87, 93 (D. Mass. 2018). The *CardioNet* claims recited a combination of a detector for health data and computers for processing the data, but did not recite any *inventive* concept using the components. The Court explained the claims only "add conventional computer components to the abstract idea." *Id.* at 97. *See, e.g., Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1348 (Fed. Cir. 2019) ("conventional components, all recited in a generic way, are no better equipped to save the claim from abstractness than . . . the conventional computer used in *Alice* or the scanner used in *Content Extraction*"). That is also the case here.

Philips alleges the claims "were not well known, routine, or conventional" and "represent specific improvements over the prior art," without explaining *how* the claims achieve such specific improvements and unconventional technological advances. Dkt. 25 ¶¶ 85–93. Philips' allegations are not "rooted in the specification" and cannot add unrecited limitations to the claims or negate admissions in the specification. *See British Telecom. PLC v. IAC / InterActiveCorp*, 381 F. Supp. 3d 293, 322–23 (D. Del. 2019) (Bryson, J., Circuit Judge) ("*Aatrix* and *Berkheimer* do not stand for the proposition that a plaintiff can avoid dismissal simply by reciting in the complaint that the invention at issue is novel and nonconventional."); *Berkheimer v. HP, Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) (no step two "factual dispute"

without "improvements" in the specification that are "captured in the claims").[2]

Philips alleges the patent improves computer functionality by "establishing a distributed personal health communication system" and "enabling remote monitoring of vital signs or other physiological parameters." Dkt. 25 ¶¶ 85, 87, 89. But the *claims* do not recite a "distributed" system or require "remote monitoring," only the result of secure data transfer from a "first personal device" to a "second device" that "communicat[es]" with the first device. '233 patent, 15:5–9. Unlike in *Cellspin Soft, Inc. v. Fitbit, Inc.*, where the Federal Circuit determined "what makes the claims inventive [wa]s recited by the claims" and "discussed throughout the shared specification," 927 F.3d 1306, 1316–17 (Fed. Cir. 2019), here Philips alleges "significant advancement[s]" and "concrete and technological improvements" to monitoring devices, Dkt. 25 ¶¶ 87, 90, but the claims recite nothing showing *how* any monitoring device itself is improved. *See* section II.A.1. Philips also alleges the recited systems were "unavailable" and not conventional in view of the art "twenty years ago." Dkt. 25 ¶¶ 91, 85. But applying an abstract idea to a "nascent but well-known environment" does not save a claim. *See TLI*, 823 F.3d at 607. The specification admits the components and system structure were known. *See* section II.A.1. Philips also admits: "before the invention, communications between cellular phones . . . could be established in various manners including Bluetooth." Dkt. 25 ¶ 88. Thus, there is nothing in the claims besides the ineligible abstract idea itself, which cannot supply the required inventive concept. *BSG Tech.*, 899 F.3d at 1290. The '233 patent claims fail *Mayo/Alice* step two.

### 3.    Claim 1 of the '233 patent is representative

---

[2] Philips' repeated allegations that the Patent Office carefully examined the claims is irrelevant. "The mere allowance of claims during prosecution does not preclude dismissal for patent ineligibility." *Uniloc USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 901 (Fed. Cir. 2019). This is because "[t]he 'novelty' of any element or steps in a process, or even of the process itself, is of ***no relevance*** in determining whether the subject matter of a claim falls within [] § 101." *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1315 (Fed. Cir. 2016).

Claim 1 is representative. The '233 patent includes four independent claims with the same general focus (1, 33, 48, 55), each reciting the same generic components of two devices, a detector input, wireless communication modules (short- and/or long-range), and a "security mechanism." Dependent claims 7–9 limit the detector to collecting physiological data. The other claims show the breadth of the generic components. Claims 2–6, 41–46 recite conventional "security mechanisms." Claims 10–12, 14–32, 34–40, 47, 49–54, 56–57 recite generic mobile device components and conventional wireless communication aspects. None of these dependent claims change the focus away from the abstract idea of secure data transfer between two devices.

**B.      The '377 patent is invalid as patent ineligible**

The '377 patent claims recite a method with steps of: (1) downloading an application to a phone (1.a.); (2) coupling the phone to a device which provides exercise-related data and collecting data using the device (1.b., d., e., f.); (3) transmitting data wirelessly on the Internet (1.g); (4) analyzing the data at a server (1.h); and (5) presenting the data in the app (1.c., i.). Dependent claims 4–6 specify data is transmitted to the phone using the IEEE 802.11 wireless or Bluetooth standards. Philips alleges infringement of claim 6 of the '377 patent, which depends from claims 4, 5, and independent claim 1, all of which are reproduced and color-coded in **Appendix A-2**. These claims are directed to "health-monitoring of persons where measured or input health data is communicated by a wireless device to and from a software application running on an internet-connected server." '377 patent, 1:35–39. Previous systems provided "interactive physiological monitoring in the home environment" through personal computers and "cellular telephone technology," *id.* at 2:4–37, but were "not designed to be used with 'off-the-shelf' wireless devices or health measuring equipment," *id.* at 2:29–30, 2:38–40.

