UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PHILIPS NORTH AMERICA LLC, | |
| Plaintiff, | Civil Action No. 1:19-cv-11586-IT |
| v. | **Oral argument requested** |
| FITBIT, INC., | |
| Defendant. | |

## FITBIT, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT OF INVALIDITY UNDER 35 U.S.C. § 112

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................... 1

II.    BACKGROUND ............................................................................................ 1

III.   LEGAL STANDARD.................................................................................... 4

     A.    Definiteness requirement for claims invoking 35 U.S.C. § 112, ¶ 6 .................... 5

     B.    Computer-implemented means-plus-function limitations .................................... 7

IV.   ARGUMENT ................................................................................................. 9

     A.    The "means for computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver" recites a computer-implemented function invoking 35 U.S.C. § 112, ¶ 6, and therefore the corresponding structure is a special-purpose processor programmed to perform an algorithm disclosed in the specification, not a generic CPU or processor ..................................................................................... 9

     B.    There is no algorithm in the specification clearly linked to performance of the function corresponding to the "means for computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver" by either the device's CPU, the GPS module's processing unit, or the two processors in tandem ................................................ 12

V.    CONCLUSION ............................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*,
  521 F.3d 1328 (Fed. Cir. 2008)...................................................................8, 9, 12, 13

*Atmel Corp. v. Info. Storage Devs., Inc.*,
  198 F.3d 1374 (Fed. Cir. 1999)...................................................................7

*Augme Techs., Inc. v. Yahoo! Inc.*,
  755 F. 3d 1326 (Fed. Cir. 2014)...................................................................8, 13

*B. Braun Med., Inc. v. Abbott Labs.*,
  124 F.3d 1419 (Fed. Cir. 1997)...................................................................6

*Blackboard, Inc. v. Desire2Learn, Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009)...................................................................6, 7, 8, 10

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A.*,
  412 F.3d 1291 (Fed. Cir. 2005)...................................................................6, 7

*In re Donaldson Co.*,
  16 F.3d 1189 (Fed. Cir. 1994) (en banc)...................................................................6

*ePlus, Inc. v. Lawson Software, Inc.*,
  700 F.3d 509 (Fed. Cir. 2012)...................................................................15

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
  785 F.3d 616 (Fed. Cir. 2015)...................................................................9, 10

*Finisar Corp. v. DirectTV Group, Inc.*,
  522 F.3d 1323 (Fed. Cir. 2008)...................................................................8, 15

*Function Media, LLC v. Google, Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013)...................................................................8, 9

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005)...................................................................8

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
  732 F.3d 1376 (Fed. Cir. 2013)...................................................................15

*In re Katz Interactive Call Processing Patent Litig.*,
  639 F.3d 1303 (Fed. Cir. 2011)...................................................................10

*MobileMedia Ideas LLC v. Apple Inc.*,
    780 F.3d 1159 (Fed. Cir. 2015)................................................................6, 11

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
    545 F.3d 1359 (Fed. Cir. 2008)....................................................................10

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003)..................................................................7, 12

*Personalized Media Commc'ns LLC v. Int'l Trade Comm'n*,
    161 F.3d 696 (Fed. Cir. 1998)........................................................................5

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013)........................................................................7

*Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*,
    753 F.3d 1375 (Fed. Cir. 2014)..............................................................6, 8, 12

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015) (en banc).....................................................5, 9

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)..................................................................7, 8

**Statutes**

35 U.S.C. § 112.......................................................................... *passim*

September 16, 2012, the pre-America Invents Act .....................................................1

**Other Authorities**

Federal Rules of Civil Procedure Rule 56 .....................................................1

# I.     <u>INTRODUCTION</u>

Fitbit Inc.'s ("Fitbit") motion requests the Court to make three legal determinations: (1) the asserted claims of U.S. Patent No. 6,013,007 ("the '007 patent") recite a "means-plus-function" limitation invoking 35 U.S.C. § 112, ¶ 6[1]; (2) the specification indicates a general-purpose processor or computer is used to perform the claimed function; and (3) the specification does not disclose or describe an "algorithm" in form of a step-by-step procedure the processor or computer would use to perform the claimed function—whether described as a mathematical formula, in prose, as a flow chart, or any other manner that provides sufficient disclosure of an algorithm. Importantly, the Federal Circuit has repeatedly instructed that expert testimony cannot be used to replace disclosure of such an algorithm in the specification, meaning there is no need to wait until after fact or expert discovery closes to rule on this motion.

