UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHILIPS NORTH AMERICA LLC,

               Plaintiff,

     v.

FITBIT, INC.,

               Defendant.

Civil Action No. 1:19-cv-11586-IT

## **<u>FITBIT'S OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................. 1

II.    U.S. PATENT NO. 6,013,007 .......................................................................... 1

    A.    "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" (Claims 1, 21)......... 2

    B.    "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" (Claim 7) ................................................................................ 7

III.    U.S. PATENT NO. 6,976,958 .......................................................................... 8

    A.    "in the event of an interruption of the wireless connection . . . configured to store the health parameter or visual data in a memory or on the removable memory device" (Claims 15, 16) ......................................... 8

    B.    "memory" (Claims 15, 16)................................................................... 10

    C.    "internet-enabled wireless web device" (Claims 15, 16).................................... 11

    D.    "health parameter indicative of a disease state or condition of a patient" (Claim 15) and "health parameter or visual data corresponding to a patient's disease state or condition" (Claim 16) .................................... 12

IV.    U.S. PATENT NO. 7,088,233 .......................................................................... 15

    A.    "governing information transmitted between the first personal device and the second device" (Claim 1).............................................................. 15

    B.    "first personal device" (Claim 1) ........................................................ 16

    C.    "wireless communication" (Claim 1)................................................... 18

V.    U.S. PATENT NO. 8,277,377 .......................................................................... 19

    A.    "indicating a physiologic status of a subject" (Claim 1)...................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
   651 F.3d 1318 (Fed. Cir. 2011)..................................................................................9

*Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*,
   521 F.3d 1328 (Fed. Cir. 2008)..............................................................................3, 4

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 ...........................................................................................................9

*B. Braun Med., Inc. v. Abbott Labs.*,
   124 F.3d 1419 (Fed. Cir. 1997)..............................................................................2, 8

*BlackBoard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009)..........................................................................4, 5, 7

*Certain Digital Media Devices, Including Television, Blu-Ray Disc Players,
   Home Theatre Systems, Tablets, and Mobile Phones, Components Thereof and
   Associated Software*,
   Inv. No. 337-TA-882, USITC Pub. 539707................................................................9

*Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A.*,
   412 F.3d 1291 (Fed. Cir. 2005)..................................................................................5

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
   355 F.3d 1327 (Fed. Cir. 2004)..................................................................................3

*GPNE Corp. v. Apple Inc.*,
   830 F.3d 1365 (Fed. Cir. 2016)....................................................................11, 16, 18

*In re Katz Interactive Call Processing Patent Litig.*,
   639 F.3d 1303 (Fed. Cir. 2011)..................................................................................5

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004) ...............................................................................12

*MobileMedia Ideas LLC v. Apple Inc.*,
   780 F.3d 1159 (Fed. Cir. 2015)..................................................................................7

*MTD Prods. Inc. v. Iancu*,
   933 F.3d 1336 (Fed. Cir. 2019)..................................................................................6

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
   521 F.3d 1351 (Fed. Cir. 2008)..................................................................................1

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................................................1

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008)...................................................................................11, 18

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012)..........................................................................................12

*Trading Techs. Int'l, Inc. v. eSpeed*,
    595 F.3d 1340 (Fed. Cir. 2010)..........................................................................................17

*Vederi, LLC v. Google, Inc.*,
    744 F.3d 1376 (Fed. Cir. 2014)............................................................................................1

*Verizon Servs. Corp. v. Vonage Holding Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007)..........................................................................................14

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)....................................................................................2, 3, 7

*Wis. Alumni Research Found. v. Apple Inc.*,
    905 F.3d 1341 (Fed. Cir. 2018)..........................................................................................16

*WMS Gaming, Inc. v. Int'l Game Tech.*,
    184 F.3d 1339 (Fed. Cir. 1999)............................................................................................4

**Statutes**

35 U.S.C. § 112............................................................................................................1, 3, 8

## I.   <u>INTRODUCTION</u>

The purpose of claim construction is to "resol[ve] disputed meanings and the technical scope, to clarify and when necessary to explain what the patentee covered by the claims." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). A patent's claims, specification, and prosecution history (including references cited therein) comprise "intrinsic evidence" that must be consulted before any other evidence when construing patent claims. *Vederi, LLC v. Google, Inc.*, 744 F.3d 1376, 1382 (Fed. Cir. 2014). "[T]he prosecution history provides evidence of how the PTO and the inventor understood the patent" and may show that "the inventor limited the invention in the course of prosecution . . ." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (citations omitted). Fitbit's proposed constructions follow these and other canons of claim construction. Philips' constructions ignore the canons, seek to recast the scope of its patents in an attempt to cover Fitbit's innovative technology, and repeatedly contradict its prior arguments in this case and at the Patent Office.

