**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| PHILIPS NORTH AMERICA LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:19-cv-11586-IT |
| v. | ) | |
| | ) | |
| FITBIT, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    LEGAL STANDARDS ..........................................................................................1

III.    THE ASSERTED PATENTS ..................................................................................2

      a.    U.S. Patent No. 6,013,007 (the '007 Patent) ...............................................2

      b.    U.S. Patent No. 6,976,958 (the '958 Patent) ...............................................2

      c.    U.S. Patent No. 7,088,233 (the '233 Patent) ...............................................3

      d.    U.S. Patent No. 8,277,377 (the '377 Patent) ...............................................4

IV.    LEVEL OF ORDINARY SKILL IN THE ART .....................................................4

V.    DISPUTED CONSTRUCTIONS ............................................................................5

      a.    '007 Patent: "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver".........................5

          i.    Construction of functional language (claims 1, 21)...........................5

          ii.    The term is not indefinite (claims 1, 21)..........................................7

      b.    '007 Patent: "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" (Claim 7) .................................................................................11

      c.    '958 Patent: "in the event of an interruption of the wireless connection . . . configured to store" (Claims 15, 16)....................................................12

      d.    '958 Patent: "memory" ..............................................................................13

      e.    '958 Patent: "internet-enabled wireless web device" ...........................14

      f.    '958 Patent: "health parameter [or visual data] [indicative/corresponding to] of a disease state or condition of a patient" ................................................15

      g.    '233 Patent: "governing information transmitted between the first personal device and the second device".............................................................16

      h.    '233 Patent: "first personal device" ........................................................18

      i.    '233 Patent: "wireless communication"...................................................18

      j.    '377 Patent: "indicating a physiological status of a subject" (Claims 1, 12).........19

VI.    CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*,
  841 F.3d 1334 (Fed. Cir. 2016)................................................................. 15

*AllVoice Computing PLC v. Nuance Comms., Inc.*,
  504 F.3d 1236 (Fed. Cir. 2007)................................................................. 15

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,
  448 F.3d 1324 (Fed. Cir. 2006)................................................................... 5

*Biomedino, LLC v. Waters Techs. Corp.*,
  490 F.3d 946 (Fed. Cir. 2007)................................................................... 13

*Cardia Pacemakers, Inc. v. St. Jude Med., Inc.*,
  296 F.3d 1106 (Fed. Cir. 2002)................................................................... 6

*Finisar Corp. v. DirecTV Grp., Inc.*,
  523 F.3d 1323 (Fed. Cir. 2008)................................................................. 15

*Koninklijke Philips, N.V. v. Zoll Med. Corp.*,
  2014 U.S. Dist. LEXIS 113735 at *23-24 (D. Mass. Aug 15, 2014) ....................................... 14

*McGinley v. Franklin Sports, Inc.*,
  262 F.3d 1339 (Fed. Cir. 2001).............................................................. 6, 10

*Medtronic Minimed Inv. v. Animas Corp.*,
  21 F.Supp.3d 1060 (C.D. Cal. 2014) .......................................................... 14

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)................................................................... 5

*S3 Inc. v. NVIDIA Corp.*,
  259 F.3d 1364 (Fed. Cir. 2001)................................................................. 15

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996)................................................................... 5

**Statutes**

35 U.S.C. § 112.............................................................................. 6, 10

## I.       INTRODUCTION

Plaintiff Philips North America, LLC ("Philips") submits its opening claim construction brief.  As demonstrated below, Philips's proposed constructions are grounded in the intrinsic record and the plain meaning of various terms to a person of ordinary skill in the art, while Defendant Fitbit, Inc's ("Fitbit") proposals are divorced from the specifications of the asserted patents—in some instances going so far as to exclude exemplary embodiments.  While Fitbit might desire unreasonably broad constructions that would ensnare prior art, or unreasonably narrower ones that would support non-infringement arguments, those are not the tenets that should guide claim construction.  Of note, despite advancing a number of unsupported constructions in the present litigation, Fitbit has filed IPR petitions against the '233, '958, and '377 Patents where it argued that **<u>no terms</u>** required construction.

## II.      LEGAL STANDARDS

Claim construction is supposed to stay true to the meaning that a claim would have to a technically qualified person of ordinary skill in the art in light of the intrinsic record.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*).  The patent specification "is the single best guide to the meaning of a disputed term."  *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  Expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field."  *Philips*, 415 F.3d at 1318.

