**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| PHILIPS NORTH AMERICA LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 1:19-cv-11586-IT |
| v. | ) | |
| | ) | |
| FITBIT, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**PLAINTIFF'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I.      INTRODUCTION ...........................................................................................................1

II.     PHILIPS'S POSITIONS ON CLAIM CONSTRUCTION SHOULD BE ADOPTED ......1

        A.      '007 Patent: "means for computing athletic performance feedback data from the
                series of time-stamped waypoints obtained by said GPS receiver"........................1

                i.      "Athletic performance feedback data" does not include calories burned..........1

                ii.     The claim does not require that all items that would constitute "athletic
                        performance feedback data" be computed to infringe .......................................3

                iii.    The term is not indefinite. ................................................................................4

        B.      '007 Patent: "means for suspending and resuming operation of said means for
                computing when a speed of the athlete falls below a predetermined threshold"
                (Claim 7) ................................................................................................................8

        C.      '958 Patent: "in the event of an interruption of the wireless connection . . .
                configured to store the health parameter [or visual data] … in a memory or on
                [a/the] removable memory device"..........................................................................9

        D.      '958 Patent: "memory" ..........................................................................................10

        E.      '958 Patent: "internet-enabled wireless web device" ...........................................11

        F.      '958 Patent: "health parameter [or visual data] [indicative/corresponding to] of a
                disease state or condition of a patient" .................................................................12

        G.      '233 Patent: "governing information transmitted between the first personal device
                and the second device"..........................................................................................13

        H.      '233 Patent: "first personal device" .....................................................................15

        I.      '233 Patent: "wireless communication"................................................................17

        J.      '377 Patent: "indicating a physiological status of a subject" (Claims 1, 12).........18

III.    CONCLUSION............................................................................................................19

# TABLE OF AUTHORITIES

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*,
  841 F.3d 1334, 1345 (Fed. Cir. 2016) ..................................................... 6

*Am. Calcar, Inc. v. Am. Honda Motor Co.*,
  651 F.3d 1318, 1329, 1339-40 (Fed. Cir. 2011) .................................... 9

*Asyst Tech., Inc. v. Empak, Inc.*,
  268 F.3d 1364, 1370 (Fed. Cir. 2001) .................................................. 7

*Chiuminatta Concrete Concepts, Inc v. Cardinal Indus., Inc.*,
  145 F.3d 1303, 1308-09 (Fed. Cir. 1998) ............................................ 7

*Ecolab USA Inc. v. Diversey, Inc.*,
  No. 12-CV-1984 (SRN/JJG), 2014 WL 258570 at *21 (D. Minn. January 23, 2014) ................ 13

*Finisair Corp. v. DirecTV Grp., Inc.*,
  523 F.3d 1323, 1340 (Fed. Cir. 2008) .................................................. 6

*Gemalto S.A. v. HTC Corp.*,
  No. 6:10-CV-561 LED-JDL, 2012 WL 2505745 at *23-24 (E.D. Tex. June 28, 2012) ........... 5

*In re Schreiber*,
  128 F.3d 1473, 1477 (Fed. Cir. 1997) ................................................ 16

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324, 1330 (Fed. Cir. 2005) .................................................. 4

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
  324 F.3d 1308, 1318-19 (Fed. Cir. 2003) ............................................ 4

*Signal IP v. Am. Honda Motor Co.*,
  No. LA CV14-02454 JAK (JEMx), 2015 WL 5768344 ...................................... 5

*Typemock, Ltd. v. Telerik, Inc.*,
  No. 17-10274-RGS, 2018 WL 4189692 at *8 (D. Mass. Aug. 31, 2018) ................... 5

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
  473 F.3d 1173, 1182 (Fed. Cir. 2006) ................................................ 13

## I.      INTRODUCTION

Plaintiff Philips North America, LLC ("Philips") submits its responsive claim construction brief.  As demonstrated below, Fitbit's opening claim construction brief (Dkt. 73) fails to demonstrate, by clear and convincing evidence, the indefiniteness of any asserted claims. Fitbit further fails to justify why any of its proposed constructions—which not only lack support in the specifications but often contradict them—should be adopted by this Court.  Philips's proposed constructions are grounded in the intrinsic record and the plain meaning of various terms to a person of ordinary skill in the art and should be adopted.

