UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

PHILIPS NORTH AMERICA LLC,

               Plaintiff,

     v.

FITBIT, INC.,

               Defendant.

Civil Action No. 1:19-cv-11586-IT

## **FITBIT'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

**Page**

I.     U.S. PATENT NO. 6,013,007 ..................................................................................1

    A.     "means for computing athletic performance feedback data from the series
of time-stamped waypoints obtained by said GPS receiver" (Claims 1, 21) .........1

        1.     Philips' admissions compel a finding of indefiniteness ...........................1

        2.     Philips' case law citations actually support a finding of
indefiniteness ..........................................................................................5

        3.      Philips' other arguments against indefiniteness fail................................7

        4.     Philips misrepresents Fitbit's proposed construction and the
parties' disputes........................................................................................8

        5.     Construction of "athletic performance feedback data"............................9

    B.     "means for suspending and resuming operation of said means for
computing when a speed of the athlete falls below a predetermined
threshold" (Claim 7).............................................................................................11

II.    U.S. PATENT NO. 6,976,958 ................................................................................13

    A.     "in the event of an interruption of the wireless connection . . . configured
to store the health parameter or visual data in a memory or on the
removable memory device" (Claims 15, 16)........................................................13

    B.      "memory" (Claims 15, 16) ..................................................................................14

    C.     "internet-enabled wireless web device" (Claims 15, 16) ....................................15

    D.     "health parameter indicative of a disease state or condition of a patient"
(Claim 15) and "health parameter or visual data corresponding to a
patient's disease state or condition" (Claim 16) ..................................................16

III.   U.S. PATENT NO. 7,088,233 ................................................................................16

    A.     "governing information transmitted between the first personal device and
the second device" (Claim 1)................................................................................16

    B.      "first personal device" (Claim 1) ........................................................................18

    C.     "wireless communication" (Claim 1)...................................................................19

IV.    U.S. PATENT NO. 8,277,377 ................................................................................20

    A.     "indicating a physiologic status of a subject" (Claim 1)......................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009)..........................................................................15

*Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.*
841 F.3d 1334 (Fed. Cir. 2016)........................................................................6, 7

*Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008)........................................................................1, 8

*Augme Techs., Inc. v. Yahoo! Inc.*,
755 F. 3d 1326 (Fed. Cir. 2014)............................................................................8

*B. Braun Med., Inc. v. Abbott Labs.*,
124 F.3d 1419 (Fed. Cir. 1997)......................................................................4, 12

*Biomedino, LLC v. Waters Techs. Corp.*,
490 F.3d 946 (Fed. Cir. 2007).........................................................................5, 6

*BlackBoard, Inc. v. Desire2Learn, Inc.*,
574 F.3d 1371 (Fed. Cir. 2009)............................................................................3

*Default Proof Credit Card System, Inc. v. Home Depot USA, Inc.*,
412 F.3d 1291 (Fed. Cir. 2005)............................................................................3

*EON Corp. IP Holdings LLC v. AT&T Mobility LLC*,
785 F.3d 616 (Fed. Cir. 2015).....................................................................3, 4, 12

*Finisar Corp. v. DirecTV Grp., Inc.*,
523 F.3d 1323 (Fed. Cir. 2008).........................................................................5, 6

*Function Media, LLC v. Google, Inc.*,
708 F.3d 1310 (Fed. Cir. 2013).........................................................................3, 8

*GPNE Corp. v. Apple, Inc.*,
830 F.3d 1365 (Fed. Cir. 2016).......................................................................14, 19

*Harris Corp. v. Ericsson Inc.*,
417 F.3d 1241 (Fed. Cir. 2005)............................................................................2

*Merck & Co. v. Teva Pharms. USA, Inc.*,
395 F.3d 1364 .......................................................................................................13

*Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*,

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

868 F.3d 1013 (Fed. Cir. 2017) ............................................................................. 13

*Oatey Co. v. IPS Corp.,*
514 F.3d 1271 (Fed. Cir. 2008) ................................................................. 16, 18, 20

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... 18, 20

*S3 Inc. v. NVIDIA Corp.,*
259 F.3d 1364 (Fed. Cir. 2001) ............................................................................. 5

*SkinMedica, Inc. v. Histogen Inc.,*
727 F.3d 1187 (Fed. Cir. 2013) ........................................................................... 16

*Ventana Med. Sys. v. BioGenex Labs., Inc.,*
473 F.3d 1173 (Fed. Cir. 2006) ........................................................................... 15

*Williamson v. Citrix Online, LLC,*
792 F.3d 1339 (Fed. Cir. 2015) ........................................................... 1, 2, 9, 12

*WMS Gaming, Inc. v. Int'l Game Tech.,*
184 F.3d 1339 (Fed. Cir. 1999) ....................................................................... 7, 8

## Statutes

35 U.S.C. § 112 ...................................................................................................... 7

Fitbit's claim constructions are supported by Federal Circuit law and intrinsic record. Philips' constructions rely on expert testimony to rewrite claim language, skirt statutory disclosure requirements, and contradict file history admissions. The case law is decidedly on Fitbit's side; even Philips' legal authorities support Fitbit's positions.

