# EXHIBIT A

1

1              UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF MASSACHUSETTS

3

4

5    PHILIPS NORTH AMERICA LLC,  ) Case No. 1:19-cv-11586-IT

6            Plaintiff,         )

7        v.                     )

8    FITBIT, INC.,              )

9            Defendant.         )

10   _____)

11

12

13

14            REMOTE VIDEOTAPED DEPOSITION OF

15              THOMAS L. MARTIN, PH.D.

16                 June 18, 2020

17        10:02 a.m. Eastern Standard Time

18              Blacksburg, Virginia

19

20

21

22

23   REPORTED BY:

24   Kristi Caruthers

25   CLR, CSR No. 10560

1    the patents issued or were filed?

2          A.   No, I do not.

3          Q.   Other than your lawyers, did you speak

4    with anyone in connection with the preparation for

5    your exhibit today -- or for your deposition today?

6          A.   No, I didn't.

7          Q.   Sticking with your materials considered,

8    you have a number of cites from this www.ck12.org

9    website.

10          Do you see that?

11          A.   Yes, I do.

12          Q.   What is the ck12.org organization?

13          A.   It provides a set of tutorials for

14    different topics for kindergarten through 12th

15    grade, for grade school materials.

16          Q.   Have you ever cited ck12.org in connection

17    with any of your published papers?

18          A.   No, I haven't had a need to.

19          Q.   And why did you choose to cite to ck12.org

20    in connection with this matter?

21          A.   So one of the points in my declaration is

22    that the math that was required for calculating the

23    distance between two GPS waypoints is relatively

24    simple and would have been obvious to somebody who

25    was skilled in the art.

**Thomas Martin, PH.D. - June 18, 2020**

41

1            And the math is the sort of math that you

2     would do for finding distance for somebody who was

3     exercising, is the kind of thing that somebody with

4     a knowledge of high school trigonometry or geometry

5     would be able to do.

6            And so I was citing the -- these cites

7     because they back up that opinion, showing that it's

8     the kind of thing that is taught in grade school.

9        Q.   Now, why did you feel a need to look

10    outside the specification on the patent in order to

11    demonstrate an algorithm that calculated distance?

12            MR. RODRIGUES:  Objection to form, lacks

13    foundation.

14            THE WITNESS:  Actually, I wasn't trying to

15    show that there was an algorithm; I was just trying

16    to show that just saying find the distance between

17    two points is relatively simple.

18    BY MR. PETERMAN:

19        Q.   And -- oh.  Why were you -- why were you

20    trying to establish the point that finding the

21    distance between two points was relatively simple?

22        A.   Because just saying finding the distance

23    between two points would be the kind of step -- if I

24    was sketching out an algorithm, that might be the

25    kind of step that I would provide in the sketch of

1   the algorithm.

2            So just saying calculate the -- find the

3   distance between these two points, you find the

4   distance.

5        Q.   So where in the specification of any of

6   the patents-in-suit that you reviewed is there an

7   algorithm for finding the distance between two

8   points?

9        A.   I'm sorry.  I just said I don't think

10  you -- you need to specify an algorithm for finding

11  the distance between two points.  Saying "find the

12  distance between two points" would be the step that

13  I would provide within an algorithm.

14       Q.   So is there anywhere in the specification

15  where there is an algorithm for finding the distance

16  between two points?

17            MR. RODRIGUES:  Objection to form.

18            THE WITNESS:  You know, as I've described

19  in my report and as what I think I've said in the

20  last couple of questions, just saying "find the

21  distance between these two GPS points" is enough to

22  describe what you need to do.

23  BY MR. PETERMAN:

24       Q.   And what's your basis for saying that's

25  enough to describe what you need to do under patent

Thomas Martin, PH.D. - June 18, 2020

43

1    law?
2              MR. RODRIGUES:  Objection to form.
3              THE WITNESS:  Again, it would have been
4    someone skilled in the art, as I've laid out in
5    my -- in my report, would have seen "find the
6    distance between these two GPS waypoints" and, you
7    know, would have understood what that meant and how
8    to find the distance.
9    BY MR. PETERMAN:
10        Q.  So sticking with this find the distance
11   between two GPS waypoints, what would a person of
12   skill in the art then do to find the distance?
13        A.  Well, as I've described in the report, you
14   have to assume the radius of the earth, and the
15   basic distance formula between two points -- give me
16   a second while I look back through the report.
17              (Document reviewed by witness.)
18              THE WITNESS:  So in Paragraph 19, I lay
19   out the distance between two points, which again
20   would be something that somebody in grade school
21   would be taught.
22              And then so you have the two GPS
23   waypoints.  They would typically -- you know, they
24   begin in lat and long, typically in degrees.  You'd
25   have to convert those to radians, but again, that's

1    a really common thing.

