```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MASSACHUSETTS
 2

 3      --------------------------------X
        PHILIPS NORTH AMERICA, LLC,     |
 4                                      |
                Plaintiffs,             |
 5                                      |   Civil Action No.
            v.                          |   1:19-cv-11586-IT
 6                                      |
        FITBIT, INC.,                   |
 7                                      |
                Defendants.             |
 8      --------------------------------X

 9

10

11

12

13

14         BEFORE THE HONORABLE INDIRA TALWANI, DISTRICT JUDGE

15               MARKMAN HEARING VIA VIDEOCONFERENCE
                      Wednesday, August 5, 2020
16                          10:01 a.m.

17

18      John J. Moakley United States Courthouse
        Courtroom No. 9
19      One Courthouse Way
        Boston, Massachusetts

20
        Robert W. Paschal, RMR, CRR
21      Official Court Reporter
        rwpaschal2002@gmail.com

22

23

24

25
```

1                          A P P E A R A N C E S

2

3      On behalf of Plaintiff:

4           FOLEY & LARDNER, LLP
            BY:  ELEY O. THOMPSON
5                RUBEN J. RODRIGUES
                 JOHN CUSTER
6           111 Huntington Avenue, Suite 2500
            Boston, MA  02199
7           617-342-4000
            ethompson@foley.com
8           jcuster@foley.com
            rrodrigues@foley.com

9

10

       On behalf of Defendant:
11
            PAUL HASTINGS, LLP
12          BY:  Yar R. Chaikovsky
                 Chad J. Peterman
13          1117 S. California Avenue
            Palo Alto, CA  94304
14          650-320-1832
            yarchaikovsky@paulhastings.com
15          chadpeterman@paulhastings.com

16

17

18

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1                (In open court at 10:01 a.m.)

2           THE DEPUTY CLERK:  United States District Court

3 is now in session, the Honorable Judge Indira Talwani

4 presiding.

5           This is Case Number 19-cv-11586, Philips North

6 America LLC versus Fitbit, Inc.  Will counsel please

7 identify themselves for the record.

8           MR. THOMPSON:  Good morning, Your Honor.  It's

9 Eley Thompson from Foley & Lardner on behalf of Plaintiff

10 Philips.

11           THE COURT:  Morning.

12           MR. RODRIGUES:  And Ruben Rodrigues, also Foley &

13 Lardner, on behalf of Plaintiff Philips.

14           THE COURT:  Good morning.

15           MR. RODRIGUES:  Good morning.

16           MR. CHAIKOVSKY:  Your Honor, on behalf of

17 Defendant Fitbit, you have Yar Chaikovsky.  Good morning.

18 I'd also like to introduce briefly, on the line is our

19 client representative, Matt Hollander.  And then I will let

20 my colleague introduce himself.

21           THE COURT:  Good morning.

22           MR. PETERMAN:  Good morning, Your Honor.  Chad

23 Peterman from Paul Hastings on behalf of Fitbit.

24           THE COURT:  Good morning.

1          MR. THOMPSON:  Your Honor, I should probably

2     mention too that a client representative for Philips is on

3     as well, Elias Schilowitz.

4          THE COURT:  Good morning.

5          It is -- it's actually been very interesting with

6     these Zoom proceedings that I think it has made it much more

7     possible for clients to observe everything and stay

8     involved.  It seems to be one of the benefits of this

9     difficult time we're working through.

10         So we're here for claim construction, and I guess

11    we received notice of -- that -- so I think everyone needs

12    to turn off their microphone unless they're the ones

13    talking, because we've got a lot of noise.

14         So we did receive notice that one of the patents

15    may not be at issue and we don't need to do a claim

16    construction regarding the core terms; that's the '958

17    patent.  Any dispute about that, that we don't need to

18    address those today?

19         MR. THOMPSON:  Your Honor, that is correct.  We

20    had spoken with Fitbit about withdrawal of those terms in

21    that patent, and I believe that they withdrew those slides

22    from their presentation.  So I do believe we have agreement

23    that we're not addressing those today.

24         THE COURT:  Okay.  And no disagreement from

25    Fitbit, correct?

```
 1              MR. PETERMAN:  No, Your Honor.  No disagreement

 2    from Fitbit.

 3              THE COURT:  Okay.  So I have six remaining claim

 4    terms, and I think the parties wanted to start with a

 5    10-minute introduction, so I'm happy to proceed with that.

 6    Given that we don't have those six terms, maybe we don't

 7    need to use the full 2½ hours.  But at any rate, we can move

 8    through at a steady pace.  So I'll start with the 10-minute

 9    introduction, and do the parties have an agreement as to who

10    would start on the introduction?

11              MR. THOMPSON:  I would suggest that the

12    plaintiffs should go first, but I don't believe that we

13    discussed the order yet.  I could be wrong about that.

14              THE COURT:  Any objection to the plaintiff

15    proceeding first with the introduction?

16              MR. PETERMAN:  No objection from Fitbit,

17    Your Honor.

18              THE COURT:  Okay.  So please begin.

19              MR. THOMPSON:  Thank you, Your Honor.  I'm going

20    to share my screen, and hopefully this is going to work

21    properly.  So please let me know if everybody can see this.

22              THE COURT:  Well, I can see it.

23              MR. THOMPSON:  Okay.  Well, thank you,

24    Your Honor.  And thank you for your time today to address

25    this.
```

1          I would like to speak -- I don't know that I -- I

2    definitely will not be speaking for 10 minutes.  I think

3    that the materials in the patents had been submitted to the

4    Court, so I don't plan to go through every aspect of it,

5    because I do think that the introduction -- to be efficient,

6    we should focus on, you know, the parts in the context that

7    we'll be addressing.  So I will just talk a little bit about

8    the technology in context of the patents in relation to some

9    slides that I will then later talk about how they pertain to

10   some of the disputes between the parties.

11         So the first one that I would like to address --

12   oh, and I should also mention that Philips -- that my

13   colleague and I, Ruben Rodrigues, have split the argument,

14   if that is okay with the Court, where I will address the

15   root '007 patent and the Quy '377 patent, and Mr. Rodrigues

16   will address the Menard '233 patent.

17         THE COURT:  That's fine.

18         MR. THOMPSON:  Okay.  Thank you, Your Honor.

19         So what I would like to do then is refer to this

20   drawing, Figure 6.  This is the root -- the root patent, the

21   '007.  It is, I believe, in our sequence, the first patent

22   that we would address.  And I wanted to talk momentarily

23   about just the background and the technology.

24         The drawing in Figure 6 is the device that is

25   patented in the claims.  And what you can see from this

1    drawing, which is highly technical, of course, is that there

2    is included an audio portion, which is 606, which is

3    connected to headphones in this particular -- or related to

4    the headphones, the 202, which is what the runner or athlete

5    would use.

6              And then there is a GPS and memory connected

7    through the CPU.  The idea behind this and the usefulness,

8    this device makes it so an athlete in the field is able to

9    get separate locational-type information about their

10   athletic performance, a feedback while they're -- while

11   they're performing, while they are doing their athleticism.

12   And so I'll just talk about the claim a little bit to

13   talk -- because it highlights parts of what this system

14   brought forth.

15             And it refers to being able to get updates --

16   7(f) -- an athlete's performance, and that that uses GPS.

17   And then, importantly, in the next part of the claim, it

18   talks about how you're going to do this.  And it identifies

19   a very particular way, which is that there would be a series

20   of time-stamped waypoints -- and we'll end up talking about

21   this in claim construction more -- but a series of

22   time-stamped waypoints.  And those are put into the memory,

23   that thing on 608, and that indicates how you would then

24   calculate the athletic performance.

25             So from those time-stamped waypoints, that is the

1    manner in which you would identify various athletic

2    performance, and there are multiple ones, such as pace and

3    speed, the typical things that you would expect for an

4    athlete performing.

5            And that the idea here -- there would be, of

6    course, lots of different ways that athletic performance, I

7    guess, as a very general concept, could be measured --

8    stopwatches, which is, of course, kind of typical.  You

9    think of somebody running around a track and then there's a

10   stopwatch or things like that.  But this is a particular

11   methodology of obtaining athletic performance through

12   time-stamped waypoints.  And when you do it that way -- when

13   you do it that way, you get a device that is highly useful

14   and then, of course, in the context of this case, Philips is

15   asserting that Fitbit infringes.

16           And then the last part, of course, in this

17   invention is in the relationship to presenting that

18   information, that feedback to the athlete; that can be done

19   at different times, including while the athlete is

20   performing.

21           So that is a little bit of the context of what

22   this device is.  There were no devices like it.  And so it,

23   in the context of its particular methodology, of using

24   time-stamped waypoints, certainly, and having a device that

25   does this is the invention that was brought forth in the

1   '007 patent and then, of course, later on adopted by Fitbit

2   per our infringement claims.

3           The next patent -- and I will switch over to the

4   '377 that I would like to talk about.  And I -- forgive me,

5   because I'm going to have to slip through some of our slides

6   to get to this particular one.

7           So I'd like to talk about the Quy patent in terms

8   of its claim.  Because I think that that really encapsulates

9   what the invention is.  And not all of these terms --

10  there's highlighted ones here that we'll be talking about

11  for construction, but I wanted to talk a moment and explain

12  what Quy's patent and its invention is about.

13          So one thing that's really important with both of

14  these patents, but I think in particular this one, is that

15  their priority dates -- like for this one, it's 2000, the

16  year 2000.  And then for the other one, it's even before; I

17  believe it's 1998.  And I was saying, in particular for this

18  one, it's important; and I think that is because as the kind

19  of cellular world has evolved, it's so pervasive to us now,

20  with having cell phones and smartphones and all that, I

21  think that as a society, we lose track of the fact of how

22  much has changed in that, in 2000, there weren't smartphones

23  of the type that we're used to now.

24          And there weren't app stores like we're used to

25  now, like whenever you may be looking at the Apple store,

1    the Google apps or -- Google apps or Play -- those Play

2    locations where you go to get different apps.  All that

3    stuff wasn't in existence as it is now in the year 2000.

4            So what the invention is and what was developed

5    by Dr. Quy -- Dr. Quy here is a scientist who had been

6    working in -- is a doctor in the relevant fields here,

7    realized that you could use a phone -- and back at that

8    point in time, he thought of how you might be able to use a

9    phone as an interface.  So he devised an architecture and a

10   system in ways that he could set up a system to have that

11   work.

12           And so the claim talks about many different

13   things that are new relative to that.  So starting with A,

14   downloading an application to the device from a remote

15   server.  So that's step 1.  So his idea is that the -- that

16   you would move the application, and then that application,

17   you could couple the phone to the device, which has the

18   exercise information and render an interface on the phone.

19           And then importantly, using that application that

20   was downloaded, you receive data of physiological status of

21   the subject, and that's like heart rate; and then using the

22   data, you also receive exercise information.  So this app

23   that is on the phone now is receiving this data.

24           And then -- and then it notes in (f) that, of

25   course, it's receiving the data from another device, right,

1    and in the infringement, that's the watch; that the data can

2    go through that watch first.  And, of course, there will be

3    latency and different sorts of things, and you can have

4    different protocols for energy conservation, and then that's

5    received through the app.  And then that is, of course, done

6    at least partially, you know, so at least at one point in

7    time while the subject is exercising.

8            Then it goes on, right?  So to make this device,

9    this architecture that he has contemplated and come up with,

10   you'd send that information to a server.  This -- and then

11   you would receive a calculated response back.  So -- and

12   then, ultimately, you would use the application that you had

13   downloaded to display that response.

14           Now, that is a device and system that did not

15   exist at all at the time.  At the time phones were of the

16   sort that you recall, you know, had really no functionality.

17   The idea of having a device that would have physiological

18   information and exercise information and would then connect

19   to an app that had been downloaded onto, you know, like a

20   standard phone or whatever, was -- was not at all possible.

21           And so all of this -- all of this functionality

22   in here in this architecture created what, of course, now we

23   know as a very functional and useful type of device where

24   you use your phone, but the app has been developed, like in

25   this instance by Fitbit.  Philips has apps as well.  And

1    they are installed and then thereby transform the phone into

2    a customized device, either one customized as per Fitbit or

3    one customized as per Philips.

4            And then that device then connects to a specialty

5    device -- a watch for Fitbit -- and establishes this

6    architecture that is hugely useful.  And it's foundational

7    in the sense that that makes the system and -- bearing in

8    mind that this was something that was developed by Dr. Quy

9    in 2000.  Fitbit did not even become a company until 2007.

10   So this is -- much predates their effort.  And when they did

11   establish themselves in 2007, one of the things the founder

12   said is that now that the technology is available, we find

13   that we can have our company and provide these products.

14           And so they also, by the way, did not have any

15   patents issued to them at the time that they opened their

16   doors in 2007.  So that's a little bit of background on the

17   '377.  I'd like to turn it over to Ruben -- I'm sorry?

18           THE COURT:  I'm going to cut you off here.  I was

19   giving 10 minutes for opening.  You said you didn't think

20   you would need 10 minutes.  We're at 15.  So I'm going to

21   let your colleague talk about the other patent in connection

22   with the terms when we get there, and I'm going to move for

23   the intro piece to Fitbit now for their intro, and then

24   we'll go back to the individual terms.

25           MR. THOMPSON:  Your Honor, I apologize for going

1    over.  I guess I had more to say than I thought I did.  So

2    thank you for your indulgence.

3             THE COURT:  So now if I could hear from Fitbit an

4    introduction, please.

5             MR. CHAIKOVSKY:  Your Honor, yes.  We are

6    migrating our slides to share.

7             You know, I hope -- this is Yar Chaikovsky.  I

8    hope that our presentation is a little bit more directed to

9    the patent claims and the patent specification.

10            If we go to the slide, subject content -- next

11   slide.

12            You know, as a whole here, and I think we heard

13   some of it for opposing counsel, is the patents here are

14   directed to wireless devices.  Part of that is the

15   chronological time in which this was filed.  So we have

16   wireless --

17            THE COURT:  You're going -- I'm sorry.  You're

18   going to need to talk just a little bit slower for me to

19   keep up with you.

20            MR. CHAIKOVSKY:  -- wireless devices and GPS

21   devices used for medical or exercise monitoring.  So as you

22   see here, you know, that's what we're talking about.  We're

23   not talking about what Fitbit sells and markets, which is

24   smart watches and trackers.  These patents were for cell

25   phones.

1          If we go to the next slide, we have the claim of

2     the '007 patent.  I'll touch upon it later.

3          Next slide, for sake of speed.

4          What wasn't mentioned is, what was the '007

5     patent doing?  As we see in the background in Column 1,

6     lines 16 through 27, it was taking known activity monitoring

7     performed by indoor devices such as treadmills.  You can see

8     that in the spec.  It says treadmills provide all the

9     functionality that we're talking about in the claims here:

10    Continuous readouts of time, distance, speed, pace, in fact,

11    some things that perhaps were not included:  Inclination --

12    a treadmill can be inclined up or down -- calories burned

13    and so forth.