**1.      The '377 patent is directed to the abstract idea of collecting and analyzing exercise data, and presenting that data to a user**

a.   <u>*Claims are directed to the abstract idea of data collection, analysis, and presentation*</u>

The focus of the '377 patent claims is the abstract idea of collecting and analyzing exercise data, and presenting that data to a user. The specification admits the collection, analysis, and presentation of health data was not new, and known systems had "used cellular telephone technology to increase the wireless health monitoring range." '377 patent, 2:22–28. But these systems "requir[ed] significant modifications of the mobile phone" and did not use conventional "off-the-shelf" wireless devices. *Id.* at 2:28–40. Through functional, result-oriented limitations, the '377 patent claims recite no more than collecting, analyzing, and presenting exercise data in a generic mobile environment. Restated, the claims take the conventional monitoring of exercise at an exercise facility or medical specialist office using sensors, *e.g.*, attaching a heart rate monitor to someone running on a treadmill, and move that practice to a mobile phone technological environment. Such claims are at the core of the abstract idea exception.

Collecting data, even "when limited to particular content," analyzing the data, and "displaying certain results of the collection and analysis," are well-established as ineligible abstract concepts. *Elec. Power*, 830 F.3d at 1353. In *Elec. Power*, although the "lengthy and numerous" claims recited "real-time performance monitoring . . . from multiple data sources," the claims were ineligible because they "d[id] not go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general terms, without limiting them to technical means for performing the function that [we]re arguably an advance over conventional computer and network technology." *Id.* at 1351; *see also Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1340–41 (Fed. Cir. 2017) (holding claims directed to the abstract idea of "collecting, displaying, and manipulating data" ineligible).

Like those in *Electric Power*, the '377 patent claims recite the collection (*i.e.*, "receiving

data indicating a physiologic status . . . at least partially while the subject is exercising"), analysis (*i.e.*, "receiving a calculated response from the server . . . based on the exercise-related information"), and display (*i.e.*, "displaying the response") of exercise data in a generic mobile phone environment. Nor are the claims limited to particular "technical means" for performing the collection, analysis, and display of exercise data that is an advance over conventional computer and network technology. Instead, the claims recite generic components of a mobile environment like a software "application," "web-enabled wireless phone," and "remote server," and use those generic components to collect a subject's physiologic data, analyze that data by receiving a "calculated response" from a server, and display results of the collection and analysis.

  b.  *Claims recite no improvements to technology or methods for exercise monitoring*

  The patent's goal is not to improve any technical hardware, but to connect "off-the-shelf" wireless devices and "any type of exercise machine or monitor" by known wireless technology. '377 patent, 3:36–42, 3:52–57, 7:46–55. Indeed, the patent's "major advantage" is "the system is compatible with current and prior [health monitoring devices]." *Id.* at 4:19–22; 2:58–62. The "devices" for "monitor[ing] the physiologic status of a healthy subject" are "exercise machines" or "health monitoring devices." *Id.* at 3:1–2, 3:33–42. These include generic "medical devices," "any type of exercise machine or monitor," or "other variety of health care equipment," *id.* at 3:2–4, 3:40, 4:1–3, as long as it "include[s] some means for determining a health parameter." *Id.* at 5:59–60. The generic devices can collect data using a "physiologic sensor" for measuring "any . . . desired parameter," 7:8–11, or even by accepting "manual[] input." *Id.* at 7:25–31, 10:39–43.

  "[C]oupling" a generic monitoring device to a mobile phone is defined as being in "signal communication," which is "any type of connection between components where the connection is, e.g., electro-magnetic, and where the connection allows information to be passed from one component to the other." *Id.* at 6:14–19. This includes "connect[ing] via a generic input/output

port" using "any type of convention" and "off-the-shelf" technology. *Id.* at 4:50–53, 6:29–33.

### c. *Claims recite no improvements to mobile phone technology*

The patent recites no improvement in mobile app infrastructure or wireless technology. Downloading applications to mobile phones from Internet servers is described in functional, result-oriented terms without any technical detail on how it occurs. *Id.* at 4:43–50, 9:6–15. Wireless communication between devices and the server occurs in "known fashion" using "protocols . . . [that] are known." *Id.* at 7:46–60 (sending wireless signal to base station in "known fashion," which is connected "in known fashion" with server communicating with Internet in "known fashion," using protocols in "known fashion," and server can be accessed by client "in known fashion"). The "various protocols" can include known Bluetooth or IEEE 802.11 protocols, but "[o]ther techniques . . . employing IR, microwaves, optical techniques using lasers, and so on" also suffice. *Id.* at 12:40–46; *id.* at 7:20–22, 7:31–35; *see* Ex. A (Sept. 20, 2010 Applicant Remarks) at 9 (conceding "Bluetooth® [was] a term well-understood to one skilled in the relevant art"). And the patent emphasizes that even beyond those described in the specification, "other such wireless technologies may also be employed." '377 patent, 12:61–63.