Based on these three discrete legal determinations, the asserted claims of the '007 patent are invalid as indefinite as a matter of law under 35 U.S.C. § 112, ¶ 2. Fitbit thus moves the Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for an order of partial summary judgement that asserted claims 7 and 21–29 of the '007 patent are invalid as indefinite.

# II.     <u>BACKGROUND</u>

The '007 patent is directed to a GPS-based system for computing and comparing outdoor athletic performance. The patent contends that known GPS devices were not designed for use by an outdoor athlete and "do not include real-time athletic performance algorithms" to compute athletic performance feedback. '007 patent, 1:46–48. The patent seeks to address this shortcoming by disclosing a "GPS-based performance monitor" device that includes a "central processing unit (CPU)" that "controls the operation of the device." *Id.* at 5:36–40. Connected to

---

[1] Because the '007 patent was filed before September 16, 2012, the pre-America Invents Act version of 35 U.S.C. § 112(f) applies.

the CPU 602 within the device is a GPS receiver module 604 (identified in annotated Figure 6 below, an electric schematic of the performance monitor). *Id.* at 5:41–43.

The '007 patent explains that "[a]ccording to well known operations, the GPS receiver 604 receives GPS radio wave signals 205 which are emitted from existing GPS satellites 204 and received via the GPS receiving antenna 301." *Id.* at 7:29–32. Within the GPS module 604, is "a built-in processing unit and memory for processing the GPS radio wave signals 205 to determine the latitude and longitude coordinates of the GPS antenna's current position, as well as determine its current speed and direction of travel." *Id.* at 7:36–40.



Fig. 6

The latitude and longitude coordinates determined by the GPS module's "built-in processing unit," "along with other information" are stored in the separate memory 608, and from this information, certain "performance data" "are calculated." *Id.* at 7:40–50.

During the exercise session, the GPS receiver module 604 continuously determines the athlete's geographical position and stores it in the memory 608 along with other information such as the date and time that each position was acquired. From these positions and times, performance data such as elapsed distance, current and average speeds and paces, calories burned, miles remaining, and time remaining are calculated. Based on this data, recommendations to increase or decrease level of effort to meet pre-set performance targets are then determined.

The specification does not explicitly identify whether the GPS module 604's built-in processing unit, the device's CPU 602 that "controls the operation of the device," or a combination of the two processors performs these calculations of performance data. However, as shown in Figure 6 (excerpted), only CPU 602 is shown as in direct connection to or in communication with memory 608.



Figure 11 illustrates "a flowchart showing feedback information cycles of the preferred embodiment," *id.* at 6:49–51, and Figure 12 illustrates exemplary "historical exercise session performance data sets," *id.* at 6:16–17. Neither of these figures provide any description of the calculations performed by the GPS module 604's processing unit or the device's CPU 602 to arrive at this "performance data" or "feedback information." Instead, these diagrams illustrate the outputs, or results, of the algorithms performed by the GPS module's processing unit or the device's CPU.



In sum, no portion of the specification describes how the GPS module's built-in processing unit or the CPU controlling the performance monitor device carries out any of the "performance data" calculations identified in the specification at 7:40–50.

All asserted claims in this case depend from either independent claims 1 or 21 of the '007 patent, both of which attempt to capture the calculation of performance data through recitation of a "***means for*** computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver." *Id.* at 11:8–17, 12:23–36.