## II.   <u>U.S. PATENT NO. 6,013,007</u>

The '007 patent claims a system for computing outdoor athletic performance, presenting the performance data audibly over a wired headset, and transmitting the performance data to a remote computer for comparison with other athletes. *See* '007 patent, cover, 2:1-3:13, 6:63-9:20. Importantly, the specification explains prior art GPS systems "do not include real-time athletic performance algorithms." *Id.*, 1:47-48. Yet, no such algorithms are disclosed in the patent. The lack of such algorithms invalidates the asserted claims under 35 U.S.C. § 112, ¶ 6.

The two disputed terms for the '007 patent are written in the means-plus-function ("MPF") format, pursuant to 35 U.S.C. § 112, ¶ 6, which states:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in

support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

In other words, MPF allows a patentee to claim a function (*e.g.*, tracking performance) without identifying in the claim itself a specific structure for performing that function. By employing the convenience of claiming in this manner, the claims "shall be construed to cover the corresponding structure, material, or acts ***described in the specification*** and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015)(emphasis added). The duty to link or associate structure with the function is the *quid pro quo* for using MPF. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). The asserted claims of the '007 patent fail to disclose adequate structure linked to the claimed function, which renders the claims indefinite. *Williamson*, 792 F.3d at 1351-52. Fitbit's pending Motion for Partial Summary Judgement (MSJ) contains a discussion of controlling MPF law.[1] D.I. 44 at 4-9.

A.   **"means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" (Claims 1, 21)**

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| **Function:** computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver | **Function:** computing athletic performance feedback data from the series of time stamped waypoints obtained by said GPS receiver |
| **"athletic performance feedback data"** means elapsed distance, current and average speeds and paces, <u>calories burned, miles remaining and time remaining</u> | **"athletic performance feedback data"** means elapsed distance of an athlete, current or average speed of an athlete, and current or average pace of an athlete |
| **Structure:** Limitation **is indefinite** under 35 § 112, ¶ 2 because specification does not provide an actual algorithm to program a processor to perform the function | **Structure:** a processor and equivalents thereof (*see, e.g.,* Fig.6, col. 5 ll. 36-40 and col. 9 ll. 31-35). Limitation is **not indefinite**. |
| | **Proposed Construction:** a processor (and equivalents thereof) that determines any of the |

---

[1] Granting Fitbit's currently pending 15-page MSJ, D.I. 44 will render moot all of the claim construction disputes relating to the '007 patent.

| | |
|---|---|
| As detailed in this section, Philips' "Proposed Construction" is a legally improper construct that runs afoul of settled MPF law. Moreover, Philips' construction only requires structure for determining "any of" (as opposed to all of) the data elements. As discussed below, this is contrary to law. | following from a series of time stamped waypoints obtained by said GPS receiver during an exercise session: elapsed distance of an athlete; current or average speed of an athlete; current or average pace of an athlete |

Two disputes remain: (1) whether the means-plus-function term is indefinite and (2) the meaning of the term "athletic performance feedback data" within the claimed function. Both disputes relate to validity. As detailed in the MSJ, the asserted claims are indefinite because the specification does not provide an algorithm, as required for a computer-implemented MPF, for performing the agreed upon function of "computing ***athletic performance feedback data*** from the series of time-stamped waypoints obtained by said GPS receiver." The specification lacks the required algorithm regardless of whether Fitbit's or Philips' construction of "athletic performance feedback data" is adopted. The second dispute might also relate to infringement as Philips is attempting to broaden the scope of the claims by including less required claim elements in them.

"Construing a means-plus-function claim term is a two-step process. The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 793 F.3d at 1351-52; *see also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1333 (Fed. Cir. 2004).[2] The claim language

---

[2] Philips introduces a new construct for the MPF claims that it calls "Proposed Construction." This runs counter to the required "two-step process" where function is identified first and then structure. Philips improperly combines the term's function and processor structure together. This amounts to purely functional claiming of all possible ways to program a processor to perform the claimed "computing . . ." function. The Federal Circuit expressly forbids this strategy. *See Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.,* 521 F.3d 1328, at 1333 (Fed. Cir. 2008) ("Because general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer as the structure designated to perform a particular function does not limit the scope of the claim to 'the corresponding structure, material, or acts' that perform the function, as required by section 112 paragraph 6"). Further, it is counter to § Aristocrat 112, ¶ 6 which delineates function and structure ("such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents

defines the function as: "computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver." The parties do not dispute this, just the meaning of "athletic performance feedback data," which is addressed at the end of this section.