When claim construction involves disputed means-plus-function limitations, the Court must identify the claimed function and the corresponding structure that performs that function. *See Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006).

"Ordinary principles of claim construction govern the interpretation of the claim language used to describe the function." *Cardia Pacemakers, Inc. v. St. Jude Med., Inc.*, 296 F.3d 1106, 1113 (Fed. Cir. 2002). A means-plus-function claim is construed to cover "the corresponding structure . . . described in the specification and equivalents thereof." 35 U.S.C. § 112 ¶ 6; *see also McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1347 (Fed. Cir. 2001) ("Drafters of means-plus-function claim limitations are statutorily guaranteed a range of equivalents extending beyond that which is explicitly disclosed in the patent document itself.")

## III.    THE ASSERTED PATENTS

### a.    U.S. Patent No. 6,013,007 (the '007 Patent)

The '007 Patent is entitled "Athlete's GPS-Based Performance Monitor," and an aspect of the invention described therein utilizes a "Global Positioning System (GPS) based personal athletic performance monitor for providing an athlete with real-time athletic performance feedback data such as elapsed exercise time, distance covered, average pace, elevation difference, distance to go and/or advice for reaching pre-set targets." (Ex. 1 at Abstract.) One embodiment of the '007 Patent is an "Internet web site which displays comparison data representing the relative performances of two or more athletes, provides customized individual training advice and virtual competitions, and an opportunity for advertisers to reach highly well defined potential customers." (Ex. 1 at Abstract.) As shown in Fig. 2, an athlete wears the GPS-based performance monitor 101 during an exercise session, while Fig. 6 provides a schematic view of various components of an exemplary embodiment that includes a CPU and memory.

### b.    U.S. Patent No. 6,976,958 (the '958 Patent)

The '958 Patent is entitled "Method and Apparatus for Health and Disease Management Combining Patient Data Monitoring With Wireless Internet Connectivity," and the invention described therein "provides a method and system for assisting patients to manage a disease or

2

maintain healthy lifestyle by collecting health-related data and providing information in response to those data by means of [an internet-enabled wireless web device ("WWD")] designed to display interactive information through a connection to the Internet." (Ex. 2 at 3:27-32.)

In an exemplary embodiment, an "internet-enabled wireless web device" ("WWD"), such as a mobile phone, receives health parameters from a health monitoring device, such as a heart rate monitor. (Ex. 2 at 3:44-51, 5:58-67). The health parameters correspond to a patient who can be "a person under the care of a physician" or "a 'normal' or healthy individual who is interested in maintaining a healthy physiologic balance." (Ex. 2 at 6:7-11).  An important feature of the '958 Patent is the presence of an intermediary internet-enabled wireless web device, where the intermediary device itself stores a health parameter—even when communication of the intermediary device with the internet might be interrupted.  (*See* e.g., Ex. 2 at, 14:19-33, Fig. 11.)

### c.      U.S. Patent No. 7,088,233 (the '233 Patent)

The '233 Patent is entitled a "Personal Medical Device Communication System and Method," and utilizes "two-way communication devices and a bi-directional communication network" and "provides multiple levels" of prioritization and various types of authentication. (Ex. 3 at Title, Abstract).  Fig. 5 demonstrates an exemplary embodiment of the invention:



(Ex. 3 at Fig. 5.) In Fig. 5, the personal device 100 of victim V is in short-range wireless communication (via, for example, BLUETOOTH) with a second device of a bystander B. (*See* Ex. 3 at 11:49-66.)  The personal device of victim V can then be in wireless communication with other aspects of the network.  (*See* Ex. 3 at 12:1-37.)

### d.    U.S. Patent No. 8,277,377 (the '377 Patent)

The '377 Patent is entitled "Method and Apparatus for Monitoring Exercise With Wireless Internet Connectivity" and the invention described provides a method and apparatus "for wireless monitoring of exercise, fitness, or nutrition by connecting a web-enabled wireless phone to a device which provides exercise-related information, including physiological data and data indicating an amount of exercise performed."  (Ex. 4 at Abstract.)  The invention further provides that an "application for receiving the exercise-related information and providing a user interface may be downloaded to the web-enabled wireless phone from an internet server.  The exercise-related information may be transmitted to an internet server, and the server may calculate and return a response."  (Ex. 4 at Abstract.)