## II.     PHILIPS'S POSITIONS ON CLAIM CONSTRUCTION SHOULD BE ADOPTED

### A.      '007 Patent: "means for computing <u>athletic performance feedback data</u> from the series of time-stamped waypoints obtained by said GPS receiver"

As explained in Philips's opening claim construction brief, and confirmed in Fitbit's own brief, the structure and function for this claim element is largely undisputed.  What is disputed is the construction of "athletic performance feedback data" and whether the specification supports the recited function.  The claim construction dispute is summarized as follows:

| Philips's Proposal | Fitbit's Proposed Construction |
|---|---|
| Determining any of the following from a series of time-stamped waypoints obtained by said GPS receiver during an exercise session: elapsed distance of an athlete; current or average speed of an athlete; current or average pace of an athlete. | "athletic performance feedback data" means elapsed distance, current and average speeds and paces, calories burned, miles remaining and time remaining. |

#### i.      "Athletic performance <u>feedback</u> data" does not include calories burned

The dispute as to this term boils down to one primary issue:  whether the construction of "athletic performance feedback data" should include "calories burned."  Fitbit attempts to include "calories burned" in the construction of "athletic performance feedback data" in order to

buttress its indefiniteness argument because every other type of athletic performance feedback data simply utilize high school level math to determine some form of distance or speed from a series of time-stamped GPS waypoints, and comply with the requirements of Section 112, ¶¶2 and 6. (*See* Dkt. 73 at 7-10 and Dkt. 73-5, Martin Decl. ¶¶ 13-27.)

The written description of the specification only mentions calories twice.  Once in describing how prior art treadmills displayed a measure of calories burned (*see* Dkt. 73-1 at 1:22-24), and again in characterizing how a number of items can constitute "athletic performance data" but never referring to calories burned as "athletic performance feedback data" (*see* Dkt. 73-1 at 7:44-47).  Fitbit has failed to explain how or why "calories burned" should be included in the construction of "athletic performance feedback data" given such a limited and ambiguous disclosure, nor why or how one of ordinary skill in the art would have understood "athletic performance feedback data" as including calories burned.  They would not have.   To the contrary, and as explained in Philips's opening brief the specification unambiguously confirms that elapsed distance of an athlete, current or average speed of an athlete, or current or average pace of an athlete, all constitute athletic performance feedback data determined from a series of time-stamped GPS waypoints.  (*See* Dkt. 73-0 at 6-7.).

Philips's original proposed construction did not include "miles remaining" and "time remaining" because those measures are not necessarily determined from a "series of time-stamped waypoints obtained by said GPS receiver" (as required by the claim language itself). Philips would not dispute that determinations of "miles remaining" and "time remaining" for an athlete that actually did rely on a "series of time-stamped waypoints obtained by said GPS receiver" would constitute "athletic performance feedback data" in the claim, as those items

2

would be derivative of calculating elapsed distance and speed.[1]  Accordingly, Philips would not object to including "miles remaining" and "time remaining" to its proposed construction.

### ii.    The claim does not require that <u>all</u> items that would constitute "athletic performance feedback data" be computed to infringe

Philips's proposed construction is focused on identifying the set of items that, consistent with the specification, constitute "athletic performance feedback data."[2]  Philips has never suggested that **all** of the items, any one of which **could** constitute athletic performance feedback data, **must all** actually be determined in order to meet the limitations of the claim.  Indeed, what would have been the purpose of reciting a broader class ("athletic performance feedback data") if the interpretation was to require that every single type of "athletic performance feedback data" be provided in order to meet the limitation?  Yet, Fitbit's opening brief seems to argue—for the first time—that any construction of "athletic performance feedback data" would require that **all** types of athletic performance feedback data be determined and provided to a user in order to

---

[1] For example, if one were to calculate distance remaining from a single recent waypoint (as opposed to a series of them) as discussed in Philips's Opening Brief and the declaration of Dr. Thomas Martin, Ph.D. (*See* Dkt. 73 at 7 and Dkt. 73-5 at ¶ 26) that would not meet the claim limitation.  If, however, one were to determine miles remaining based on subtracting elapsed distance from a target number of miles, then that would indeed constitute athletic performance feedback data determined from a series of time stamped waypoints since the calculation of elapsed distance is itself determined from a series of time-stamped waypoints (as explained in Philips's Opening Brief (Dkt. 73 at 6-7) and the supporting declaration of Dr. Martin, (Dkt. 73-5 at ¶¶ 19-21)).