I.      **U.S. PATENT NO. 6,013,007**

A.      **"means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" (Claims 1, 21)**

1.      **Philips' admissions compel a finding of indefiniteness**

The law of indefiniteness pertaining to a computer-implemented function of a means-plus-function ("MPF") is straightforward. Such claim terms are indefinite if the patent specification fails to disclose a linked algorithm, as is the case here. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1351-52 (Fed. Cir. 2015); D.I. 72 at 2-5; D.I. 44 at 9-15.[1] As detailed in subsection I.A.2 below, Philips' opening brief grossly misstates the relevant law. Indeed, the cases Philips relies on recognize the MPF disclosure requirements and support indefiniteness here.[2]

In an attempt to supply the missing algorithm, Philips supplements the '007 patent disclosure with testimony from its expert, Dr. Martin. This strategy is inappropriate because the content of the specification controls. *See Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253

---

[1] The '007 patent's failure to disclose the necessary algorithm is not surprising given that it was filed in 1998 and issued in 2000. It was not until years later that the Federal Circuit provided guidance that "[t]he corresponding structure for a § 112, ¶ 6 claim for a computer-implemented function is the algorithm disclosed in the specification." *Aristocrat Techs. Australia Pty. Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

[2] Philips argued in the parties' joint status report that indefiniteness should be addressed during claim construction (D.I. 60 at 2-3, 7-9). Now Philips takes the inconsistent position that the Court should delay addressing indefiniteness until after claim construction (D.I. 73 at 8). Indefiniteness for failure to disclose an algorithm is commonly determined in the context of claim construction. *E.g.*, *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1345-46, 1351-55 (*en banc*) (affirming finding of indefiniteness in claim construction order).

(Fed. Cir. 2005) ("A computer-implemented means-plus-function term is limited to the corresponding structure <u>disclosed in the specification</u> . . .") (emphasis added). And "[t]he testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification." *Williamson*, 792 F.3d at 1354. Moreover, Dr. Martin confirmed that there was no algorithm for performing the claimed function in the specification – only that a skilled artisan would know what to do because the algorithms were so simple and obvious. Dr. Martin's declaration offers pages of formulas and assumptions for computing athletic performance feedback data. (D.I. 73-5 at ¶¶ 18-26). However, none of these formulas or any other formula for computing athletic performance feedback data are disclosed in the '007 patent specification or included in Philips' proposed construction.[3] *See* Martin Tr. 41:9-45:23[4] (no disclosure of algorithm for calculating distance), 45:25-46:21 (no disclosure of algorithm for calculating/finding average or current speed), 69:14-72:25 (no disclosure of algorithm for claimed "computing athletic performance feedback data . . ."), 75:3-76:11 (no "smart algorithm" disclosed and "implementation details are not provided").

In fact, Dr. Martin admitted during deposition that he "wasn't trying to show that there was an algorithm" in the specification for the claimed "computing athletic performance feedback data . . ." *Id.*, 41:14-17. Rather, the opinions in his declaration were meant to show that the claimed algorithm would have been "relatively simple and would have been obvious to somebody who was skilled in the art" or would have been known to a POSITA. *Id.*, 40:16-43:8.

Even if the simplicity and obviousness of the algorithm were true, it is irrelevant under

---

[3] The '007 patent criticizes the prior art because "[t]hey do not include real-time athletic performance algorithms…" '007 patent, 1:47-48. Yet Philips and Dr. Martin admit the specification of the '007 patent also does not include such algorithms, and that a person of skill in the art would need to look outside the specification for the algorithms.
[4] The Martin Depo excerpts are attached to the Peterman Declaration as Ex. A

MPF law as even simple algorithms for performing a claimed function must be expressly disclosed in the specification. *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623-624 (Fed. Cir. 2015) ("[w]here the specification discloses no algorithm, the skilled artisan's knowledge is irrelevant"). Importantly, "[a] patentee cannot avoid providing specificity as to structure simply because someone of ordinary skill in the art would be able to devise a means to perform the claimed function." *BlackBoard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009); *see also Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1319 (Fed. Cir. 2013) ("proving that a person of ordinary skill **could** devise some method to perform the function is not the proper inquiry as to definiteness"). Dr. Martin's admissions regarding the specification's lack of algorithms and decision to not find algorithms because they were obvious shows that "means for computing . . ." is indefinite. *See EON*, 785 F.3d at 623-624.

Moreover, Dr. Martin's endeavors to boil the omitted algorithms down to known arithmetic (D.I. 73-5 at ¶¶ 18-26) conflict with the '007 specification, which explains that the invention requires a "smart algorithm" for computing athletic performance feedback to correct for errors in GPS waypoints. '007 patent, 7:52-56 ("smart algorithm can be used to filter out the erroneous position points"). Dr. Martin admitted the problems associated with inaccurate GPS waypoints at the time of invention. Martin Tr. 73:1-7 ("Q. Back in the 1998 time frame, did GPS waypoints possibly contain errors? A. Yeah. Selective availability was still being used in the '90s"); *see also id.*, 75:22-79:14.  He also admitted that errors in GPS waypoints would lead to errors in the claimed "computing performance feedback data . . ." based on these waypoints, however the "smart algorithm" required to correct these errors is an "implementation detail" not supplied by the specification. *Id.*, 73:17-76:11. *Default Proof Credit Card System, Inc. v. Home Depot USA, Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) ("the testimony of one of ordinary skill in

the art cannot supplant the total absence of structure from the specification"). Again, Dr. Martin's testimony demonstrates that the disclosure of the '007 patent is insufficient under law.