2              Most of the programming languages that I

3    use, the trigonometric functions in those

4    programming languages require that the input angle

5    be given in radians, not in two degrees.  So again,

6    someone of skill in the art would have known to make

7    that conversion.

8              And then for the sorts of distances that

9    we're talking about with exercise, even -- even the

10   distance of running a marathon or an ultra marathon,

11   you can treat the earth's surface as a plane, and so

12   you've got these two X, Y coordinates on the plane,

13   and you convert from the lat and long taking into

14   account the radius of the earth to find those -- to

15   find the distance.

16   BY MR. PETERMAN:

17        Q.  And where in the specifics is the

18   conversion to radians mentioned?

19              MR. RODRIGUES:  Objection to form.

20              THE WITNESS:  Again, that would be obvious

21   to somebody skilled in the art.

22   BY MR. PETERMAN:

23        Q.  Where in the specification of the patents

24   is the, you know, radius of the -- the earth

25   mentioned?

Thomas Martin, PH.D. - June 18, 2020

45

1            MR. RODRIGUES:  Objection to form.

2            THE WITNESS:  Again, it's my opinion that

3    would be obvious to somebody, you know, skilled in

4    the art.

5    BY MR. PETERMAN:

6        Q.  And you keep using the term it would be

7    obvious to someone of skill in the art.

8            What does -- what does that mean?

9        A.  Well, as I've detailed in the report, I'm

10   assuming somebody with a degree in electrical

11   engineering or computer engineering or computer

12   science, some related field, related knowledge, you

13   know, from practice in the field.

14       Q.  Were you finished or -- I wasn't sure if

15   you were finished with your answer.

16       A.  Yes, I'm finished.

17       Q.  So your opinion is is that all of these

18   calculations that are called for in the claims would

19   have been obvious for someone of skill in the art to

20   implement?

21           MR. RODRIGUES:  Objection to form.

22           THE WITNESS:  Yes.  It would have been

23   obvious to someone skilled in the art.

24   BY MR. PETERMAN:

25       Q.  So we've talked a lot about distance.

Thomas Martin, PH.D. - June 18, 2020

46

1          Would it also have been obvious to

2     determine the current or average speed of an

3     athlete?

4          A.   Well, as I've described in my report, once

5     you have the distance and you know the -- and you

6     would have been keeping track of the time, then

7     average speed is just the distance divided by the

8     time, again, a calculation that someone in grade

9     school would be able to do.

10         Q.   Is there an algorithm for calculating

11    average sp.eed that's disclosed in the patent

12    specification?

13              MR. RODRIGUES:   Objection to form.

14              THE WITNESS:   It's my opinion that just

15    stating -- you know, finding the average speed would

16    be sufficient.

17    BY MR. PETERMAN:

18         Q.   And is that your same opinion also for

19    finding the current speed?

20              MR. RODRIGUES:   Objection to form.

21              THE WITNESS:   Yes.

22    BY MR. PETERMAN:

23         Q.   So I'd like to understand this a little

24    bit more, and I know we're talking about the '007

25    patent, and you've identified a processor as being

1    the structure in connection with the function of

2    computing athletic performance feedback data from a

3    series of time-stamped waypoints obtained by a GPS

4    receiver; is that correct?

5              MR. RODRIGUES:  Objection to form.

6              THE WITNESS:  And I'm sorry, Chad.  Would

7    you repeat that again?  You broke up in the middle.

8    BY MR. PETERMAN:

9         Q.  Sure.  I'd like to just direct your

10   attention to Exhibit 1, Paragraph 13 of your report.

11        A.  Let me -- let me scroll back.  You said

12   Paragraph 13?

13        Q.  Correct.

14        A.  Okay.  I'm looking at it.

15        Q.  Okay.  And why don't you read it to

16   yourself.  I'm going to ask you some questions about

17   that paragraph.

18              (Document reviewed by witness.)

19              THE WITNESS:  Okay.  I've read it to

20   myself.

21   BY MR. PETERMAN:

22        Q.  Okay.  So do you agree with Philips's

23   proposed construction for the term means for

24   computing athletic performance feedback data from

25   the series of time-stamped waypoints obtained by

Thomas Martin, PH.D. - June 18, 2020

48

1    said GPS receiver?

2         A.   I agree.

3         Q.   Part of that construction is a processor.

4              Do you see that?

5         A.   Yes, I do.

6         Q.   What is meant by "processor" here?

7              MR. RODRIGUES:   Objection to form.

8              THE WITNESS:   It means a computational

9    element, you know, a microcontroller or a

10   microprocessor.

11   BY MR. PETERMAN:

12        Q.   So, for example, an Intel chip would be an

13   example of a microprocessor?