14         So the patent was noticing, Hey, here's what we

15    have, and we have these in exercise materials.  A treadmill

16    is one example.  As you can see in this background, running,

17    bicycles, outdoors, other ways we're doing this with

18    runners, but the treadmill is a specific example that you

19    can think of that was known.

20         We go to the next slide.  And we go, Okay, so

21    what do we want to do about it, back here in 1998.  So back

22    here in 1998, what they thought was patentable way before

23    Alice and all that, they said, "Hey, we're going to take

24    known GPS technology" -- we didn't invent anything -- "we're

25    going to combine it."  And that GPS technology is there in

1    the Column 1, line 39 through 51.  GPS is becoming widely

2    available.  Handheld GPSes are presently on the market.

3    That's what the patent says to use.  There's nowhere that

4    it's going to be pointed out by plaintiff's counsel that

5    we're using some novel GPS technology.

6            And we're going to combine that with audio/visual

7    display showing our currently geographical location,

8    destinations, navigations, such as GPS would do.  And then

9    we're going to provide you realtime athletic performance

10   data that's going to be, hey, stuff that we got, for

11   example, on that treadmill that I showed on the prior slide,

12   Slide 5, and we're going to provide it audibly.

13           And that audibly, as we'll see, if you look at

14   the figures of the patent -- we actually don't have it here

15   on the slides -- is, for example, like a Walkman or a device

16   attached to the user with headphones.  So we had a GPS with

17   the treadmill readout information and a Walkman.  That's

18   what we've done here.

19           Next slide.

20           In fact, we go to Garmin's -- in fact, better

21   than our Slide 7, if we go to Garmin's slide here, slide 4,

22   which we have, Your Honor -- let's take a moment to switch

23   to Slide 4 -- Slide 4, Garmin's presentation.  Apologies for

24   the time.

25           But I'll talk about it as we get it up on the

1    screen.  They highlighted the claim in a way I found that

2    was quite illuminating.  You know, they highlighted the

3    claim showing that we have a GPS system in Claim 1.  We have

4    a means for presenting the feedback.  That's the Walkman.

5    We have a modem as you can see in Slide 21.  That's just a

6    standard modem.  No one is going to say we have a special

7    modem.  That's 21.  Claim 1 doesn't have that modem, as you

8    can see here, Slide 4, from Garmin's presentation.

9            And then we have this means for computing

10   athletic performance feedback, again, like the treadmill

11   competed, except here we're doing it using waypoints of a

12   GPS receiver.

13           That slide is the one we wanted, Slide 4.

14           And as you can see from how they presented the

15   figures on their Slide 4, if you have hard copies,

16   Your Honor, they demark the GPS, they demark the CPU, they

17   demark the memory.  There's nothing unique about the GPS.

18   There's nothing unique about the CPU.  That's GPS, 604; CPO,

19   602; memory, 608.  In fact, there's nothing in here that's

20   unique or different.  And we'll see as we go through the

21   claim construction that there's nothing unsurprising in the

22   claim construction.  In fact, that means they're computing

23   athletic performance feedback.  Ultimately, their argument

24   is going to be the algorithm's in the claims.

25           Because of our briefs and our opening brief and

1    where we went in our opening brief and said you can't cite

2    Katz -- they're going to say, "Okay.  But we can cite it.

3    It's in the claim."  I'll tell you, for an MPF claim, from

4    the federal circuit, you're never going to see them say the

5    claim's enough when the word "means" is used.  They don't

6    have that case because that case doesn't exist.  Think it's

7    enough for them to go --

8            '007 -- if we go to the '377 patent on our

9    presentation, that's Slide 8, Your Honor.  The '377 patent,

10   which was in the same family as the now dropped '958, that,

11   again, applies to off-the-shelf wireless devices -- this is

12   in 2000 approximately -- to health monitoring.  And, really,

13   the focus was on a method for interactive exercise

14   monitoring, "interactive" being the key word.  We want this

15   to be interactive while you're exercising.

16           If we go to the next slide, how does the claim

17   show us that in the claim?  You know, we heard a lot of

18   history of the story of the inventer, et cetera, but the

19   focus is going to be on the claim here in the *Markman*

20   process and also eventually, Your Honor, when you have your

21   101 hearing.

22           There's nothing in the claim that's unique.

23   Again, the preamble has this interactive exercise

24   monitoring.  As was pointed out by counsel for Garmin in

25   (d), you use the application receiving data indicating a

1    physiological status of the subject.  That's while they're

2    exercising.  So I want -- well, exercising to know what

3    their status is.

4            Okay.  Then, I go to slot -- Element F, and at

5    the end, there's a wherein clause where it says, "Wherein

6    the data indicating that status of a subject is received at

7    least partially while the subject is exercising."  And

8    that's -- it's not saying we don't receive their exercise

9    data while they're exercising.  It's -- I'm receiving it at

10   least in part, if not in whole, while they're exercising,

11   but it's of them exercising.  And I've got to receive it at

12   least partially while they're exercising.

13           Well, if we go to their infringement

14   contentions -- that's the next slide -- we see, although

15   difficultly.  If you have the hard copy, Your Honor,

16   probably much better than the visual, and I apologize for

17   the Zoom aspects here -- that in their infringement

18   contentions, they point to Fitbit receiving status at a data

19   of 15-minute intervals.

20           It doesn't matter whether I was exercising or

21   not.  It doesn't matter whether it's measuring exercise.

22   It's just, hey, at 15-minute data intervals, I'm getting

23   heart rate data.  And that's one of the bases -- and partly

24   why you're going to see them construe terms in the way

25   they're construing them -- one of the bases in which they're

1    accusing our devices of infringing, is this automatic needs

2    of sensing heart rate data, again, whether the user is

3    sitting, exercising or doing whatever they're doing.

4              Next slide.

5              And the last patent, the '233 patent, Your Honor,

6    that, again, combines these off-the-shelf cell phones,

7    wireless devices, not wearable devices, with sensors that

8    were used for personal medical devices at the time, adding a

9    layer of security -- of course, there will be fights about

10   that -- between the devices using known techniques.

11             You can see here in the specification -- and this

12   is actually various -- as you can see in Slide 11 -- various

13   columns put together from the patent.  So this is not one

14   location on Slide 11 -- that the patent always refers to

15   this as a personal medical device, a PMD, and it says it can

16   take many forms.

17             And then the next section here, which is from

18   Column 2, describes a device to be coupled with the PMD to

19   provide wireless communications.  So we take this personal

20   medical device, and that can be implanted or strapped to a

21   person; we combine it wirelessly; and we connect to a

22   wireless network.

23             So I'm taking a sensor.  I connect it wirelessly

24   to a wireless network -- cell phone, sensor.  And then the

25   following are possible embodiments of security.  What is

1   that?  And we see that on the bottom, Column 13, lines 41

2   through 46.  And that's just saying data can be transmitted

3   to and from a personal device.  That's, in fact, the PMD.

4   That may be encrypted by an encryption algorithm.  That's

5   just security.

6          So I'm going to take a sensor, attach it to a

7   human body, a wireless device, like a cell phone, and I'm

8   going add an encryption algorithm of any kind.  There's your

9   patent.  And that's the '233 patent.

10          I have nothing further -- ah, the claim -- I

11   guess, Claim 12 to -- show Slide 12 -- and, again, the first

12   personal device is the sensor.  There's nothing unique

13   there -- processer, memory, detects a signal, connects to

14   wireless.  We then have the second device -- short range,

15   wireless.  And we have a security mechanism, as I just said,

16   in the specs.  So the claim is the same.  I'm not, you know,

17   taking that out of context in the specification.

18          Slide 13 -- one last slide, and I'll be done --

19   and that's their infringement contention, by the way, and

20   you'll see this come up with when we construe the term.

21   Logging into an account, logging into your Fitbit app, which

22   is what's shown on that figure on Slide 13, that meets the

23   security mechanism element according to them in their

24   infringement contentions.  So, again, sensor device,

25   wireless device, logging into your app -- that's the patent.

1          THE COURT:  Okay.  We're going to go to the

2    individual terms.  Let me just give a few points that might

3    help you in understanding how I am viewing the purpose of

4    today.

5          So, Mr. Chaikovsky, I'm speaking with you also.

6          I'm -- we are having a claim construction

7    hearing.  I understand my job here to be looking at these

8    claims and determining whether the terms need to be

9    construed, and if so, how that construction would go,

10   thinking about instructing a jury.

11         You both -- or all of you, have far more

12   engagement, obviously, in the litigation than I do.  Today

13   is not infringement day.  I understand that there may be

14   interest in how I understand the construction -- there's

15   clearly interest.  How I construe these terms impacts the

16   infringement or noninfringement.  There's no question that's

17   the endgame here.  But it's not today's game.

18         So it would be helpful for me to not be asked to

19   weigh into what I think is ultimately going to be a question

20   for the jury of how these -- whether these technologies do

21   or do not -- whether Fitbit's product does or does not

22   infringe.

23         All I want to be doing today is understanding the

24   patents in front of me and determining whether I need to

25   describe something more with these words for purposes of the

1    instructions to the jury.

2            I understand there are also pending motions to

3    dismiss, for summary judgment, et cetera.  And to the extent

4    that those motions will require claim construction,

5    obviously, some of that may ultimately be leaking into that.

6    But I am focused right now on thinking about this, if this

7    were going to a jury, what do I need?  Do these claims say

8    what they say?  Do -- how do they say it?  Do I need to give

9    something more to a jury?

10           And in this regard, I think this is always hard

11   for patent lawyers to understand, but we're courts of

12   general jurisdiction, and so we sort of treat this in some

13   ways like other cases.  If you have a property dispute and

14   there is a deed, the jury will decide whether there was a

15   trespass.  And I sort of view this the same way.  At the end

16   of the day, infringement is for the jury, not for me.  My

17   job is to make sure that, assuming that this does get to a

18   jury, that the jury will understand what the claims are.

19           So with that introduction from me, we have six

20   terms, and I believe I understand that we're starting with

21   the '007 patent.  I'm going to just proceed along the joint

22   claim construction chart unless there is a disagreement.  I

23   think in terms of the time we have left, it's probably 10

24   minutes per side per term.

25           And with that, let's start with the first term

 1   here, the "means for computing athletic performance feedback

 2   data from the series of time-stamped waypoints obtained by

 3   said GPS receiver."  And who is starting on that?

 4                  MR. THOMPSON:  Your Honor, I think that -- I

 5   would suggest that plaintiffs go first on the claim

 6   construction, and so I was -- I'm ready to speak to that.

 7                  THE COURT:  Okay.  Let's have you start on the

 8   first term.

 9                  MR. THOMPSON:  Okay.  Thank you, Your Honor.

10                  I am going to share my screen.

11                  Okay.  So relative to the term, we are looking at

12   the highlighted term here, "means for computing athletic

13   performance feedback data from a series of time-stamped

14   waypoints obtained by said GPS receiver."

15                  So in looking at a means-plus-function claim, it

16   is certainly true that sometimes you can use the word

17   "means" and there can be enough structure or -- provided in

18   the claim that it does not need to have further review.  I

19   think that this claim is -- has -- if you break it apart

20   into function, a means for function -- so a means plus

21   function is supposed to be "means for" and then just state

22   the function.

23                  So here, I think that the words of the claim

24   actually end up being a means plus function plus structure

25   in the form of the algorithm.  So it's -- the function is a

1   means for computing, right, and the computing is of athletic

2   performance feedback data.  So that's the computing this

3   thing, so that's the function.

4          But then the "from," the "from" tells you how.

5   You are going to do it from not just time-stamped waypoints,

6   but from a series of time-stamped waypoints.  And then

7   the -- at least the location will be from the GPS receiver.

8   That indicates a lot of -- relative to the -- to the

9   algorithm that would be executed.

10          The specification makes clear what the structure

11   is, right?  And that's what is identified there in 40 to 43

12   in Column 7.  And it's highlighted in the drawing that I was

13   referring to before.  It's the GPS providing positional

14   information, the CPU and the memory having the time-stamped

15   waypoints, and then, of course, a series of those being used

16   to calculate the athletic performance feedback data.

17          The -- I want to skip this for a moment.  I'll

18   come back to this slide.

19          When identifying the structure, the algorithm,

20   one of the things that is absolutely essential in review of

21   patents is to recognize that patents are not written for

22   laypeople.  They're not written for nontechnical folks on a

23   legal team or that sort of person.  They are written

24   relative to a person of skill in the art.

25          And Philips was the only one to identify what

1    that background, what that knowledge base would be.  And

2    this is from our brief, that it would be a bachelor's degree

3    in electrical engineering, computers, computer-science type

4    education, having experience in activity monitoring, and

5    also having experience with GPS.  So that's the knowledge

6    base.  This is important when we look at what this patent

7    discloses.

8            THE COURT:  So let me -- let me ask a question

9    here.  Assuming I am on board that you can calculate all of

10   the feedback data that you've been highlighting, but that

11   there isn't anything that would allow a person of ordinary

12   skill in the art to calculate calories burned, what's the

13   import of -- if I were to make that determination?

14           I mean, you have a two-part argument here.  One

15   is that you're arguing that the feedback data doesn't

16   include calories burned, and then you're arguing that the

17   rest of the feedback, that the feedback data that you're

18   identifying, can be calculated.  So if I agree with you that

19   feedback can be calculated, but I were to conclude that

20   calories burned can't be calculated, where does that leave

21   you in your construction of this patent?

22           MR. THOMPSON:  Well, I think that -- and I'll

23   switch back so that we have reference to the claim.  I think

24   that you're referring to athletic performance feedback data

25   and whether in this claim that would require that each and

1    every different thing has to be calculated; in other words,

2    that you have to calculate speed, you have to calculate

3    pace, you have to calculate each and every single one of

4    them.

5              I think that athletic performance feedback data

6    is a class of information.  You may -- the claim only

7    requires that you would calculate any one of them.  So I

8    think that --

9              THE COURT:  Okay.

10              MR. THOMPSON:  -- that that's important too --

11              THE COURT:  So --

12              MR. THOMPSON:  -- because I think that there is a

13    possibility of a -- of assuming that each and every thing

14    within a class has to be calculated, and I don't think

15    that's what that claim says.

16              THE COURT:  Okay.  So if I were to say that the

17    specifications suggest that athletic performance feedback

18    data includes calories burned, contrary to your argument,

19    you would say that wasn't -- I think you said in your briefs

20    that that isn't part of the feedback data.