The wirelessly-downloaded app is not specific software, and is described in functional terms. *Id.* at 4:50–58. The server application is also described in functional terms, performing the *result* of "calculat[ing] or provid[ing] a response based at least in part on data from the [health monitoring apparatus, *id.* at 6:38–39]." *Id.* at 8:14–16. The server analyzes collected physiological data using a generic "algorithm," which "may be of varying complexity, from a simple program that merely acknowledges receipt of information to an artificial intelligence algorithm, such as an expert system." *Id.* at 4:59–64. The term "calculate" is "used generally, and may entail a simple calculation as well as a complex one." *Id.* at 9:47–49. The patent provides no specificity on how the system uses the physiological data other than that the calculation is "based

at least in part" on a physiological "parameter." *Id.* at 10:47–49.

The display is also described in functional terms without technical detail. *See id.* at 10:51–53 ("The application server then sends the response [of the calculation] to the [phone], where the response is displayed."); *id.* at 4:50–51 ("[T]he software provides a personalized display for the user."). It can include a user interface that "may vary widely in sophistication, e.g., from a simple data entry field to a full graphical user interface." *Id.* at 8:8–11.

> d. *The Federal Circuit has determined similar claims to collection, analysis, and display of physiological data to be patent-ineligible*

In a similar field of collecting and analyzing physiological data using the Internet, claims for analyzing "physiologic data" from "bedside device[s]" over the Internet and "convert[ing] received data streams" to a data "format independent of any particular bedside machine" were determined ineligible as directed to the abstract idea of "collecting, analyzing, manipulating, and displaying data." *See Univ. of Fl. Res. Found. v. GE Co.*, 916 F.3d 1363, 1366, 1368 (Fed. Cir. 2019). The Federal Circuit rejected the patentee's argument that "data synthesis technology," which purportedly allowed presentation of data from the bedside machines in a "configurable fashion within a single interface," was a technological improvement, because the software device drivers for performing that "syntheses" were recited in "purely *functional* terms" that "fail[ed] to provide any technical details for the tangible components" or "explain *how* the [recited device software] drivers do the [data] conversion." *Id.* at 1367–68 (emphasis original). Thus, the claims did not provide "a specific improvement to the way computers operate." *Id.* Like the *Univ. of Fl.* claims, the '377 patent claims recite only functional results without technical details on how to achieve those results, and thus are directed to the same ineligible abstract idea.

## 2.     The '377 patent recites no inventive concept

Nor do the '377 patent's claims recite an inventive concept. The claims recite generic

health monitoring and mobile devices that communicate using conventional wireless protocols to collect, analyze, and display health data in a functional, result-oriented manner, with no technical detail to limit the claims to a particular way to perform these functions. *See* section II.B.1.

Philips' complaint alleges the patent is unconventional and a "concrete advancement[]" because it recites a "distributed system" with a server performing "real-time" health monitoring, "a device which continuously and accurately monitors the physiologic status of a subject while the subject is exercising," and communication with a server to "overcom[e]" "reliance on local processing capabilities." Dkt. 25 ¶¶ 110, 112, 114. But nothing in the claims requires continuous, accurate, or real-time data monitoring. The claims require only the result of "receiving" "data indicating a physiological status," and only "receiving" this data "at least ***partially*** while the subject is exercising." '377 patent, 13:39–41. And the claims recite a generic "server," not a "distributed system." *See Two-Way Media*, 874 F.3d at 1338–39 (no inventive concept of "scalable architecture" where *claims* only required "conventional computer and network components operating according to their ordinary functions"). The generic "real time" processing can be "a simple calculation" and "may simply be an acknowledgment that [a] parameter was received by the application server," '377 patent, 9:45–50, making clear no "distributed system" is required. Indeed, the '377 patent claims are like those held ineligible by this Court in *Am. Well Corp. v. Teladoc, Inc.*, 191 F. Supp. 3d 135, 145 (D. Mass. 2016) (claims did not improve functioning of any *technology*, but rather "merely add generic and previously-known computer components to an abstract idea" to provide an alleged "instantaneous" result).