For example, claim 21 recites:

> **21.** A system for comparing the performance of an athlete with the performance of other athletes, said system comprising:
>
> a global positioning system GPS receiver for obtaining a series of time-stamped waypoints;
>
> means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver;
>
> means for presenting the athletic performance feedback data to an athlete; and
>
> a modem for transmitting the athletic performance feedback data to a remote computer for comparison with athletic performance data of other athletes.

## III.   <u>LEGAL STANDARD</u>

The reason the claims of the '007 patent are invalid as indefinite and the reason that summary judgment is proper at this time is the use of the term "means" in describing performance of the claimed function of "computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver." The use of this term invokes 35 U.S.C. § 112, ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall

be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Section 112, ¶ 6 allows, in certain circumstances, patentees to claim a function, without identifying in the claim itself a specific structure for performing that function. These type of claims are often referred to as "means-plus-function" claims, because they recite a "means for" performing a function. By employing the convenience of claiming in this manner, as the statute indicates, the claims "shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."

A well-developed body of law exists on the use of what are referred to as "means-plus-function" claims, and even further on a subset of computer-implemented "means-plus-function" claims that rely on general purpose computers or processors as the "means" for performing the claimed function. The Federal Circuit has delineated strict requirements for this latter type of means-plus-function claim, requirements the '007 patent fails to satisfy as a matter of law.

A.   <u>Definiteness requirement for claims invoking 35 U.S.C. § 112, ¶ 6</u>

Use of the term "means" in claim limitation creates a presumption that 35 U.S.C. § 112, ¶ 6 applies. *Personalized Media Commc'ns LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 703 (Fed. Cir. 1998). The Federal Circuit explained in *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc):

> In enacting [35 U.S.C. § 112, ¶ 6], Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.

In short, in exchange for the convenience of functional claiming, the "specification must disclose with sufficient particularity the corresponding structure for performing the claimed

function and clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014). The duty to link or associate structure with the function is the *quid pro quo* for the convenience of employing § 112, ¶ 6. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). A disclosed structure is a "corresponding structure" only if the specification clearly links or associates that structure to the claimed function. *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1169 (Fed. Cir. 2015). Where the specification fails to do so, a patent claim is invalid as indefinite under § 112, ¶ 2. *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009). This is because by "fail[ing] to set forth an adequate disclosure, the applicant has in effect failed to particularly point out and distinctly claim the invention as required by the second paragraph of section 112." *In re Donaldson Co.*, 16 F.3d 1189, 1195 (Fed. Cir. 1994) (en banc),

Given that the "primary purpose of the definiteness requirement is to ensure the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public (*e.g.*, competitors of the patent owner) can determine whether or not they infringe," the Federal Circuit requires strict compliance with the requirement the specification discloses linked structures, even if those structures would have been "well known in the art." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A.*, 412 F.3d 1291, 1302–03 (Fed. Cir. 2005). For example, "[a] bare statement that known techniques or methods can be used does not disclose structure." *Triton Tech*, 753 F.3d at 1379. Thus, to evaluate whether the specification discloses sufficient structure to satisfy the statute's requirement, the question is "not what structures a person of ordinary skill in the art would know are capable of performing a given function, but what structures are specifically

disclosed and tied to that function in the specification." *Saffran v. Johnson & Johnson*, 712 F.3d 549, 563 (Fed. Cir. 2013).

Put another way, "[a] patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function." *Blackboard*, 574 F.3d at 1385. Indeed, "the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification." *Default Proof*, 412 F.3d at 1303; *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332 (Fed. Cir. 2003) ("impermissib[e]" to "rel[y] on expert declarations to clearly link the claimed function" with corresponding structures because patentees cannot use the declaration of its expert "to rewrite the patent's specification"); *Atmel Corp. v. Info. Storage Devs., Inc.*, 198 F.3d 1374, 1380 (Fed. Cir. 1999) ("consideration of the understanding of one skilled in the art in no way relieves the patentee of adequately disclosing sufficient structure in the specification").