The agreed-upon function "computing athletic performance feedback data. . ." requires "computing," a computer-performed step. Performing the function therefore requires an algorithm to instruct the computer processor to perform the claimed computing function. "[T]he corresponding structure for a § 112, ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Aristocrat,* 521 F.3d at 1333; *see also BlackBoard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1384 (Fed. Cir. 2009) ("when a computer is referenced as support for a function in a means-plus-function claim, there must be some explanation of how the computer performs the claimed function"). Thus, in addition to the processor, there must be a specific algorithm disclosed in the specification for performing the function of "computing athletic performance feedback data . . ." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, at 1348 (Fed. Cir. 1999) at 1348 ("[t]he structure of a microprocessor programmed to carry out an algorithm is limited by the disclosed algorithm"); *see also* D.I. 44 at 7-8.

The necessity for an algorithm is highlighted by the patent's admission that prior art GPS systems "do not include real-time athletic performance algorithms." '007 patent, 1:47-48. Yet here the '007 specification provides no specific algorithm—it simply states a result: "from these [GPS] positions and times, performance data…are calculated." '007 patent, 7:45-48; *see also* D.I. 44 at 12-13. Thus, the claims are indefinite under § 112, ¶ 2. *Blackboard*, 574 F.3d at 1382.

---

thereof.") Philips combination construction is simply trying to circumvent the strict rules attendant to having used a means-plus-function claiming format and would also lead to jury confusion at trial. For example, a jury may erroneously conclude that simply achieving the functional result using a processor, without regard to how the processor does it, satisfies the claim limitation.

When Fitbit asked Philips about the missing algorithm during the meet and confer process, Philips stated that one skilled in the art would know how to use the processor to perform the claimed function. This is legally deficient: "[a] patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function." *Id.* at 1385; D.I. 44 at 8-9. Indeed, "the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification*." Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A.*, 412 F.3d 1291, 1303 (Fed. Cir. 2005). Philips' identification of a processor alone, without an algorithm, might be relying on *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) which provides a very narrow exception where standard microprocessors can be structure for 'functions [that] can be achieved by any general purpose computer without special programming." The Federal Circuit has explained this *Katz* exception is limited to functions "**coextensive**" with a microprocessor itself, such as "basic 'processing,' 'receiving,' and 'storing' functions." *EON Corp.*, 785 F.3d at 621–22 (emphasis added). The Federal Circuit further explained: "A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions require disclosure of an algorithm." *Id.* at 623. The agreed upon computer-implemented function is "computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver." On its face, this function goes beyond the basic function of a microprocessor.  Again, this is confirmed by the specification, which admits that prior art GPS systems "do not include real-time athletic performance algorithms," demonstrating that such functionality is not coextensive with microprocessor function, but must be programmed to do so. '007 patent, 1:47-48. Therefore, the specification fails to meet the *quid pro quo* of MPF claiming.

This second dispute is the meaning of "athletic performance feedback data" within the function. According to Philips, it means elapsed distance, current and average speeds and paces. Computing these types of data go beyond the basic functions of a microprocessor.  Moreover, Philips' construction omits required data. Based on the express disclosure in the specification, "athletic performance feedback data" must also include "calories burned, miles remaining and time remaining," pushing the function further beyond the basic functions of the microprocessor. '007 patent, 7:45-48; *see also id.*, 6:49-50. Fitbit's construction tracks the specification language exactly and includes all embodiments of performance data. Philips' construction, in contrast, cherry picks the first four types of data, while excluding "calories burned, miles remaining and time remaining" from the scope of the function. *Id.*, 7:47-48. There is no basis for this cherry picking, particularly as the data Philips omits is identified in the specification as being "calculated" from GPS "positions and times" data. *Id.* 40-47. Perhaps Philips is attempting to invoke the *Katz* exception by making the function less complicated. However, as explained above, Philips' incorrect construction still goes beyond, basic processor functions.

Philips' construction may also be an infringement-driven attempt to broaden the scope of the claims by including less requirements in them. This is further evidenced by Philips' "Proposed Construction" (discussed in fn.2, above), which attempts to broaden the required structure by arguing that the structure only needs to be capable of determining "any of" (*i.e.*, just one of) the athletic performance feedback data as opposed to all of such data. However, the law is clear— "[w]here there are multiple claimed functions, as we have here, the patentee must disclose **adequate** corresponding structure to perform **all of the claim functions**." *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343 n.2 (Fed. Cir. 2019) (citing *Williamson*, 792 F.3d at 1351-52). Philips' proposals are directly counter to settled MPF law and should be rejected.