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art of the patented inventions is an individual with a.) at least a bachelor's degree in electrical engineering, computer engineering, computer science, or the equivalent thereof, and  b.) some experience with activity and/or health monitoring technologies, or the equivalent thereof. For the '007 Patent, a person of ordinary skill in the art would additionally have experience with GPS technologies, while for the '233 Patent a person of ordinary skill in the art would also have experience with security in the context of wireless communications.  This level of ordinary skill is supported by the accompanying declaration of Dr. Thomas L. Martin, PhD, who has much more than the ordinary level of skill in the art pertinent to the patents.  (*See* Ex. 5, Martin Decl. ¶ 11.)

As used above, the term "or the equivalent thereof" is intended to mean that the required

levels of experience may be met by varying means, such as through educational experience –

*e.g.*, a person of ordinary skill could potentially have less industry experience but some other

relevant educational experience or vice versa.

## V.   DISPUTED CONSTRUCTIONS

### a.   '007 Patent: "means for computing <u>athletic performance feedback data</u> from the series of time-stamped waypoints obtained by said GPS receiver"

#### i.   Construction of functional language (claims 1, 21).

As reflected in the Joint Claim Construction Chart (Dkt. 68-1 at 1), the parties do not

dispute that this term is governed by 35 U.S.C. § 112, ¶ 6, nor is there any real dispute as to

structure.[1]  However, there is a dispute as to how the function **"computing athletic**

**performance feedback data from the series of time stamped waypoints obtained by said**

**GPS receiver"** should be construed:[2]

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| determining any of the following from a series of time-stamped waypoints obtained by said GPS receiver during and exercise session: elapsed distance of an athlete; current or average speed of an athlete; current or average pace of an athlete. | "athletic performance feedback data" means: elapsed distance, current and average speeds and paces, calories burned, miles remaining and time remaining. |

The '007 patent generally describes different types of "performance feedback" of

an athlete during an exercise session as including "elapsed time, elapsed distance, current

---

[1] Philips contends that any formal construction of structure include the language "and equivalents thereof," consistent with the law governing construction of means-plus-function claims. *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1346-48 (affirming claim construction of structure that included the phrase "and any equivalents of such structure").  Fitbit, however, has baselessly rejected any such proposal.

[2] The Claim Construction Chart (Dkt. 68-1) further identifies Philips's proposal for a narrative construction for § 112 ¶ 6 claims that incorporates the requisite structure and function in a manner that would be helpful, as opposed to confusing, for a potential jury.

and average speeds and paces, [and] current climbing rate." (*See* Ex. 1 at 2:8-13; *see also* Ex. 1 at Abstract ("athletic performance feedback data such as elapsed exercise time, distance covered, average pace, elevation difference, distance to go and/or advice for reaching pre-set targets.").)  Claims 1 and 21 of the '007 Patent, however, concern only athletic performance feedback data that is computed "**from a series of time-stamped waypoints** obtained by a GPS receiver," meaning that not **all** types of athletic performance feedback data are claimed.  For example, while the patent explains that a "current climbing rate" or "elevation distance" constitute athletic performance feedback data, the patent explains that this form of athletic performance feedback is computed from a barometric pressure sensor and **not** a series of time-stamped GPS waypoints:  "Elevation changes can be determined by measuring changes in the atmospheric pressure. A barometric pressure sensor 610 is used to calculate the relative elevation changes during the exercise Session." (Ex. 1 at 8:48-51.)  Climbing rate is therefore not "athletic performance feedback data" as contemplated by the claim because it is not computed from a series of time-stamped GPS waypoints.

The '007 Patent also describes the types of data that **can be** calculated from GPS position and time information, even though not everything that one can calculate from GPS data would constitute "athletic **performance feedback** data."  Items that the patent discloses as determinable from GPS waypoints includes "elapsed distance, current and average speeds and paces, calories burned, miles remaining, and time remaining."  (Ex. 1 at 7:40-50.)  In each instance, the values must be computed from a "series of time stamped waypoints" as opposed to simply current distance or current time.