[2] Fitbit objects to Philips's proposal to construe the entirety of the disputed term as "a processor (and equivalents thereof) [structure] that determines any of the following from a series of time stamped waypoints obtained by said GPS receiver during an exercise session: elapsed distance of an athlete, current or average speed of an athlete, current or average pace of an athlete [function]."  Philips's proposal incorporates the structure and function consistent with the requirements of construing means-plus-function terms.   It is unclear why Fitbit insists that any proposed construction adopted by the court separately identify "Function" and "Structure" on separate lines instead of a simple sentence that can then be easily understood by a future jury, expert, or anyone else who may need to rely on the construction.  This is not a "new construct for the MPF" claims, it is the mere application of the English language.  However, Philips defers to the Court's preference on how to present means plus function claims in its ruling.

infringe.  (*See* Dkt. 72 at 3 (alleging that Philips is attempting to "broaden the scope of the claims by including less required claim elements in them").)

There is no basis for Fitbit's argument.  Indeed, it appears to solely be based on Fitbit's misrepresentation of Philips's actual proposed construction as simply an interpretation of "athletic performance feedback data" as reciting a list of items joined with an "and." (*See* Dkt. 72 at 2.)  Philips has never framed the issue in that manner.  To the contrary, Philips's proposal (as recited above) has repeatedly stressed that **<u>any one</u>** of the types of data that qualify as "athletic performance feedback data" would meet the limitation of the claim. (*See* Dkt. 73 at 5 and Dkt. 68-1 at 1.)

      iii.      **The term is not indefinite.**

      a)      **Indefiniteness does not render claim construction moot.**

As an initial matter, Fitbit is wrong in arguing that indefiniteness renders the claim construction moot.  (*See* Dkt. 72 at 2, n. 1.)  Fitbit solely argues that the claim is indefinite because the specification lacks algorithmic structure for the recited function.  The parties dispute the proper construction of that function (e.g. "athletic performance feedback data" as discussed above).  Federal Circuit precedent is manifest that, prior to evaluating the structural support for a means-plus-function term **<u>first</u>** the function must be determined.  *See JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1330 (Fed. Cir. 2005) ("Determining a claimed function and identifying structure corresponding to that function involve distinct, albeit related, steps that must occur in a particular order. In short, function must be determined before corresponding structure can be identified."); *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318-19 (Fed. Cir. 2003) ("After identifying the function of the means-plus-function limitation and construing the meaning of the claim language, we look next to the written description to identify the structure corresponding to the function."))

**b)      No algorithm beyond the claims themselves is required.**

As explained in Philips's opening brief, no algorithm beyond what is already recited in the claim is required. (*See* Dkt. 73 at 7-10.)

First, Fitbit completely ignores the fact that <u>**the claims themselves recite the requisite algorithm**</u>.  The claims don't simply say "means for calculating athletic performance feedback data" in the abstract as Fitbit appears to assume.   Rather, they require that athletic performance feedback data be calculated from a series of time-stamped waypoints obtained from a GPS receiver. (*See* Dkt. 73-1 at Claim 1.)  Where, as here, a means-plus-function term recites its own underlying structure, no further analysis into support in the specification is necessary.  *See Typemock, Ltd. v. Telerik, Inc.*, No. 17-10274-RGS, 2018 WL 4189692 at *8 (D. Mass. Aug. 31, 2018) ("Because the claim language discloses the algorithm to perform the stated function, the court finds that the [disputed] terms are not subject to analysis under 35 U.S.C. § 112, para. 6, and are therefore not indefinite."); *Gemalto S.A. v. HTC Corp.*, No. 6:10-CV-561 LED-JDL, 2012 WL 2505745 at *23-24 (E.D. Tex. June 28, 2012) (finding that because the claims "include all the necessary algorithmic steps to perform the 'means for translating' function," "the claim term cannot fall under § 112 ¶ 6");  *Signal IP v. Am. Honda Motor Co.*, No. LA CV14-02454 JAK (JEMx), 2015 WL 5768344 at *40 (C.D. Cal. Apr. 17, 2015) (finding that though unusual, the algorithm required under § 112 ¶ 6 "is disclosed in the claim itself").