Dr. Martin's testimony also confirmed that the *Katz* exception does not apply[5]. Dr. Martin admitted that a generic processor would have needed to be specially programmed in order to perform the claimed "computing athletic performance feedback data . . ." Martin Tr. 48:6-50:20. Thus, the *Katz* exception would not apply regardless of whether the algorithms are "relatively simple to implement." *EON Corp.*, 785 F.3d at 621-22, D.I. 72 at 5.

Finally, Philips' arguments are inconsistent with its own proposed construction. Philips and Dr. Martin contend a skilled artisan would have understood the multiple algorithms required to program a processor to compute athletic performance feedback data from a series of time-stamped waypoints simply by reading the '007 claims and specification (D.I. 73 at 8-10; D.I. 73-5 at ¶¶ 18-26), yet Philips failed to include these algorithms in its proposed construction. Philips argues that the POSITA's knowledge would render these missing algorithms and programming "obvious," yet Philips does not want to limit its claims to these algorithms and instead identifies only a processor as the "means for computing . . ." structure.[6] This is an obvious attempt to avoid its duty to link the claimed function with any specific algorithm, which is the required *quid pro quo* for using functional claiming. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). Philips cannot have it both ways: if the "obvious" algorithms provided by Dr. Martin are required to perform the claimed function and render the claim definite, these algorithms must be included in the structure linked to the claimed "computing . . ." function.

---

[5] As noted in Fitbit's opening brief, this is a very narrow exception applicable only where standard microprocessors can be structure for 'functions [that] can be achieved by any general purpose computer without special programming." D.I. 72 at 5.

[6] The algorithms now identified by Dr. Martin were never mentioned by Philips during the meet and confer process or in the joint chart submitted to the court, nor does Philips include them in its proposed construction.

2.    **Philips' case law citations actually support a finding of indefiniteness**

Philips' argument that the specification need not disclose what was known to a skilled artisan is not correct in the context of disclosing structure for a means-plus-function limitation. Here, Philips cites to a number of cases that do not stand for the propositions Philips claims. Philips cites *S3 Inc. v. NVIDIA Corp.*, 259 F.3d 1364, 1371 (Fed. Cir. 2001) to argue that the specification need not disclose an algorithm known to a POSITA. *See* D.I. 73 at 8. The *S3* decision said no such thing. In *S3*, the MPF term at issue was not a computer-implemented function, but rather a means for receiving a data stream. *S3*, 259 F.3d at 1370. The specification *did* disclose the structure (a known electrical component called a "selector") corresponding to the claimed function. *Id.* at 1370-71. NVIDIA argued that the disclosure of the electronic selector component alone did not provide sufficient details about the "electronic structure" or the "details of its electronic operation." *Id.* at 1371. The Federal Circuit stated that these mundane details related to a "standard electronic component" were not required to be disclosed in the specification. *Id.* at 1371-72. This is far from holding that an algorithm required to perform the claimed computer-implemented function need not be disclosed. Philips also provides entirely context-lacking citations to *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) and *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 950 (Fed. Cir. 2007). *See* D.I. 73 at 8. In both cases, the Federal Circuit found means-plus-function limitations <u>indefinite</u> due to lack of a linked structure disclosed <u>in the specification</u>. *Finisar*, 523 F.3d at 1340-41; *Biomedino*, 490 F.3d at 951-53.

Indeed, the analysis and outcome in *Biomedino* directly contradicts Philips' position. In *Biomedino*, the Federal Circuit asked "the following question: for purposes of § 112, P 6, is sufficient corresponding structure disclosed when the specification simply recites that a claimed function can be performed by known methods or using known equipment where . . . the

testimony of experts suggest that known methods and equipment exist?" *Biomedino*, 490 F.3d at 951. The Federal Circuit answered this question in the negative, and explicitly distinguished cases where the <u>specification</u> described how methods for performing the claimed function were known from cases where this information was provided by expert opinion alone. *Id.* at 951-52 ("There is a significant difference between the facts of *Atmel* and those in the present case. In *Atmel* it was not the fact that one skilled in the art was aware of known circuit techniques that resulted in a conclusion that sufficient structure was recited. Rather, it was the inclusion in the written description . . . The expert's testimony did not create or infer the structure"). Similarly, in *Finisar*, the Federal Circuit explained that structural disclosure "at least [] satisfact[ory] to one of ordinary skill in the art" must be included in the <u>specification</u>. *Finisar*, 523 F.3d at 1340. In *Finisar*, the Federal Circuit referenced a mathematical formula as something that would be "satisfactory" to a POSITA (*id.*)—something conspicuously missing from the '007 patent.