14        A.   Yes, an Intel chip would be an example of

15   a microprocessor.

16        Q.   Do microprocessors need to be programmed

17   with algorithms in order to perform?

18             MR. RODRIGUES:   Objection to form.

19             THE WITNESS:   Yes, they need to be

20   programmed.

21   BY MR. PETERMAN:

22        Q.   Does an Intel chip off the shelf know how

23   to calculate distance between two waypoints?

24             MR. RODRIGUES:   Objection to form.

25             THE WITNESS:   No.   An Intel processor off

49

1  the shelf would not be able to find the distance

2  between two points.  It also wouldn't be able to do

3  anything else.

4  BY MR. PETERMAN:

5       Q.  Would any processor off the shelf be able

6  to find the distance between two waypoints?

7            MR. RODRIGUES:  Objection to form.

8            THE WITNESS:  I'm not a lawyer -- I'm

9  sorry.  What was that?

10           MR. RODRIGUES:  I was just saying

11  objection to form.

12           You can answer.

13           THE WITNESS:  Okay.  I'm not a lawyer, but

14  it is entirely possible that somebody could have

15  made a processor that's dedicated to find distances

16  between latitude and longitude points.

17  BY MR. PETERMAN:

18       Q.  But in the 1998 to, you know, 2002 time

19  frame, what processors were you aware of off the

20  shelf that could find distance between two GPS

21  waypoints?

22       A.  Well, almost any processor that somebody

23  programmed to find those -- those waypoints would be

24  able to do it.

25       Q.  But the key is that someone would need to

Thomas Martin, PH.D. - June 18, 2020

50

1    program those off-the-shelf processors; correct?

2         A.   That is correct.

3         Q.   And the same is true for the current or

4    average speed of an athlete; correct?  That would

5    need to be programmed by someone?

6         A.   So the average speed would have to be

7    programmed, but the '007 patent actually stated that

8    the GPS unit could provide current speed.

9         Q.   Would the average pace of an athlete need

10   to be programmed into an off-the-shelf

11   microprocessor?

12              MR. RODRIGUES:  Objection to form.

13              THE WITNESS:  Someone would have to write

14   a program to do that, yes.

15   BY MR. PETERMAN:

16        Q.   And it's your opinion that it would just

17   be obvious to write a program to do these

18   calculations; correct?

19              MR. RODRIGUES:  Objection to form.

20              THE WITNESS:  That is correct.

21   BY MR. PETERMAN:

22        Q.   Just want to shift gears a little bit,

23   still sticking with your expert declaration.  And I

24   also know that we've been going a little bit over an

25   hour.  If you'd like to take a break at this point,

69

```
1    BY MR. PETERMAN:

2         Q.   I'll break it down.

3              Prior to 1998, were you aware of any

4    system that used GPS for the purposes of navigation?

5              MR. RODRIGUES:  Objection to form.

6              THE WITNESS:  Yes, that's the -- the main

7    point of GPS is -- I mean it is for navigation.

8    BY MR. PETERMAN:

9         Q.   Were you aware of any systems using GPS

10   for navigation and also providing information as to

11   how long it would take to arrive at a destination?

12        A.   I -- I don't recall anything around the

13   time saying that, no.

14        Q.   In Paragraph 18 of your report, you state

15   that:

16                  "To the extent the court

17             construes the term means for

18             computing athletic performance

19             feedback data from the series of

20             time-stamped waypoints obtained

21             by said GPS receiver as a

22             processor and equivalence

23             thereof, that determines any of

24             the following from a series of

25             time-stamped waypoints obtained
```

Thomas Martin, PH.D. - June 18, 2020

70

1              by said GPS receiver during an

2              exercise session."

3              And then you go ahead and you list a

4    number of variables.

5              You go on to say:

6                  "The specification in the

7              claims also sufficiently

8              discloses an algorithm for

9              computing a lap distance,

10             current or average speed,

11             current or average pace," et cetera.

12             Do you see that?

13        A.   Yes, I see that.

14        Q.   You used the term -- you say:

15                 "The specification in the

16             claims sufficiently discloses an

17             algorithm."

18             I just want you to point to me where in

19   the specification there is a disclosure of the

20   algorithm.

21             A.   Well, as I described in my report and said

22   earlier, you know, once you find the distance

23   between the two points of which is, you know, a

24   sufficient description for somebody skilled in the

25   art, then the -- the sorts of -- of athletic

Thomas Martin, PH.D. - June 18, 2020

71

1    feedback that is described, the last distance, the

2    average speed and so forth, would be easily derived

3    from that.

4         Q.   Okay.   But I just want to focus on the

5    language that you used where you said:

6              "The specification in the

7              claims also sufficiently discloses

8              an algorithm."