21              But if I were to say this patent is claiming a

22    means for computing six things, but only disclosed --

23    sufficiently discloses an algorithm, because the algorithm

24    is just high school math, for five things, what's the impact

25    of that?  What's the next step in that analysis?

```
 1              If the calories burned is listed as something
 2    here that would be feedback, does that simply mean that if
 3    you're -- that the patent then is limited where the means is
 4    adequately disclosed or the algorithm is adequately
 5    disclosed, and I write the calories burned out of the
 6    patent, or does it write the claim out?
 7              MR. THOMPSON:  I think that there's two levels to
 8    that.  There's actually multiple levels.  So I'm going to
 9    skip over the question of whether calorie -- calories burned
10    is properly considered an athletic performance feedback data
11    point, because I think that the claim does talk about that
12    those -- narrows those that are relevant to this claim to
13    those calculated from a series of time-stamped waypoints.
14    So the claim worked together, right?
15              So it's not every athletic performance feedback
16    data; it's the ones that are calculated from a series of
17    time-stamped waypoints, right?  And our viewpoint has
18    been --
19              THE COURT:  And I understand you made that
20    argument, and I'm not necessarily rejecting that argument.
21    My question for you, to move this beyond just what's in the
22    briefs, is that if I were to disagree with you and I were to
23    read this as Fitbit says, that the claim sought to include
24    six different data points, but the specifications are
25    only -- provide enough information for five, what is the
```

1   import of that?  Does that mean the claim goes away, or does

2   that just mean that, to the extent it was trying to claim

3   calories burned as some of the feedback data, it fails on

4   that point?

5          MR. THOMPSON:  I think it would be -- I think

6   that, first off, upon that interpretation, then we would go

7   and look at how that shook out.  But I do think if it did

8   not -- if it was not there, it would be the latter concept

9   that you said, that the claim athletic performance feedback

10  data is a -- is a statement for which the structure does

11  support the function.  And the athletic performance feedback

12  data can include but does not have to include a grouping of

13  different things.

14         So any one of which, the claim would apply to, is

15  how I think that the claim is written and what -- because it

16  doesn't say "a means for computing" and then lists, you

17  know, each of -- like, it doesn't say "a means for computing

18  each of:  Speed, pace," da, da, da, da.  It says "athletic

19  performance feedback data," which can include a number of

20  things, is how that -- I think that that's what -- the way

21  to approach looking at athletic performance feedback data.

22         So in the context of what you're saying is that

23  the claim would be -- would not be indefinite because that

24  part is not required to be in there.

25         THE COURT:  Okay.

 1          MR. THOMPSON:  It can be or it may not be, if you

 2     assume that it was.  I think that it actually should not be,

 3     as I've expressed relative -- because the series of

 4     time-stamped waypoints is not that kind of data, in my view,

 5     primarily.

 6          THE COURT:  I understand that argument.  But you

 7     do concede that there isn't sufficient structure disclosed

 8     for calories burned?  If I were to say calories burned is

 9     part of that, you would agree, I believe, that there's

10     nothing in the specifications that would help someone figure

11     out how to get to calories burned?

12          MR. THOMPSON:  I think we have not addressed

13     that.  That's a second step.  Our first step is that we

14     don't think it's in there.  So what I'm saying is, if we

15     were to get to that, then I think I would want to speak to

16     our expert, the only person who's spoken here, and have them

17     address that, because like you're saying, this is claim

18     construction as far as interpreting the claims.  This isn't

19     summary judgment.

20          Although I will note that in the -- in the

21     *Biomedino* case, the Court held that where there is a

22     declaration uncontested of an expert, that that prevents

23     indefiniteness on summary judgment, because here are -- at

24     least relative to all the other ones.  It hasn't

25     addressed -- first off, we're not in a summary judgment

1    context, which is clear and convincing evidence, so on and

2    so forth.  But our expert, the declaration, he has explained

3    precisely how the structure is there for the function,

4    and --

5              THE COURT:  But he has --

6              MR. THOMPSON:  -- that is uncontested.

7              THE COURT:  But he has explained and it is

8    uncontested as to all of these other data points, except for

9    the -- he doesn't attempt to explain how that the data

10   point -- that the calories would be calculated?

11             MR. THOMPSON:  Yeah, he hasn't done that yet

12   because our position is, for claim construction, that it

13   shouldn't be in there.  That's correct.

14             THE COURT:  Okay.  We're -- I've used up some of

15   your time there, but if there's anything else on Term 1,

16   I'll give you a minute or two, and then I'm going to pass it

17   over to Fitbit.

18             MR. THOMPSON:  Well, I -- we have -- I'll leave

19   the slides for the Court's review after the hearing.  We've

20   highlighted parts where he speaks to, as a -- and you

21   mentioned as a -- it's high school work to simply -- to do

22   the -- follow the direction of using a series of

23   time-stamped waypoints in the context of the structure that

24   is identified.  And I'm referring back here to this, using

25   the series of time-stamped waypoints in the context of the

1    structure that's identified to accomplish the function of

2    athletic performance.

3          I suppose the only other thing I would say is to

4    reiterate our position as to -- that the proposed -- that

5    calories should not be in the claim.  The -- we've

6    identified here on Slide 12 different parts of the

7    specification where there is a difference between athletic

8    performance feedback data that has "athletic" and "feedback"

9    in it, as opposed to "performance data."  And that's part of

10   the difference.

11         And so you can see here that in the abstract,

12   that athletic performance feedback data does not have

13   calories, right, because that's not one of the --

14         THE COURT:  Just to push back on that, you're

15   suggesting that "calories burned" is something that

16   ultimately serves a different goal weight loss; and,

17   therefore, I shouldn't look at it as athletic performance

18   feedback data.  But I think you would have people who might

19   be starting off by saying -- weight loss or athleticism, who

20   knows -- but who might view their athletic performance in

21   terms of calories burned.

22         For example, you hear people say, "Oh, if you

23   walk, you'll burn X number of calories per hour; and if you

24   run, you'll burn X number of calories"; and, therefore, it's

25   still seen as a measure of -- tied to athletic performance

1     even if the ultimate goal might be a different one.

2              MR. THOMPSON:  I think that the patent, though,

3     makes clear what the athletic performance feedback is.  I

4     think that's -- that may -- I don't know what people in

5     general -- and I don't know that our record has any evidence

6     of that in it, what they may consider it to speak to.  I do

7     know what the specification says, and the differences that

8     the specification draws.

9              And I have, as an addition -- it's not just -- by

10    the way, it's not just the difference in the specification

11    between when athletic performance feedback is identified

12    versus just performance.  It's also that the patent talks

13    about the data that comes from a series of time-stamped

14    waypoints.  That's in the claim.

15             THE COURT:  But if you were calculating -- I

16    mean, I don't know what the formula would be for calculating

17    calories burned.  And my guess is that there would be

18    various different assumptions that are used to determine how

19    many calories are burned by a particular activity.

20             But it would seem to me it's a more complicated

21    formula, but it's still the same point, that you would have

22    a time and effort; and based on that, someone's doing a

23    mathematical calculation of calories, using distance, speed,

24    exertion, heart rate, who knows what else, to figure out

25    calories.

1          But to suggest that it is unrelated to your

2    speed -- that your calories burned is unrelated to the speed

3    and distance you're covering, I'm just not sure why that

4    would be so.

5          MR. THOMPSON:  Well, it's very interesting that

6    you say that, because that is a nature of this claim, right?

7    And the fact that the -- it's athletic performance feedback

8    data that's identified.  The structure, the algorithm to get

9    that, has to be broadly identified because it tags on a lot

10   of different things, right?  You can't -- you wouldn't have

11   the structure be the algorithm to calculate speed, right,

12   because that's different than -- has some differences as to

13   pace in the finer points.  The fundamental -- that's why it

14   can be described broadly here.

15         So to your point -- and this hasn't been

16   addressed.  So it could be that -- and, again, I don't think

17   that calories is really what athletic performance feedback

18   data is here.  It may be that time-stamped waypoints, as a

19   general point, could be used in it.  I don't know.  But that

20   would be -- that's why I said we haven't asked our expert in

21   that regard, because I do think that it's not included in --

22   in the -- what is athletic performance.

23         And I'll say, there's the -- you know, the part

24   that is the only thing -- so calories is only mentioned

25   twice, but when it is mentioned in the part that has been

1    relied upon by Fitbit, it's just identified as performance.

2    And there's all types of different things that can be in and

3    out of these -- the athletic performance feedback that's

4    claimed is, by the terms of the claim, that which comes from

5    a series of time-stamped waypoints.  That's what the claim

6    says.

7                    THE COURT:  Okay.  I'm going to hand it over to

8    Fitbit.

9                    MR. THOMPSON:  Okay.  I -- let me stop presenting

10   too.

11                   MR. CHAIKOVSKY:  Your Honor, I'm going to start

12   where you had your questions, and this is on our slides, 53.

13   Calories burned is absolutely part of athletic performance

14   feedback.  In fact, up until this moment, really, until

15   their reply brief, they were challenging whether miles

16   remaining and time remaining -- in fact, their expert even

17   challenged that with --

18                   THE COURT:  Okay.  But that part, we've resolved.

19   So let's go to the calories burned part.

20                   MR. CHAIKOVSKY:  So go to the next slide.

21                   The one comment I'd make there, Your Honor, it's

22   resolved, but the algorithm's not there for those either.

23   But going back to calories burned, because that's your

24   focus, Your Honor, this is -- I'm --

25                   Next slide.  Next slide.

1          That's them identifying it as for infringement,

2     so they did identify it for infringement even though they're

3     backtracking here.

4          56.  Next slide.

5          As you can see here and as we talked at the

6     beginning of the intro, the spec says that calories burned

7     is performance data calculated from a series of time-stamped

8     waypoints.  It says --

9          THE COURT:  What's your response, though, to

10    their point that when they're using the words "calories

11    burned," the sentence says "performance data," not "athletic

12    performance data"?

13         MR. CHAIKOVSKY:  That is athletic performance

14    data.  There is nothing in this patent that differentiates

15    performance data from athletic performance data.  In fact,

16    as you read the specification, it's used interchangeably.

17    That's a red herring from counsel.

18         In fact, this is where the parties got the

19    laundry list.  They want to exclude calories burned solely

20    for the reason that there are so many ways to compute

21    calories burned using time-stamped waypoints that they

22    couldn't concoct a defense to the indefiniteness argument.

23         THE COURT:  Okay.  I want to -- really, it's much

24    more helpful to me if you put your litigation disputes in a

25    different room and just help me work through the patent.

1          MR. CHAIKOVSKY:  Well, I -- so this is --

2     Column 7 is referring to athletic performance data.  That is

3     in the claims.  For any other reaction for this Court, or

4     eventually if this were to go up on appeal, I'd be pointing

5     to this and saying that's athletic performance data.

6          THE COURT:  Okay.  And I -- and I was following

7     along with that, and I saw this same claim and I read it the

8     way -- or this same language, and I read it the way you're

9     urging me.

10         And Mr. Thompson has pointed out that here, the

11    words "calories burned" are paired with "performance data"

12    in the spec.  And I guess, sort of, if I can ask this

13    question two ways, one, some of the -- other places in the

14    specs is "calories burned" in the same sentence as "athletic

15    performance data," or is it simply your point that you think

16    "performance data" and "athletic performance data" are used

17    interchangeably?

18         MR. CHAIKOVSKY:  The latter point is absolutely

19    the case, that "performance data" and "athletic performance

20    data" are used interchangeably.  Just so I have your first

21    question, Your Honor, could you restate the first part of

22    the question?

23         THE COURT:  So Mr. Thompson drew my attention --

24    there's just a lot of noise in the background.  I don't know

25    if there's some way we can reduce that.

1              Mr. Thompson drew my attention that, on this

2      sentence, same one you have here, that, from the

3      specifications that references -- uses the words "calories

4      burned," the sentence also uses "performance data" and not

5      "athletic performance data."  And my question to you is

6      merely, are there other places in the specifications where

7      "athletic performance data" and "calories burned" are in the

8      same sentence, or is he correct that "calories burned" only

9      shows up with "performance data" and not "athletic

10     performance data"?

11             MR. CHAIKOVSKY:  I -- Your Honor, right now, I

12     can't -- I'm looking at -- I think in the patent, you're

13     going to see it referred to as "performance data"

14     throughout.  And I'll give you another example, which they

15     can't point to -- I guess what I would say is, you can ask

16     Mr. Thompson, can you point to athletic performance data

17     that recites all of these disparate things that he agrees

18     are performance data, and you won't find it outside the

19     claims.

20             The penultimate disclosure of the preferred

21     embodiment of the claims is in Figure 11.  Figure 11 is, in

22     fact, entitled, "preferred embodiment performance feedback

23     information cycles."  If we went to our next slide, frankly,

24     besides this one sentence from Column 7, this is the

25     preferred embodiment which discloses how I actually employ

1    elapsed distance, elapsed time, elevation change, current

2    speed, average speed, average pace, current pace, and --

3    wow, surprising -- calories burned, on full information

4    cycles.

5           And so that -- the patent throughout -- and then

6    at the end, I guess the tie-in that maybe perhaps Your Honor

7    is looking for, when you look at all these features, which

8    includes the ones they like and the ones -- calories burned,

9    the patent says, I'm going to give you an athletic

10   performance rating, if you see that at the end of Figure 11.

11   You know, here, it's question out of 100, full information

12   cycles.

13          And so the patent is talking throughout its

14   entirety, when it gives you the prior art, with treadmills,

15   all these things together, when it gives you that comment in

16   Column 7, all these things together, and again when it gives

17   you the ultimate conclusion, it has all of them tied

18   together.  This is the performance feedback or athletic

19   performance feedback.  That nomenclature doesn't matter if

20   it adds the word "athletic."  That's the feedback and

21   athletic performance feedback that the patent is discussing.

22          THE COURT:  Okay.  Proceed.

23          MR. CHAIKOVSKY:  And I -- Figure 12 also has

24   similarly that disclosure, by the way, Your Honor, in terms

25   of listing all of those items and, again, with athletic

1  performance rating inside of it.  And so it's an apparatus

2  claim with respect to that.

3           I will also comment that, with respect to not

4  just calories burned, with respect to all of the disclosure,

5  really, that the applicant was using or the patentee was

6  using, we have a deficiency in that -- and here's a case,

7  Your Honor.  You asked a question about a partial of a claim

8  that's not disclosed, *Noah Systems v. Intuit*, 675 F.3d 1302.

9  It actually wasn't in our briefs, Your Honor, and I

10 apologize for that.

11          But Judge O'Malley from the federal circuit wrote

12 an opinion that stood for the proposition that if you don't

13 disclose all the elements of the function that is

14 disclosed -- here, calories burned, although we would argue

15 also the other elements also -- if you only have partial --

16 and I would suggest to you the only one at best that their

17 expert Martin did, and I can get to that, is the distance

18 with the tail, and the rest he kind of got a little bit less

19 specific -- that Judge O'Malley in *Noah Systems* said if we

20 don't do all of them, that's as good as doing no algorithm.