Moreover, Philips' allegation that the patents improve "specific apparatus[es]" which were previously "unavailable" (Dkt. 25 ¶¶ 109–10), is in direct contradiction to the patent's stated "major advantage" that it uses "off-the-shelf" wireless devices. '377 patent, 3:52–57, 2:37–40. And the specification does not purport to improve any recited component, describing

them as generic or conventional. *See* section II.B.1. Philips' allegation that undescribed inventive concepts exist due to "the state of the art nearly twenty years ago" (Dkt. 25 ¶ 116) is immaterial to the § 101 inquiry (*see TLI*, 823 F.3d at 612) and inconsistent with the specification, which concedes the patent merely applies existing health-monitoring methods to a generic mobile environment. *See* section II.B.1; *British Telecom.*, 381 F. Supp. 3d at 322–23. Nothing in the claims, either individually or taken together, recites anything the specification does not admit was well-understood, routine, or conventional. The abstract idea had already been implemented "us[ing] cellular telephone technology to increase the wireless health monitoring range." *See* '377 patent, 2:22–28. The claims place this abstract idea in a generic, "off-the-shelf" mobile environment. Thus, for purposes of the § 101 inquiry, the claims recite no more than the ineligible abstract idea itself, which cannot supply the required inventive concept. *BSG Tech.*, 899 F.3d at 1290. The '377 patent's claims fail *Mayo*/*Alice* step two.

### 3.     Claim 1 of the '377 patent is representative

Claim 1 is representative. The '377 patent includes two independent claims (1, 13). Both recite the same general components (claims 10–11, 13–14 tie the method to a "computer readable medium"). Claims 2, 3, 7–9, 12, 16–19 recite generic exercise machines, monitors, and aspects of conventional wireless connections and "off-the-shelf" adapters. Claim 15 recites a user goal. None of the claims change the focus away from the "directed to" abstract idea.

### C.     <u>The '958 patent is invalid as patent ineligible</u>

The '958 claim 16 recites a "wireless web device" and a "generic input/output port" that can receive a "health parameter" from a "health monitoring device" or "visual data from a digital camera." If the wireless connection is interrupted, the device can store collected data in memory. Claim 17 adds that the "wireless web device" can be a mobile phone, palm pilot, PDA, laptop, or hybrid computer/mobile phone. Philips alleges infringement of claim 17, which depends from

independent claim 16, both of which are reproduced and color-coded in **Appendix A-3**. The claims are directed to "health-monitoring of persons where measured or input health data is communicated by a wireless device to and from a software application running on an internet-connected server." '958 patent, 1:21–25. Both '958 and '377 patents tout the same benefit of providing a system for use with "off-the-shelf" wireless devices. *Id.* at 2:22–26.

> 1. **The '958 patent is directed to the abstract idea of collecting and storing health data so it is not lost during a wireless connection interruption**

The focus of the '958 patent's claims is the abstract idea of collecting health data and storing that data so that it is not lost during an interruption in the wireless connection with a server, applied to a generic mobile environment. This focus is an abstract concept similar to those the Federal Circuit has repeatedly determined to be abstract and patent-ineligible.

> a. *Collecting and storing data is an abstract concept*

In *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347 (Fed. Cir. 2014), claims reciting the extraction of information from a scanner were directed to "the abstract idea of 1) collecting data, 2) recognizing certain data within the collected data set, and 3) storing that recognized data in a memory." Although the claims recited a physical scanner device and the patentee argued the recited collection of data could not be performed by humans, this did not change the focus or character of the claims. *See id.* In *TLI*, 823 F.3d at 610, the claims recited the automatic assigning of classification data such as a timestamp to digital images taken from a mobile phone, the transmission of those images to a server, and the classification and storage by the server using that data. These claims were directed to the abstract idea of "classifying and storing digital images in an organized manner." *Id.* at 613. The Federal Circuit noted the patent did not describe a "new telephone, a new server, or a new physical combination of the two" and "fail[ed] to provide any technical details for the tangible

components," describing them in "functional terms." *Id.* at 612. Thus, the claims were "directed to the use of conventional or generic technology in a nascent but well-known environment," and limiting the claims to "a particular environment—a mobile telephone system—[did] not make the claims any less abstract for the step 1 analysis." *Id.* at 612–13.

b. *Claims recite the abstract idea in a generic mobile environment*

Like those in *Content Extraction* and *TLI*, the '958 patent's claims recite the abstract idea of collecting and storing health data in a generic mobile environment. The claims recite no improvements to phones, servers, or devices for capturing health data. Like the '337 patent, the patent's "advantage" is to "allow[] users with consumer 'off-the-shelf' wireless devices" to extend their "range of connectivity over that of wired computer[s]." '958 patent, 3:37–42. Like the '377 patent, these components are described as "off-the-shelf," known, or generic. *Id.* at 2:23–26, 3:37–50. Communication between the phone and server proceeds "in known fashion," using "known protocols." *Id.* at 6:12–27, 7:55–66, 11:64–12:4. Transferring data (including camera images) using phones over "cellular systems" was known. *Id.* at 12:26–37.

c. *Recited storing of health data is a result, not a specific improvement or solution*

First, like the '377 patent, the recited devices used to collect health data are generic, and include "any type of exercise machine or monitor" or "any type of medical device" where "information pertaining to a patient's disease or condition may be ascertained." *Id.* at 3:20–26, 5:52–67, 7:12–15, 7:28–43, 9:57–61, 10:36–39. These generic devices collect data, which "may be any value," include sensors "connect[ed] to any type of medical device," and interface with generic, "off-the-shelf" data input/output ports. *Id.* at 6:28–32, 9:57–61, 11:30–47.