### B.      Computer-implemented means-plus-function limitations

For functions implemented using a processor or general-purpose computer, the Federal Circuit recognizes that allowing processors or general purpose computers to act as the corresponding structure would in effect allow such claims to "read[] on any means for performing the recited function," which is "at odds with the requirements of 35 U.S.C. § 112." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999). For these means-plus-function claims, where the corresponding structure "is a computer, or microprocessor, programmed to carry out an algorithm, the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."[2] *Id.* at 1349. This is because the disclosed algorithm in the form of "instructions of

---

[2] A notice of allowance for the '007 patent was filed on March 28, 1998 and prosecuted before the *WMS Gaming* decision issued on July 20, 1999. This may be one reason the '007 patent fails

- 7 -

[a] software program in effect 'create a special purpose machine for carrying out the particular algorithm.'" *Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Thus, for computer-implemented functions, "[t]he structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm." *WMS Gaming*, 184 F.3d at 1348; *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253 (Fed. Cir. 2005) ("A computer-implemented means-plus-function term is limited to the corresponding structure disclosed in the specification and equivalents thereof, and the corresponding structure is the algorithm.").

For means-plus-function limitations where a processor or software is linked to performing the function, "[i]t is well-settled that simply disclosing software, . . . without providing some detail about the means to accomplish the function, is not enough." *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (internal quotations omitted). Similarly, "disclosing a black box that performs the recited function is not a sufficient explanation of the algorithm required to render [a] means-plus-function term definite." *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F. 3d 1326, 1338 (Fed. Cir. 2014). Rather, the specification itself must contain express disclosure of an algorithm "in any understandable terms including as a mathematical formula, in prose, . . . or as a flow chart, or in any other manner that provides sufficient structure." *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). An algorithm—even if "described in prose"—must describe a "step-by-step procedure[] for performing the claimed function." *Triton Tech*, 753 F.3d at 1379.

In the same way as with non-processor and non-software structures, the patentee cannot rely on knowledge of a skilled artisan to cure the failure to disclose an algorithm in the specification. *BlackBoard*, 574 F.3d at 1385 ("A patentee cannot avoid providing specificity as

---

to comply with the Federal Circuit's interpretation of 35 U.S.C. § 112, ¶ 6.

to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function."); *Function Media*, 708 F.3d at 1319 ("proving that a person of ordinary skill *could* devise some method to perform the function is not the proper inquiry as to definiteness" (emphasis original)). Indeed, "[w]here the specification discloses no algorithm, the skilled artisan's knowledge is *irrelevant*." *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 624 (Fed. Cir. 2015) (emphasis added). The Federal Circuit has "repeatedly and unequivocally" rejected as "meritless" the argument "a microprocessor can serve as sufficient structure for a software function if a person of ordinary skill in the art could implement the software function." *Id.* at 623; *see Aristocrat*, 521 F.3d at 1334 (that a "worker in the art" could program "standard microprocessor" to perform function using "appropriate programming imposes no limitation whatsoever, as any general purpose computer must be programmed"). This is because "a person of ordinary skill in the art *plays no role whatsoever* in determining whether an algorithm must be disclosed as structure for a functional claim element." *EON Corp.*, 785 F.3d at 624 (emphasis added)

## IV.  ARGUMENT

### A.  The "means for computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver" recites a computer-implemented function invoking 35 U.S.C. § 112, ¶ 6, and therefore the corresponding structure is a special-purpose processor programmed to perform an algorithm disclosed in the specification, not a generic CPU or processor

When a limitation recites the word "means" associated with the performance of a function, the claim is presumed to invoke 35 U.S.C. § 112, ¶ 6. The presumption that § 112, ¶ 6 applies can only be rebutted if the claim itself would have been understood to have "sufficiently definite meaning as the name for structure." *Williamson*, 792 F.3d at 1348.