**B.**   **"means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" (Claim 7)**

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| **Function:** suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold | **Function:** No dispute. |
| **Structure:** This means-plus-function term **is indefinite** under 35 § 112, ¶ 2 because the specification does not disclose structure that performs the claimed function. | **Structure:** The means-plus function limitation **is <u>not</u> indefinite.** The structure is a processor and equivalents thereof (*see, e.g.*, Fig.6, col. 5 ll. 36-40 and col. 9 ll. 31-35.) |
| | **Proposed Construction:** a processor (and equivalents thereof) that suspends said computing when a speed of the athlete is below a predetermined threshold and resumes said computing when a speed of the athlete is not below said predetermined threshold.[3] |

The sole dispute here is whether the term is indefinite, which would invalidate claim 7. The parties agree the claimed function is "suspending and resuming operation of ***said means for computing*** when a speed of the athlete falls below a predetermined threshold." This function references the same "means for computing" discussed above in Section II.A.  Like the "means for computing," the "means for suspending . . ." fails to satisfy the second step of the MPF construction analysis.  Here, there is no structure "clearly linked" in the specification to the performance of the claimed function. *Williamson*, 792 F.3d 1351-52; *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1169 (Fed. Cir. 2015) (finding that a disclosed structure is a "corresponding structure" only if the specification clearly links or associates that structure to the claimed function). Thus it is indefinite under § 112, ¶ 2. *Blackboard*, 574 F.3d at 1382. Notably, the term "predetermined threshold" only appears in the claim. The specification does not even use the word "threshold" or

---

[3] As discussed in fn.2, Philips' combination structure / function proposed constructions are improper and not recognized under Federal Circuit precedent.

otherwise describe a structure that suspends and resumes the operation the means for computing based on a threshold. The specification fails to meet the *quid pro quo* for the convenience of employing § 112, ¶ 6. *B. Braun Med.*, 124 F.3d at 1424.

## III.   U.S. PATENT NO. 6,976,958

The '958 patent describes monitoring disease data using "off the shelf" wireless devices (*e.g.*, mobile phones and tablets), sending the data from the mobile phone to a server over a wireless connection, and programming the mobile phone to save the data to the mobile phone in the event that the wireless connection is interrupted. *See* '958 patent, 2:38-5:5, 9:30-10:67, 12:47-13:55.

### A.   "in the event of an interruption of the wireless connection . . . configured to store the health parameter or visual data in a memory or on the removable memory device" (Claims 15, 16)

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| Claim 16: programmed to store the health parameter or visual data in a memory or on the removable memory device in response to the event of an interruption.<br><br>Claim 15: programmed to store the health parameter from the health monitoring device in a memory or on a removable memory device in response to the event of an interruption. | No construction necessary. |

Fitbit's construction is the plain meaning and is supported by the patent specification. Philips disagrees, but has provided no alternative construction. This construction is relevant to non-infringement as Fitbit does not configure third-party wireless devices (*e.g.*, mobile phones and tablets) running the Fitbit app to store data in the event of an interruption of a wireless connection.

The surrounding claim language states that "**in the event of**" an interruption of a wireless connection, the wireless web device **is "configured to"** store information. '958 patent, 17:29-18:2, 18:19-25. This "configured to…" claim language is limiting and requires actual programming (*i.e.*, computer code or program instructions) to perform the function of storage in the event of

interruption, not just mere capability or coincidence. *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1349 ("configured to" has the "narrower definition" of "designed to" or "adapted to," not the "broader" meaning "capable of" or "suitable for"); *Certain Digital Media Devices, Including Television, Blu-Ray Disc Players, Home Theatre Systems, Tablets, and Mobile Phones, Components Thereof and Associated Software*, Inv. No. 337-TA-882, USITC Pub. 539707, Init. Det. at 223 (U.S.I.T.C. Jul. 7, 2014) ("configured to" means "computer code or program instructions sufficient to perform the operations recited [in the claims] without additional modification or the addition of further program instructions"). There must be an actual programmed "cause and effect" relationship between the "interruption of the wireless connection" and the "stor[ing] the health parameter [or visual data] in a memory." *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1329, 1349-50 (Fed. Cir. 2011) ("identifying . . . in response to a vehicle condition" requires the identification to occur "*in response to* a vehicle condition, *not in response to any [other]* action" because "a skilled artisan would understand the claims as requiring a 'cause-and-effect' relationship between the occurrence of the vehicle condition and the [] identification"). Mere coincidence that storage may occur when there is no wireless connection is insufficient. Fitbit's construction gives meaning to the claim language "is configured" and the narrow requirements that flows from the claim language.

The '958 specification also supports Fitbit's construction: "[i]n the event of drop-outs, interruptions, or unavailability, of the wireless network, no loss of data occurs, as the data has been stored on the memory device and may be wirelessly transmitted at a later time when cellular or mobile service is again available." '958 patent, 12:53-13:18. This ties the storage of data to the precondition of an interruption of the wireless connection. Inputting Fitbit's construction into the surrounding claim language of claim 16 yields: "wherein *in the event of* an interruption of the

9

wireless connection between the internet-enabled wireless web device and the server, the internet-enabled wireless web device is <u>programmed to store the health parameter or visual data in a memory or on the removable memory device in response to the event.</u>" (Fitbit's construction is underlined).