Philips's proposed construction seeks to capture the overlap between what constitutes athletic **performance feedback** data in the specification, which necessarily reflects **feedback** on

the athletes **performance** provided during an exercise session, and the set of items that the specification discloses as being capable of being calculated from a series of time-stamped waypoints.  Meanwhile, Fitbit's proposed construction seeks to interpret **anything** that may be determined from GPS/location data as athletic performance feedback data, regardless of whether it constitutes feedback to the athlete "from a series of time-stamped waypoints."  For example, Fitbit's proposed construction includes calories, however, the specification never contemplates calories being provided as feedback data during an exercise session, as opposed to tracking calories for some other purpose.  This of course makes sense.  Information such as distance, speed and pace is the sort of information provided as feedback on an athlete's performance during an exercise session, while tracking calories has little to do with feedback on performance as opposed to being useful for weight management over time.  One would not provide feedback on a runner's performance in a race by noting how many calories they burned.

Fitbit further proposes that the proposed construciton include "miles remaining" and "time remaining," both of which would require that a user input some sort of destination end point for the exercise session—a step contrary to the calculation contemplated by either claim 1 or claim 21.  Additionally, "miles remaining" would be a calculation based solely on the most recent GPS location (rather than a **series** of time-stamped waypoints as required by the claim) while the specification never identifies "time remaining" as a form of feedback data on an athlete's performance.  (*See* Ex. 5, Martin Decl. ¶ 26.)

### ii.    The term is not indefinite (claims 1, 21).

Fitbit further contends that, regardless of the construction adopted above, the claims are indefinite because the specification fails to disclose an "algorithm" for implementing the claimed function. (*See* Dkt. 68-1 at 1.)  Yet it is Fitbit's burden to provide indefiniteness with clear and convincing evidence—a burden it cannot meet.  That said, any inquiry into whether or not the

claimed function is supported by the specification requires that the above dispute on the construction of function be resolved first, and Philips would ask for the ability to full brief indefiniteness issues after claim construction.  Even so, the claim is not indefinite.

To survive a definiteness challenge for lack of algorithmic support under § 112 ¶ 6 the specification need only "disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112, ¶ 6." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008). The required algorithm can be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Id* (internal citation omitted). The algorithm needs only to "disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art." *AllVoice Computing PLC v. Nuance Comms., Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007).

Importantly, there is no requirement that the specification disclose information that a person of ordinary skill would already know as "[t]he law is clear that patent documents need not include subject matter that is known in the field of the invention and is in the prior art, for patents are written for persons experienced in the field of invention." *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001). Thus, a patent provides adequate algorithmic structure if, based on the specification, a person of ordinary skill would know to apply a well-known or basic formula to achieve the recited function, even where said formula may not be expressly disclosed in the specification. *See e.g.*, *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1345 (Fed. Cir. 2016) (finding sufficient disclosure of an algorithm for calculating impedance as a person of ordinary skill would know to apply Ohm's law, even though it was not expressly disclosed in the specification).

8

Here, the structure for performing the claimed function is a central processing unit (CPU) (a processor) that also utilizes memory and is connected to a GPS receiver module that provides geographical position information signals to the memory where such information is stored.  The specification explains a structure as including a CPU 602 with memory 608 that receives location signals from the GPS module.  (*See* Ex. 1 at 5:38-50.)  The series of time stamped waypoints are accessed from the memory 602 to determine the "athletic performance feedback data."  Fig. 6 shows the central processing unit, memory, and GPS:



Fig. 6

(Ex. 1 at Fig. 6.)

There is little doubt that "one skilled in the art" would "know and understand what structure corresponds to the means limitation."  *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007) (citations omitted).  Fitbit is incorrect in asserting that computer

programming steps are the only way that structure may properly be specified.  The specification and the claim itself describe how the CPU interacts with other components, demonstrating that it is not merely a "black box" that achieves a result but is an integrated structure of multiple components.  *Koninklijke Philips, N.V. v. Zoll Med. Corp.*, 2014 U.S. Dist. LEXIS 113735 at *23-24 (D. Mass. Aug 15, 2014) (J. Gorton); see also *Medtronic Minimed Inv. v. Animas Corp.*, 21 F.Supp.3d 1060, 1070-71 (C.D. Cal. 2014).  The the claims are not the sort of unbounded claims typically found invalid for lack of algorithmic support.  Rather, the specification provides that "the GPS receiver module 604 continuously determines the athlete's geographical position and stores it in the memory 608…" (Ex. 1, at 7:41-50.) and the claims require that athletic performance feedback data be determined "**from the series of time-stamped waypoints obtained by the GPS receiver**"—a meaningful limitation on the scope of the claim that one of ordinary skill in the art would understand as providing the framework by which to calculated athletic performance feedback data—no further algorithm is required.