Second, the specific structure recited in the specification (a processor in communication with a GPS receiver and a memory) is more specific than a general purpose computer and also suffices to provide the requisite structure for determining athletic performance feedback data from a series of time-stamped GPS waypoints obtained from said GPS receiver.  (*See* Dkt. 73 at 9-10.)

c)      **To the extent an algorithm is required, a person of ordinary skill would understand the specification as disclosing one.**

In an effort analogize this dispute to cases that Fitbit would like to rely on, Fitbit alleges that during the meet and confer "Philips stated that one skilled in the art would know how to use the processor to perform the claimed function."  (Dkt. 72 at 5.)  That has never been Philips's contention and Fitbit's use of a full page in its brief to describe cases where such an argument failed is a red herring. (*See* Dkt. 72 at 5.)

Rather, as explained in Philips's opening brief, a person of ordinary skill in the art would understand that an **<u>algorithm is disclosed</u>** in the specification—namely, calculating athletic performance feedback data (elapsed distance, average or current speed, or current or average pace) from a series of GPS waypoints obtained from a GPS receiver.  (*See* Dkt. 73 at 7-10 (explaining the applicable legal standards, and how well-known and basic formulas—even when forming part of algorithm—need not be expressly disclosed if a person or ordinary skill in the art would understand them from the disclosure).)  This is consistent with the Federal Circuit's instruction that a specification need only "disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112 ¶ 6," and that the algorithm can be expressed "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Finisair Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citation omitted).

Here, the formulas for calculating distance, speed, and pace from a series of points—all of which involves high school level math—are not expressly disclosed in the specification, but are aspects of the algorithm that a POSITA would nevertheless be well aware of.  *See Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*, 841 F.3d 1334, 1345 (Fed. Cir. 2016) (finding

sufficient disclosure of an algorithm for calculating impedance since a person of ordinary skill would know to apply Ohm's law, even though it was not expressly disclosed in the specification).

> **d)      Corresponding structure must be tied to the claimed function.**

During the deposition of Dr. Martin, Philips's expert, counsel for Fitbit hypothesized on various schemes for correcting GPS signals that are not claimed in the '007 Patent.  Presumably Fitbit intends to now argue that the claims are indefinite because the specification fails to disclose algorithms for correcting errors in GPS signals (and perhaps other items as well). However, it would be error to require structural elements (such as an algorithm for error correction) that do not correspond to what the parties agree is the recited function.  *See Chiuminatta Concrete Concepts, Inc v. Cardinal Indus., Inc.,* 145 F.3d 1303, 1308-09 (Fed. Cir. 1998) (reversing district court for identifying structure that did not correspond to the recited function); *Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) (limiting the structure to be included in claim construction because "[s]tructural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations.")  Accordingly, algorithms for correcting errors in GPS signals are not required because the claims are not directed to a "means for GPS error correction"—rather, the agreed function is simply "computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver."  Any discussion in the specification about GPS error correction therefore cannot correspond to the function that is actually claimed. Were Fitbit's argument adopted then every ancillary function to the actually claimed function could be read into the claim, which would be improper.

**B.**     **'007 Patent: "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" (Claim 7)**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| a processor (and equivalents thereof) that suspends said computing when a speed of the athlete is below a predetermined threshold and resumes said computing when a speed of the athlete is not below said predetermined threshold | Indefinite |

The specification describes how the invention may suspend or resume activities depending on the speed of an athlete. (*See* Dkt. 73-1 at 8:5-13.)  That is what the agreed function covers, and Fitbit does not dispute this.  The only conceivable structure in the specification for accomplishing that function is a processor, yet Fitbit argues that because the specification does not literally use the words "a processor for suspending and resuming operation…" the processor is not "clearly linked" to the claimed function.  That cannot be.  A person of ordinary skill would plainly recognize that the processor would be responsible for the actions of suspending and resuming operation as recited in both the specification and the claims; and as explained in Philips's opening brief (and not actually dispute by Fitbit) no algorithm is necessary.[3]

Fitbit also argues that the specification does not use the term "predetermined threshold." However the specification explains how the invention may "determine if the athlete has temporarily suspended exercising and temporarily pauses monitoring until exercise is resumed" based on a variety of parameters.  These include speed, pace, and heart rate—all of which would at a minimum necessarily implicate a threshold of some sort, which a person of ordinary skill in the art would appreciate.