Philips also relies heavily on *Alfred E. Mann Found. for Sci. Research v. Cochlear Corp.* 841 F.3d 1334 (Fed. Cir. 2016). *See* D.I. 73 at 8, 10. In *Alfred Mann*, the Federal Circuit found sufficient structural disclosure for certain challenged claims because the specification adequately disclosed an algorithm for "processing [] status-indicating signals to derive information therefrom." *Alfred E. Mann*, 841 F.3d at 1345. The specification disclosed that "both voltage and current are measured and that these values are associated with the [claimed] 'status-indicating signal'" and also that "impedance is calculated based on voltage and current." *Id.* The Federal Circuit found that this disclosure, which expressly linked impedance, voltage, and current in a single phrase, was enough to "render the bounds of the claim understandable to one of ordinary skill in the art" given that both parties' experts testified that a POSITA's knowledge of Ohm's law reflecting the relationship between impedance, voltage and current meant that the disclosure

of measurements of voltage and current necessarily also disclosed impedance. *Id.*

Unlike the claims found definite in *Alfred E. Mann*, the '007 patent does not provide any disclosure of "computing athletic performance feedback data from the series of time-stamped waypoints." The '007 patent specification notes that "real-time athletic performance algorithms" were not disclosed in GPS prior art systems and that a so-called, unspecified "smart algorithm" could be used as part of the process. '007 patent, 1:47-48, 7:52. Indeed, the '007 claims are more similar to those found <u>indefinite</u> in *Alfred E. Mann* because, similar to those claims, the '007 claims' "means for computing . . ." function "may be implemented through various unspecified algorithms." *Id.* at 1343-44. The Federal Circuit affirmed indefiniteness where the "patent d[id] not disclose an algorithm, or even a small set of algorithms for performing the claimed logarithmic conversion function" and noted that "[d]isclosing [a] broad class of [logarithmic conversion] d[id] not limit the scope of the claim . . . as required by Section 112"). *Id.*

### 3.   Philips' other arguments against indefiniteness fail

Philips' proposed construction is also wrong because identification of the generic processor alone as the linked structure, without an algorithm to program the processor, would result in functional claiming of "any means for performing the recited function," which is "at odds with the requirements of 35 U.S.C. § 112." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348 (Fed. Cir. 1999).

Further, Philips' attempt to rely on structural details of system components unrelated to performance of the means for computing function are irrelevant, as the structural details it identifies do not provide the requisite algorithm for "computing athletic performance feedback data . . .". *See* D.I. 73 at 9. Here, Philips merely identifies that the generic processor (CPU 602) with memory (memory 608) obtains inputs (time-stamped waypoints) from a GPS receiver module and then outputs athletic performance feedback data. *See id.* Fatally, this does not

disclose <u>how</u> the generic processor "comput[es] athletic performance feedback data." Dr. Martin conceded that the processor could not perform this function, absent additional programming that is not disclosed in the specification. Martin Tr. 49:25-50:2 ("Q. But the key is that someone *would need to program* those off-the-shelf processors; correct? A. That is correct") (emphasis added).

Federal Circuit precedent confirms that simply disclosing inputs and expected outputs is not sufficient for disclosure of a computer-implemented algorithm—rather, the <u>specification</u> (not expert testimony) must disclose <u>how</u> the processor performs the claimed function. *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F. 3d 1326, 1338 (Fed. Cir. 2014) ("disclosing a black box that performs the recited function is not a sufficient explanation of the algorithm required to render [a] means-plus-function term definite"); *Function Media*, 708 F.3d at 1318 (""[i]t is well-settled that simply disclosing software, . . . without providing some detail about the means to accomplish the function, is not enough"); *Aristocrat*, 521 F.3d at 1334 (rejecting argument that sufficient structure was disclosed in patent because it simply "describes the result of practicing the third function . . . the equation is not an algorithm that describes how the function is performed, but is merely a mathematical expression that describes the outcome of performing the function"). Philips' statement that the claimed function of "computing various forms of elapsed distance, current and average speed, and current and average pace from a series of GPS waypoints . . . **is the algorithm**" (D.I. 73 at 10 (emphasis added)) is exactly the argument the Federal Circuit rejected as a matter of law in *Augme* and *Aristocrat. See Augme*, 755 F.3d at 1326; *Aristocrat*, 521 F.3d at 1334.

4.    **Philips misrepresents Fitbit's proposed construction and the parties' disputes**

Philips' opening brief is inconsistent with the joint claim construction chart (see D.I. 68-

1), misrepresents Fitbit's proposed construction, and inaccurately portrays the parties' disputes regarding the "means for computing . . ." and the "means for suspending…" terms. For example, Fitbit's proposal for "means for computing  . . ." includes the function and specific reference to the lack of structure, which Philips ignores. (Compare D.I 65-1 at 1-2 with D.I 73 at 5.)

Philips also claims in its brief that the parties do not have "any real dispute as to structure" for this term. As discussed above and shown in the joint claim construction chart, this is clearly false. Further, there is an even more fundamental dispute between the parties which Philips now ignores: whether structure and function must be identified separately for construction of a means-plus-function term. D.I. 72 at 2 (Philips combines structure and function into a "Proposed Construction"). Ignoring the wealth of controlling Federal Circuit authority spelling out the two-step process for MPF construction and application of that construction to determine infringement (identification of function first, then structure clearly linked to performance of the claimed function), Philips insists on proposing a "combination" construction that does not delineate a clear function and its linked structure.[7] Philips' proposed combination seeks to capture all possible algorithms that could allow a processor to perform the claimed function, and should therefore be rejected.