9              What portion -- and you can feel free to

10   look at the '007 specification -- what portion of

11   the specification supports your statement here in

12   Paragraph 18?

13             (Document reviewed by witness.)

14             THE WITNESS:   So if you look at

15   Column 7 -- and I apologize.   The dog just started

16   barking.

17             If you look at Column 7, the paragraph

18   beginning around Line 50 -- no, sorry, around

19   Line 40 through 50, that paragraph, again, you know,

20   once you have the geographical position and the

21   timestamps, you know, the last distance and the

22   current and average speeds are easily derivable from

23   that.

24        Q.   Other than what you refer to in Column 7

25   going from around lines 40 to 50, is there any

1   portion of the specification that you're relying

2   upon for your opinion in Paragraph 18 of your

3   report?

4       A.   Oh, I'm sure there's other places, but I

5   was just looking for a specific place to answer your

6   previous question.

7       Q.   Okay.  But you didn't cite any portion of

8   the specification in connection with Paragraph 18 of

9   your report; correct?

10      A.   No, Paragraph 18 doesn't cite any specific

11  part of the -- of the patent.

12      Q.   In fact, is there any portion of your

13  report that cites a specific portion of the

14  specification for your conclusion that an algorithm

15  is disclosed?

16      A.   My report refers to Claims 1 and 21, but

17  other than that, it doesn't refer to other specific

18  portions of the patent.

19      Q.   How come you didn't find it necessary to

20  cite to specific portions of the specification for

21  your conclusions?

22      A.   It -- it seems like finding the distance

23  is such an easy thing, that just saying "find the

24  distance between these waypoints," from that it

25  would be obvious.

Thomas Martin, PH.D. - June 18, 2020

73

1      Q.   Back in the 1998 time frame, did GPS
2  waypoints possibly contain errors?
3      A.   Yeah.   Selective availability was still
4  being used in the '90s.   I think they turned it off
5  during the Gulf -- the first Gulf War for a short
6  period of time, but -- and I'd have to go back and
7  look exactly when they turned it off.
8      Q.   And what does "selective availability"
9  mean?
10      A.   So -- sorry.   Selective availability, when
11  GPS first came out, it was intended for military
12  applications, and the consumer versions of the
13  receivers got a less accurate version of the
14  signals.   And so selective availability referred to
15  that less accurate version of the GPS that was
16  available for consumers.
17      Q.   So how did the patent claims overcome
18  issues of selective availability?
19           MR. RODRIGUES:   Objection to form.
20           THE WITNESS:   So the patent did note that
21  selective availability was an issue and limited the
22  accuracy, but for the types of distances involved,
23  and the application is there, the accuracy would
24  have been -- actually, in terms of the sorts of
25  feedback that they were giving the runner, or that

Thomas Martin, PH.D. - June 18, 2020

74

1    they actually -- I'm sorry -- would have been better

2    than what would have been available without GPS,

3    even in its -- even in the selective availability

4    form.

5    BY MR. PETERMAN:

6         Q.   Where does the specification say what you

7    just said?

8              MR. RODRIGUES:   Objection to form.

9              THE WITNESS:   It mentions selective

10   availability in that same column, Column 7.   I'd --

11   I'd have to look back through it to find out if it

12   mentions selective availability anywhere else.

13   BY MR. PETERMAN:

14        Q.   So in Column 7 at Line 51, it's a

15   paragraph saying:

16                   "A smart algorithm can be

17              used to filter out the erroneous

18              position points resulting from

19              signal interference or from

20              induced errors through the U.S.

21              government's Selective

22              Availability (SA) program, which

23              intentionally limits the absolute

24              accuracy of civilian GPS

25              receivers."

Thomas Martin, PH.D. - June 18, 2020

75

1           Do you see that?

2      A.   Uh-huh, yes.

3      Q.   Other than saying "smart algorithm," does

4   the specification actually provide an algorithm?

5           MR. RODRIGUES:   Objection to form.

6           THE WITNESS:   Actually, my opinion is

7   wherever the phrase "smart algorithm" is used seemed

8   to be referring to in addition to the other things

9   that were already claimed.   So in addition to the

10   feedback, they could be calculated from the

11   waypoints.   Whenever it mentioned smart algorithm,

12   it was going further.

13   BY MR. PETERMAN:

14      Q.   So in answer to my question, is there a

15   smart algorithm disclosed in the specification or

16   not?

17      A.   So smart algorithm is mentioned in a

18   couple of places in response to a couple of

19   different things.

20           So are you asking about this particular

21   mention of smart algorithm?

22      Q.   Yeah, I'm just asking whether there's an

23   algorithm actually disclosed in the specification to

24   filter out the erroneous position points resulting

25   from signal interference or from induced errors

1    through the SA program.

2         A.   So it's saying that if you want to avoid

3    these errors, you would have to filter out those --

4    filter out the induced errors.