21          And, in fact, in that case, when you have no

22 algorithm disclosed, partial algorithm equals no algorithm,

23 in *Noah Systems*.  When you have no algorithm disclosed, we

24 don't even look to the knowledge of one of ordinary skill in

25 the art.  We don't consider expert testimony.  It's only

1    when an algorithm is disclosed, and the algorithm means that

2    you need the complete algorithm, which here would include

3    calories burned, do we look at an expert's disclosure.

4            So I think *Noah Systems v. Intuit*, which is an

5    oft-cited federal circuit case -- apologies for it not being

6    in our brief is -- very, very indicative of this issue where

7    we do have multiple items and the applicant has at least not

8    shown calories burned, but I suggest not shown others.

9            And why am I so vehement on the not show others?

10   Because the test for whether there's been a structure

11   disclosed or an algorithm in this context sufficiently

12   disclosed is not whether one of ordinary skill in the art

13   can supplant it or further describe it.  And you'll see that

14   in our slides, 28, 29.  We have the cases saying we need to

15   look to the specification itself.  We don't supplant it with

16   what was known to one of ordinary skill.

17           I will tell you also *Blackboard*, which is not on

18   those slides, is a fantastic case from the federal circuit

19   where -- *Blackboard* said the correct inquiry -- and this is

20   574 F.3d 1371, at 1385, the correct increase to look at the

21   disclosure of the patent is to determine if one skilled in

22   the art would have understood that disclosure to encompass

23   software and been able to implement such a program, not

24   whether one would have been able to write such a software

25   program.  It's not proper to look at the knowledge of one

1   skilled in the art apart and unconnected to the disclosure.

2          And, again, when we took Dr. Martin's deposition,

3   what's key and what tells you that he's filling in the

4   blanks is on page -- and this is in docket Number 71-1.

5   They've submitted -- that is, Philips has submitted -- and I

6   apologize if I used "Garmin" in my intro -- Philips has

7   submitted his testimony on page 40:  "And why did you choose

8   to cite certain information in connection this matter?

9          "Well, one of the points in my declaration is the

10  math was required for calculating the distance between two

11  waypoints, and that's simple and would have been obvious to

12  one of skill in the art."  Obviousness or enablement is not

13  the test.

14         What happened again, on page 43:  "Sticking with

15  this kind of distance waypoints, what would a person skilled

16  in the art would find in the distance?

17         "Well, as I describe in the report, you would

18  have to assume the radius of the earth" -- the patent

19  doesn't mention radius of the earth -- "and the basic

20  distance formula between two points.

21         "Give me a second and I will look back through

22  your report."

23         "Most of these functions, again, someone skilled

24  in the art would have known to make that conversion.

25         "QUESTION:  Where in this specification" -- and

1    this is on page 44 -- "would you have known to use radius of

2    the earth?"

3            Page 45:  "It's my opinion it would have been

4    obvious to somebody skilled in the art."

5            That is not the task for 112(6).  It's not

6    whether it's obvious.  It's whether it's sufficiently

7    disclosed in the specification.

8            And so even outside of calories, which dooms this

9    claim, they have a problem across the board that their

10   expert extrapolated.  This is not *Alfred E. Mann*, where

11   necessarily I must use Ohm's law because everyone knows

12   impedance is voltage over current.  This is an expert

13   filling in the blanks saying, Oh, I would know how to use

14   radians," et cetera, and it would be obvious.  That's

15   impermissible and, again, the federal circuit would not

16   be -- consent to this kind of attempt to make a claim

17   survive.

18           THE COURT:  Okay.  So I think we're on to Term 2?

19           MR. THOMPSON:  Yes, Your Honor.  There is one

20   point I might share with you before we go on to address that

21   last figure that counsel brought up that I think might

22   clarify something for you in your review.

23           THE COURT:  Briefly.

24           MR. THOMPSON:  Yeah, very briefly.

25           So let me -- I'm going to share my screen.  Oop.

1  Excuse me for one second.  And I am going to first -- oh,

2  yes, so I think that they need to -- they need to stop

3  sharing for a moment, and then I can.  Perhaps I can -- I

4  don't know what happens now.

5          THE COURT:  Back on you.

6          MR. THOMPSON:  Yeah.  Okay.

7          Okay.  So this is the figure that they were

8  displaying.  I've taken it straight out of the patent.

9          One thing I wanted to point out is that this

10  table they say is the athletic performance feedback data

11  from the claim includes a lot of other things that are not

12  athletic performance feedback data, and I highlighted one.

13          The elevation change -- elevation change,

14  obviously, by its nature, and that's why it's identified as

15  a full information, is not about waypoints, right?

16  Elevation's about, what's your elevation?

17          So I don't think that it is proper to just grab a

18  chart that has a whole bunch of full information identified,

19  that gets played to the athlete like, you know, a warning

20  message and all of that, just say, well, all of this is

21  athletic performance data.

22          The fact is they were challenged to identify

23  where calories burned is associated with athletic

24  performance data, and the -- coming from a series of

25  time-stamped waypoints, and they could not.  And that's a

1    simple point I wanted to make here, and then I will end with

2    that and suggest we can go on to the next term.

3              THE COURT:  Yes, if you could, please.

4              MR. THOMPSON:  Okay.  Forgive me for one second

5    here while I clean this up a second.

6              Okay.  Okay.  The next term is a similar -- it's

7    a dependent claim, Claim 7.  So we're talking about a

8    dependent claim.  It comes from Claim 1.  We have set forth

9    the claim here.

10             This is a -- this is another instance where

11   the -- it's not just a means plus function, but it's a means

12   plus function plus algorithm, is built into the claim.  And

13   I think that we've identified -- and I'll divert for one

14   moment just to highlight this so you know where these cases

15   are.  The cases that -- it's this set of cases here -- talks

16   about how when the algorithm is in the claim, that it does

17   not necessarily -- it doesn't need to be -- it can be

18   construed in that nature as the algorithm being there.  And

19   whether that becomes subject to 112, paragraph 6, or not

20   is -- I suppose it converges in some ways, but I wanted to

21   point that out because I do think that that is quite

22   relevant.

23             Back to this particular claim here, you can see

24   that the claim itself says what the algorithm is.  When the

25   speed of the athlete falls below a -- that you -- that you

1    suspend or resume dependent upon when you fall below a

2    predetermined threshold in speed; that is exactly how you do

3    it.  I don't know what more we really need to say.  You set

4    a value.  If it's above it, then you're resumed.  If it's

5    below it, it's suspended.

6          They try -- you know, their suggestion is that a

7    whole bunch of additional things would need to be read into

8    this, because it's clear and it's referenced in the

9    specification as there could also be other forms of ways to

10   do it.  This one's very clear.  And the particular part that

11   they refer to is this sentence that we've identified here.

12   It's part of the algorithm based on various parameters, and

13   if the athlete has temporarily suspended exercise or

14   temporarily pauses monitoring.

15         Well, in this instance, the -- there may be other

16   ways, but the particular way that the claim, right, is

17   referring to is just a threshold, a value.  So there is no

18   additional structure, algorithm that would need to be put

19   with the claim.  The function is there.

20         THE COURT:  So are you saying that if you had a

21   device that suspended a feedback system based on a change in

22   heart rate, that wouldn't be covered by Claim 7?

23         MR. THOMPSON:  Yeah, if it were like some sort

24   of -- I don't know -- if the -- it changed depending upon

25   whether the heart rate was regular or not or something like

1    that, that would be -- that's obviously a different thing

2    than a predetermined threshold for speed.  So, yeah, that

3    would be -- and to do that, yeah, maybe that would be a

4    smart algorithm that would need to be determined to do that

5    sort of thing.  But this one's just a predetermined

6    threshold --

7              THE COURT:  Okay.

8              MR. THOMPSON:  -- in the claim.

9              THE COURT:  So Claim 7 would not claim a feedback

10   system that would suspend once heart rate became erratic?

11             MR. THOMPSON:  Right.  That's absolutely true.

12   It says so in the terms.  It says the speed of the athlete

13   falls below a predetermined -- that's not heart rate.

14             THE COURT:  Okay.  Okay.

15             MR. THOMPSON:  So I don't know.  There's not a

16   whole lot -- you know, this one's pretty simple, so I do not

17   have a whole lot more to say about this.

18             THE COURT:  Okay.  For Fitbit?

19             MR. CHAIKOVSKY:  Your Honor, could I briefly --

20   briefly, in 30 seconds, address that last point on the final

21   term that Mr. Thompson raised?

22             THE COURT:  Briefly.

23             MR. CHAIKOVSKY:  If you went back again -- and,

24   again, it relates to this Figure 11, Column 7.  That column

25   is talking about -- that we keep arguing about -- the GPS

1    receiver model determines the athlete's position and stores

2    it in memory.  It says from these positions and times, which

3    is the GPS waypoints, that we're using time stamps, a series

4    of time stamps, waypoints, and it provides this list.

5            And then it says, right after it, line 50, a

6    relative performance rating can be derived.  That is tied to

7    Figure 11 and these elements that use GPS waypoints as

8    disclosed in Column 7 as being part of the athletic

9    performance feedback.

10           And one last point is, in Column 4, it talks

11   about -- talking about performance data.  This is in

12   lines 26 through 40, and, in fact, says cycles the latest

13   measure of athletic performance when it's talking about

14   performance data, tying the two together, also, in columns

15   50 through 56, same thing, cycling through that Figure 11,

16   talking about athletic performance.

17           That's all I will add on that one, Your Honor.

18           THE COURT:  Okay.

19           MR. CHAIKOVSKY:  The term "means for suspending,"

20   we go to Slide 61 of our presentation.  Really, it's whether

21   we have this entire function performed.  And, you know, the

22   issue here is the smart algorithm -- Slide 63, really --

23   everyone agrees is, you know, a means for -- a means for --

24   a means plus function in this instance.  But it's a spec

25   as -- and still in the opening brief says the specification

1      contemplates a smart algorithm, but yet Claim 7 only claims

2      a dumb one.

3              So the spec, which had the smart algorithm for

4      terming various things, correcting the GPS, should be part

5      of the last term also; but also here, for determining when

6      to suspend or resume, otherwise I don't know when to do it,

7      if they want to claim that they can use a dumb algorithm

8      here or somehow that the -- that this is sufficient in and

9      of itself based on the function itself, if we go to

10     Slide 65, the spec only discloses that the smart algorithm

11     is used to suspend operation when an athlete stops.

12             There's no predetermined threshold, you won't

13     find that anywhere in the specification.  It's not

14     disclosed.  I don't know how an algorithm can be disclosed

15     pursuant to the case law from the federal circuit when

16     there's no discussion of --

17             THE COURT:  Well --

18             MR. CHAIKOVSKY:  -- threshold.

19             THE COURT:  -- the argument Mr.-  --Philips,

20     Mr. Thompson, is making is that it's disclosed in the claim

21     itself.  What's your response to that?

22             MR. CHAIKOVSKY:  As I started in the

23     introduction, Your Honor, Mr. Thompson will not be able to

24     point to a federal circuit case where the claim itself --

25     when the term was a means-plus-function term, which the

1    parties agree here that it is, that the function alone is

2    the structure.  There are cases where --

3         THE COURT:  But that's not a function alone as a

4    structure.  That's saying that the words "predetermined

5    characteristic" is the information that you need, and it

6    sits in the claim, and that if those -- if that part of the

7    determination is in the claim itself, is their argument,

8    then you don't have to look at specification.

9         MR. CHAIKOVSKY:  Sorry.  I apologize, Your Honor.

10        Slide 61, the parties agreed that the function --

11   61 -- for the function, for the means plus function, you can

12   see both parties said the entire function is suspending or

13   resuming operation of said means for computing, which is the

14   indefinite means, when a speed of the athlete falls below a

15   predetermined threshold.

16        So first, the term is indefinite because it has

17   means for computing; but, secondly, that's the entire

18   function.  And yet now, what they're doing -- and they've

19   done it in both of these terms -- which, again, you're not

20   going to see this done by -- anywhere.  They're just saying

21   a processor that performs a function -- that's functional

22   claiming, because the function is the entirety of it.  They

23   may now want to parse it, but that's what they agreed.

24   That's --

25        THE COURT:  I'm parsing -- I need to figure out

1    how to parse this for a jury, and I can promise you I will

2    not be instructing the jury on what the back-and-forth was

3    between counsel.  I'm going to give them an instruction.

4          So do I understand your argument to be that even

5    though the claim says when a -- when the speed of an athlete

6    falls below a predetermined threshold -- well, let's put it

7    this way.

8          If it says function, suspending and resuming the

9    operation at certain points, and then in the specification,

10   it said it'll be suspended or resumed when the speed of the

11   athlete falls below a predetermined threshold, that would be

12   okay, because the words are in the specification instead of

13   in the claim?

14         MR. CHAIKOVSKY:  Your Honor, that might be okay.

15   I'm not analyzing those facts because they don't exist, but

16   where we do have a function and the algorithm --

17         THE COURT:  Okay.

18         MR. CHAIKOVSKY:  -- is nowhere to be found in the

19   specification, then -- we have a result here.  This is a

20   functional result.  The entire intent of this body of law

21   was to not allow functional claiming and to end up with

22   their proposed construction, which is a processor that

23   performs a function.  That's the quid pro quo for means plus

24   function.

25         And they're effectively arguing we didn't have to

1    give anything up by using the terms "means for."  That's

2    what the entire line of cases are about, that you can't have

3    a claim survive based on words in the claim as opposed to

4    what's in the spec.

5            THE COURT:  And what you're saying to me -- what

6    I hear you saying to me is that if the claim had said

7    "suspending and resuming operation" as the function and then

8    had the rest of the sentence in the specification, it would

9    be okay; but because it's all in the claim, it's not okay?

10   I just want to make sure that is what you're saying here.

11           MR. CHAIKOVSKY:  No, so -- I apologize.  I think

12   that's unfair.  I guess I was saying that I haven't analyzed

13   that because that's not what's happening.  I would say to

14   you that if the claim, for example, said "suspending and

15   resuming operation," I would still need to know how I'm

16   doing that.  And the fact that the specification says --

17           THE COURT:  And --

18           MR. CHAIKOVSKY:  -- when the speed of an athlete

19   falls below -- that's not how.  That's not sufficient,

20   telling me what's the algorithm -- when I have a processor,

21   what's the algorithm -- which here was the smart

22   algorithm -- what's the algorithm that tells me how -- to

23   determine whether the speeds fell below a threshold or

24   above?  That's not enough.