Nor is there a particular or improved way to store data. Data is stored in generic "memory cards" or "any . . . type of removable media that may be connected to a [wireless web device] to store information." *Id.* at 8:30–42, 12:53–62. The specification identifies no algorithm to assist

the server, health monitoring device, or mobile phone in identifying or responding to wireless connection interruptions, and no particular way to achieve the storing of data after interruptions, only the *result* of storing data when a wireless connection is interrupted. *Id.* at 13:8–12 ("In the event of drop-outs, interruptions, or unavailability, of the wireless network, no loss of data occurs, as the data ***has been stored*** on the memory device and may be wirelessly transmitted at a later time when cellular or mobile service is again available."), 14:20–23 (phone "***may save the data*** on the memory device for contemporaneous or later transmission"), 14:24–27 ("[I]n the case of a dropout or other disruption of wireless service, . . . the data ***may be stored*** on the memory device or in the [wireless device]") (emphases added). The only description of software in specification describes generic server applications that can perform "simple calculation[s] as well as complex one[s]." *Id.* at 8:7–60, 9:51–56, 10:53–62.

In short, the claims recite no technological improvement and no specific way of achieving their result-oriented limitations. All that remains is an abstract idea in a particular environment: collecting health data in a generic mobile phone environment, and storing that collected data so it is not lost during an interruption in a wireless connection to a server.

### 2.    The '958 patent recites no inventive concept

Nor do the '958 patent's claims recite an inventive concept. The claims recite generic components that communicate using conventional wireless protocols to achieve the result of storing data if an interruption in the wireless connection occurs, without technical detail to limit the claims to a particular way for how the storage upon interruption occurs. *See* section II.C.1.

Philips alleges the claims improve technology by "enabling the preservation and storage of health information in the event of an interruption of the wireless connection." Dkt. 25 ¶¶ 129, 133. But the claims recite functional results, not specifics for *how* reactions to a network interruption are improved. *See* section II.C.1. Philips also alleges "concrete advancements"

through "three devices (health monitoring device, [wireless web device], and the server)

work[ing] together to preserve disease state or condition information." Dkt. 25 ¶ 132. But the

claims make clear only the "wireless web device is configured to store the health parameter," not

all three working together. *E.g.*, '958 patent, 18:19–25. And none of the three recited

components are described other than as generic and conventional. *See* section II.C.1.

Philips' conclusory allegations that the claims recite a "non-conventional and non-generic

arrangement" that is "a technical improvement" (Dkt. 25 ¶¶ 137–38) cannot withstand the

specification's admissions the patent does no more than apply existing health monitoring

techniques to a generic mobile environment. *See British Telecom.*, 381 F. Supp. 3d at 322–23.

The patent (and Philips in its amended complaint) admits the recited abstract idea of collecting

and storing health data was already known, but had not been applied using conventional "off-the-

shelf" wireless devices. *See id.* at 2:8–26, 3:43–50; Dkt. 25 ¶ 134. The '958 patent claims,

through functional and result-oriented limitations, recite no more than this abstract idea in a

generic mobile environment, which cannot supply an inventive concept. *BSG Tech.*, 899 F.3d at

1290. The '958 patent claims fail *Mayo*/*Alice* step two.

### 3.     Claim 16 of the '958 patent is representative

Claim 16 is representative. The '958 patent includes seven similar independent claims (1,

5, 7, 11, 14–16) that recite generic components of "internet-enabled wireless web device" (all), a

generic camera (1, 7, 14, 16), "health-monitoring device" (5, 11, 15, 16), server (1, 5, 7, 11, 16)

and server application (1, 5, 16). The claims have the same general focus of collecting and

storing health data so that it is not lost after an interruption in the wireless connection. Dependent

claims 2, 17 recite generic "wireless web devices." Claims 3, 9, 12 recite storing with generic

"memory device[s]." Claims 4, 9, 13, recite collection of particular types of data.