For computer-implemented means-plus-function claims, recitation of a processor or computer does not rebut the presumption that § 112, ¶ 6 applies, as "when a computer is referenced as support for a function in a means-plus-function claim, there must be some explanation of how the computer performs the claimed function." *BlackBoard*, 574 F.3d at 1384. The Federal Circuit has made clear that reciting a computer alone does not provide sufficient structure to rebut the "means for" presumption.[3] *See Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1366 (Fed. Cir. 2008) (rejecting contention a computer-implemented means-plus-function limitation performed on a "bank computer" provided sufficient structure to rebut presumption § 112, ¶ 6 applied and limiting corresponding structure to a disclosed algorithm).

For the '007 patent, there can be no dispute that claim 1 and 21's "***means for*** computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver" does not recite structure, and explicitly uses the "means" language that creates a presumption that § 112, ¶ 6 applies. In addition, there can be no dispute this "means-plus-function" limitation is computer-implemented, and therefore its corresponding structure must be a processor programmed with an algorithm to perform the claimed function, rather than a processor alone.

---

[3] *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) provides a narrow exception where standard microprocessors can be structure for 'functions [that] can be achieved by any general purpose computer without special programming." The Federal Circuit has explained this *Katz* exception is limited to functions "***coextensive***" with a microprocessor itself, such as "basic 'processing,' 'receiving,' and 'storing' functions." *EON Corp.*, 785 F.3d at 621–22 (emphasis added). The Federal Circuit further explained: "A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions require disclosure of an algorithm." *Id.* at 623. Here the claims require something beyond the "basic" functions in the limited *Katz* exception. For example, the specification asserts that conventional GPS systems do not include "real-time athletic performance algorithms." '007 patent, 1:47–48.

First, the function itself recites "***computing*** athletic performance data." Second, as discussed in section II, the specification indicates that the device's CPU 602, the GPS module's processing unit, or possibly the two processors in tandem perform the calculations of this performance data. The specification explains the GPS module's processing unit takes "positions and times" obtained from the GPS receiver, and "stores it in the memory 608 along with other information." '007 patent, 7:41–44. From this information, stored in memory 608, "performance data such as elapsed distance, current and average speeds and paces, calories burned, miles remaining, and time remaining ***are calculated***." *Id.* at 7:44–48 (emphasis added). As shown in Figure 6, the device's CPU 602, which "controls the operation of the device," is the only component connected directly to the memory 608. *Id.* at Fig. 6, 5:38–40.

Regardless of whether it is the GPS module's built-in processing unit or the device's CPU, the specification makes clear the function of "computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver" is performed by ***some*** processor.[4] The specification also makes clear the claimed function of computing athletic performance data is not a function that is coextensive with general-purpose computers or generic processors. In particular, the specification asserts that known GPS systems "d[id] not include real-time athletic performance algorithms" to compute athletic performance feedback. *Id.* at 1:46–48. The specification therefore confirms a general-purpose computer or generic processor alone is insufficient structure to perform the claimed function—the corresponding structure must

---

[4] For the purpose of this motion, Fitbit assumes that either the device's CPU 602 or the GPS module 604's processing unit are "clearly linked" to the claimed function. Fitbit reserves its rights to contend the asserted claims of the '007 patent are also indefinite for failing to clearly link corresponding structure to the claimed function of the means-plus-function limitation at issue in this motion. *See MobileMedia*, 780 F.3d at 1169. Fitbit also notes that in Philips' required patent disclosures under L.R. 16.6(d)(1), Philips agrees the claimed function is performed by "the underlying processor(s)." Chaikovsky Decl. ¶ 6, Ex. C.

be a special-purpose processor programmed to perform a particular algorithm disclosed in the specification for "computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver."

**B.** **There is no algorithm in the specification clearly linked to performance of the function corresponding to the "means for computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver" by either the device's CPU, the GPS module's processing unit, or the two processors in tandem**

The construction of a means-plus-function limitation follows a two-step approach. First, the claimed functions must be identified, and second, the corresponding structures in the written description that perform those functions must be ascertained. *Omega Eng'g*, 334 F.3d at 1321. As discussed in section III.B, the corresponding structure for computer-implemented functions is a processor programmed to perform a particular algorithm disclosed in the specification, not just a processor. *Aristocrat*, 521 F.3d at 1333 ("[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification.").