### B.      "memory" (Claims 15, 16)

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| persistent data storage | No construction necessary. Alternatively: any device capable of storing information, including temporary storage |

Fitbit's construction, "persistent data storage" or data storage that is not temporary, meets the purpose of the claim and is supported by the evidence. The accused mobile phone running the Fitbit App does not preserve this data and does not infringe as properly construed.

The "memory" referred to here is "memory" recited within the claim term construed immediately above "in the event of an interruption of the wireless connection . . . configured to store the health parameter or visual data in a memory or on the removable memory device."  The purpose of the memory, as evidenced by the plain claim language is to "store" health data in the event the wireless connection gets interrupted. The '958 specification explains memory was essential to the system for medical monitoring as it prevented loss of important data "**as the data has been stored on the memory device and may be wirelessly transmitted at a later time when cellular or mobile service is again available . . .**" *Id.*, 13:6-25 (emphasis added). To meet the goals of the claim, as confirmed by the specification, the data must remain and be available in the memory in the event of interruption of the wireless connection.  Fitbit's construction accomplishes this goal. Philips' construction, which includes an amorphous concept of "temporary" memory (which could last a fleeting amount of time), does not.

The specification identifies only persistent data storage components, including cards, sticks, and drives. *Id.*, 12:53-62. "[W]hen a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016). Moreover, in the face of Fitbit's § 101 motion to dismiss (D.I. 20), Philips amended its complaint to assert: "the ['958] claimed inventions improve functionality of health monitoring devices by **enabling for the preservation and storage of health information** in the event of an interruption of [] wireless connection" (D.I. 25, ¶ 129) and "the three [claimed] devices (health monitoring device, internet-enabled wireless web device, and the server) work together to **preserve disease state or condition information in unstable situations**" (*id.*, ¶ 132). Philips' assertions illustrate the claimed memory must **preserve** the data (*i.e.*, not be temporary) to be available in the event of wireless interruption. Philips may not pursue one interpretation for purposes of validity and another for infringement. *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1310-11 (Fed. Cir. 2008).

**C.**    **"internet-enabled wireless web device" (Claims 15, 16)**

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| No construction necessary | a device designed to display interactive information through a connection to the Internet |

"Internet-enabled wireless web device" does not require construction because it has an ordinary meaning. Philips' construction seeks to avoid invalidating prior art that displays data which Philips alleges is not "interactive." Other applications in the '958 patent family specifically claim wireless web devices *and* displaying interactive information independently, demonstrating that the "internet-enabled wireless web device" does not inherently include the additional limitation of displaying interactive information.

11

"Internet-enabled wireless web device" is not a technical term of art. The '958 specification explains prior art systems "suffer from [] deficiencies in that they are not designed to be used with 'off the shelf' wireless devices," which shows the '958 invention is advantageous because it uses *existing* devices. '958 patent, 2:23-26. "Internet-enabled wireless web device" does not have a special meaning as it is "off-the-shelf". *Id.*, 6:29-30 (means "convention[al], standard, universal, stock, consumer"), and the '958 specification also does not "clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012).

The prosecution history of related applications in the '958 patent family further support Fitbit's position. Here, the originally-filed claims in application no. 13/632,771 (an application related to the '958 patent) recited a wireless web device, but did not recite an interactive display of information. These claims were then amended to specifically add elements relating to interactive display. For example, the following was added to the claims: "the web-enabled wireless mobile device **[is] enhanced via the interactive user interface**." Ex. A at 3/7/2019 applicant amendment, pg. 3. This amendment to a related application shows the term "web-enabled wireless web device" does not include "display of interactive information" since that separate feature had to be added by an additional claim limitation. *See e.g., Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1349-1350 (Fed. Cir. 2004) ("Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction . . .").

D.     **"health parameter indicative of a disease state or condition of a patient" (Claim 15) and "health parameter or visual data corresponding to a patient's disease state or condition" (Claim 16)**

| Fitbit's Proposal | Philips' Proposal |
|---|---|
|  |  |

| information used by health care professionals in medically diagnosing / treating a patient | No construction necessary. Alternatively: "the health parameter indicative of [or visual data corresponding to] a disease state or condition of a person under the care of a physician or a healthy individual interested in maintaining a healthy physiologic balance." |
| --- | --- |

The '958 specification describes "[t]wo complementary [] systems": one "[s]ystem [f]or [d]isease management" and one "[s]ystem for [h]ealth [m]anagement[.]" '958 patent, 2:49-65, 5:58-67, 9:27-29; *compare id.* 9:30-10:25 *with* 10:26-67. In the "disease management" embodiment, the "health parameter" is used by a health care professional to diagnose / treat the patient. *See id.*, 2:51-56, 7:12-15 ("For medical devices and applications . . . parameter as required by the physician"), 9:30-10:25.[4] This is in contrast to "health management" embodiment where the "health parameter" is used, potentially by a health care professional, in connection with exercise and nutrition guidance. *Id.*, 2:58-65, 3:6-17.  The disputed term is relevant to non-infringement as the accused devices are not used for diagnosing or treating patients as required in the disease management embodiment.