Second, if an algorithm beyond what is described by claims themselves were required, a person of ordinary skill in the art would understand that the specification **does disclose** an algorithm for computing various forms of elapsed distance, current and average speed, and current and average pace from a series of GPS waypoints—that is the algorithm.   A person of ordinary skill would understand this as a sufficient algorithmic disclosure because all that is required is a basic high school understanding of geometry and trigonometry to implement the algorithm. *See Alfred E. Mann Found.*, 841 F.3d at 1345.  This understanding of math would be well within the wheelhouse of a person of ordinary skill in the art, as explained in the accompanying declaration of Dr. Thomas Martin, PhD.  (*See* Ex. 5 Martin Decl. ¶¶ 18-25.)

**b.     '007 Patent: "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" (Claim 7)**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| a processor (and equivalents thereof) that suspends said computing when a speed of the athlete is below a predetermined threshold and resumes said computing when a speed of the athlete is not below said predetermined threshold | Indefinite |

The dispute on this § 112 ¶ 6 term again boils down to whether additional algorithmic support in the specification is required to avoid indefiniteness (it is not), though Philips further believes that construction of the function would be helpful to the court and jury.  Philips's proposed construction is consistent with the disclosure of the specification, which describes how the invention may suspend or resume activities depending on the speed of an athlete:

> A smart algorithm based on measured parameters such as speed, pace, exercise type, heart rate, and so forth can be optionally used to automatically determine if the athlete has temporarily suspended exercising and temporarily pauses monitoring until exercise is resumed.

(Ex. 1 at 8:5-13.)    While the specification contemplates a "smart algorithm" making a determination based on multiple input parameters—claim 7 only claims a dumb one: "**suspending and resuming** operation of said means for computing **when a speed of the athlete falls below a predetermined threshold**."  Accordingly, it would be improper to construe the claim as requiring a "smart algorithm" as Fitbit suggests—solely for the purpose of then arguing indefiniteness—when the plain language of the claim is itself directed to a more simple implementation: suspending operations when speed drops below a threshold, and resuming them once the speed is not below said threshold.   The claim is not indefinite.

Philips further requests that the Court construe the term to avoid potential confusion by an eventual fact finder or disingenuous arguments by Fitbit.  The concern is that without a formal construction, Fitbit may argue that the claimed function requires **both** suspending **and** resuming operations when a speed of the athlete falls below a predetermined threshold (e.g. at the very same time).  That of course is not what the specification contemplates, and not what was intended by the claim language.  Accordingly, Philips's proposed construction should be adopted.

c.    '958 Patent: "in the event of an interruption of the wireless connection . . . configured to store"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary. | Claim 16: stores the health parameter or visual data in a memory or on the removable memory device in response to the event |
| | Claim 15: stores the health parameter from the health monitoring device in a memory or on a removable memory device in response to the event |

No construction is required as the term means exactly what it says: that the internet-enabled wireless web device ("WWD") is configured to store the health parameters in the event of an interruption of the wireless connection.  There is no requirement, as Fitbit suggests, that the storage of the health parameter be made "in response" to an event—those words never appear in the specification or prosecution history.  The claim speaks to what happens "in the event of an interruption" and that during such event, the device is "configured to store."  Fitbit's construction would exclude embodiments of the specification and should not be adopted.

Thus, the specification contemplates storing data in memory in the time period **after** an interruption of the wireless connection: "in the case of a dropout or other disruption of wireless service (step 218 of FIG. 11), the data may be stored on the memory device or in the WWD **if it**

**has not already been**, as may be the case for streamed data (step 216 of FIG. 11)." (Ex. 2 at 14:24-27.)  The point of the specification is that storage happens during the event of interruption (i.e., "in the event of an interruption")  Figure 11 further substantiates this as Step 216 explicitly contemplates that data is stored **during an interruption**. (*See* Fig. 11 and step 298.)