---

[3] Fitbit had previously argued that this term was indefinite for lack of algorithmic support. Perhaps after realizing that no additional algorithm is required to support turning something on or off based on a threshold, Fitbit has changed its argument.

**C.**   **'958 Patent: "in the event of an interruption of the wireless connection . . . configured to store the health parameter [or visual data] … in a memory or on [a/the] removable memory device"**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary. | Claim 16: stores the health parameter or visual data in a memory or on the removable memory device in response to the event |
| | Claim 15: stores the health parameter from the health monitoring device in a memory or on a removable memory device in response to the event |

The crux of the dispute on this term is Fitbit's improper attempt to replace "in the event of" in the claim language with "in response to."  Philips does not intend to argue that "configured to" means merely "capable of".  Philips however does disagree that there must be a "cause and effect" relationship as Fitbit contends.  As explained in Philips's opening claim construction brief, the specification simply describes storing data in a memory in a time period **after** an interruption of the wireless connection, whether or not that occurs **specifically because** of the interruption (e.g. "in response to") or because the device **was already configured** to store said data after the interruption.  (*See* Dkt. 73 at 12-13; Dkt. 73-2 at 14:24-27 and Fig. 11, including step 218.)  To adopt Fitbit's construction would be to improperly exclude the embodiments configured to store data "in the event of an interruption" where said configuration occurred **before** an interruption, but data nonetheless was stored **afterwards**.

Fitbit's reliance on *Am. Calcar, Inc. v. Am. Honda Motor Co.*, 651 F.3d 1318, 1329, 1339-40 (Fed. Cir. 2011) is inapposite. (*See* Dkt. 72 at 9.) There, the court was construing a term that recited "in response to" as (uncontroversially) requiring "in response to."

### D.    '958 Patent: "memory"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary.<br><br>Alternatively: "any device capable of storing information, including temporary storage" | persistent data storage |

Fitbit admits that its goal is to exclude any form of temporary storage from what would otherwise be the plain and ordinary meaning of "memory" by requiring that the memory be "persistent". (*See* Dkt. 72 at 10-11.)  Fitbit takes issue with Philips's use of the word "temporary" in its alternative proposed construction—but fails to explain what exactly it means by "persistent data storage."  Indeed, it identifies "cards, sticks, and drives" as exemplary "persistent" data storage devices—but never explains **why** that is so.  Any of those devices could be used in a temporary rather than persistent fashion.  That storage may be temporary is reinforced by the specification's discussion of how wireless web devices tend to have **limited** memory—they would not be suitable as the location for permanent storage or archiving of health information.  (Dkt. 73-2 at 4:16-24, 8:42-45, 12:47-49.)  This is not inconsistent with the fact that an overall goal of the invention is the "preservation and storage of health information" as Fitbit points out.  (*See* Dkt. 72 at 11.)  By temporarily storing health data on a wireless web device one can then archive that data to a more permanent storage solution when a connection to the internet resumes.  Indeed, even Fitbit acknowledges such an embodiment in its brief. (*See* Dkt. 72 at 10 (quoting the following embodiment from the specification: "as the data has been stored on the memory device and may be wirelessly transmitted at a later time when cellular or mobile service is again available. . .").)  There is no basis for Fitbit's construction.

E.      '958 Patent: "internet-enabled wireless web device"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| a device designed to display interactive information through a connection to the Internet | No construction necessary. |

As explained in Philips's opening brief, the specification overwhelming demonstrates that "internet-enabled wireless web devices" are those that are designed to display interactive information through a connection to the Internet and not simply "dumb" devices that might send a signal over the internet (e.g a sensor, as Fitbit contends).  (*See* Dkt. 73 at 14-15.)  That, as Fitbit points out, related patents have focused on the interactive nature of an internet-enabled wireless web device only bolsters this conclusion. (*See* Dkt. 72 at 11.)   Fitbit points out that the specification's exemplary "WWDs" are all off-the shelf wireless devices—but fails to point out that they are also all ***interactive*** devices (e.g. phone, PDA, or laptop computer). (*See* Dkt. 72 at 12 and Dkt 73-2  at 3:40-50.)