### 5.    Construction of "athletic performance feedback data"

Philips' effort to exclude distance remaining, time remaining, and calories burned

---

[7] As Fitbit explained in its opening claim construction brief (D.I. 72 at 1-4) and the Motion for Partial Summary Judgment (D.I. 44 at 4-9), construction of means-plus-function claim limitations is a two-step process that requires identification of both a function and its corresponding linked structure. *Williamson*, 792 F.3d at 1351-52 ("Construing a means-plus-function claim term is a two-step process. The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function") (citations omitted). The Federal Circuit's Model Jury Instructions also illustrate this two-step process. *See* Peterman Decl. Ex. B (Instruction 3.1b requiring, for purposes of finding infringement, separate identification of structure and function for means-plus-function terms).

contradicts the specification and relies exclusively on attorney argument and unsupported expert opinions.[8] The specification clearly states that distance remaining, time remaining, and calories burned are "performance data" calculated "[f]rom [the athlete's GPS position**s** and time**s** data (*i.e.*, a series of time-stamped waypoints)], **performance data such as** elapsed distance, current and average speeds and paces, **calories burned, miles remaining, and time remaining are calculated**." '007 patent, 7:40-48 (emphasis added).

Philips, citing no evidence, argues that "miles remaining" and "time remaining" should be excluded from "athletic performance feedback data" because both "require that a user input some sort of destination end point for the [] session—a step contrary to the calculation contemplated by either claim 1 or claim 21." D.I. 73 at 7. Philips provides no explanation why entering a destination would be a "step contrary" to either of these claims' calculations. Moreover, Philips' underlying premise is wrong as the specification expressly states that the user can use input buttons to set performance targets (*e.g.*, total miles or time): "The GPS-based personal performance monitor and feedback device 101 includes input buttons 115 . . . for inputting the feedback options and targets." '007 patent 4:4-8; *see also id.* at 2:14-16. And, Philips' expert admitted that one could just enter a "total distance"—such as in a situation where an athlete is running laps on a track. Martin Tr. 87:24-89:19.

Philips and its expert argue "miles remaining" should be excluded because it is "based solely on the most recent GPS location (rather than a **series** of time-stamped waypoints[).]" D.I. 73 at 7; D.I. 73-5, ¶ 26. Yet, during his deposition, Dr. Martin admitted that calculating "distance remaining" does in fact involve "using a series of waypoints," since the "total distance that

---

[8] Philips seeks to exclude these instances of performance feedback data because they make the required algorithms (that are missing from the specification) even more complicated. Philips' expert offers no example of an algorithm that would perform the calculations for these claimed functions of calories burned or miles and time remaining.

you've already traveled" is calculated by "the distance between the waypoints as you've gone along." Martin Tr. 90:5-92:16. Dr. Martin's deposition admission is unsurprising, as his initial opinion was clearly not thought through: a calculation for miles remaining must necessarily include both the starting location and the current location. For example, if an athlete inputs a goal to run 5 miles, and at the 3 mile mark she is told she has 2 miles remaining, that "miles remaining" feedback is based on her initial location (time-stamped waypoint 1) and current location (time-stamped waypoint 2) and thus a calculation using a series of time-stamped waypoints.

Philips' attorneys argue (citing no evidence) that excluding "calories burned" from the claimed feedback data "of course makes sense," as "tracking calories has little to do with feedback on performance[.]" D.I. 73 at 7. Philips' argument is contradicted by the intrinsic record which specifically identifies calories burned as relying on a series of time-stamped GPS waypoints. '007 patent, 7:40-48. Further, in describing the background art the specification expressly describes "calories burned" as a feedback provided in real-time: "Treadmills provide the runner with **continuous read-outs** of time, distance, speed, pace, inclination, **calories burned** and so forth." *Id.* at 1:22-24 (emphasis added.)

Beyond attorney argument, Philips employs a red herring that "not **all** types of athletic performance feedback data are claimed," as some types of feedback data, including "current climbing rate" or "elevation distance" are allegedly not calculated from a series of time-stamped GPS waypoints, as required by the claims. D.I. 73 at 6. These arguments are misdirection, as Fitbit's construction does not include "current climbing rate" or "elevation distance" as part of the claimed "athletic performance feedback data."

**B.** **"means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" (Claim 7)**

As discussed in Fitbit's opening claim construction brief (D.I. 72 at 1-8), Fitbit's Motion for Partial Summary Judgment (D.I. 44 at 4-9), and above in section I.A, an algorithm must be disclosed in the specification for means-plus-function terms with computer-implemented functions not "coextensive with a microprocessor or general purpose computer." *Eon Corp.*, 785 F.3d at 623. Yet, the '007 patent discloses <u>no</u> algorithm for the claimed function of suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold. Philips does not point to anywhere in the specification where such an algorithm is disclosed to program a processor to perform this function.

Rather than focusing on the performance of the claimed function concerning actions related to a "predetermined threshold" Philips argues "it would be improper to construe the claim as requiring a 'smart algorithm'" because the claim language "only [recites] a dumb one." D.I. 73 at 11.[9] Yet, Philips fails to identify *any* algorithm—smart or dumb—that is linked to "suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold." *Id.* Nor did Philips' expert point to any "dumb" algorithm linked to this function as it did for the "means for computing . . ." term. *See generally* D.I. 73-5. The duty to clearly link a structure in the specification to the performance of the claimed function is the *quid pro quo* for the convenience of employing functional claiming. *B. Braun Med.*, 124 F.3d at 1424; *see also Williamson*, 792 F.3d at 1347 ("Congress struck a balance"). Despite this clear duty, Philips does not identify anywhere in the specification where the requisite structure is found, nor even where a "predetermined threshold" is disclosed at all.