5         Q.   And does the specification provide an

6    algorithm for filtering out the induced errors?

7              MR. RODRIGUES:   Objection to form.

8              THE WITNESS:   It notes that if you were

9    concerned about the errors, you would have to filter

10   them out, but implementation details are not

11   provided.

12   BY MR. PETERMAN:

13        Q.   And does the opinion that you offer in

14   your report relate to the smart algorithm at all?

15        A.   Well, as I said before, the smart

16   algorithm that's mentioned in the various places in

17   the patent seems to be, in my opinion, in addition

18   to what's described in terms of calculating

19   performance, and it doesn't affect the opinion I've

20   expressed in -- expressed in the declaration.

21        Q.   If the waypoints have errors in them,

22   won't the calculation of the performance also have

23   errors?

24             MR. RODRIGUES:   Objection to form.

25             THE WITNESS:   As I said earlier, the

1   accuracy would -- would be better than what would be

2   available without GPS, and so even with those

3   errors, you would still have a better estimate of

4   the distance you've traveled and your average speed

5   and so forth than if you didn't have any GPS at all.

6   And it would -- in my opinion, would be more than

7   sufficient for the sort of athletic performance that

8   we're talking about.

9   BY MR. PETERMAN:

10        Q.   So you're comparing the performance with

11   GPS versus without GPS; correct?

12        A.   Yes.   So trying to calculate those

13   parameters without having a GPS unit, I don't think

14   you could get that kind of accuracy by yourself, you

15   know, anyplace in the world.

16        Q.   But let's assume that you're in a fully

17   GPS world.

18            Would you rather have waypoints without

19   errors or waypoints with errors before doing the

20   calculation of distance?

21            MR. RODRIGUES:   Objection to form, calls

22   for speculation, incomplete hypothetical.

23            THE WITNESS:   That wasn't the comparison I

24   was making earlier.   The comparison I was making

25   earlier was with GPS or without GPS.   I mean if I'm

1    comparing two GPS systems and one's got more error

2    than the other, then I prefer the one with less

3    error, but if all I have is the choice of the one

4    with error, I'd prefer that over nothing.

5    BY MR. PETERMAN:

6         Q.   Other than selective availability back in

7    the 1998 time frame, what are other sources of error

8    that could cause a GPS waypoint to be inaccurate?

9         A.   Well, as noted in the patent, the altitude

10   value from GPS had less accuracy than -- than the

11   latitude/longitude estimate, so that would be

12   another source of error.

13             Off the top of my head, you know,

14   interference from the signal.  So if you're in an

15   area -- this still occurs with GPS units again.  If

16   you're in an area with tall buildings or heavy trees

17   or something that's blocking the signal, you might

18   lose the signal for a while, and that would induce

19   errors.  That's all I can think of at the moment.

20        Q.   Would the clock synchronization

21   potentially introduce errors?

22        A.   Can you explain what you mean by "the

23   clock synchronization"?

24        Q.   If the satellites that you were using for

25   GPS were not, you know, synchronized in terms of

Thomas Martin, PH.D. - June 18, 2020

79

1   their -- their clocks, could that introduce errors

2   into the actual waypoints that get -- that get

3   calculated?

4        A.  I'd -- I'd have to go read in more detail

5   the description of how GPS works, but off the top of

6   my head, if I'm recalling correctly, if the

7   satellites got out of sync with each other, you'd

8   have bigger problems than -- than your error.  It

9   depends -- GPS depends upon the time of flight of

10  the signals.

11       Q.  So if you had inaccurate time of flights,

12  that would impact the GPS waypoint calculation?

13       A.  Again, I'd have to go look more to say,

14  but off the top of my head, yes.

15       Q.  And are there environmental factors, you

16  know, caused by, you know, the ionosphere or other

17  atmospheric layers that could impact GPS accuracy?

18       A.  I'd have to look into that.  I'm not aware

19  off the top of my head, but I'd have to look into

20  that.

21       Q.  Are you an expert on GPS calculations?

22       A.  In terms of what to do from the unit, or

23  how the actual units work in the satellite system?

24       Q.  In terms of how the actual units work in

25  the satellite system.

Thomas Martin, PH.D. - June 18, 2020

87

1  the distance between two waypoints" is sufficient

2  for someone skilled in the art for what the patent

3  was claiming.

4  BY MR. PETERMAN:

5      Q.  But the question was whether or not any of

6  these references were included in the specification

7  of the '007 patent.

8          MR. RODRIGUES:  Objection to form, to the

9  extent that's a question.

10  BY MR. PETERMAN:

11      Q.  Were any of these references that you cite

12  in Paragraphs 19 through 23 of your report expressly

13  included within the specification of the '007

14  patent?