25           If that was prose, under *Typhoon Touch*, in the

1    specification, that would not be sufficient because that's

2    not the detailed step-by-step algorithm that's required to

3    tell someone how to suspend and resume operation for the

4    means for computing.  That would not be enough.

5              THE COURT:  Okay.

6              MR. CHAIKOVSKY:  How do we achieve that result?

7    How do we know when we've met that threshold or not?  That's

8    what's needed.

9              THE COURT:  Okay.  I think I understand your

10   argument.

11             Are we ready to move on to the next patent?

12             MR. THOMPSON:  Yes, Your Honor.

13             I think that in the schedule that was submitted

14   before, the next patent would be the Menard patent.  And as

15   to that patent, I will turn it over to Ruben Rodrigues, my

16   colleague, to address that one.

17             And you're on mute, Ruben.

18             MR. RODRIGUES:  Thank you.  Morning, Your Honor.

19             THE COURT:  Good morning.

20             MR. RODRIGUES:  I am going to try to pull up the

21   slides.

22             And so to jump right into the claim construction

23   issues, the first term we have up is the "governing

24   information transmitted" term, and our proposed construction

25   for that is "controlling the transmission of information

1  between the first personal device and the second device."

2         And the crux of this dispute is really that

3  encryption alone does not govern information transmitted.

4  And our construction is tailored to address that dispute,

5  because Fitbit has, you know, in the past argued that, and

6  we don't think that's correct.

7         THE COURT:  What I don't understand is, what

8  difference does it make whether you're using "controlling"

9  or "governing"?

10         MR. RODRIGUES:  So "controlling" was an effort to

11  get more at the essence of what the claim actually means.

12  And with an eye towards, you know, a jury looking at this

13  eventually, "governing" could be considered more of a

14  technical term.  That's why we have Dr. Martin's testimony

15  sort of opining on how, looking at the specification, he

16  views "governing" as focusing on the control aspect.

17         At the end of the day, we have cited information

18  that says "governing," one of the definitions is

19  "controlling."  They're very close terms.  The goal that

20  we -- as we see it, is to focus on a way that doesn't cover

21  the encryption, because we think that's just wrong, given

22  the prosecution history and the prior art of record.

23         THE COURT:  Okay.  But that's not -- I think my

24  problem here on this claim is -- or on this construction is

25  you're trying to get to the result in an infringement claim,

1   but you're not actually -- I'm not sure the difference

2   between "control" and "govern."  I'm not sure that that's

3   meaningful.

4          And I'm not sure that -- it doesn't -- it seems

5   to me the more critical question is that the word before the

6   term that the parties are focused on is "security

7   mechanism."  And so you have a security mechanism governing

8   information, or you have a security mechanism controlling

9   information.  I'm not sure there's any difference between

10  those two.

11         MR. RODRIGUES:  I think, from our view,

12  "controlling" implies a level of interaction that I guess

13  maybe is not necessarily different from "governing," but

14  that -- let me step back for a moment.  There's a dispute on

15  how the term is being interpreted, because Fitbit says it

16  covers encryption and Philips says it does not.

17         THE COURT:  Okay.  But that's not my problem

18  today.  That's I guess where I'm starting out by saying

19  we're not doing infringement today.

20         My problem is, if you think about it this way, if

21  you were asking a court to analyze a statute, right, the

22  first thing you would probably do is some level of a textual

23  analysis.  It would depend where -- how closely you queue to

24  Justice Scalia's view and how closely you queue to the other

25  ones.

1          But you start with the language, and you say,

2     "Here is this language.  Here is what the law is.  Here is

3     what the thing is, and now I'm going to apply it to the

4     circumstances."  That's how I view what we're doing here

5     today.

6          So I don't actually care about encryption today.

7     That's your problem for infringement.  I want you to give me

8     a textual analysis or, you know, you want to look at the

9     prosecution history, that's kind of like the legislative

10    history, or you want to look at the specifications; that

11    might be, you know, the comments and the notes, the

12    reporter's notes when you've passed the statute.

13         I want to know what do these -- what I think

14    these words mean so I can tell a jury.  From that, you can

15    decide whether there was an infringement or not an

16    infringement.  Maybe it will be hard for the jury to tell.

17    Maybe the claim doesn't clarify that.

18         But I need to -- I don't need to determine this

19    based on the end question of, does this cover encryption or

20    not?  I need to go through this analysis that says, well,

21    what do the words of the claim mean?  What do the

22    specifications help me with?  What does the prosecution

23    history tell me?  What does the extrinsic evidence tell me?

24    But I'm trying to figure out what the claim says, not

25    whether there was infringement.

1          So here, I have this word "controlling" and

2     "governing," that you're wanting me to substitute one for

3     the other.  So you need to show me, not because you want a

4     result of it, but because there's something in the text or

5     the specifications or the prosecution history that helps me

6     choose those words.

7          And part of my problem here is I can't -- you're

8     saying, well, you think "controlling" would convey to the

9     jury -- you're conceding, I think, that "controlling" and

10    "governing" might be synonyms, but one might convey more

11    control than "governing," that "controlling" might seem more

12    dictatorial, and "governing" might seem more ad hoc or

13    something.  I don't know.

14         But -- so you're saying, "I want to convey a

15    slightly different meaning to the jury."  My question is,

16    what -- not what meaning do you want to convey to the jury.

17    My question is, what meaning -- what's the meaning of the

18    patent terms?

19         And so I think what you're saying -- and maybe

20    this is a way to get to the problem -- you're saying to me

21    that there needs to be something at some level of higher

22    security or higher critical level than otherwise.  And so my

23    question then is, help me through the patent specifications,

24    anything that helps me understand what level of control or

25    security is anticipated that could then help me understand

1  whether "govern" is the appropriate word or whether it needs

2  clarification or some other construction.

3         Does that -- have I framed the problem in a way

4  that you can help me resolve it?

5         MR. RODRIGUES:  I think so, Your Honor.  And to

6  an extent, you're correct; there are similarities between

7  "govern" and "control."  I guess the way we got here is

8  seeing a dispute on the understanding of what it means to

9  govern, and I know we're not going to talk about that

10  dispute.

11         THE COURT:  Okay.  But so you're saying to me

12  there's a subtle difference between the words "govern" and

13  "control," and you want me to tell the jury "control."  And

14  so I have two problems.  One is the word there is "govern."

15  So if there's a subtle difference, why would I use "control"

16  rather than "govern"?

17         And, secondly, what -- maybe it's the same

18  question -- what is it that would lead me to believe that

19  what the patent was seeking to claim was something more than

20  the word "govern"?

21         MR. RODRIGUES:  And I think, for us, it boils

22  down to the ambiguity that Fitbit has introduced as to what

23  "govern" means.  So it's really reactionary to that.

24         I think, as I'm -- a higher level issue -- if the

25  claim was construed "governing transmission of information,"

1    which is what the examiner actually described the term as

2    meaning, I think we would be okay with that.  I think we

3    still have a dispute between the parties going forward

4    because they're going to say that covers encryption and we

5    say we don't, but what I'm hearing is that will be a dispute

6    for some other day.

7               THE COURT:  That's a dispute for the jury.

8               MR. RODRIGUES:  Right.  Then -- and I think we

9    understand that, and we were trying to resolve that dispute

10   probably a little earlier than it needed to be.

11              But perhaps I should move on to the third bullet

12   on this slide, which goes to not so much the

13   controlling/governing and which word should be used, because

14   they are, in our view, pretty synonymous, and more on the

15   ordering of the list.

16              So the term itself says "governing information

17   transmitted."  And we've proposed in our construction

18   "controlling the transmission of information," which could

19   also be "governing the transmission of information."  And

20   the reason for that -- and Mr. Martin's declaration talks

21   about this a bit as well -- is because the specification is

22   focused on trying to provide something with multiple levels

23   of security.

24              And in allowing the case, the examiner said that

25   the primary reason for allowance is the inclusion of one

1    element and then also the inclusion of this element that

2    we're disputing here, "security mechanism which governs the

3    transmission of information between a personal device and an

4    entity receiving the information over a network."

5          And we believe the examiner understood that the

6    level of governing or control that is trying to be claimed

7    here is something that involves the transmission of

8    information on the network.  Are you going to --

9          THE COURT:  But what is the difference?  So then

10   what you're saying is that I should instruct a jury that "a

11   security mechanism governing information transmitted," dot,

12   dot, dot, is "a security mechanism governing the

13   transmission of information," dot, dot, dot.  And so I guess

14   I'm not sure what's the difference between "a security

15   mechanism governing information transmitted" and "a security

16   mechanism governing the transmission of information."

17   What's the difference between "information transmitted" and

18   "transmission of information"?

19         MR. RODRIGUES:  So it -- for us, it comes down

20   to -- and I think this maybe boils back down to where the

21   dispute here originated.  For Philips, it comes down to

22   focusing more on the control aspect that the specification

23   is trying to get at, that the overall patent is trying to

24   get at.

25         And while I don't want to belabor the encryption

1    point and get back to that, the dispute here is being driven

2    by -- you know, it's our position, Philips' position, that

3    the term as written, "governing information transmitted,"

4    would not cover encryption.  And that's because it just --

5    as it's written, it requires more control.  It requires

6    something more active at that second layer of security that

7    the patent is talking about to control the transmission of

8    that information.  And the examiner seems to have understood

9    that when he wrote them notice of allowance because he's

10   also talking about governing the transmission of

11   information.

12          Now, encryption doesn't do that.  Encryption was

13   known in the prior art.  Encryption is all over the

14   specification.  It talks about Bluetooth and other

15   encryption means.  So we don't believe that that should be

16   covered by this term.

17          And if the Court chooses not to construe the

18   term, I mean, we'll -- Philips will continue to argue that,

19   and I suppose that will be an issue to be resolved some

20   other day.  But that's where our proposal is really coming

21   from, from both elements.

22          THE COURT:  So -- well, what you're saying to me

23   is I should construe "security mechanism which governs" --

24   "security mechanism governing information transmitted," but

25   excluding encryption?

1              MR. RODRIGUES:  Yes.  That would be something

2     that perhaps is even a better proposed construction --

3              THE COURT:  But, I mean, that's --

4              MR. RODRIGUES:  -- would resolve the dispute.

5              THE COURT:  That's essentially what you're

6     saying.  You're not saying, here's a better way of

7     conveying -- because, frankly, I don't see why the one

8     formulation you've given versus another formulation is

9     covering encryption.

10             It seems to me what you're saying is, "I'm

11    dancing around words, but the reason is because I'm saying

12    that the understanding of this term was that it was not to

13    include encryption."  And I think what you're saying is that

14    has to have been the understanding even though it's not

15    evident from the term -- claim words itself, but from the

16    specification and the prosecution history that was clearly

17    disclaimed or not covered.

18             I mean, that -- I don't know what the answer is

19    to that, because I haven't gone and tried to analyze it that

20    way, but I just -- right now, I feel like there's sort of a

21    dance of words that don't really make any difference here.

22             MR. RODRIGUES:  The one caveat I would make to

23    what Your Honor just said is that we do think the words

24    themselves do convey to a person of ordinary skill in the

25    art that encryption would not be included, so I understand

 1    that, and that's sort of the focus of Mr. Martin's

 2    declaration as well.

 3            THE COURT:  Okay.  Well, I will go and look at

 4    Mr. Martin's declaration, but just -- and, again, on that, I

 5    don't really see either the difference between your

 6    construction and the term itself or how it's -- resolves

 7    anything.  But I will try to see if that, further reading of

 8    his declaration, makes any difference on that argument.

 9            For Fitbit, anything further that you want to say

10    in response to that?

11            MR. PETERMAN:  Thank you, Your Honor.  It's Chad

12    Peterman.  I will be extremely brief.

13            Our position is that the plain and ordinary

14    meaning should govern here.  The patentees decided to use

15    the term "governing information transmitted."

16    Mr. Rodrigues' pointing to subtle differences between

17    "governing" and "control" and "information transmitted"

18    versus "transmission of information," the jury can parse

19    that out.  There's certainly no legal principle which

20    invites, you know, this Court to rewrite the claim in the

21    way that Mr. Rodrigues and Philips is suggesting.

22            It's as -- we talked about encryption a lot here.

23    I know that this will be probably addressed by the jury.

24    But just to, you know, point out and reiterate again, the

25    dependent claim specifically points out that the security

1    mechanism could include encryption.  And so it says,

2    Claim 2, "the system of Claim 1, wherein the security

3    mechanism encrypts the information."  So this suggestion

4    that somehow the security mechanism governing information

5    couldn't -- you know, does not include encryption is just

6    contradicted by the patent itself.

7            Moreover, Mr. Rodrigues keeps on referring to

8    testimony by Dr. Martin, although Philips has tried to walk

9    this back.  I took Dr. Martin's deposition.  I asked him

10   specifically -- and this is on Slide 74, where we call out

11   this from his deposition.  I asked him, "So does Claim 1(c)

12   of the '233 patent as written allow the security mechanism

13   to only include encryption?"

14           Mr. Rodrigues made an objection, but the witness

15   said, "It could only be encryption."  It's clear as day and

16   certainly can't be denied, given that Claim 2 specifically

17   relates to encryption.

18           So -- and we think that the correct course for

19   this Court is to just leave it at plain and ordinary

20   meaning.  The jury can certainly understand what "governing

21   information transmitted" means.  If they want to have a

22   fight about encryption, we can deal with that in front of

23   the jury.

24           But they certainly did not in any manner in the

25   specification or in the prosecution history disclaim

1  encryption.  And, in fact, they claimed it.  You know, this

2  is literally the opposite of a disclaimer when you look at

3  Claim 2 in connection with Claim 1.

4          Thank you, Your Honor.

5          THE COURT:  Okay.  Thank you.  I think that gets

6  us to the second term in the '233 patent.

7          MR. RODRIGUES:  Yes, Your Honor.  Let me get my

8  slides back up.  May I just respond briefly to the dependent

9  claim point?

10          THE COURT:  Yes.  Briefly.

11          MR. RODRIGUES:  So on the dependent claim point,

12  the claim recites that it can include encryption.  Our point

13  is that encryption alone doesn't satisfy the security

14  mechanism governing the information transmitted.  So we've

15  never disputed that it -- that encryption couldn't be part

16  of it.  We just don't think it satisfies the term.  The fact

17  that it's included in a subsidiary dependent claim I think

18  supports that conclusion.  That's all I was going to say.

19          And I guess, briefly, could I just point out the

20  statement about Dr. Martin that was made?

21          THE COURT:  Briefly.

22          MR. RODRIGUES:  So we have in our slides

23  Slide 19.  We revisited the testimony at the end of the

24  deposition that Mr. Martin had provided.  Mr. Martin never

25  discussed with counsel -- I defended the deposition.  I

1   never discussed his answers with counsel.  And at the end of

2   the deposition, he clarified that he must have been mistaken

3   and that his opinion is that encryption alone wouldn't have

4   satisfied the term.