### D.     The '007 patent is invalid as patent ineligible

The claim 21 of the '007 patent recites a system for comparing the performance of athletes that includes a GPS receiver to obtain a series of "time-stamped waypoints," a "means for" computing athletic performance feedback data, a "means for" presenting that data, and a "modem" for transmitting the data to a computer for comparison with other athletes' data. Dependent claim 23 specifies the system also includes a headset and audio module to present data to the user. Philips alleges infringement of claim 23, which depends from independent claim 21, both which are reproduced and color-coded in **Appendix A-4**. The claims are directed to the use of "(GPS) technology for the personal performance monitoring of outdoor athletes," which the patent admits could "presently only be done indoors" '007 patent, 1:8–10, 1:18–24.

1.     **The '007 patent is directed to the abstract idea of collecting and analyzing exercise data to track an athlete's performance**

The goal of the '007 patent is to take existing systems that could track an athlete's performance in an ***indoor*** exercise environment—*e.g.*, on a treadmill—and apply that functionality to an ***outdoor*** environment using "widely available" GPS technology. *See id.* at 1:38–39. To achieve this goal, the claims recite conventional technology to aid in collection, analysis, and presentation of exercise information to a user. The focus of the claims is well-established as an ineligible abstract idea. *See Elec. Power*, 830 F.3d at 1353.

a.     *Reciting generic physical components is immaterial to whether a claim is "abstract" under § 101*

To begin, that the '007 patent recites generic physical components like a GPS receiver and headset does not save the claims from § 101 "abstraction." In *American Axle*, although the patent described "a method of manufacturing a driveline propshaft containing a liner designed such that its frequencies attenuate two modes of vibration simultaneously," the "focus of the claimed advance" was directed to the abstract idea of "tuning liners." 939 F.3d at 1361; *see Charge Point*, 920 F.3d at 772 (ineligible claims focused on concept of interacting with

networked electric vehicle charging stations, rather than improving stations themselves); *Smart Sys.*, 873 F.3d at 1373 (claims involving physical mass transit systems ineligible even though reciting steps that were "necessarily performed in the physical rather than conceptual realm" (alterations omitted)). Like those in *American Axle*, *ChargePoint*, and *Smart Sys.*, the focus of the '007 patent claims, as discussed in sections II.D.1.b–II.D.1.d, is not on improvements to the physical components, but on their functional use to achieve a result—collecting and analyzing exercise data for the purpose of tracking and comparing performance with other athletes.

In this way, the '007 patent claims are like the ineligible claims in *TLI*, as they are recited in functional terms—most in means-plus-function format—and "fail[] to provide any technical details for the tangible components." 823 F.3d at 612. Because the claims are "directed to the use of conventional or generic technology in a nascent but well-known environment," limiting the claims to "a particular environment"—a GPS-enabled exercise monitor—"does not make the claims any less abstract for the step 1 analysis." *Id.* at 612–13.

b. *Claims do not recite improvements to GPS, networking, or exercise monitoring technology*

The '007 patent does not purport to improve any recited components in its exercise data collection system. The specification admits the technology underlying the key component to the outdoor exercise monitor—the GPS—was becoming "widely available," and operates according to "known operations" by "receiv[ing] GPS radio wave signals [] which are emitted from existing GPS satellites." '007 patent, 1:38–39, 7:30–33. The GPS uses these known modules "such as those manufactured by SiRF Technology, Trimble Navigation Limited, and others" to obtain "geographic waypoints," or location data, which are "Latitudes and Longitudes." *Id.* at Fig. 12, 2:60–62, 4:54–59, 5:41–43, 7:35–38. In addition to the GPS, generic network technology in the form of a generic "modem," transmits data to a generic "remote computer" and

"modem bank" using a "standard telephone line." *Id.* at 4:60–64, 8:58–62, 6:12–16.

c. *Claims do not recite improvements to athletic feedback data analysis*

The system includes a generic CPU that "controls the operation of the device." *Id.* at 5:38–40. The processor performs "calculations" and "smart algorithms"—*i.e.*, calculations "are performed," a "smart algorithm based on measured parameters . . . can be optionally used"—that are described only as results, not particular solutions. *Id.* at 7:45–48, 8:5–9, 9:10–15. Regardless, even if the patent described specific calculations or algorithms, "a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, … is nonstatutory." *American Axle*, 939 F.3d at 1365 (quoting *Parker v. Flook*, 437 U.S. 584, 595 (1978)).

d. *Claims recite no improvements to presentation or comparing of athletic performance data*

Presentation of information occurs using generic "audio headphones" that are worn "as usual." '007 patent, 5:5. A generic "display," or "feedback device," can also "scroll[] information." *Id.* at 4:36–39, 6:63–66, 7:19–20, 8:34–36. Even the purpose of the patent—comparing athletes' performance—is described in a functional manner with no specificity. *See id.* at 6:36–39 (generic "web page for comparing an athlete's performance to other participating athletes from around the [USA]"); *id.* at 10:31–34 (same).