As discussed above, the claimed function for the "means-plus-function" limitations at issue is "computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver." And as discussed in section II, The '007 patent discloses a "built-in processor" in the GPS module as "continuously determin[ing]" latitude and longitude coordinates and times, as well as its "current speed and direction of travel." '007 patent, 7:41–44. The geographical position data, "along with other information such as the date and time that each position was acquired," are stored in memory 608. *Id.* From the data stored in memory 608, which is connected to CPU 602, which "controls the operation of the device," *id*. at Fig. 6, 5:38–40, "performance data" "are calculated." *id.* at 7:41–49.

Nowhere does the specification disclose a step-by-step procedure—whether as a formula, flow chart, prose, or other manner—for ***how*** the device's CPU 602, the GPS module 604, or the

two processors in tandem, transforms the data stored in memory 608, including the latitude and longitude coordinates of the GPS current position, into the athletic "performance data" of elapsed distance, current and average speeds and paces, calories burned, miles remaining, and time remaining. *See id.*; *see also Triton Tech.*, 753 F.3d at 1379. This is because the specification includes ***no*** disclosure of any algorithm for translating geographical position data into "athletic performance data" like elapsed distance, average speeds or paces, calories burned, or miles remaining. Rather, the specification describes a proverbial "black box" wherein a processer of some sort performs calculations to compute athletic performance from the GPS location information stored in memory. As explained in section II and emphasized by Figures 11 and 12, the patent's disclosure of this athletic performance data is literally a list of labeled boxes providing examples of the performance data itself without any other detail, not how those performance data results are determined from the geographic positions collected by the GPS. In a sense, the specification's disclosure is illuminating: "performance data . . . ***are calculated***." *Id.* at 7:44–48 (emphasis added). The function is performed, with no instruction on how it is done.

The Federal Circuit has made clear that providing inputs and outputs from a "black box" to achieve a functional outcome is not a "sufficient explanation of the algorithm" required to transform a processor into a special-purpose processor that qualify as corresponding structure for computer-implemented functions under § 112, ¶ 6. *See Augme*, 755 F. 3d at 1338 (no corresponding structure where specification discloses "inputs to and outputs from the code assembler instructions, but does not include any algorithm for how the second code module is actually assembled"); *Aristocrat*, 521 F.3d at 1334–35 ("a description of the ***outcome*** of the claimed functions [is] not a description of structure, i.e., the computer programmed to execute a particular algorithm" (emphasis added)).

Thus, neither the device's CPU 602 or the GPS module 604's "built-in processor" are disclosed to be special-purpose processors programmed to perform a particular algorithm— because the specification does not disclose *any* particular algorithm for performing the claimed function of "computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver" at all. As a result, neither the device's CPU 602 nor the GPS module's processor, nor a combination of the two can act as corresponding structure under § 112, ¶ 6 for the computer-implemented function of "computing athletic performance data from the series of time-stamped waypoints obtained by said GPS receiver."

The need to describe an algorithm for performing the claimed function is highlighted by the specification's statement that prior art GPS systems "do not include real-time athletic performance algorithms." '007 patent, 1:48–49. Thus, while recognizing the need for such algorithms, the '007 patent seeks to claim all such advancements without offering to the public even a single example of one.[5] Without § 112, ¶ 6's limits, the claims would *cover all ways* for a *GPS processor* to perform the function of "computing athletic performance feedback data from the series of time-stamped waypoint obtained by said GPS receiver."

Philips' infringement contentions demonstrate why the Federal Circuit has placed such absolute and strict limitations on functional claiming. Philips' infringement charts allege Fitbit infringes based only on the functional result of using a GPS device, not because the processor on the GPS device performs any particular algorithm described in the specification.