The claim language "health parameter **indicative of a disease state or condition of a patient**" (Claim 15) and "health parameter or visual data **corresponding to a patient's disease state or condition**" (Claim 16) demonstrates that only the disease management embodiment is claimed. Philips' agrees the construction should include information "indicative of [or visual data corresponding to] a disease state or condition of a person under the care of a physician." The dispute is whether the claim also includes the exercise-related health management embodiment, in the last part of Philips' construction ("a healthy individual interested in maintaining a healthy

---

[4] Another patent in the '958 patent family further illustrates the distinction between the "health parameter" corresponding to the disease management system and the health management system. Ex. B, claim 3 of U.S. Patent No. 6,602,191 recites a "health parameter corresponding to a health, fitness, nutrition, or exercise state or condition of the patient" and claim 5 recites a "health parameter **corresponding to a disease state or condition of a patient.**"

physiologic balance.").

A disclaimer made in the prosecution of a related patent supports Fitbit. During prosecution of a later-filed application, in order to overcome a double patenting rejection over the '958 patent, applicant argued: "the claims noted in '958 [] only relate to disease states or conditions of a patient. They do not relate to exercise parameters[.]" Ex. C, App. No. 12/692,080, Oct. 22, 2012 Applicant Amendment/Arguments at 17. This disclaimer is unequivocal and clear; Philips is bound by it. *Verizon Servs. Corp. v. Vonage Holding Corp.*, 503 F.3d 1295, 1307-08 (Fed. Cir. 2007) (applying disclaimer made in later-filed application to patent-in-suit, even though patent-in-suit issued before disclaimer was made.) Once the disclaimer of the exercise embodiment is excised, Philips' construction "the health parameter indicative of [or visual data corresponding to] a disease state or condition of a person under the care of a physician ~~or a healthy individual interested in maintaining a healthy physiologic balance.~~" supports Fitbit's position.

The claim language, read in light of the specification, describes a "health parameter [or visual data] indicative of a disease state or condition of a patient." '958 patent, 17:23-29, 18:8-18. Information indicative of a disease state or condition of patient are both captured in Fitbit's construction "information used by health care professionals in medically diagnosing / treating a patient." The "information" may include a heath parameter indicative of a disease state ( "blood glucose levels, blood pressure, heart rate, or any other desired parameter as required by the physician") *Id.*, 7:12-15 *see also id.*, 2:51-57, 9:30-10:25. The "information" may also include observation data indicative of a "condition" of a patient (i.e. consciousness or a broken limb.) *id.* 12:12-15 ("visual data such as photographs or videos may be transferred as an indication of a patients' condition and to aid remote diagnosis**.**") The specification describes the disease

management embodiment is "employed to manage the disease state or condition of a patient." *Id.*, 2:49-53; *see also id.*, 9:30-61.

The claims must recite the "disease management embodiment" because the specification only describes the claimed "health parameter indicative of **a disease state or condition of a patient**" in the context of this embodiment. The specification does not use this bolded claim language in reference to the exercise and health management embodiment. *See id.*, 2:58-65. Fitbit's proposed construction gives life to the text of the claim and the express disclaimer. Philips' alternative construction improperly seeks to recapture a disclaimed embodiment.

## IV.   U.S. PATENT NO. 7,088,233

The '233 patent describes systems wherein a personal medical device monitors health and wirelessly communicates with another device. *See* '233 patent, 1:60-2:35, 3:10-7:52, 13:24-14:14.

### A.   "governing information transmitted between the first personal device and the second device" (Claim 1)

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| No construction necessary | controlling the transmission of information between the first personal device and the second device |

This term does not require construction because the language is non-technical and has an ordinary meaning. The complete claim language is "a security mechanism governing information transmitted between the first personal device and the second device." The "security mechanism" simply governs information transmitted between the two claimed devices and needs no further explanation. It is not clear what Philips is trying to accomplish with its construction. At one point, Philips told Fitbit that "a security mechanism governing information . . ." excluded encryption. This exclusion is not in Philips' construction. Also, any argument excluding encryption would fail because the claims/specification disclose using encryption.  *See* '233 patent, Claim 2 ("The system of claim 1, wherein the security mechanism encrypts the information."), *Id. at* 15:13-14.