      **d.**    **'958 Patent: "memory"**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary. Alternatively: "any device capable of storing information, including temporary storage" | persistent data storage |

      The term "memory" should be given its plain and ordinary meaning.  Fitbit's proposed construction "persistent data storage" improperly adds the vague and unsupported requirement of "persistence" to the term that is neither found in the specification nor any reasonable reading of it. Fitbit's proposed construction also does more harm than good, as it not clear what constitutes "persistent" data storage versus "non-persistent" data storage.  Merriam-Webster defines "persistent" as "retained beyond the usual period," which begs the question: what is the usual period?  (*See* Ex. 7.)  Fitbit provides no guideposts in its construction, nor is it one supported by the specification—which contemplates any device capable of storing information as memory.

      To the extent that the Court determines a construction is necessary for this term, Philips proposes a construction consistent with the plain and ordinary meaning of the term, and which makes it clear that temporary storage of information is included.  Both technical and non-technical dictionaries include temporary storage in the definition of memory. (*See e.g.* Ex. 8, Cambridge Business English Dictionary (defining memory as "the part of a computer in which information or programs are stored either permanently or temporarily, or the amount of space available on it for storing information"); Ex. 9, Oxford Dictionary of Electronics & Electrical

Engineering (defining memory as "Any device or physical medium associated with a computer and used to store information for subsequent retrieval.").)

e.      '958 Patent: "internet-enabled wireless web device"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| a device designed to display interactive information through a connection to the Internet | No construction necessary. |

The specification demonstrates that an "internet-enabled wireless web device" ("WWD") is more than just a device capable of transmitting information to the Internet.  Rather, a WWD provides an **interactive** connection to the Internet, allowing the device to display information from the Internet to a user, and allowing the user to interact with the Internet.

The specification distinguished prior art systems that "currently lack[] employment of full back-end server functionality with which to provide a wide range of **interactive communication** with the patient.  Instead, such systems, if internet-enabled are often **limited to a mere one-way non-interactive data transfer** via a modem." (Ex. 2 at 2:27-32 (emphasis added).)  In contrast, "the present invention provides a method and system for assisting patients to manage a disease or maintain healthy lifestyle by collecting health-related data and providing information in response to those data by means of **a WWD designed to display interactive information** through a connection to the Internet." (Ex. 2, at 3:27-32 (emphasis added).)  Thus, the specification considers the ability to "display interactive information through a connection to the Internet" a defining characteristic of an internet enabled wireless web device.

This is further supported by the exemplary embodiments of a WWD found in the specification, all of which are examples of interactive internet-enabled devices, including a "web-enable mobile phone," a "palm, handheld or laptop computer, or a PDA, equipped with a

wireless modem," and a "hybrid device that combines the functions of a computer, PDA and telephone." (Ex. 2, at 3:43-51.)

Fitbit, however, has asserted that various prior art devices that do not display interactive information, but which rather simply engage in the one-way transmission of information as contemplated by the prior art that the patent distinguishes, meet this limitation of the claim. Accordingly, construction is necessary.

**f.      '958 Patent: "health parameter [or visual data] [indicative/corresponding to] of a disease state or condition of a patient"**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary. Alternatively: "the health parameter indicative of [or visual data corresponding to] a disease state or condition of a person under the care of a physician or a healthy individual interested in maintaining a healthy physiologic balance" | information used by health care professionals in medically diagnosing / treating a patient |

While no construction of this term is necessary, Philips proposes an alternative construction to Fitbit's that construes the term "patient" as explicitly defined in the '958 Patent: "The term 'patient' is used, **in addition to a person under the care of a physician, to also refer to a 'normal' or healthy individual interested in maintaining a healthy physiologic balance**." (Ex. 2 at 6:7-11 (emphasis added); *see also id.* at 3:27-29 ("the present invention provides a method and system for assisting patients to manage a disease or maintain healthy lifestyle . . . ."), 2:58-65, 3:6-26, and 5:62-66.)