Fitbit's reliance on an office action response in related Patent Application No. 13/632,771 is misplaced. (*See* Dkt. 72 at 12.)  The cited amendment did not actually modify what constituted a "web-enabled wireless mobile device" in the claim.   Rather, the amendment focused on specific aspects of "an interactive application program for measurement an [*sic.*] exercise parameter and an interactive user interface."   (*See* Dkt. 72-1 at 2.) That these claims were amended to claim a specific application with specific interactive user interface features has no bearing on what one of ordinary skill would nonetheless understand the scope of "internet enabled wireless-web device" to be in view of the specification.

**F.      '958 Patent: "health parameter [or visual data] [indicative/corresponding to] of a disease state or condition of a patient"**

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary.<br>Alternatively: "the health parameter indicative of [or visual data corresponding to] a disease state or condition of a person under the care of a physician or a healthy individual interested in maintaining a healthy physiologic balance" | information used by health care professionals in medically diagnosing / treating a patient |

Fitbit's entire argument for this term is based on a false dichotomy between exemplary embodiments for "disease management" and "health management" as described in the specification.  That the specification refers to these as "complementary" does not mean that they are mutually exclusive as Fitbit appears to assume.  The invention is directed to both, and the plain meaning of the claim language covers both—especially when one considers that the specification itself described how "[t]he term 'patient' is used, in addition to a person under the care of a physician, to also refer to a 'normal' or healthy individual interested in maintaining a healthy physiologic balance."  (Dkt. 73-2 at 6:7-11.)

Were there any doubt, the specification explains how "[e]mbodiments of the invention provide a method and apparatus for a wireless health monitoring system for interactively **monitoring a disease or health condition of a patient**," e.g. both the "disease management" and "health management" embodiments.  (Dkt. 73-2 at Abstract.)  The term "health parameter" is also specifically use to describe information obtained in the "health management" embodiments that Fitbit seeks to exclude from the claims.  (*See* Dkt. 73-2 at 2:58-65.) Indeed, the preamble of claim 16 actually recites "[a] internet-enabled wireless web device for **monitoring health**," which completely contradicts Fitbit's assertion that the claim must be limited to disease management as oppose to, more broadly, health monitoring.

Fitbit's reliance on an office action in related application No. 12/692,080 is misplaced. First, the related application is a continuation-in-part application of the '958 patent and neither shares the same specification as the '958 patent nor the same disputed claim language. *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006) ("But the doctrine of prosecution disclaimer generally does not apply when the claim term in the descendant patent uses different language."). The claims at issue in the cited office action are focused on the claim language "exercise parameters"—a term that does not even appear in the specification of the '958 patent. Accordingly, the office action has no bearing on the claim construction issue before the court and certainly does not rise to the level of a disclaimer that should bind the meaning of different claim language here. *See, e.g., Ecolab USA Inc. v. Diversey, Inc.*, No. 12-CV-1984 (SRN/JJG), 2014 WL 258570 at *21 (D. Minn. January 23, 2014) (statements made in subsequent prosecution were "not a reliable indicator of the proper scope of the Patents-in-Suit" as those statements may have been relevant but not binding when different claim language was at issue ("cleanliness" vs. "cleanliness result")).

### G.  '233 Patent: "governing information transmitted between the first personal device and the second device"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| controlling the transmission of information between the first personal device and the second device | No construction necessary. |

As explained in Philips's opening brief, Philips's proposed construction reflects what it means to govern (i.e. control) the transmission of information between a first device and second device. (*See* Dkt. 73 at 16-18.) Fitbit's only apparent issue with Philips's proposed construction is the fact that it would not cover encryption alone. Encryption alone, however, does not exert the sort of control contemplated by the claim and specification. Encryption does not control

13

what is transmitted or whether it is transmitted—encryption simply obfuscates it during transmission.  As Dr. Martin explained, encryption "achieve[s] the goal of not allowing someone to eavesdrop on the data." (*See* Ex. 11, Martin Dep. at 126:13-14.)