---

[9] Importantly, Fitbit did not rely on the "smart algorithm" in its proposed construction of the structure for this term. Rather, Fitbit argues the specification provides **no structure** linked to performing the claimed function. *See* D.I. 72 at 7-8. Philips agrees, since it argues the disclosed "smart algorithm" also does not perform the function of suspending operation in relation to athlete speed falling below a predetermined threshold. *See* D.I. 73 at 11-12.

Finally, Philips seeks construction of this term to clarify that the claimed function does not both suspend and resume operations "at the very same time" when the athlete falls below a predetermined threshold. Fitbit agrees—the natural reading of the claim is that the operations "suspend" when the speed of the athlete falls below the "predetermined threshold" and "resum[e]" when the speed of the athlete rises back above the "predetermined threshold." By extension, the specification must therefore disclose an algorithm for detecting the "predetermined threshold" is reached and then either suspending or resuming operations depending on which side of this threshold the athlete's speed is on. No such algorithm is disclosed in the specification.

## II.    U.S. PATENT NO. 6,976,958

### A.    "in the event of an interruption of the wireless connection . . . configured to store the health parameter or visual data in a memory or on the removable memory device" (Claims 15, 16)

The plain meaning of this claim language[10] rebuts Philips' contention that "[t]here is no requirement . . . that the storage of the health parameter be made 'in response' to an event[.]" D.I. 73 at 12. If Philips was correct, the claim language "in the event of an interruption of the wireless connection" would become meaningless, which is improper under well-established canons of claim construction. *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 ("A claim Construction that gives meaning to all the terms of the claim is preferred over one that does not do so"). As shown in Fitbit's opening brief, the words "configured to" are limiting and

---

[10] Philips' contention that Fitbit filed IPRs on the '233, '377 and '958 and "argued **no terms** required construction" is inaccurate. Fitbit's IPR petitions relied upon the *Phillips*' analysis for claim construction and noted the patent office need only construe the claims when necessary to resolve the underlying controversy. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017). Where any reasonable construction results in patent invalidity, no further construction is required. Philips does not identify any inconsistency between Fitbit's proposed constructions offered here, and the application of the prior art to the claims relied upon to show invalidity in the IPRs.

require actual programming to perform the function of storage <u>in the event of interruption</u>[11], not just mere capability to store anytime, including coincidentally upon interruption. D.I. 72 at 8-9.

Philips' argument regarding "storing data in memory in the time period **_after_** an interruption of the wireless connection" is consistent with Fitbit's proposed construction. *See* D.I. 73 at 12-13. Fitbit does not disagree with Philips' contention that "[t]he point of the specification is that storage happens during the event of interruption[.]" *Id.* at 13. However, more is required under the Federal Circuit's consistent treatment of the language "configured to": the system must be programmed to ("configured to") carry out that storage when triggered by the "interruption of the wireless connection," as opposed to merely storing when there happens to coincidentally also be an interruption of the wireless connection. *Id.* at 12-13.

## B.    "memory" (Claims 15, 16)

Philips' proposals rely entirely on extrinsic evidence and ignore the intrinsic record, which repeatedly and consistently identifies only persistent data storage and refers to the claimed systems' memory providing the ability to preserve data for later transmission (i.e., *persistent* data storage). *GPNE Corp. v. Apple, Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016); *see* '958 patent, 12:50-62 (listing persistent memory devices). Philips admits that it seeks to include "temporary memory" within the scope of the claimed "memory." D.I. 73 at 13-14. Temporary memory includes memory which holds data only for a millisecond, and thus would not achieve the stated purpose of the claimed invention expressed in the intrinsic record. Further, Philips makes no attempt to tie this extrinsic evidence to statements in the intrinsic record, including how the suggested generic dictionary definitions of "memory" are consistent with the stated purpose of

---

[11] The specification states that limited memory space on the wireless web device is a drawback (*e.g.* "small amount of memory"). '958 patent, 4:18-28; *see also id.* at 8:42-46 ("sufficient on-board memory"), 12:47-49. This highlights the importance of programming the device to only store data in the memory in the event there is an interruption to the wireless connection.

the invention to utilize memory to <u>preserve</u> health data: "[i]n the event of drop-outs, interruptions, or unavailability, of the wireless network, no loss of data occurs, as the data has been stored on the memory device and may be wirelessly transmitted at a later time when cellular or mobile service is again available." '958 patent, 13:8-13. The data stored in memory must survive wireless network unavailability.

### C.    "internet-enabled wireless web device" (Claims 15, 16)

In violation of fundamental canons of claim construction, Philips' seeks to import limitations from the specification into the claim language. *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1288 (Fed. Cir. 2009) ("courts must take care not to import limitations into the claims from the specification"). Philips argues that the concept of interactivity should be included in construction of this term because allegedly the "specification distinguished prior art systems" that lacked interactivity. *See* D.I. 73 at 14. Yet, the Federal Circuit has explicitly "decline[d] to interpret these general statements" distinguishing the invention from the prior art as "effect[ing] a complete surrender" of claim scope. *Ventana Med. Sys. v. BioGenex Labs., Inc.*, 473 F.3d 1173, 1180-81 (Fed. Cir. 2006) ("Such general statements, without more, will not be interpreted to disclaim every feature of every prior art device discussed in the "BACKGROUND ART" section of the patent").