15      A.  No, they were not.  It's my opinion they

16  didn't need to be.  Stating that "finding the

17  distance between two waypoints" was sufficient for

18  someone to understand what needed to be done.

19      Q.  Turn to Paragraph 26 of your report.  If

20  you want to take a moment to review that paragraph.

21          (Document reviewed by witness.)

22          THE WITNESS:  Okay.  I've read it.

23  BY MR. PETERMAN:

24      Q.  In the second sentence at the end, you use

25  the term "destination endpoint."

Thomas Martin, PH.D. - June 18, 2020

88

1               Do you see that?

2          A.   Yes.

3          Q.   What does destination endpoint mean?

4          A.   If you're going to calculate the time

5     remaining and the miles remaining, you have to know

6     how far -- where you're intending to go to.  And so

7     the destination endpoint just refers to the point

8     that you're traveling to.

9          Q.   So is that a lat/long?

10         A.   Yes, it could be a lat/long.

11         Q.   What else could it be besides a lat/long?

12         A.   From the standpoint of the user, if a map

13    were available so that they could point to a spot on

14    the map, that would be another way of inputting it,

15    if that's what you're asking.

16         Q.   Other than a lat/long and, you know,

17    dropping a pin or some communication on a map, were

18    you conceiving of anything else in terms of

19    destination endpoint?

20              MR. RODRIGUES:  Objection to form.

21              THE WITNESS:  Well, again, without an

22    endpoint, it's -- in terms of calculating the

23    remaining, you know, you need some way to specify

24    how far you intended to go.

25    ///

Thomas Martin, PH.D. - June 18, 2020

89

1    BY MR. PETERMAN:

2         Q.  So what if I'm running on a standard

3    Olympic track, running several laps.

4              How do I signify my destination endpoint?

5              MR. RODRIGUES:  Objection to form, lacks

6    foundation, vague.

7              THE WITNESS:  I'm sorry, Ruben.  You broke

8    up.  The last thing you said was "lacks foundation."

9              MR. RODRIGUES:  I said "Objection to

10   form" -- let me start over.

11             Objection to form, lacks foundation and

12   vague.

13             THE WITNESS:  Okay.  So if you were

14   running on a track, I suppose you could enter the

15   total distance you intended to travel.

16   BY MR. PETERMAN:

17        Q.  So it wouldn't be a lat/long, but it would

18   be a total distance?

19        A.  A total distance.

20        Q.  So in your formulation here in

21   Paragraph 26 of your report, a destination endpoint

22   could also be total distance?

23        A.  Actually, total distance is the concern.

24   It's even easier than what I was laying out here.

25   Because there, if total distance is your only

Thomas Martin, PH.D. - June 18, 2020

90

```
 1    concern, you're just doing a subtraction.  I know
 2    the total distance that I've already traveled.  I
 3    know the intended final total distance and I just
 4    subtract the difference.  So --
 5            Q.  Well, how do you know the total
 6    distance -- how do you know the total distance that
 7    you've already traveled?
 8            A.  Because you've been calculating a distance
 9    between the waypoints as you've gone along.
10            Q.  And you're using a series of waypoints to
11    calculate that distance; correct?
12            A.  That's correct.
13            Q.  You can't just use the last waypoint to
14    calculate the distance that you've traveled;
15    correct?
16            A.  No, you'd have to calculate it along the
17    path that you traveled.
18            Q.  So in that instance, you're running on a
19    track and you wanted to know the miles remaining,
20    you would be using a series of time-stamped GPS
21    waypoints; correct?
22                MR. RODRIGUES:  Objection to form, vague.
23                THE WITNESS:  Using it for what?
24    BY MR. PETERMAN:
25            Q.  If you wanted to know the miles remaining
```

1   in a run that you were doing on a track, you would

2   need to use a series of time-stamped GPS waypoints;

3   correct?

4              MR. RODRIGUES:  Objection to form.

5              THE WITNESS:  You would need the series to

6   calculate how far you had already traveled, and then

7   once you had that, the distance remaining is just

8   the difference between your desired total distance

9   and how far you've already come.

10  BY MR. PETERMAN:

11       Q.  But the distance remaining requires there

12  to be a calculation of the distance that you've

13  already run, which is based on the series of

14  time-stamped GPS waypoints; correct?

15       A.  That's correct.

16       Q.  Towards the bottom of Paragraph 26, you

17  state:

18              "To determine time remaining,

19          one would simply divide the

20          distance remaining by the average

21          speed of the user for the exercise

22          session."

23          Do you see that?

24       A.  Yes.

25       Q.  So in the situation where you're running

Thomas Martin, PH.D. - June 18, 2020

92

1    on a track, again, in order to determine the time

2    remaining, a series of time-stamped GPS waypoints

3    would be part of that calculation that's used to

4    find the distance remaining; correct?