5          And it's understandable given the length of the

6   deposition.  Going back, these things happen.  But we did

7   clarify it, and he was unequivocal both before and after the

8   answer that counsel is relying on.

9          THE COURT:  Okay.  Thank you.

10         MR. RODRIGUES:  So for "first personal device,"

11  Philips' position is that no construction is necessary.  And

12  if the Court were to construe it, we think the fact that the

13  term "personal" is used here is to distinguish between, you

14  know, an institutional system, some corporate system.  It's

15  a personal device for private use by a person.

16         And Fitbit points to -- points to and relies on a

17  lot on the fact that various embodiments of the invention in

18  the specification are described as personal medical devices.

19  That's true.  That is an example of a personal device in

20  this context.  But the specification also repeatedly uses

21  the term "personal device" over and over again.

22         Moving on to Slide 21, in response to that, in

23  the briefs, Fitbit has said that "personal device," where it

24  comes up, it's just being used as shorthand for "personal

25  medical device."  But the specification has a shorthand for

1  personal medical device.  It's "PMD."

2       So I think that just reinforces the idea that the

3  claims are reciting a "personal device," while the

4  specification has used "personal medical device" as an

5  example, there's no reason to import "personal medical

6  device" into the claim.  The claims could have recited a

7  "personal medical device," and they didn't do that.

8       And if we go back --

9       THE COURT:  What is the import of whether this is

10  a -- well, let me put it this way.  Is a medical device,

11  rather than a health device, rather than a personal device,

12  is that differentiated anywhere in the patent?  And why

13  do -- what is -- what is the -- other than saying one word

14  is used one place and one word is used another place, what's

15  the difference between a "personal device" and a "personal

16  medical device"?

17       MR. RODRIGUES:  To be honest, Your Honor, we

18  don't think there is a difference, and we cited this and we

19  discussed this in our responsive brief.

20       The fact is that these are apparatus claims that

21  we're dealing with and simply reciting an intended use,

22  right, an exercise device, a medical device, something

23  for -- an apparatus claim that's focused on the intended use

24  doesn't actually limit anything.  If you had the same device

25  that would be used for whatever use, but it met the

1      limitations of the claim, we would argue that the limitation

2      is met.

3              So, ultimately, we don't think this really

4      matters, but at the same time, we don't think it's

5      appropriate to unnecessarily import "medical device" when

6      the patent was pretty clearly trying to recite claims that

7      would apply to any sort of device.

8              THE COURT:  How much is this fight about concerns

9      about the FDA approval question that's raised somewhere in a

10     footnote?

11             MR. RODRIGUES:  It -- I would have to sort of

12     defer to Fitbit on that.  That was raised in a

13     meet-and-confer where they sort of acknowledged that that

14     would be an issue.  I know of no doctrine for determining

15     whether a limitation in a patent claim is met based on

16     whether or not it is subject to FDA approval.  But that

17     seemed to be the argument that Fitbit was advancing, that we

18     are trying to, I guess, address.  That's why there's a

19     dispute here.

20             THE COURT:  Okay.

21             MR. RODRIGUES:  And, again, Philips' position

22     here is that the plain and ordinary meaning suffices or that

23     no construction is necessary suffices.

24             THE COURT:  Fitbit on -- Fitbit's counsel on

25     personal device?

1          MR. PETERMAN:  Yes.  Yes, Your Honor.

2          This is a situation where the patent is very

3     clear, starting from the title and continuing throughout the

4     specification, that, you know, there is a distinction

5     between a personal medical device, which is, you know, what

6     this patent is geared to, and --

7          THE COURT:  Help me, because I don't know what a

8     medical device is different from some other -- a health

9     device or an exercise device.

10          MR. PETERMAN:  Yeah, I think that the -- that the

11     real distinction here is, you know, the use of a device or a

12     device intended to be used for, you know, medical, you know,

13     diagnostic purposes as opposed to exercise monitoring or

14     tracking.  Fitbit sells devices for exercise --

15          THE COURT:  I don't want -- I don't want to know

16     about the infringement or what Fitbit does.  I want to know

17     about this patent.  And I'm just trying to figure out, if I

18     use a device for my own personal medical health or for my

19     own personal health, is that a medical device?  And if so --

20     if not, why not?  I mean, if -- I guess I'm just trying to

21     figure out, what's the import of the word "medical" there,

22     and where do you get that import from?

23          MR. PETERMAN:  Yeah, so the question regarding,

24     you know, "medical," I think it really has to deal with, you

25     know, sort of confidentiality, HIPAA, you know, medical

1    information that's, you know, used for, you know, the

2    treatment of a disease state or understanding a disease

3    state, as opposed to exercise.

4                THE COURT:  Okay.  So I'm going to stop you

5    there.  I don't know of any reason why, when I'm analyzing a

6    claim, I'm going to be worrying about laws that apply in all

7    different other circumstances to certain things.

8                So whether this is FDA approved, whether HIPAA

9    requirements have to do with the communication -- I mean, I

10   think, for example, the question of whether HIPAA

11   requirements apply is an analysis of who is sending the

12   information, what information is in there, et cetera.  You

13   can have communications between a doctor and a patient that

14   aren't HIPAA covered, and you can have communications that

15   are HIPAA covered.  I'm not going there on this patent case.

16               So, I guess, I'm just trying to figure out, other

17   than the word "medical" and whatever import we all want to

18   give to the title, is there anything more in the patent that

19   talks about either that this is being used for diagnostic

20   purposes or that this is being used for personal purposes?

21               MR. PETERMAN:  Well, the whole purpose of the

22   patent, as we discussed with the last term, is this idea of

23   security mechanisms and making sure that the information

24   that is collected, you know, only gets into the hands of

25   people who, you know, have a right to see this information.

1          And so we're not suggesting that you need to look

2     outside of the four corners of the patent here.  I think, if

3     you, you know, start from the title, work through the --

4     work through the specification, the patent is all directed

5     toward securing medical information.  And so you don't want

6     to have, you know, an unsecured device that is, you know,

7     tracking and compiling medical information.

8          THE COURT:  Well, so does -- you're moving this

9     to -- and there was a -- yeah, the -- is this talking about

10    "medical" in the sense of patient/doctor relationship,

11    communication, treatment, diagnostics, versus medical as it

12    relates to personal health?

13         MR. PETERMAN:  I think my -- looking through the

14    patent and the fact that it's focused on security and the

15    examples that it gives, the example of a first responder,

16    you know, coming to a person in need of aid, you know,

17    sending that secured information from the owner of the

18    device to the medical professional, that's what the whole

19    patent is geared towards.

20         Otherwise you don't need to have, you know, this

21    security mechanism.  If it was just a personal health

22    device, you know, someone's running, they're looking at

23    their stats, we're not concerned with adding this additional

24    security mechanism, this additional security layer.

25         And so -- and starting from, you know, the title

1    through the background of the invention, everything that is

2    written about this invention describes it as the present

3    invention, you know, relating to a personal medical device

4    that includes this security mechanism.  And so you don't

5    need to secure, you know, sort of exercise-related data or

6    data that's, you know, not intended to be, you know, shared

7    with a medical professional.

8              THE COURT:  Well, sure you do.  I mean, I'm not

9    telling you what my weight is or how fast I can run.  I keep

10   very personal about that.

11             MR. PETERMAN:  And so that information -- the

12   exercise information is not being transmitted to a third

13   party.  The goal is -- the '233 patent is to -- is to enable

14   secure communications from that personal medical device to a

15   third party, whether it be a doctor in the office or a first

16   responder.  And, you know, otherwise there wouldn't -- there

17   would be no necessity for this security mechanism that we

18   discussed in the last -- in the last claim.

19             It's -- and I think if you look at -- and I'll --

20   I won't belabor the point, but within our brief and in the

21   slides, we point out that the specification repeatedly

22   refers to the present invention as being this personal

23   medical device.  And, you know, the federal circuit in *GPNE*

24   took -- you know, put great importance on the use of the

25   present invention as describing and defining the invention.

1          And so when Philips or, actually, the patentee,

2    when Philips acquired this patent, decided to use the

3    present invention to describe the personal medical device,

4    that operates as a limiting decision.  So the principle that

5    we are relying upon is the fact that it's the present

6    invention and also the repeated and consistent usage.  And,

7    you know, the goal, obviously, is to have secure

8    communications between the wearer of the device and medical

9    personnel; and so, otherwise, you know, the security

10   mechanism would not be required.

11          THE COURT:  And maybe on this, I can have just a

12   brief response from plaintiff's counsel.  It does seem,

13   certainly, as I look at the background of the invention,

14   it's really talking about providing this information to

15   healthcare professionals, medical centers, caregivers,

16   medical condition, et cetera, and not just personal -- a

17   personal health device.

18          Why -- other than the fact that they don't --

19   that they could have said it with "a PMD" and they didn't,

20   why isn't the language throughout about "personal medical

21   device" controlling here?

22          MR. RODRIGUES:  Sure, Your Honor.  For that

23   response, let me actually use one of Fitbit's slides that

24   I'm going to endeavor to put up.

25          So we heard Mr. Peterman talk about the use of

1    present invention in the claims, and Your Honor just talked

2    about the background.  I want to just look very closely at

3    what the background actually says.  And it says, "The

4    present invention" -- and this is from their slide -- "The

5    present invention relates generally to bidirectional

6    personal and health wellness provider communication systems,

7    and in particular, to a personal communication system

8    suitable for use with children, vulnerable adults."  And

9    then it says more specifically "medically distressed persons

10   and those in whom a personal medical device has been

11   deployed."

12        So we view this has as a broad description, not

13   necessarily limited to a personal device, but just broadly

14   describing all the different situations where this may apply

15   to any device in any communication system within the context

16   of the invention and what's actually claimed.

17        I also want to revisit, if I may, our slides.

18   The very beginning of the patent, the abstract, talks about

19   a personal and/or -- let me make this bigger -- a personal

20   and/or institutional health and wellness communication

21   system used for a variety of emergency and nonemergency

22   situations using two-way communication devices and

23   bidirectional communication networks.  Again, not

24   specifically focused on "personal medical device."  That is

25   provided as an example later on, but it's not where -- it's

 1    not where the patent starts.

 2            And then the last thing I'd like to show

 3    Your Honor -- and we have these citations in our briefing,

 4    but I want to just sort of scroll through -- one moment --

 5    the many instances -- apologies, Your Honor.  Can you -- can

 6    someone tell me what's actually on the screen right now?  Am

 7    I sharing something?

 8            THE COURT:  You are.  But I -- but you scrolled

 9    through, and I did see there were a lot of parts, blue

10    highlighting that it had just "personal device."  So I

11    understand that point.

12            MR. RODRIGUES:  Okay.

13            THE COURT:  So I think, with that, that was

14    just -- I just wanted a brief rebuttal.  I think I'm ready.

15    It's now noon, and we should move to the last patent.

16            MR. THOMPSON:  Okay.  Thank you, Your Honor.  I

17    will -- give me one second, and I will get this ready.

18            THE COURT:  I actually -- I'm sorry.  Did I

19    jump -- I did jump a term.

20            MR. THOMPSON:  Yes.

21            THE COURT:  "Wireless communication."  I didn't

22    mean to jump that.

23            MR. THOMPSON:  Oh, okay.

24            MR. RODRIGUES:  I think that one's still on my

25    plate, so I will bring up the slides again for that.

1           And the argument here is pretty brief,

2    Your Honor, and I know Your Honor doesn't want to talk about

3    infringement and invalidity, but this is another one of

4    those where the dispute is really being driven by what we

5    see as Fitbit's unreasonable application of this claim to

6    something that's not wireless.

7           You know, Fitbit has argued during

8    meet-and-confers leading up to claim construction that

9    "wireless communication" means literally without wires, so

10   that if you're using some sort of -- any other constructer

11   to transmit an electrical signal, that that would be

12   wireless as long as it's not literally a wire.  And there's

13   prior references.  They use the body as a conductor, and we

14   don't need to get into the details of that.

15          But our point is wireless means wireless.  When

16   people use the term "wireless," they are talking about

17   communications over the air, over various mediums that we

18   all commonly know as "wireless," and that that's what a

19   person of ordinary skill in the art would understand.  And

20   if there was any doubt about that, that's the only thing

21   that's described in the specification.

22          "Radio frequency" is used repeatedly.  It's the

23   focus of the specification.  There's also description of

24   using radio frequency to communicate with impantable

25   devices, but we've included infrared and optical in there as

1    well because the specification identifies those also as

2    wireless communication means.  So, very short, that's our

3    position and that's the basis for the construction.

4                   THE COURT:  Okay.  For Fitbit's counsel, what

5    does -- if "wireless communication" is a well-known phrase,

6    what does it mean?

7                   MR. PETERMAN:  Yes, Your Honor, wireless

8    communication is a very well-known phrase, and it has not

9    been -- it was not in the patent.  You know, the patentee

10   didn't act as a lexicographer to then, you know, redefine

11   wireless as only being related to over the air.

12                  THE COURT:  But what is it?  I'm not asking you

13   what it doesn't mean.  I'm asking you what -- if you're

14   telling me that "wireless communication" is well known, what

15   does it mean?

16                  MR. PETERMAN:  I think in this context --

17                  THE COURT:  No, just in general.  What -- if it's

18   a well-known phrase, I don't need to construe it, what does

19   it mean?

20                  MR. PETERMAN:  It's communication without wires.

21   You know, the specification in this patent, you know, just

22   talks about the transmission of information without wires

23   and --

24                  THE COURT:  So let me -- let me tell you this.

25   If I wanted -- if you wanted this patent, this term to mean

1   wireless means without -- any communication without wires,

2   and you want me to instruct the jury of that, then let's do

3   a construction here where they're proposing over-the-air

4   communication, and you're proposing that the construction

5   means any communication without wires -- any communication

6   that's without wires.

7          So I think that's our -- because I don't -- I

8   don't -- just reading wireless communication, I understand

9   why you could say wireless could mean any communication

10  that's without wire.  I'm not saying that's improbable or an

11  impossible interpretation.  But I think if I told a jury

12  "wireless communication," I don't think on its face they

13  would necessarily understand that to mean anything.

14         So let's assume I'm going to instruct the jury

15  that it means without wires.  Tell me where I get to that

16  using normal claim construction.

17         MR. PETERMAN:  Okay.  Well -- and, again, I mean,

18  our position is that it should just be the plain and

19  ordinary meaning.  But, you know, with respect to --

20         THE COURT:  But I'm telling you that if you're

21  asking what the plain and ordinary meaning of "wireless

22  communication" -- I'm telling you that I don't think a jury

23  is going to be just -- doing okay with that instruction.