## 2. The '007 patent recites no inventive concept

Nor do the '007 patent claims recite an inventive concept. The claims recite generic GPS, CPU, display, audio headset, and network components the specification admits were known and conventional to achieve the abstract concept of collecting and analyzing exercise data to track an athlete's performance, without technical detail that limits the claims to a particular way of achieving this desired goal. *See* section II.D.1

Philips alleges the patent provides "concrete improvements" by "computing athletic

performance feedback data from a series of timestamped waypoints," and presenting that data "safely and conveniently" via audio or a headset. Dkt. 25 ¶¶ 61–62, 65–66. But neither the claims nor specification explain how the recited generic GPS, processor, audio headset, or modem are improved. *See* section II.D.1. For example, "timestamped waypoints" are latitude and longitude data collected by GPS receivers through "well known operations." '007 patent, Fig. 12, 4:54–59, 5:41–44, 7:29–39. The GPS can use known modules, and the CPU for "computing" and the audio module for "presenting" are generic. *See id.* at 5:38–44. As a result, the patent applies well-understood and conventional GPS technology to replicate the age-old method of a track coach providing comparative split times and encouragement to athletes for each lap run. The specification admits the components of this GPS system are generic and operate in their usual, conventional manner to perform the functional and result-oriented goals of split timing and coaching using generic technology. Philips' conclusory allegations the claims were unconventional and recite "technical improvements" (Dkt. 25 ¶¶ 62, 67–68) cannot overcome the specification's admissions. *See British Telecom.*, 381 F. Supp. 3d at 322–23.

Nor do the claim limitations as an ordered combination function other than as expected. The specification provides no indication that the combination of the GPS, headset, or CPU provides an improvement to the involved technology. *See* section II.D.1. Moreover, no particular combination of components is required, as the specification asserts the "GPS-based personal performance monitor and feedback device of the present invention can be provided in various shapes, forms and configurations." '007 patent, 10:59–62. There is nothing in the claims save the abstract idea in a generic technical environment. This cannot supply the required inventive concept. *BSG Tech.*, 899 F.3d at 1290. The '007 patent claims fail *Mayo/Alice* step two.

**3.      Claim 21 of the '007 patent is representative and Fitbit's motion should be granted even under Philips' constructions**

Claim 21 is representative. The '007 patent includes five independent claims (1, 8, 21, 31, 38) that recite a system with a generic GPS receiver and a "means for" computing and presenting performance data to the user. The claims have the same focus of comparing athletes' performance with data collected using known GPS technology. The dependent claims recite components and functions of generic GPS (10–14), headphones (2–5, 9, 23, 29), sensors (15, 19, 20, 32–34), and connectors (6, 16–18, 35–37), a generic web site (24–28), and a "means for" analyzing collected data using unspecified "calculations" or "smart algorithms" (7, 22).

The '007 patent's claims recite "means-plus-function" limitations that presumptively invoke 35 U.S.C. § 112 ¶ 6. For example, claim 21 recites a "means for computing . . ." and a "means for presenting . . ." "athletic performance feedback data." '007 patent, 12:29–33. This motion can be resolved by construing terms "to the extent needed" under constructions favorable to Philips for the purpose of this motion. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018); *CardioNet, LLC v. InfoBionic, Inc.*, No. 15-CV-11803, 2017 WL 1788650 at *1 n.5 (D. Mass. May 4, 2017).[3] Other courts have granted Rule 12 motions under § 101 where the claims included means-plus-function limitations. *See TLI*, 823 F.3d at 610 (affirming § 101 dismissal where district court "declined to give patentable weight" to a "means for allocating" limitation); *Hyper Search LLC v. Facebook Inc.*, No. 17-1387, 2018 WL 6617143, at *5 (D. Del. Dec. 17, 2018) ("courts have dismissed infringement suits involving patents with means-plus-function claims on the pleadings based on § 101 eligibility").

## III.   <u>CONCLUSION</u>

Fitbit requests the Court to dismiss Philips' First Amended Complaint with prejudice.

---

[3] Fitbit reserves its rights to advance different constructions during *Markman* briefing, including to contend that any "means-plus-function" limitations are indefinite under *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

Dated: December 10, 2019

FITBIT, INC.

By Its Attorneys,


/s/ *Yar R. Chaikovsky*

Yar R. Chaikovsky (*Pro Hac Vice*)
yarchaikovsky@paulhastings.com
David Beckwith
davidbeckwith@paulhastings.com
David Okano
davidokano@paulhastings.com
Radhesh Devendran
radheshdevendran@paulhastings.com
Berkeley Fife
berkeleyfife@paulhastings.com

PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, California  94304-1106
Telephone:    1(650) 320-1800
Facsimile:    1(650) 320-1900

Chad J. Peterman (*Pro Hac Vice*)
PAUL HASTINGS, LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 318-6797
Facsimile: (212) 230-7797
E-mail: chadpeterman@paulhastings.com