---

[5] The specification also indicates a "smart algorithm" is needed to "filter out the erroneous position points resulting from signal interference or from induced errors through the U.S. government's Selective Availability (SA) program, which intentionally limits the absolute accuracy of civilian GPS receivers." '007 patent, 7:52–56. But again there is no disclosure of what this "smart algorithm" is or how the GPS's built-in processing unit should be programmed to implement the "smart algorithm" to filter out erroneous position points.

the spinning activity on Ionic. Some exercises, like running, biking, and hiking, automatically use GPS to capture additional stats such as a map of your route and elevation gained.

When you track an activity with GPS, your device calculates your distance using GPS data rather than steps. If you begin moving before you get a GPS signal, your device calculates distance using your steps

(Excerpt from Philips' infringement chart for the "means for computing" claim limitation, red box emphasis in original. Chaikovsky Decl. ¶ 5 and Ex. B. In supplemental local rule patent disclosures, Philips references "calculations" and a "computation," but does not describe any details about how any calculations or computations are performed. *Id.* ¶ 6 and Ex. C.)

Philips seeks to capture all possible algorithms capable of performing the claimed function, ignoring the *quid pro quo* for use of functional claiming that limits the claim to the structures, in the form of algorithms, disclosed in the specification and linked to performance of the claimed function. *See e.g. ePlus, Inc. v. Lawson Software, Inc.* 700 F.3d 509, 519 (Fed. Cir 2012) (claim indefinite where "no instruction for using a particular piece of hardware, employing a specific source code, or following a particular algorithm . . . nothing in the specification to help cabin the scope of the functional language in the means for processing element: *The patentee has in effect claimed everything that generates purchase orders under the sun*."(emphasis added)); *Finisar*, 523 F.3d at 1340–41 ("Simply reciting 'software' without providing some detail about the means to accomplish the function is not enough."); *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1381-1382 (Fed. Cir. 2013) (claim invalid as indefinite where algorithm sought to capture "all ways of taking into account the listed variables" by "merely list[ing] inputs without specifying any single formula or function or algorithm defining the contributions of any of the inputs to a computation").

## V.  CONCLUSION

All asserted claims of the '007 patent recite a means-plus-function limitation that invokes 35 U.S.C. § 112, ¶ 6—a "means for computing athletic performance feedback data from the

series of time-stamped waypoints obtained by said GPS receiver." The specification does not disclose structure in the form of a processor programmed to perform a particular algorithm linked to performance of this means-plus-function limitation. And as the Federal Circuit has made clear, expert testimony is irrelevant where no structure is disclosed in the four corners of the specification. Therefore, the asserted claims are invalid as indefinite under 35 U.S.C. § 112, ¶ 2 as a matter of law. Fitbit's motion for partial summary judgment of invalidity should be granted.

Dated: March 19, 2020

FITBIT, INC.

By Its Attorneys,

/s/ Yar R. Chaikovsky

Yar R. Chaikovsky
yarchaikovsky@paulhastings.com
Dave Beckwith
davidbeckwith@paulhastings.com
David Okano
davidokano@paulhastings.com
Radhesh Devendran
radheshdevendran@paulhastings.com
Berkeley Fife
berkeleyfife@paulhastings.com

PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, California 94304-1106
Telephone:    1(650) 320-1800
Facsimile:    1(650) 320-1900

Jennifer B. Furey (BBO # 634174)
Andrew T. O'Connor (BBO # 664811)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, MA 02110
Telephone: (617) 482-1776
Facsimile: (617) 574-4112

E-mail: jfurey@goulstonstorrs.com
aoconnor@goulstonstorrs.com

## CERTIFICATE OF SERVICE

I certify that a true copy of the above document was served on the attorney of record for each party via the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants, and paper copies will be sent to those indicated as nonregistered participants.

Dated: March 19, 2020

By: */s/ Yar R. Chaikovsky*
Yar R. Chaikovsky (*Pro Hac Vice*)