15

### B.    "first personal device" (Claim 1)

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| personal medical device | No construction necessary. Alternatively: a device for private use by a person. |

The '233 patent is titled "**Personal Medical Device** Communication System and Method" and repeatedly and consistently refers to the "present invention" with a "personal medical device" as the claimed "first personal device." *GPNE Corp. v. Apple Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) ("when a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization"); *see also Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1351 (Fed. Cir. 2018) (finding the "ordinary meaning" of a term is "its meaning to the ordinary artisan after reading the entire patent" which was based on the patent's "repeated[] and consistent[] characterize[ation] of a term"). In opposing Fitbit's § 101 motion, Philips characterized the claims as a "medical system." D.I. 25, ¶¶ 87-88. This term is relevant to non-infringement, the accused devices are not medical systems or devices.

First, the <u>only</u> device disclosed in the '233 specification with the features of the claimed "first personal device" is "personal medical device (PMD 100)[.]" '233 patent, 3:12. There are <u>no other examples or embodiments described that have these features</u>. Compare PMD 100's block diagram (Fig. 2) with the claims' recitation of the first personal device's components:



*Compare id.*, FIG. 2, 3:18-59 *with id.*, 14:62-15:4, 15:32-33, 15:42-46. The specification attributes additional claimed "first personal device" features to the PMD 100. For example, the specification describes PMD 100's detector inputs 140 providing a connection to "any sensor of bodily or physiological parameters such as, but not limited to: temperature, motion, respiration, blood oxygen content, electrocardiogram (ECG), electroencephalogram (EEG), and other measurements" (*id.*, 3:37-33), and the claims describe a "detector connected to the [first personal device's] at least one detector input," where the detector "senses body or physiological parameters" "selected from the group consisting of temperature, motion, respiration, blood oxygen content, and electroencephalogram" (*id.*, 15:24-31). *See also e.g., id.*, 8:41-10:12 (PMD 100 communicates with "central communications base station 700"). PMD 100 is the <u>only device disclosed in the '233 patent</u> that includes all features of the claimed "first personal device."

Second, the '233 patent repeatedly and consistently refers to "the present invention" including PMD 100 as the claimed "first personal device." Figure 1 presents "a block diagram showing the overall structure of **the system of the present invention**" (*id.*, 2:38-39) and Figures 4A-F illustrate "block diagrams showing various configurations of **the system of the present invention**" (*id.*, 2:44-45). The only device in any of these Figures with the features of the claimed "first personal device" is PMD 100. *See Trading Techs. Int'l, Inc. v. eSpeed*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010) (affirming a limiting construction and stating that although the interpretation "relies heavily on the specification," the court takes "comfort against [the] risk" of "reading improperly a preferred embodiment into the claims" because of the "inventors' use of the term 'the present invention' rather than 'a preferred embodiment' or just 'an embodiment'").

Third, the specification's "Summary of the Invention" is entirely devoted to personal medical devices. *See* '233 patent, 1:60-2:35 ("We describe a device and method to couple with

PMDs to provide wireless communication and locating functions"). This section includes different "purpose[s]" of the invention which all involve monitoring medical conditions (*id.*, 2:12-22) and different "embodiment[s]" which each includes a PMD (*id.*, 2:23-35). *GPNE.*, 830 F.3d at 1370.

Finally, in the face of Fitbit's § 101 motion, Philips admitted the '233 patent is directed to a personal *medical* system. Philips amended its complaint to allege: "[w]ireless devices prior to the inventions claim in the '233 patent . . . were not designed to be included in personal medical communication systems" (D.I. 25, ¶ 87) and "[a] person having ordinary skill in the art would understand that the separate claims of the '233 patent . . . are improvements to personal medical device communication systems" (*id.*, ¶ 88). Philips may not pursue one interpretation for validity and another for infringement. *PowerOasis*, 522 F.3d at 1310.

### C.    "wireless communication" (Claim 1)

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| No construction necessary | an over-the-air communications link (e.g. via radiofrequency (RF), infrared, or optical techniques) |

The '233 patent provides examples of "wireless communication" schemes but never engages in lexicography to limit the scope of "wireless connection" to "over-the-air" communications. *See* '233 patent, 4:45-6:16; *see also id.*, 2:58-64 ("The embodiments provided herein are not intended in an inclusive or limited sense"). In fact, the specification never uses the term "over-the-air communications link."

Philips admitted during the meet and confer process that its motive is to overcome prior art wherein implanted devices communicate wirelessly via conductivity through a body medium. Yet the specification states that the PMD of the '233 patent may be surgically implanted (*id.*, 1:63-64; 11:49-50; 14:16-19) and the implanted PMDs provide "wireless communication" (*id.*, 2:11-12). Moreover, prior art cited in prosecution of the '233 patent includes "wireless communications"

through human tissue: "The IMD (implanted medical device) may be equipped with a radio frequency transmitter or receiver, or an alternate wireless communication telemetry technique or media which may travel through human tissue." Ex. D, WO2001047597A2, 7:13-18.[5] Philips may not now rewrite its claims in an effort to avoid invalidating prior art.