In contrast, Fitbit proposes no construction of the word "patient," but instead tries to construe every other word in the phrase in a manner **inconsistent with** the specification's understanding of the word "patient."  In doing so, Fitbit hopes to limit the claims to medical

diagnosis or treatment in a misguided effort to eventually argue that, since its products are not

FDA approved, Fitbit cannot infringe.   Fitbit's proposed construction should be rejected.

   g.      '233 Patent: "governing information transmitted between the first personal
   device and the second device"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| controlling the transmission of information between the first personal device and the second device | No construction necessary. |

   Fitbit contends that no construction of this term is necessary, yet advances invalidity

contentions that would effectively render the term completely meaningless—equating the term

with features of the prior art Bluetooth protocol, which is itself discussed in the specification.

This is so despite the fact that the Examiner identified this limitation as the basis for **allowing** the

claim.  (Ex. 6, Notice of Allowance.)  Philips's proposed construction—as supported by the

specification and the accompanying declaration of Dr. Thomas Martin, Ph.D—reflects the fact

that the claim element provides an additional level of security for controlling the transmission of

information **beyond** what might be provided by any particular communications protocol used to

effectuate transmission (but which does not control the transmission).

   As noted throughout the specification and the accompanying declaration of Dr. Martin,

and perhaps not disputed by Fitbit, a key aspect of invention is security and access to sensitive

information.   To that end, the patent explains how it provides a system with "**multiple levels** of

prioritization, authentication of a person (task, step, process or order), and confirmation via

interrogation of person, device, or related monitor."  (Ex. 3 at Abstract; Ex. 5, Martin Decl. ¶

28.).

   The embodiment of Fig. 5, which is briefly described above, is particularly helpful to

understanding security in the context of the invention (*See* Section III(c), above.) Important in

this embodiment is the idea that "the ability of various entities spread around a network to receive and/or transmit to and control the personal device 100 requires some measure of security." (Ex. 3 at 13:27-30; Ex. 5, Martin Decl. ¶ 29.)  To that end, the patent describes how

> "Only authorized agents should be allowed access to the device 100.   For example, in the example shown in FIG. 5, only responding personnel RP (such as trained paramedics) who are on the scene of the event may be allowed to send a command to the personal device 100 causing the personal device 100 to dispense medication to the victim.  Certainly, **the bystander B should not be allowed this level of access**, even though the bystander B's personal wireless device 600 may be acting as an intermediary in communication from the personal device 100 to the dispatcher D."

(Ex. 3 at 13:30-41 (emphasis added).)

As Dr. Martin explains, "[t]his disclosure demonstrates that, beyond the communications protocols that might be utilized to implement a short-range wireless communication scheme between the first personal device of victim V and a second device of bystander B (or a second device of responding personnel RP once on site), an **additional level** of security is required that controls the transmission of information between the devices."  (Ex. 5, Martin Decl. ¶ 30.)  This additional level of security, one that specifically controls the transmission of information, is reflected in the disputed claim term, which specifically requires that information transmitted between the first personal device and the second device be **governed** in a fashion consistent with the description in the specification—*i.e.* that the transmission of information between the first personal device and the second device be **controlled** in some manner.  (*See* Ex. 5, ¶¶ 31-32.) While the specification may describe other forms of security that do not control the transmission of information (such as, for example, encryption), that is not what was intended by the language actually used in the claim.  (*See* Ex. 5, Martin Decl. ¶ 33.)

Indeed, that Philips's construction is what one of ordinary skill would understand is further supported by the plain and ordinary meaning of the term "govern" which means to

**control**.  (*See* Ex. 5, Martin Decl. ¶ 35; Ex. 10, Collins English Dictionary (defining "govern" as "to control or determine"); Ex. 7, Merriam-Webster Dictionary (defining "govern" as "to control, direct, or strongly influence the actions and conduct of").)   Philips's proposed construction should be adopted.

h.      **'233 Patent: "first personal device"**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary.<br>Alternatively: a device for private use by a person | personal medical device |

There is no basis on which to construct "first personal device" in the claim as a "personal medical device," an apparent attempt by Fitbit to again avoid infringement by arguing that its devices are not medical devices because they are not FDA approved.  The Court should decline the construction as it is inconsistent with the claim language itself and the specification.  While some embodiments of the specification specifically describe a "personal medical device 100" or "PMD 100," said device 100 is also described as simply a "personal device 100."  (*See* Ex. 3, at 8:50-67, 9:12-15, 9:49-12:49, 13:29-54, 14:9-19, 14:49-51.)