Yet, Fitbit argues that the proposed construction **does** cover encryption in an apparent effort to invalidate the claims by merely relying on the Bluetooth protocol and other references that might discuss encryption.[4]  That argument itself demonstrates why "governing information transmitted between the first personal device and the second device" cannot merely be satisfied via encryption.  The Bluetooth protocol is repeatedly mentioned throughout the specification (*See* Dkt. 73-3 at 4:46-5:15, 5:28, 5:41, 5:51, 5:59, 8:45-49, 9:10-20, 9:41, 9:53-56, 11:29, 11:63-67, 14:21-26) and more than 15 Bluetooth prior art references were of record during prosecution. (*See* Dkt. 73-2 at 2-3.)  The applicants and the examiner clearly did not interpret "governing information transmitted between the first personal device and the second device" as merely directed to encryption and neither should this Court. To resolve the dispute once and for all, the Court should consider adopting a construction that further explains that encryption alone does not "govern" or "control" the transmission of information between a first personal device and a second device.

In its responsive brief, Fitbit will likely cite some deposition testimony by Dr. Thomas Martin where, after a confusing line of questioning, Dr. Martin suggested that use of encryption alone would satisfy the claim element "governing information transmitted between the first personal device and the second device."   It appears that Dr. Martin may have been misled to believe that he was answering a question with respect to a hypothetical security mechanism, without having noticed

---

[4] Fitbit has argued in the past that Bluetooth alone would invalidate the claims, and has included Bluetooth as prior art to be considered in its invalidity contentions.

that the questioning had shifted back specifically to the requirement that the claimed security mechanism "govern" information transmitted. (*See* Ex. 11 at 130:1-133:4.) Counsel for Philips accordingly objected to the question given the confusion, and Dr. Martin provided an answer as he had understood the question. During redirect by Philips's counsel (and without ever having consulted with Dr. Martin during the deposition as confirmed at the deposition itself), Dr. Martin clarified—consistent with his original declaration—that use of encryption alone—in the context of the **entire claim**—would not satisfy "governing information transmitted between the first personal device and the second device," as demonstrated in the below excerpt of his testimony:

> Q.      And I guess my question is: Could you explain that?
>
> A.      And sorry if I wasn't clear, but I thought I said this in response to Mr. Peterman's question. The encryption would keep people from being able to sniff that data that was being transmitted, but encryption by itself wouldn't be able to authenticate that somebody – as the example in Figure 5 of the bystander, encryption by itself wouldn't be able to control the action that they were – the dispensing of the medication that was given in the example.
>
> Q.      Got it.
>
> A.      So encryption by itself wouldn't provide the authentication to do that.
>
> Q.      And so encryption by itself wouldn't meet Element (c) of Claim 1; is that correct?
>
> A.      In that case, no.

(Ex. 11, Martin Dep. at 165:1-18.)

## H.      '233 Patent: "first personal device"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
|---|---|
| No construction necessary.<br><br>Alternatively: a device for private use by a person | personal medical device |

The crux of this dispute is Fitbit's attempt to avoid infringement by arguing that its products are not "personal medical devices" because they are not FDA approved.  Assuming, *arguendo*, that Fitbit's construction were adopted there is no basis for such a non-infringement argument.  The specification is silent as to whether a "personal medical device" requires FDA approval, and any attempt to limit these apparatus claims to "medical" applications is tantamount to a non-limiting intended use.  *See In re Schreiber*, 128 F.3d 1473, 1477 (Fed. Cir. 1997) (explaining how claim language directed to intended use in an apparatus claim should be given no weight).  To the contrary, and consistent with the specification, a "personal medical device" would include any personal device that collects body or physiological parameters (Dkt. 73-3 at 3:27-33 (describing how PMD would collect information from detectors of body or physiological parameters).)

That said, Fitbit is wrong that the specification exclusively refers to personal device 100 as a "personal medical device."  To the contrary, and as explained in Philips's opening brief, device 100 in the specification is repeatedly also simply referred to as "personal device 100." (*See* Dkt. 73 at 18.)

Philips amended complaint never "admitted" that the term "first personal device" means a "personal medical device" as Fitbit argues.  At most, Philips stressed that the invention provided an improvement over prior art personal medical device communication systems—which is true—regardless of how "first personal device" is construed.  Philips is further not pursuing "one interpretation for validity and another for infringement"—indeed, Philips does not believe any construction is necessary, it is simply responding to Fitbit's proposals.