As discussed in Fitbit's opening brief, Philips' effort to argue interactivity is inherent in the term "internet-enabled wireless web device" directly contradicts the intrinsic record. D.I. 72 at 11-12. The prosecution history of related applications shows that the inventors explicitly added the "interactive" display feature to claims already reciting a wireless web device. *Id.* The addition of this "interactive" display limitation indicates that a wireless web device alone does not necessarily include an interactive interface, despite what Philips now contends. If Philips desired the claims to include an additional limitation of interactivity, it clearly knew how to draft

such limitations, and yet it elected not to in this instance.

**D.    "health parameter indicative of a disease state or condition of a patient" (Claim 15) and "health parameter or visual data corresponding to a patient's disease state or condition" (Claim 16)**

Philips' arguments relating to the word "patient" (*see* D.I. 73 at 15) ignore the surrounding claim language, which makes clear that the claims are directed to monitoring the disease state or condition of a patient, as opposed to monitoring exercise parameters of a healthy person. That the generic term "patient" may generally refer to either a person under the care of a physician or a healthy individual interested in monitoring exercise does not mean that the surrounding claim language must be ignored or re-written. The claims recite a "health parameter" (or "visual data") corresponding to a patient's "disease state or condition." As discussed in Fitbit's opening brief, a health parameter indicative of a disease state or condition corresponds to the disease management embodiment disclosed in the '958 patent, wherein a "patient" is an individual under the care of a physician. This is further evidenced by Philips' explicit disclaimer of the health management embodiment. D.I. 72-3 ("the claims noted in '958 [] *only relate to disease states or conditions of a patient. They do not relate to exercise parameters*") (emphasis added)).

**III.    U.S. PATENT NO. 7,088,233**

**A.    "governing information transmitted between the first personal device and the second device" (Claim 1)**

Philips relies on extrinsic evidence to re-write the claim language and exclude multiple embodiments from the specification. *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) (declining to "interpret claim terms in a way that excludes embodiments disclosed in the specification"); *SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187,1210 (Fed. Cir. 2013) (finding expert opinions "unhelpful to" claim construction when they "lack any substantive explanation

tied to the intrinsic record");

Philips begins its claim language re-write by changing the order of the claim language. The '233 claims recite a security mechanism "governing information transmitted," yet Philips' construction switches the order to "governing transmission of information." Philips wants to place the emphasis on a security mechanism that governs transmission to the exclusion of security mechanisms that govern information. The claim language, in contrast, is directed to security mechanisms governing information. Philips then replaces the claim language "governing" with the word "controlling." Philips offers no intrinsic evidence support for these edits. Philips' expert's opinions regarding construction of this term should be given no weight, as Dr. Martin admitted that the "basis" of the phrasing of Philips' construction was "based on counsel" and he "wasn't the [] one to choose it[.]" Martin Tr. 115:12-17.

Philips and its expert both assert that "the term 'govern' [] means to **control**." D.I. 73 at 17-18; Martin Tr. 108:5-9 ("Q. So are you just simply replacing the word "governing" with "control"? A. In the context of the patent as I'm reading it, they – they mean essentially the same thing"), 113:1-6 ("A. Yes, governing and controlling are synonymous"). There is no reason for the Court to replace the claim language with at best a synonym. Philips admits the purpose of its construction is to defend against invalidity.  Philips argues the claimed "governing information transmitted" must include "multiple levels of prioritization, authentication of a person, and confirmation via interrogation," yet none of these limitations are recited in the claims. D.I. 73 at 16. Philips' arguments are also inconsistent with the dependent claims which recite the claimed "security mechanism governing information transmitted" encompassing only one type ("level") of security. '233 patent, 15:13-23.

Philips' effort to use Figure 5 to limit the scope of claim 1's "security mechanism

governing information transmitted" should also be rejected. Figure 5 presents merely <u>an</u> <u>embodiment</u> of the invention. D.I. 73 at 16. The claims are not limited to this embodiment. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"). Philips argues that "bystander B should not be allowed this level of access" and relies solely on its expert to conclude that the invention thus requires some "additional level of security" that is not otherwise provided by encryption. D.I. 73, at 16-17. What Philips misses is that security mechanisms it seeks to exclude, such as encryption, may be used to forbid "bystander B" access.[12] Martin Tr. 131:7-12; 132:5-133:4. For example, in the context of Figure 5, the trained paramedic and dispatcher may possess encryption keys while bystander B does not. The bystander B's wireless device may act as a mere intermediary, transmitting encrypted information between the paramedic and the dispatcher. Encryption would therefore be "governing information transmitted" by allowing only those with keys to access the "information transmitted," while preventing access to the "information transmitted" by the bystander who does not possess the necessary key. Philips' attempt to exclude encryption from the scope of the claimed security mechanism governing information transmitted would exclude claimed embodiments. '233 patent, claim 2, 13:43-46. *Oatey Co.*, 541 F.3d at 1276.