5              MR. RODRIGUES:  Objection to form.

6              THE WITNESS:  The time remaining would be

7    derived from knowing how far you'd traveled and how

8    far you had left to go.

9    BY MR. PETERMAN:

10         Q.  Which, in part, is derived from the series

11   of time-stamped GPS waypoints; right?

12             MR. RODRIGUES:  Objection to form.

13             THE WITNESS:  The distance you've traveled

14   would be found from a series of time-stamped GPS

15   waypoints.

16   BY MR. PETERMAN:

17         Q.  When you wrote Paragraph 26, you didn't

18   consider an athlete running on a track; correct?

19             MR. RODRIGUES:  Objection to form.

20             THE WITNESS:  Yeah, because off the top of

21   my head, that's a much simpler problem than just

22   running down the street or down some longer path,

23   because when you're running around the track, you

24   simply need to count laps.

25             So I was -- that paragraph is trying to

1    transmission of information between the first

2    personal device and second device?

3        A.  That's correct; that it would be

4    controlled in some manner.

5        Q.  Okay.  So are you just simply replacing

6    the word "governing" with "control"?

7        A.  In the context of the patent as I'm

8    reading it, they -- they mean essentially the same

9    thing.

10       Q.  "Governing" and "control" mean the same

11   thing?

12       A.  In the context of the patent, that's

13   correct.

14       Q.  Okay.  And I want to -- my questions will

15   all be about the context of the patent unless I

16   specify otherwise.

17       A.  Okay.

18       Q.  So I guess in addition to changing

19   "governing" to "control," you do change the term

20   "information transmitted" into "transmission of

21   information."

22            Was that an intentional change?

23            MR. RODRIGUES:  Objection to form.

24            THE WITNESS:  It just seemed like a more

25   grammatical way of stating what was intended.

Thomas Martin, PH.D. - June 18, 2020

113

1      Q.   And you've expressed an opinion that
2   we'll, for the purposes of this question just accept
3   as true, that governing and control or controlling
4   are synonymous; correct?
5          A.   Yes, governing and controlling are
6   synonymous.
7          Q.   So if they're synonymous, one could just
8   replace the term "governing" with "control" or
9   "controlling" and not change anything else in the
10  claim language.  So it would read, "A security
11  mechanism controlling information transmitted
12  between the first personal device and the second
13  device"; correct?
14              MR. RODRIGUES:  Objection to form.
15              THE WITNESS:  The -- stating "controlling
16  the transmission of information" seems to me to be
17  more clear about some of the aspects of the patent
18  that are about access, who has the ability to access
19  the information.
20  BY MR. PETERMAN:
21         Q.   Okay.  But the original claim language
22  does not say "governing the transmission of
23  information"; correct?  It says "governing
24  information transmitted"; correct?
25         A.   That's correct.  The original patent claim

Thomas Martin, PH.D. - June 18, 2020

114

1    states it that way.

2         Q.  So in your mind, is there a difference

3    between the phrase "controlling information

4    transmitted" and "controlling the transmission of

5    information"?

6              MR. RODRIGUES:  Objection to form.

7              THE WITNESS:  As I've said, it seems to be

8    more clear to me that controlling the transmission

9    of the information makes it more clear with the

10   different sorts of situations that are involved.

11   BY MR. PETERMAN:

12        Q.  Okay.  But the patentee decided to write

13   "governing information transmitted" and not

14   "governing the transmission of information."

15             MR. RODRIGUES:  Objection to form.

16             THE WITNESS:  That's correct.

17   BY MR. PETERMAN:

18        Q.  All right.  So you say it's more clear.

19             I guess just as a threshold question, what

20   do you perceive as the difference between

21   controlling information transmitted and controlling

22   the transmission of information?

23        A.  As I said just a bit ago, some of the

24   later claims go at the ability to access

25   information, you know, the authorization access

1  information.  And so stating that it's controlling

2  the transmission information seems to make that more

3  clear.

4      Q.  But would the later claims work with the

5  term "controlling information transmitted"?

6      A.  Yeah.  Again, it doesn't seem as clear to

7  me, but...

8      Q.  Well, I mean I'm -- and the reason I'm

9  hitting this point hard is that you've chosen to

10  rewrite the orders of the words that the patentee

11  chose.

12      Other than your statement that doesn't

13  seem as clear to you, what is the basis for you

14  reordering the words of the claim?

15      A.  The reordering was not -- the phrase

16  that's in there was based on counsel, not -- I

17  wasn't the first one to choose that ordering.

18      Q.  So what reason was expressed to you as the

19  reason that the ordering was changed?

20          MR. RODRIGUES:  Objection to form and I'll

21  instruct you not to answer as to what counsel told

22  you about any of this.