24         So let's assume I'm going to say, no, what you're

25  really wanting me to cover to include or to define it that

1    "wireless" means without wires, and maybe that's unnecessary

2    for me to say in your view, but -- so I'm going to say

3    "wireless" means without wires, tell me why that is what the

4    meaning of the term is here, that "wireless" means without

5    wires.

6              MR. PETERMAN:  Yes.  Here, the patentee did not

7    redefine "wireless communications" in any specific way to

8    limit its applicability.

9              What plaintiff points out is Column 4, at

10   line 46, where it's talking about a wireless network, you

11   know, may include but is not limited to infrared or radio

12   frequency; and then it goes on, you know, down at around

13   line 60, around 60; of course, you know, other suitable

14   wireless communications, standards, or methods now or

15   existing or developed in the future are contemplated in the

16   present invention.

17             And so what that part of the specification is

18   telling you is that there's really no limits on what could

19   be included within wireless communications.  It includes RF.

20   It includes infrared.  It includes other communications now

21   developed or in the future developed.

22             And so the patentee, you know, did not have any

23   limitations that they were placing on wireless

24   communication.  So then, you know, what is wireless

25   communication?  You know, it is communication less wires, so

1    communication without wires.

2              THE COURT:  What if I thought wireless

3    communication that -- you know, I don't know much about what

4    is conductive material and what isn't conductive material.

5    But I have a sense of how electrical impulses go, which is

6    that there are things that go through conductors, and there

7    are things that just go through the air.  And I suppose you

8    could say sometimes the air is more conductive.  That's why,

9    during thunderstorms, certain things happen.  I don't know.

10   I don't know my physics well enough.

11             But if I were to divide the world into, there are

12   things that go through conductive material and things that

13   go through space, through air, and that a wireless

14   communication is something that goes without going through a

15   conductive material versus going through a conductive

16   material, being a wire, whether it's wired through a person

17   or wired through a wire, why wouldn't that be the right way

18   to understand the term?

19             MR. PETERMAN:  Because the specification does not

20   limit the type of conductor.  What Philips is asking you to

21   do --

22             THE COURT:  It's saying wireless is where there

23   is no -- maybe I'm using my physics terms wrong, but I think

24   of wireless communication as there being no conductor.  Am

25   I -- am I missing something?

1          MR. PETERMAN:  Well, and -- well, our position is

2     wireless communication, you know, means -- well, if you're

3     pushing us into this hypothetical, it means -- it means

4     without wires.  The specification --

5          THE COURT:  But so you're saying -- you're saying

6     that if -- like, I guess the question is, if I had a

7     connection, I took my monitor here or my device here,

8     whatever, I have these two different devices, and the

9     plug -- the thing has a plug on it, there's no wire, it's

10    just a plug, and I plug it into the wall without going

11    through a wire, is that wireless communication?

12         MR. PETERMAN:  If your device is communicating to

13    another device without a wire running between the two

14    devices, that would be wireless communication.

15         THE COURT:  Okay.  So just to be clear, I have a

16    device, and on the back of the device, I can just plug it.

17    It has a -- it has a two-prong plug at the end of it.  I can

18    just take my device and I can plug it straight in the wall.

19    That's the way my smoke detectors work at home, for example.

20    I have carbon monoxide detectors, right?  I have this

21    device, and I plug it right into my outlet.  Is that a

22    wireless device?

23         MR. PETERMAN:  Is this -- you're plugging into an

24    outlet for the purpose of power?

25         THE COURT:  Yeah.

1          MR. PETERMAN:  So, yes, it is -- it is a wireless

2     device, because we're talking about the communication is --

3     is -- well, a --

4          THE COURT:  Right now we're just describing the

5     word "wireless."

6          MR. PETERMAN:  A carbon monoxide detector that is

7     plugged into the wall, you know, that is not within the

8     contemplation of this patent.  And so, you know, I would not

9     define that as a wireless device.

10          There has to be some communication element here,

11     and that's the purpose of a wireless device.  And so, you

12     know, if you plug "without wires" into the claim -- so, for

13     example, Claim 1 of the '233 patent, you know, in

14     Element A(V), "a short-range, bidirectional wireless

15     communications module," if you just replace that language

16     and said "a short-range, bidirectional communication module

17     without wires," you know, that puts it in the context of

18     being a communications module.  You understand that the

19     communications have to occur without wires.  It's not

20     limited to being over the air.  "Over the air" could be

21     apart of it.

22          THE COURT:  But if instead of it being a wire,

23     it's a piece of a metal strip or it's -- I mean, the

24     wireless -- the focus -- it seems to me that the concept of

25     "wireless" is generally used with the idea that you're not

1    attached to something, that they can -- that's why I'm using

2    the words, you know, that there's air or space; that the

3    wireless communication tends to -- you know, it's the

4    opposite of an ether cable or whatever.  You're able to do

5    things without having to be connected.

6              And you're saying, well, if it's not wire but

7    something else that's connected, it's wireless.  I mean,

8    that's what you're saying.

9              MR. PETERMAN:  I'm saying that the patent itself

10   is agnostic as to the means -- the means and method of

11   communication and conductivity.  You know, the patent itself

12   describes implantable devices that, you know, communicate

13   through organ tissue.  And so, you know, our --

14             THE COURT:  I'm sorry; the patent describes the

15   organ tissue?  I thought that was somewhere else.

16             MR. PETERMAN:  Yes.  So the -- and I apologize.

17   The patent describes the use of implantable devices.  And in

18   our brief we pointed out that there was at least one other

19   reference that was in the prior art which noted that, you

20   know, the communication over, you know, or through organ

21   tissues is an example of wireless communications.

22             THE COURT:  But this patent wasn't referring to

23   the communication across an implantable device as being

24   wireless communication.  It was talking about communication

25   between the implantable device and an outside device as

1   being wireless, no?

2            MR. PETERMAN:  Well, Claim 1 is directed towards

3   a device, you know, that, you know, communicates with a

4   third party.  And so I guess I don't fully follow the

5   question, because you can have an implantable device, you

6   know, which then, you know, uses, you know, part of your

7   organ tissue as, you know, part of the --

8            THE COURT:  But that's not the wireless part of

9   it.  The wireless part of it is after it leaves your body,

10  between when it leaves your body and when it communicates

11  elsewhere, no?

12           MR. PETERMAN:  I'd agree that that's -- I'd agree

13  that that's part of it.  But, you know, our point ultimately

14  is that Philips wants to limit it to over-the-air

15  communications, and you won't find anywhere within the

16  specification that, you know, over-the-air communications is

17  a limiting factor.  And so I understand that you can push

18  the bounds of without wires far and wide, and so that's why

19  we're suggesting that you just go with the plain and

20  ordinary meaning that a jury would understand what "wireless

21  communication" is in this context.

22           THE COURT:  I don't see a jury understanding that

23  "wireless communication" includes an implant.

24           MR. PETERMAN:  Well, the patent notes, you know,

25  that this is irrelevant to implantable devices.

1          THE COURT:  It's irrelevant to implantable

2    devices, but it isn't construing the implantable device as

3    wireless communication.

4          MR. PETERMAN:  I mean, I don't think it's

5    excluding -- you know, the patent doesn't exclude anything

6    as being part of -- part of wireless communication.  You

7    know, the passage I read you in Column 4 is quite broad.

8          THE COURT:  Your argument is circular, though.

9    You're telling me a jury would know this, and I say, why

10   would a jury possibly know this?  And then you're saying the

11   claim is claiming it.

12         Okay.  I'm ready for the next claim.

13         MR. THOMPSON:  Thank you, Your Honor.  I'm going

14   to share my screen.

15         Okay.  I believe it's being shared.  The -- oh,

16   excuse me.  I have it at the wrong spot.  Here we go.

17         So we're talking about the Quy patent now, and

18   the question, I'll say up-front, is whether to add a word

19   into the claim.  This is the claim language, and I'll get

20   into the actual, you know, full claim here in a second.

21         But the -- ultimately, just to orient you, the

22   big question -- they want to put a word right here, right

23   after "a" that's not there.  So add a word.  That is, you

24   know, universally improper, right, to add words to claims

25   that aren't there, like they're suggesting.  But I will run

1    through the analysis of the claim so as to give it more

2    context.

3          So in (d), of course, we're talking, by the way,

4    the claim they want to add that word to is this phrase

5    "indicating a physiological status."  So the claim talks

6    about receiving data indicating a physiological status and

7    then there'll be, down here in (f), there's at least one

8    data -- that can be the physiological data or exercise --

9    that is received from a device which provides

10   exercise-related information.  In the infringement

11   contention, just for context, that's the watch.

12         And then it says, wherein the data indicating the

13   physiological status of the subject is received at least

14   partially while the subject is exercising, and then of

15   course, obviously, by implication, at least partially while

16   the -- but while the subject is not exercising, right?

17   That's the clear import of this.

18         Well, they want to ignore that aspect, that the

19   information can come while you're -- some of it can come

20   while you're exercising, some of it can come while you're

21   not, and then they want to add the word "current."  And then

22   they'll equate "current" to "now" so that there can't be any

23   latency, there can't be any partially while and partially

24   after.  It has to be now.

25         The claim doesn't say that.  The claim says --

1    doesn't include the word, and our position is -- and, of

2    course, they're adding that because they want to try to

3    construct a noninfringement position, but the claim doesn't

4    have that in it, and the jury doesn't need it.

5              THE COURT:  Would you agree, at least as to the

6    partial -- the data that is partially received while the

7    subject is exercising -- so would you agree that at least as

8    to data received while the subject is exercising, that that

9    is focused on current data while the subject is exercising?

10             MR. THOMPSON:  Yes.  So I think that the -- my

11   answer to that is that the physiological data needs to be

12   during the period of exercising, right?  So, like, people

13   run for an hour or whatever.  They -- the marathons are,

14   what, 2½ if you're great, 4 if you're, you know, normal, and

15   6 if you're me.  That kind of period of time, there can be

16   data that's received while you're exercising and while

17   you're not.  And that means that there can be a delay.

18             THE COURT:  Okay.  But data --

19             MR. THOMPSON:  But it is about the time that you

20   are exercising.  I agree with you in that respect.  But I

21   don't agree with them that there can't be a delay in the

22   transmission.  So that's the difference, is that I think

23   that the physiological status would be of the physiological

24   status during the time period the subject is exercising,

25   right?  Certainly, I think that that's the fair import of

1  the claim.

2            But I don't think that it has to be transmitted

3  at the moment that that occurs, because some of it can be

4  transmitted while you're exercising, and some of it can even

5  be transmitted after you've stopped.

6            THE COURT:  Okay.

7            MR. THOMPSON:  There can clearly be a delay.

8            THE COURT:  Okay.  So I have a device where it

9  relays my heart rate half an hour after it's measured.

10  Okay?

11            MR. THOMPSON:  Uh-huh.

12            THE COURT:  And I only run for 15 minutes.  So

13  when the information is relayed, I'm no longer running.

14  Does that fit in there?

15            MR. THOMPSON:  No, because it has to -- some of

16  the information during -- of the -- you said you were

17  running for 15 minutes.  Some of that information, whether

18  it be the first minute or -- let's just say, if it's the

19  first minute, that first-minute information has to be

20  relayed while you're still exercising.  It can be in the

21  15th minute, but it can't be in the 30th minute after the

22  exercise is over.  That's what this says.

23            THE COURT:  Okay.  So --

24            MR. THOMPSON:  Some of that --

25            THE COURT:  -- you're not disputing that --

1   you're agreeing that you have to still be exercising while

2   the data is being received, but you're saying there could be

3   a lag so long as the lag is shorter than the scenario I

4   suggested where the person will have been -- completed their

5   exercise?

6          MR. THOMPSON:  That's right.  And it doesn't have

7   to be all of the data transmitted.  Just some of it.

8          THE COURT:  Okay.  So some data is received,

9   there may be a slight delay, covers what you're picturing?

10         MR. THOMPSON:  Right.  So, like in your 15

11  minutes, minute number 1 could be transmitted in the last

12  minute of your exercise, of the 15 minutes, and that will

13  count.  And then the remainder of it, the remainder could

14  come after.

15         But it would be -- that would be physiological

16  status being transmitted at least partially while you're

17  exercising.  That's -- so I think we're in agreement on

18  this.

19         THE COURT:  Okay.  So, for Fitbit, let's put

20  aside for a minute the correct words to cover the concept.

21         MR. THOMPSON:  Okay.

22         THE COURT:  Do you agree with sort of the two

23  scenarios that we just laid out, one -- so I'm only running

24  for 15 minutes.  If the data doesn't get there for half an

25  hour, it wouldn't meet this, but if the data got there 10

1    minutes after I start running, it would?

2                    MR. THOMPSON:  That's right.  As long as no --

3                    THE COURT:  So --

4                    MR. THOMPSON:  We would not be applying this to

5    situations where no data is received while the subject is

6    exercising.  That's correct.

7                    THE COURT:  Okay.  So my question is for Fitbit.

8    Putting aside what the right words are to capture what we're

9    saying here, if what we're saying this covers is that it

10   doesn't cover a method where the -- there's a half hour

11   delay and I only run for 15 minutes, so therefore the data

12   wouldn't get there; but it would cover where there's a

13   five-minute delay and I run for 15 minutes, and so therefore

14   the first ten minutes of my data might get there while I'm

15   still running?

16                   MR. THOMPSON:  That's right.

17                   THE COURT:  Okay.  My question is for Fitbit.

18                   MR. PETERMAN:  It's for me.

19                   MR. THOMPSON:  Oh, I'm sorry.  I'm sorry.  Excuse

20   me.

21                   MR. PETERMAN:  Thank you.

22                   Thank you, Your Honor.

23                   With respect to your first scenario, we

24   absolutely -- we absolutely agree that, you know, data, you

25   know, that -- you know, relating to minute Number 1, you

1    know, sent to minute 30 after you've finished exercising is

2    certainly outside the claim.

3           We would also, I think, dispute that, you know,

4    data from minute 1 that's received at minute 5 or minute 6

5    is, you know, is in the claim because it doesn't give you a

6    sense of, you know, how hard you're actually working or

7    exercising at that point.

8           We believe that this part of the claim with

9    respect to psychological [*sic*] status and, you know -- and

10   "status" is an important word here, because it does, you

11   know, connote some sense of, you know, currency.  We believe

12   that there needs to be some type of, you know,

13   insubstantial -- so we're talking microseconds, you know,

14   maybe seconds.

15          But it's of no value, you know, to know what your

16   heart rate was a minute earlier when you're four minutes --

17   four minutes into the run.

18          And so, you know, we think that, you know -- and

19   I know maybe we're heading towards something, you know,

20   that's sort of a blend of our constructions.  We think that

21   there needs to be some type of insubstantial lag between the

22   status and then that, you know, transmission presentation of

23   the status while the subject is exercising.