## IV.   APPENDICES

### A.      Appendix A-1: U.S. Patent No. 7,088,233

**1**. A bi-directional wireless communication system comprising:

(a) a first personal device, the first personal device further comprising:

   (i) a processor;

   (ii) a memory;

   (iii) a power supply;

   (iv) at least one detector input; and

   (v) a short-range bi-directional wireless communications module;

(b) a second device communicating with the first device, the second device having a short-range bi-directional wireless communications module compatible with the short-range bi-directional wireless communications module of the first device; and

(c) a security mechanism governing information transmitted between the first personal device and the second device.

conventional wireless communication between **generic first personal device** and **second device**

secure data transfer with result-focused "security mechanism"

**7**. The system of claim **1**, further comprising a detector connected to the at least one detector input.

**8**. The system of claim **7**, wherein the detector senses body or physiological parameters.

**9**. The system of claim **8**, wherein the body or physiological parameters are selected from the group consisting of temperature, motion, respiration, blood oxygen content, and electroencephalogram.

**B.**     **Appendix A-2: U.S. Patent No. 8,277,377**

**1**. A method for interactive exercise monitoring, the method comprising the steps of:

    a. downloading an application to a web-enabled wireless phone directly from a remote server over the internet;

    b. coupling the a web-enabled wireless phone to a device which provides exercise-related information;

    c. rendering a user interface on the web-enabled wireless phone;

    d. using the application, receiving data indicating a physiologic status of a subject;

    e. using the application, receiving data indicating an amount of exercise performed by the subject;

    f. wherein at least one of the data indicating a physiologic status of a subject or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise-related information, and wherein the data indicating a physiologic status of a subject is received at least partially while the subject is exercising;

    g. sending the exercise-related information to an internet server via a wireless network;

    h. receiving a calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information; and

    i. using the application, displaying the response.

    **4**. The method of claim **1**, wherein the web-enabled wireless phone receives exercise-related information over a transmission medium, the transmission medium including a wired connection or a wireless connection.

    **5**. The method of claim **4**, wherein the wireless connection includes an infrared connection or a radio frequency communication protocol including a short-range wireless transmission scheme.

    **6**. The method of claim **5**, wherein the short-range wireless transmission scheme includes IEEE 802.11 protocol or short-wavelength radio transmission in the ISM band of 2400-2480 MHz.

| |
|---|
| **generic mobile environment** |

| |
|---|
| **collecting** exercise data |

| |
|---|
| **presenting** data to user |

| |
|---|
| **collecting** exercise data |

| |
|---|
| **generic mobile environment** |

| |
|---|
| **analyzing** exercise data |

| |
|---|
| **presenting** exercise data to user |

### C.   Appendix A-3: U.S. Patent No. 6,976,958

**16**. A internet-enabled wireless web device for monitoring health, the internet-enabled wireless web device connected in wireless communication with a server running an application, comprising:

an internet-enabled wireless web device with a removable memory device and running an application, the application functioning to accept inputs from a first communications port and a second communications port, the first communications port including a generic input/output port and the second communications port including a wireless link to a network, the generic input/output port for receipt of a health parameter from a health monitoring device or visual data from a digital camera, the health parameter or visual data corresponding to a patient's disease state or condition;

wherein in the event of an interruption of the wireless connection between the internet-enabled wireless web device and the server, the internet-enabled wireless web device is configured to store the health parameter or visual data in a memory or on the removable memory device.

**generic mobile environment**

**collecting** exercise data

**storing data so it is not lost during in interruption in the wireless connection**

**17**. The system of claim **16**, wherein the internet-enabled wireless web device is selected from the group consisting of: an internet-enabled mobile phone; a handheld, palm, or laptop computer or personal digital assistant having an optional implemented or integral wireless capability; and a hybrid device of a handheld computer and mobile telephone.

### D.    Appendix A-4: U.S. Patent No. 6,013,007

0

**21**. A system for comparing the performance of an athlete with the performance of other athletes, said system comprising:

a global positioning system GPS receiver for obtaining a series of time-stamped waypoints;

means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver;

means for presenting the athletic performance feedback data to an athlete; and

a modem for transmitting the athletic performance feedback data to a remote computer for comparison with athletic performance data of other athletes.

**23**. A system as recited in claim **21**, further comprising a headset and an audio module for presenting the athletic performance feedback data over said headset.

**collecting**
exercise data using
generic GPS receiver

**analyzing**
exercise data

**presenting**
data using generic
headset or display

**generic mobile
environment**

**<u>CERTIFICATE OF SERVICE</u>**

I certify that a true copy of the above document was served on the attorney of record for each party via the Court's CM/ECF system.

Dated: December 10, 2019

By: ___*/s/ Yar R. Chaikovsky*___

Yar R. Chaikovsky (*Pro Hac Vice*)