## V.   U.S. PATENT NO. 8,277,377

The '377 patent describes a system for monitoring physiologic status (*e.g.*, blood pressure, heart rate) while a subject is exercising. *See* '377 patent, cover, 2:55-5:50.

### A.   "indicating a physiologic status of a subject" (Claim 1)

| Fitbit's Proposal | Philips' Proposal |
|---|---|
| indication of a subject's current physiological state | No construction necessary. |

Fitbit's construction is based on the plain meaning of this term in light of the surrounding claim language and the prosecution history, confirming the claim is directed to the "current" physiological state of the subject. Construction of this term is relevant because Philips bases its infringement contentions on historic physiologic data rather than current data. The plain meaning of the word "status" in "physiologic status of a subject" indicates the temporal requirement of a current state. Additionally, the surrounding claim language requires "data indicating a physiological status of a subject is received at least partially while the subject is exercising," using the present tense "is exercising." And, the preamble of the claim recites a "method for interactive exercise monitoring." Interactive exercise monitoring indicates the physiological status represent

---

[5] Applications in the '958/'377 patent family show "wireless communication" includes transmittal through human tissue. The originally-filed claims recited "communications with an implantable medical device via a first wireless connection." *See* Ex. E, app. no. 10/418,845 originally filed claims, claim 31. After this claim was rejected, applicant tried to distinguish the claim from the prior art by stating: "In the current invention, the measuring device is an implantable device, and thus by its nature must communicate with the internet-enabled wireless web device in a wireless fashion, not via a cable." Ex. F, 11/05/04 applicant remarks, pg. 10.

the current state of the subject. '377 patent, 13:40-41. The specification also explicitly describes monitoring physiologic status "while eating, exercising, or performing other activities." *Id.*, 3:33-36. The monitoring of physiologic status while exercising indicates status is referring to the indication of a subject's current physiological state.

The prosecution history of the '377 patent supports Fitbit's construction. As filed, the '377 claims recited both "physiological data" and "exercise data" (Ex. G, App. No. 12/211,033, Sept. 15, 2008, claims), and were rejected as indefinite by the examiner due to the potential overlap between "physiological data" and "exercise data" (Ex. H, May 4, 2009 Non-Final Rejection at pg. 3). Applicant amended the claims to recite "data indicating an amount of exercise performed" instead of "exercise data." Ex. I, Aug. 4, 2009 Applicant Amendment. Yet, the examiner noted there could still be overlap between "physiological data" and "data indicating an amount of exercise performed" as, for example, both could encompass calories burned. Ex. J, Dec. 29, 2009 Non-Final Rejection. In response, Applicant again amended the claims to require data indicating "physiologic status of a subject that is received at least partially while the subject is exercising." Ex. K, Mar. 16, 2010 Applicant Amendment.[6] Since the "physiologic status" corresponds to simultaneous exercise activity and is distinguished from measurements that may have been taken relating to past tense activity (exercise *already performed*), "physiologic status" must mean *current* physiologic state.

Dated: June 5, 2020

---

[6] Applicant also argued in response to a rejection that the prior art was "far different" from the claimed "real-time monitoring of exercise and physiological data and real-time uploading of the same" because it instead was "for storing data about exercise and then uploading the same at a later time[.]" Ex. L, Sept. 20, 2010 Response After Final Office Action at 11-12. This indicates that "physiologic status" must be a subject's ***current physiological state*** at the time of the exercise monitoring and uploading.

Dated:  June 5, 2020

FITBIT, INC.

By Its Attorneys,

/s/ Yar R. Chaikovsky

Yar R. Chaikovsky
yarchaikovsky@paulhastings.com
Chad Peterman
chadpeterman@paulhastings.com
Dave  Beckwith
davidbeckwith@paulhastings.com
David  Okano
davidokano@paulhastings.com
Radhesh  Devendran
radheshdevendran@paulhastings.com
Berkeley  Fife
berkeleyfife@paulhastings.com

PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, California  94304-1106
Telephone:    1(650) 320-1800
Facsimile:      1(650) 320-1900

Jennifer B. Furey (BBO # 634174)
Andrew T. O'Connor (BBO # 664811)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, MA 02110
Telephone: (617) 482-1776
Facsimile: (617) 574-4112

E-mail: jfurey@goulstonstorrs.com
aoconnor@goulstonstorrs.com

21

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true copy of the above document was served on the attorney of record for each party via the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants, and paper copies will be sent to those indicated as nonregistered participants.

Dated:  June 5, 2020                              By:   */s/ Yar R. Chaikovsky*
                                                             Yar R. Chaikovsky (*Pro Hac Vice*)