Accordingly, to the extent construction is required, the term should be construed consistent with how the specification uses the term "personal device" to describe a device associated with a person, rather than an institution. (*See* Ex. 3 at Abstract ("A personal and/or institutional health and wellness communication system….").  Philips proposed construction is therefore derived from the common dictionary definition of the word "personal." (*See* Ex. 7, Merriam-Webster Dictionary (defining "personal" as "of, relating to, or affecting a particular person **:** PRIVATE, INDIVIDUAL").)

i.      **'233 Patent: "wireless communication"**

18

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| an over-the-air communication (e.g. using radiofrequency (RF), infrared, or optical techniques). | No construction necessary. |

Despite offering no construction of the term in the Joint Claim Construction Chart (Dkt. 68-1), Fitbit has taken the unreasonably broad position that wireless communications are simply those "without wires."  Accordingly, Fitbit's invalidity contentions assert a prior art reference where the purported "wireless" communications occur over a "body local area network," where wires are replaced with the human body as a medium for conducting an electrical signal.  This understanding of what constitutes "wireless communication" is fundamentally at odds with the specification, which contemplates over-the-air wireless communication techniques, most prominently via "radio frequency (RF)" signals, but with mention of "infrared" and "optical" techniques as well.  (*See* Ex. 3 at 4:43-5:3.)  What is not contemplated is replacing wires with other conductors and simply calling that "wireless."

Fitbit's interpretation of the term as "without wires" is simply too broad and unreasonable.  Sending mail via the postal service is literally communication "without wires," but obviously should not be considered "wireless communication."  Here it is clear from the context of the invention, and the specific examples of wireless communication contained therein, that Philips's proposed construction should be adopted.

**j.     '377 Patent: "indicating a physiological status of a subject" (Claims 1, 12)**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction required. | indication of a subject's current physiological state |

Besides changing the part of speech (indicating vs. indication of) for no apparent reason, Fitbit's proposed construction merely replaces "a physiological status" with "current physiological state," which is of course not what the claim recites.  The further limiting adjective is not in the claim.  And, the improper addition of "current" finds no support in the specification or prosecution history, and is inconsistent with several embodiments, and begs the question: what counts as "current"?

The specification describes how physiological status can be monitored during a host of activities: "In general, in the health management embodiment, the system may be employed to monitor the physiologic status of a healthy subject while eating, exercising, or performing other activities." (Ex. 4, at 3:33-36.)  The claim at issue here is specifically focused on exercising, and, consistent with the specification, requires that "data indicating a physiological status of a subject is received at least partially while the subject is exercising." (Ex. 4 at Claim 1.)  Fitbit's proposed construction would seem to require that **all** of this data be received while exercising so that it is "current"—that would contradict the express language of the claim itself, which contemplates that only some of the data need be received during exercise.

## VI.    CONCLUSION

For the all the foregoing reasons, Philips requests that its proposals for each of the disputed claim terms, which are supported by the intrinsic record, relevant dictionary definitions, and the expert testimony of Dr. Martin, be adopted and that Fitbit's proposals be declined.

Dated:  June 5, 2020                              Respectfully Submitted,


                                                  /s/ *Eley O. Thompson*
                                                  Ruben J. Rodrigues (BBO 676,573)
                                                  Lucas I. Silva (BBO 673,935)
                                                  John W. Custer (BBO 705,258)
                                                  FOLEY & LARDNER LLP
                                                  111 Huntington Avenue
                                                  Boston, MA 02199
                                                  Phone: (617) 342-4000
                                                  Fax: (617) 342-4001
                                                  rrodrigues@foley.com
                                                  lsilva@foley.com
                                                  jcuster@foley.com


                                                  Eley O. Thompson (*pro hac vice*)
                                                  FOLEY & LARDNER LLP
                                                  321 N. Clark Street
                                                  Suite 2800
                                                  Chicago, IL 60654-5313
                                                  Phone: (312) 832-4359
                                                  Fax: (312) 832-4700
                                                  ethompson@foley.com


                                                  *Counsel for Philips North America LLC*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on June 5, 2020, a copy of the foregoing document was filed with the Court through the ECF system and that a copy will be electronically served on registered participants as identified on the Notice of Electronic Filing.


By:     /s/ Ruben J. Rodrigues