16

I.     '233 Patent: "wireless communication"

| Philips's Proposed Construction | Fitbit's Proposed Construction |
| --- | --- |
| an over-the-air communication (e.g. using radiofrequency (RF), infrared, or optical techniques). | No construction necessary. |

The dispute here really focuses on whether or not a communication can be "wireless" if it uses human flesh as a conductor for an electrical signal.  Fitbit argues that "wireless" simply means "without wires" and that prior art that simply replaces a "wire" with some other conductor (such as the human body) constitutes "wireless communication."  That can't be.  Philips's proposed construction is designed to reflect that the different forms of "wireless communication" contemplated by the specification, all of which are over-the-air techniques, but Phillips would also agree to any construction that generally reflects that "wireless communication" means a communication that does not transmit an electrical signal over a conductor.

Fitbit's argument that the specification describes communications "through human tissue" is too clever by half.   (*See* Dkt. 72 at 18-19.)  While the specification does describe implantable devices, consistent with Philips's proposed construction, these implantable devices would communicate via radio frequency (RF) techniques.  (*See* Dkt. 73-3 at 4:43-5:3.)  What is not contemplated is replacing wires with other conductors that are not literally wires and calling that "wireless." The specification **never** contemplates communicating with an implantable device using the human body as a conductor for an electrical signal, and surely does not refer to such a hypothetical assembly as "wireless."

That Fitbit identifies other patents and publications that contemplate using the human body as a transmission medium only served to prove the point—had the inventors of the patent intended to cover situations where the human body was to be used as a conductor for an

electrical signal they would have said so.  Instead, they focused on radio frequency communications and other techniques that do not involve conductors.

J.     '377 Patent: "indicating a physiological status of a subject" (Claims 1, 12)

| Philips's Proposed Construction | Fitbit's Proposed Construction |
| --- | --- |
| No construction required. | indication of a subject's current physiological state |

Fitbit admits that its goal is to avoid infringement by limiting the claim—in absolute terms—to a subject's "current" physiological state.  Yet, that is not what the plain meaning of the claim language requires.  Rather, and as explained in Philips's opening brief, the claim merely requires that "data indicating a physiological status of a subject is received at least partially while the subject is exercising."  (Dkt. 73-4 at Claim 1.)  The claim language does not **<u>exclude</u>** use of historical information, it simply requires that it be partially received during exercise.  There remains no basis to rewrite the claim as Fitbit proposes.

Fitbit's proposed construction also introduces some practical issues.  All systems have some form of latency and it is a practical impossibility that information will instantly be received at the device in **<u>absolute</u>** real time.  Indeed, Fitbit's non-infringement argument appears to rest on this distinction since its products do receive heart rate information as a user is exercising, yet Fitbit now argues that this constitutes "historical information."  (*See* Dkt. 72 at 19.)

Fitbit's reliance on the prosecution history also simply supports the fact that the claim requires that "data indicating a physiological status of a subject is received at least partially while the subject is exercising."  Nowhere does the prosecution history cited by Fitbit support the notion that the term should additionally solely be limited to a "current" physiological state.

**III.     CONCLUSION**

For the all the foregoing reasons, Philips requests that its proposals for each of the disputed claim terms, which are supported by the intrinsic record, relevant dictionary definitions, and the expert testimony of Dr. Martin, be adopted and that Fitbit's proposals be declined.

Dated:  July 8, 2020                                    Respectfully Submitted,


                                                        /s/ *Ruben J. Rodrigues*
                                                        Ruben J. Rodrigues (BBO 676,573)
                                                        Lucas I. Silva (BBO 673,935)
                                                        John W. Custer (BBO 705,258)
                                                        FOLEY & LARDNER LLP
                                                        111 Huntington Avenue
                                                        Boston, MA 02199
                                                        Phone: (617) 342-4000
                                                        Fax: (617) 342-4001
                                                        rrodrigues@foley.com
                                                        lsilva@foley.com
                                                        jcuster@foley.com


                                                        Eley O. Thompson (*pro hac vice*)
                                                        FOLEY & LARDNER LLP
                                                        321 N. Clark Street
                                                        Suite 2800
                                                        Chicago, IL 60654-5313
                                                        Phone: (312) 832-4359
                                                        Fax: (312) 832-4700
                                                        ethompson@foley.com


                                                        *Counsel for Philips North America LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on July 8, 2020, a copy of the foregoing document was filed with the Court through the ECF system and that a copy will be electronically served on registered participants as identified on the Notice of Electronic Filing.


By:      /s/ Ruben J. Rodrigues