### B.    "first personal device" (Claim 1)

Philips ignores the specification's repeated and consistent usage of the term "personal medical device" ("PMD 100") to describe the claimed "first personal device." *Compare* '233 patent, FIG. 2, 3:13-59, 8:41-10:12 *with id.*, 14:62-15:4, 15:24-33, 15:42-16:6. Philips argues the

---

[12] Philips' own expert admitted that the claimed security mechanism could include encryption. Martin Tr. 132:25-133:4 ("Q. So does the Claim 1C of the '233 patent as written allow the security mechanism to only include encryption? THE WITNESS: It could only be encryption").

specification also refers to device 100 "as simply a 'personal device 100'" (D.I. 73 at 18) but ignores that in these instances, the specification first introduces a personal *medical* device and only then refers to "personal device 100." *See e.g.* '233 patent, 8:40-10:12 (describing a "personal medical device 100" and then shorthand "personal device 100"), 10:13-11:45 (including sections titled "Personal Medical Device" which then use shorthand "personal device 100"). The inventors' occasional use of shorthand does not overcome the fact that the patent's title recites "personal *medical* device," the "summary of the invention" only refers to "personal medical devices," every figure labeling device 100 recites "PMD 100," and the <u>only device</u> identified in the specification including the claimed characteristics of the "first personal device" is a personal *medical* device.

Philips also ignores the specification's repeated references to "*the system of the present invention*" including a "personal medical device." *Id.*, 2:38-39 ("diagram showing the overall structure of the present invention" includes "PMD 100"), 2:44-45 ("diagrams showing various configurations of the system of the present invention" include "PMD 100"), 2:46-47, 11:46-12:49, 2:47-48 ("diagram showing communications through the system of the present invention" includes a medical device as "personal device 100"); *see also id.*, 1:20-28, 1:59-2:35. Notably, in support for its construction of "internet-enabled wireless web device" Philips relies on a specification's *single* reference to what is provided by "the present invention." D.I. 73 at 14. Here, in contrast, the '233 patent *consistently and repeatedly* refers to "the present invention" including a "personal medical device" as the "first personal device." *GPNE Corp.*, 830 F.3d at 1370 ("when a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization").

## C.    "wireless communication" (Claim 1)

Philips misrepresents Fitbit's proposed construction. Philips argues that Fitbit's

construction is "without wires," yet <u>Fitbit's proposal is that no construction is necessary</u> for this well-known phrase. *Compare* D.I. 73 at 19 to D.I. 68-1. Philips' construction attempts to engage in lexicography, yet Philips presents no evidence that the '233 patent *inventors* intended to provide a special definition for the term "wireless communications" that departs from its plain and ordinary meaning. *Phillips*, 415 F.3d at 1316 ("the inventor's intention, as expressed in the specification, is regarded as dispositive"). Philips' <u>only</u> specification cite in support of its construction is to what wireless communications "may include, but [are] not limited to[.]" D.I. 73 at 19 (citing '233 patent, 4:43-5:3). Philips' construction excludes embodiments of "wireless communication" recited in the '233 patent. *Oatey Co.*, 514 F.3d at 1276 (declining to "interpret claim terms in a way that excludes embodiments disclosed in the specification"). Philips seeks to exclude "'wireless' communications occur[ring] over a 'body local area network'" (D.I. 73 at 19), despite the specification's express recital of implanted personal medical devices. '233 patent, 1:63-66, 11:49-53, 14:16-19, 16:30-32.

## IV.  U.S. PATENT NO. 8,277,377

### A. "indicating a physiologic status of a subject" (Claim 1)

Philips misstates Fitbit's position. Fitbit's does not suggest "that **all** [physiological] data be received while exercising so that it is 'current.'" D.I. 73 at 20. Rather, Fitbit's contends that data that is received "indicating a physiologic status of a subject," while the subject is exercising, must be current data. As described in Fitbit's opening brief, the specification and prosecution history both support this interpretation. For example, the specification describes monitoring physiologic status "while [] exercising." '377 patent, 3:33-36. Monitoring physiologic status "while exercising" requires current data to indicate a physiological status of a subject. This is consistent with the ordinary meaning of the word "status" and its use in the claim language.

Dated: July 8, 2020

FITBIT, INC.

By Its Attorneys,


*/s/ Yar R. Chaikovsky*

Yar R. Chaikovsky
yarchaikovsky@paulhastings.com
Chad Peterman
chadpeterman@paulhastings.com
Dave Beckwith
davidbeckwith@paulhastings.com
David Okano
davidokano@paulhastings.com
Radhesh Devendran
radheshdevendran@paulhastings.com
Berkeley Fife
berkeleyfife@paulhastings.com

PAUL HASTINGS LLP
1117 S. California Avenue
Palo Alto, California  94304-1106
Telephone:    1(650) 320-1800
Facsimile:    1(650) 320-1900

Jennifer B. Furey (BBO # 634174)
Andrew T. O'Connor (BBO # 664811)
GOULSTON & STORRS PC
400 Atlantic Avenue
Boston, MA 02110
Telephone: (617) 482-1776
Facsimile: (617) 574-4112

E-mail: jfurey@goulstonstorrs.com
aoconnor@goulstonstorrs.com

## CERTIFICATE OF SERVICE

I certify that a true copy of the above document was served on the attorney of record for each party via the Court's CM/ECF system, which will send notification of this filing (NEF) to all registered participants, and paper copies will be sent to those indicated as nonregistered participants.

Dated:  July 8, 2020                    By:    */s/ Yar R. Chaikovsky*
                                               Yar R. Chaikovsky (*Pro Hac Vice*)