23  BY MR. PETERMAN:

24      Q.  Well, you've adopted this as your opinion,

25  so what is the basis that you would tell the court

1        Q.   So what do you take the term "not meant to

2    be exclusive" to mean?

3        A.   It -- it means that there could be other

4    alternatives that aren't spelled out.  They're just

5    giving primary examples.

6        Q.   And one of the primary examples that is

7    given, in fact, the first example, is encryption.

8            MR. RODRIGUES:  Objection to form.

9            THE WITNESS:  I'm sorry, but you're taking

10   that in isolation because, you know, it talks about

11   security arrangements, you know -- sorry.

12           So the opening paragraph of the section

13   back up at Line 26 talks about various types of

14   security arrangements, and different security

15   arrangements are meant to address different types of

16   potential attacks.  And so this is just giving an

17   example of a -- of a particular arrangement, but not

18   necessarily one that addresses all possible security

19   attacks or security flaws.

20   BY MR. PETERMAN:

21       Q.   So is it your testimony, then, that

22   Claim 1 is designed for only one particular type of

23   security flaw?

24           MR. RODRIGUES:  Objection to form.

25           THE WITNESS:  No, that's not my opinion,

Thomas Martin, PH.D. - June 18, 2020

131

```
1    because looking back at the claims, there are
2    what -- the following claims after Claim 1 talk
3    about different types of security mechanisms that
4    that -- that that security mechanism in Claim 1
5    could be.
6    BY MR. PETERMAN:
7         Q.   And so, in your opinion, could encryption
8    be part of a security mechanism that is disclaimed
9    in 1(c)?
10              MR. RODRIGUES:   Objection to form.
11              THE WITNESS:   It could be a part, but it
12   may not necessarily be the totality of it.
13   BY MR. PETERMAN:
14        Q.   And what other parts could be included
15   within 1(c)?
16              MR. RODRIGUES:   Objection to form.
17              THE WITNESS:   When you say "what other
18   parts," do you mean what other parts besides
19   encryption?
20   BY MR. PETERMAN:
21        Q.   Correct.
22        A.   So there could be -- (a) there could be
23   multiple levels of encryption, so -- which is not
24   uncommon, so -- and then there could be layers of
25   authentication.
```

Thomas Martin, PH.D. - June 18, 2020

132

```
 1              There could be -- I'm trying to think
 2     of -- and so there might be a mechanism for
 3     non-repudiation, which would be, you know, trying to
 4     deny something after the fact.
 5          Q.  So I'm trying to understand your written
 6     opinion with what you're testifying to today, but is
 7     it your testimony that governing information
 8     transmitted between the first personal device and
 9     the second device could include encryption?
10              MR. RODRIGUES:  Objection to form.
11              THE WITNESS:  Again, it could include
12     encryption, but it might -- might be more.
13     BY MR. PETERMAN:
14          Q.  I understand that it could include
15     encryption but it might be more, but could it
16     include only encryption?
17              MR. RODRIGUES:  Objection to form.
18              THE WITNESS:  Sorry.  I'm trying to think
19     of situations where you would want to have only
20     encryption, and it would -- encryption, but only by
21     the ability to keep unwanted people from seeing the
22     information, from being able to tell whatever
23     information's contained.
24     BY MR. PETERMAN:
25          Q.  So does the Claim 1(c) of the '233 patent
```

Thomas Martin, PH.D. - June 18, 2020

133

1    as written allow the security mechanism to only

2    include encryption?

3              MR. RODRIGUES:  Objection to form, vague.

4              THE WITNESS:  It could only be encryption.

5    BY MR. PETERMAN:

6         Q.  So I want to go back to the distinction

7    that you were drawing where we were talking about

8    between controlling the transmission of information

9    and controlling the information transmitted.

10             Is there an actual distinction, or do you

11   think it's just cleaner English to use your

12   formulation of it?

13             MR. RODRIGUES:  Objection to form.

14             THE WITNESS:  That formulation does seem

15   to -- to make more clear the cases where you're also

16   trying to control the access to the information.

17   BY MR. PETERMAN:

18        Q.  So you think your formulation is perhaps

19   broader than just saying "controlling the

20   information transmitted"?

21             MR. RODRIGUES:  Objection to form,

22   mischaracterizes prior testimony.

23             THE WITNESS:  I mean off the top of my

24   head, if you had one of these devices where you just

25   wanted to prevent somebody from sniffing the

170

1    which this deposition is taken, and further that I

2    am not a relative employee of any attorney or

3    counsel employed by the parties hereto, or

4    financially interested in the action.

5            CERTIFIED TO BY ME on this 22nd day

6    of June, 2020.

7

8

9                    _____
                          KRISTI CARUTHERS
                          CSR NO. 10560

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25