24          THE COURT:  Okay.  Is there -- so I think we can

25   both agree that some lag is acceptable, and Fitbit is saying

1    it has to be insubstantial.  And Philips is saying it

2    doesn't matter how long the lag is as long as the person is

3    still exercising.

4              So with that being the dispute between the

5    parties, is there anything in the claim itself or in the

6    specifications to help drive the construction as to whether

7    it means an insignificant lag versus a lag of any length so

8    long as the person is still exercising?

9              MR. PETERMAN:  And, Your Honor, we would point

10   to, you know, starting off, just the claim as a whole.  I

11   mean, it is a method for interactive exercise monitoring,

12   and then, you know, you proceed through the claims.  And so

13   this whole idea of exercise monitoring, you know, does

14   connote some sense of currency.

15             And so we certainly acknowledge that there's, you

16   know -- part of the claim, you know, there is potentially

17   past psychological status, but when you get to Element F and

18   talking about the status, you know, partially received while

19   the subject is exercising, you know, we just think that the

20   ordinary meaning of that for this patent to have, you know,

21   any value and to, you know, reach, you know, its stated

22   goals is it has to have -- it has to have an insubstantial

23   lag.

24             You know, essentially the, you know, time of, you

25   know, transmission and, you know, and processing, you know,

1    but relatively current.

2          THE COURT:  Mr. Thompson, what about that,

3    interactive exercise monitoring?  If you were running a

4    6-hour marathon, and at hour 5½, you received the exercise

5    data from the first hour, that wouldn't really be an

6    interactive exercise monitoring, would it?

7          MR. THOMPSON:  Well, I think that the

8    interactive -- first off, the preambles are not limiting,

9    right?  So I think to suggest that that somehow becomes a

10   limitation is incorrect.

11         I do think that it would be interactive to a

12   certain extent, but I'm not sure that much of that is --

13   changes what the claim language explicitly says, right?  The

14   claim language --

15         THE COURT:  But isn't it then nonsensical?  I

16   mean, what's the difference on getting the -- you're running

17   your 6-hour marathon, and you've got a device that is

18   particularly making a point, that at least some of the data

19   has to happen if it's while you're still exercising; and

20   it's, therefore, going to matter whether you decided to quit

21   at hour 4 or you run at hour 6, or, you know, if you quit at

22   hour 4, you still get that information of what your first

23   half hour looked like.

24         It makes -- it -- you're right that the words say

25   as long as you are still exercising, but wouldn't it

1  matter -- wouldn't it conceptually only matter if there's a

2  reason why you would want to get it otherwise?  I'd just

3  sort of have a silly limitation there.

4           MR. THOMPSON:  So I think that that's a

5  misreading of the preamble, I think is what started this.

6  So if you look at the interactive exercise monitoring that's

7  generally referred to there, it's talking about the overall

8  system, right, which includes, you know, other elements like

9  sending to a server and whatnot.

10          It doesn't say "interactive exercise monitoring

11  only while you exercise."  You can have interactive

12  monitoring before and after.  I mean, it's an interactive

13  system.  It has -- it receives information.  It calculates.

14  It sends it back to you.  I don't think that that is what

15  the preamble -- even if you were to take it as some sort of

16  limitation -- would mean.

17          I do think that the patent claim is explicit that

18  the physiological status is -- just needs to be partially

19  received while the subject is exercising, and that shouldn't

20  be rewritten.  That's what it says.  It doesn't -- it

21  doesn't have this limitation that they're suggesting in it.

22          THE COURT:  Does it explain why it needs to be

23  received while the person is exercising?

24          MR. THOMPSON:  Does the claim say?

25          THE COURT:  No, do the specifications -- is there

1    any explanation anywhere why you would -- why you

2    wouldn't -- why this device isn't exactly the same and does

3    the same, accomplish the same thing, without the limitation

4    that at least some of the data is received while the person

5    is exercising?

6               MR. THOMPSON:  Right.  So --

7               THE COURT:  If you read that out, if it didn't

8    have it, what's the difference between the device you're

9    talking about and the device that's listed here?

10              MR. THOMPSON:  Well, I think that some of this

11   information clearly could be provided after, like, you know,

12   some of those later elements.

13              The physiological status being sent or received,

14   I guess, while the subject is exercising has that aspect

15   that we were talking about, that the physiological status

16   has to be of the period while you're exercising, not some --

17   like before and after, right?  Like your heart rate before,

18   your heart rate after you finish.

19              I think that this is talking about physiological

20   status of -- during the period that you're exercising being

21   sent partially while you're exercising.  And I think that

22   that is -- that's what it's talking about.  The benefits of

23   that are, obviously, that it's tied to the period that

24   you're exercising.

25              THE COURT:  But -- so, no question, you have to

```
 1    get data while you're exercising.  That's the whole point
 2    here.  If you're not getting the data while you're
 3    exercising, that's not useful.
 4            But it's saying here very specifically that that
 5    data is being received while you're still -- the "received"
 6    and "while" are in the same sentence.  And my question is,
 7    why?  Why not just collect all the data, and after the fact,
 8    the doctor reviews it?  And it's saying, no, it matters --
 9    for some reason, it's mattering that -- it matters that it's
10    happening while the subject is exercising.
11            MR. THOMPSON:  I think it's the combination of
12    the two, that it's -- it's that and it's that the
13    physiological status is of the time period that you're
14    exercising.  And so I think that that's -- it's the
15    combination of those two that is important, that it's that
16    the physiological status is of a period while you're
17    exercising and it's transmitted during that.
18            I think that the language as a whole conveys that
19    concept, and that's an important aspect to this, that that
20    makes it -- that ties the physiological status to the period
21    of exercising, and that's really important.
22            THE COURT:  Okay.
23            MR. PETERMAN:  Your Honor, if I could respond?
24            You know, I mean -- well, A, I think there's just
25    a logical -- it's not a logical leap.  I think there's just
```

1    a logic to understanding that part of the value of the

2    invention is the, you know, monitoring and knowing how to

3    adjust the effort that you're putting into exercise.

4           But going beyond that, in our -- in our brief,

5    our opening brief, at around page 20, we lay out a number of

6    portions of the prosecution history which further support

7    our argument.

8           I think one thing that is critical and that

9    should be noted is that in distinguishing the prior art --

10   and this is in footnote 6 of page 20 of our opening brief --

11   the patent applicant in responding to a rejection noted that

12   the prior art was far different than the, quote, "realtime

13   monitoring of exercise and physiological data and realtime

14   uploading of the same."

15          And so the patent -- the patentee, you know, put

16   this concept of, you know, realtime monitoring in there, and

17   so it's -- the patent only has value if at least part of --

18   part of the information relayed back to you is realtime.

19          THE COURT:  So if I were to agree with you with

20   the modification or the concession I think I got earlier,

21   which is there could be a slight lag, how would you use

22   that?  What words would you use then?  Because that isn't

23   current.  That recognizes that there may be some delay, and

24   the argument is just about how much delay.

25          MR. PETERMAN:  Yeah.  You could -- I think you

1    can use the term, like, you know, "simultaneous" or "near

2    simultaneous."  It's just, you know, understanding that what

3    we're really talking about here is a -- is a technical lag

4    as opposed to, you know, sending information, you know,

5    minutes or hours later.  I think Your Honor's example with

6    the marathon is exactly, I think, what the patent's not

7    intended to cover, you're not intended to know how you were

8    working at hour 1 versus hour 6.  So I think --

9            THE COURT:  I think the problem for me in picking

10   how to verbalize that difference, though, is that the

11   difference between hour 1 and hour 6 seems enormous, and

12   that makes it hard to say the time is irrelevant.

13           On the other hand, that it's instantaneous or

14   simultaneous or whatever seems unduly restrictive.  I mean,

15   it might not be the best device if there's a time lag, but

16   it contemplates that there could -- there's nothing here

17   that prohibits -- I mean, it would just be an inefficient

18   device.  It wouldn't be as good as an instantaneous one, but

19   it seems like it wouldn't be precluded.

20           MR. PETERMAN:  We would suggest something like,

21   you know, "insubstantial delay."  And so, you know, that

22   gives -- it gives some instruction to the jury.  You know,

23   it -- they can understand, you know, that it doesn't need to

24   be instantaneous, and maybe the device is, you know, backed

25   up a little bit and it comes out, you know, ten seconds

1      later.  You know, that would still be in the claim.

2            I think, you know, the jury needs something to

3      understand that it really needs to be sort of present, in

4      the moment, as opposed to, you know, historical data that

5      really is not going to help the athlete at that -- at that

6      moment.

7            THE COURT:  Mr. Thompson, your response?

8            MR. THOMPSON:  Well, my response is that is

9      absolutely nowhere in this claim, and it's not an

10     interpretation of the claim.  It's a rewriting of the claim.

11     The claim is very clear in what it was saying.  The

12     prosecution history that he referred to was the examiner

13     looking at this limitation and accepting it as

14     differentiating the art.

15           There's no -- the connection, the time period

16     you're talking about, like, is it instantaneous or is it

17     after or late, that's -- that is in this limitation itself.

18     The time period is that it has to be received.  The

19     information during the exercise has to be received before

20     the subject stops exercising.  That is exactly the period

21     that the claim, claims.  To change that period is to just

22     ignore the claim language that was what was examined in the

23     patent office.

24           And so I think that -- and that has been, of

25     course, the limitation that they've been trying to inject

1    into this claim that's not there.  And so that would be my

2    answer, is that not only is it -- is the time period

3    specified, which is this highlighted language here at the

4    bottom of (f), the period is actually specified.  It's

5    between when it happens, and when the exercise stops, it has

6    to be transmitted.

7           And in the exam -- the patent office examined it

8    in that context, and to somehow -- and that was under the

9    broadest reasonable interpretation this patent was allowed,

10   not the one that you'll be, you know, handling.  And then to

11   say now that we're going to add yet another limitation seems

12   very improper to me.

13          MR. PETERMAN:  Your Honor, if I may, I think

14   Slide 107 from our deck might be -- might be helpful here,

15   just to, you know, make sure that it has your attention.  I

16   think --

17          Can we get control back from you?

18          MR. THOMPSON:  Sure.  Did that -- hopefully that

19   did it.

20          MR. PETERMAN:  Yes.

21          And so with Slide 107, you know, we, you know,

22   take the excerpt from the prosecutorial history that I was

23   referring to, and in order to overcome a specific rejection

24   from this root reference, the patentee emphasized this idea

25   of, you know, realtime monitoring as being different than

1    the historical monitoring that was allegedly part of the

2    prior art and said, you know, the reference is clearly for

3    storing data about exercising, then uploading at a later

4    time via a separate phone line, which is far different from

5    realtime monitoring of exercise, physiological date and

6    realtime uploading of the same.

7            And so this idea that we're injecting some new

8    standard, some new limitation into this claim, you know, is

9    belied by the prosecutorial history where, in order to gain

10   allowance, the patentee focused on this realtime aspect.

11   And so if you don't want to use "substantial delay," you can

12   use "realtime" and let the jury decide what is -- you know,

13   whether a .1-second delay is realtime.  I think most people

14   would agree that's realtime, and the jury can decide.

15           I don't think it's going to be as close as, you

16   know, .1 second versus 5 seconds.  It's -- what the jury

17   will understand is that, you know, Fitbit does not, you

18   know, provide this, you know, realtime, you know -- well, it

19   does not meet this claim.  And so I think this action -- a

20   brief response is, I think, all we need in order to put the

21   proper interpretation, construction of the term.

22           THE COURT:  Okay.  I will go back, and I haven't

23   looked through your slides.  I will take a glance at them,

24   and I will go back through this and see where we are.

25           MR. THOMPSON:  May I add one last point before

 1  we -- I think we're going to close on that?  That realtime

 2  was referring to that it's transmitted while you're -- you

 3  know, at least partially while you're exercising.  So I

 4  just -- I would dispute that interpretation of that.  So --

 5  apologies for the interruption, but I wanted to at least

 6  make that clear.

 7          THE COURT:  Okay.

 8          Yes, Mr. Chaikovsky?

 9          MR. PETERMAN:  You're on mute.

10          THE COURT:  Okay.  Go ahead.

11          MR. CHAIKOVSKY:  One comment for the record so

12  that, as you go back and take a look at it, because it was

13  very important to you, you were asking for the connection of

14  athletic performance, feedback performance data.  I'll just

15  give you citations so you can really laser-like focus.

16          If you go in the patent Column 4, line -- that's

17  the '007 patent, Column 4 at lines 28 through 40, Columns 6,

18  lines 50 through 58, which then talks about Figure 11,

19  combines and connects the athletic performance with the

20  performance data.

21          Additionally just -- the three cases for the

22  Court to focus on this, *Aristocrat*, which is 521 F.3d, at

23  1334; *Blackboard* -- and what's important -- 574 F.3d, at

24  1384, 1385.  Those two cases, which came out around '08, '09

25  were ten years after the patent was prosecuted.  The patent

1    was prosecuted before you knew you could do indefiniteness

2    by an algorithm.

3              And then the *Noah* case, as I pointed out,

4    675 F.3d, at 1302, 1319, focusing on 1317 to 1319, where

5    they have to have all the functions algorithm.

6              And the *Blackboard, Aristocrat* cases were very

7    seminal, because even if they're basic, known to one of

8    ordinary skill, like here they tried to do the basic

9    historical math, the federal circuit is telling you it does

10   not matter.  That knowledge of one in the ordinary skill in

11   the art, even if simple, even if so basic, if it's not -- if

12   it's not in the patent, it's not enough.  Its function

13   describes an outcome, not a means for achieving an outcome,

14   or the structure.  That's not enough.  And that's what

15   people pointed to in *Aristocrat* and *Blackboard.*  And so

16   those are really the cases I focus on.

17             That's it.  I apologize, Your Honor.

18             THE COURT:  Thank you very much.  I appreciate

19   all the presentations.

20             THE DEPUTY CLERK:  Court is in recess.

21             (Court in recess at 12:44 p.m.)

22

23

24

25

1          **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3

4               I, Robert W. Paschal, Registered Merit Reporter

5     and Certified Realtime Reporter, in and for the United

6     States District Court for the District of Massachusetts, do

7     hereby certify that pursuant to Section 753, Title 28,

8     United States Code, the foregoing pages are a true and

9     correct transcript of the stenographically reported

10    proceedings held in the above-entitled matter and that the

11    transcript page format is in conformance with the

12    regulations of the Judicial Conference of the United States.

13

14               Dated this 9th day of August, 2020.

15

16

17

18

19               /s/ Robert W. Paschal
                 _____
20               Robert W. Paschal, RMR, CRR
                 Official Court Reporter

21

22

23

24

25