**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| **PHILIPS NORTH AMERICA LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Civil Action No.** |
| **v.** | ) | **19-11586-FDS** |
| | ) | |
| **FITBIT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION</u>**

**SAYLOR, C.J.**

This is an action for patent infringement.  Plaintiff Philips North America LLC has sued

defendant Fitbit, Inc., asserting claims under 35 U.S.C. § 271 for infringement of three patents of

which Philips is the owner and assignee.  The patents at issue concern technology related to

connected-health products, such as wearable fitness trackers.

The case is at the claim-construction stage.  The parties have submitted proposed

construction for six disputed terms:  (1) "means for computing athletic performance feedback

data from the series of time-stamped waypoints obtained by said GPS receiver," (2) "means for

suspending and resuming operation of said means for computing when a speed of the athlete falls

below a predetermined threshold," (3) "governing information transmitted between the first

personal device and the second device," (4) "first personal device," (5) "wireless

communication," and (6) "indicating a physiologic status of a subject."[1]

---

[1] The parties proposed construction of four additional terms that are in U.S. Patent No. 6,976,958.  Philips has since withdrawn its allegations of infringement of that patent.  The Court will therefore not address those terms.

## I.      Background

### A.      Factual Background

Philips North America LLC develops, among other things, connected-health technologies

and related products, such as wearable fitness trackers that monitor and analyze personal health

and fitness information.  (Second Am. Compl. ¶¶ 2, 4-7, 12, 24-25).  Its patent portfolio includes

more than 60,000 patents.  (*Id.* ¶ 8).  It licenses its patented technologies to companies in the

connected-health field.  (*Id.* ¶¶ 6, 8).

Fitbit, Inc. develops, manufactures, and sells connected-health products.  (*Id.* ¶¶ 13, 29-

30).

### B.      Patents in Suit

The second amended complaint alleges that Fitbit infringes on three patents owned by

Philips:  U.S. Patent No. 6,013,007 ("the '007 patent"), U.S. Patent No. 7,088,233 ("the '233

patent"), and U.S. Patent No. 8,277,377 ("the '377 patent").  The patents concern technology

related to connected-health products, including GPS/audio athletic training, security mechanisms

for transmitting personal data, wearable-technology products, and handling interrupted

connections.  (*Id.* ¶¶ 9, 12, 37).

#### 1.      The '007 Patent

The '007 patent is titled "Athlete's GPS-Based Performance Monitor."  ('007 patent at

Title).  The patent concerns applying "Global Positioning System (GPS) technology for the

personal performance monitoring of outdoor athletes, . . . and providing the athlete with real-time

performance feedback and optional long-term trend analysis."  (*Id.* col. 1 ll. 8-13)  It identifies

"a need for a portable GPS unit that is small and light enough to be carried or worn by an

outdoor athlete which incorporates real-time athletic performance algorithms for continuously

monitoring the athlete's progress and reporting his/her progress periodically during the exercise

session." (*Id.* col. 1 ll. 59-64).  According to the patent, "[r]eal-time audio reports would assist and motivate the athlete to improve his/her performance without any visual distractions" and "[a]n integrated radio can provide the athlete with entertainment."  (*Id.* col. 1 ll. 64-67).

The patent states that "the GPS-based performance monitor and feedback device of the present invention can be used to provide an outdoor athlete with continuous, consistent, and accurate real-time performance feedback, independent of his/her outdoor location in the world." (*Id.* col. 9 ll. 63-67).  It further states that "[t]he data presentation method of using an audio module eliminates the exclusive use of large, power-consuming, cumbersome, and visually distracting displays and leaves the athlete free to concentrate on his/her exercise, safety, and surroundings."  (*Id.* col. 9 l. 67; *id.* col. 10 ll. 1-4).

The patent provides for, among other things, a "portable feedback system providing regular updates on an athlete's performance" comprising:

- a global positioning system GPS receiver for obtaining a series of time-stamped waypoints;

- means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver; and

- means for presenting the athletic performance feedback data to an athlete.

(*Id.* col. 2 ll. 56-67).  It further provides for a "system for comparing an athlete's performance with the performance of other athletes" comprising the same components plus "a modem for transmitting the athletic performance feedback data to a remote computer for comparison with athletic performance feedback data of other athletes."  (*Id.* col. 2 ll. 65-67; *id.* col. 3 ll. 1-10).

## 2.   The '233 Patent

The '233 patent is titled "Personal Medical Device Communication System and Method." ('233 patent at Title).  It generally concerns a "bi-directional personal and health-wellness

provider communication system." (*Id.* col. 1 ll. 21-23).  More particularly, it concerns "a

personal communication system suitable for use with children, vulnerable adults (such as those

in assisted living situations), and more specifically, medically distressed persons and those in

whom a[] personal medical device has been deployed, for medical testing, and for other life

enhancements." (*Id.* col. 1 ll. 23-28).

According to the patent, personal medical devices are devices that may either "monitor"

or "provide" body functions.  (*Id.* col. 2 ll. 2-3, 5).  They may be used "to deliver drugs, heart

defibrillation, or other treatment" or "to enhance wellness, test drug therapies, monitor patient

health, deliver long-term care, or treat acute conditions." (*Id.* col. 2 ll. 7-10).  They take "many

forms" and may be "surgically implanted, strapped externally to the body, carried in a pocket,

transported in a carrying case, or installed as a home appliance." (*Id.* col. 1 ll. 63-67).

The patent describes "a device and method to couple with [personal medical devices] to

provide wireless communication and locating functions." (*Id.* col. 2 ll. 11-12).  Such

communication may be used, among other things, "to provide health care professionals with

access to information for remote diagnostic capabilities; to provide notification of acute

conditions possibly requiring immediate assistance, transportation to a medical center, or remote

treatment action; to provide a location information of mobile persons for caregivers; to notify

responsible parties of the occurrence of a medical condition; and to provide remote intervention

assistance by caregivers through verbal or visual interaction." (*Id.* col. 2 ll. 14-22).

### 3.   The '377 Patent

The '377 patent is titled "Method and Apparatus for Monitoring Exercise with Wireless

Internet Connectivity." ('377 patent at Title).  It concerns "monitoring of living subjects." (*Id.*

col. 1 ll. 35-36).  More particularly, it concerns "health-monitoring of persons where measured or

input health data is communicated by a wireless device to and from a software application

running on an internet-connected server and where the same may be studied and processed by the software application, a health professional, or the subject." (*Id.* col. 1 ll. 36-41).

The patent provides for a "method and apparatus . . . for wireless monitoring of exercise, fitness, or nutrition by connecting a web-enabled wireless phone to a device which provides exercise-related information, including physiological data and data indicating an amount of exercise performed." (*Id.* at Abstract).  It further provides that "[a]n application for receiving the exercise-related information and providing a user interface may be downloaded to the web-enabled wireless phone from an internet server" and that "[t]he exercise-related information may be transmitted to an internet server, and the server may calculate and return a response." (*Id.*).

The patent identifies two "complementary" systems that embody the invention.  (*Id.* col. 2 l. 64).  The first embodiment may be employed "to manage the disease state or condition of a patient" by "employ[ing] a health monitoring device." (*Id.* col. 2 l. 67; *id.* col. 3 ll. 1-2).  That device would provide data by a wireless connection "for processing via the internet[,] including a review by a physician or other health care professional if required." (*Id.* col. 3 ll. 1-2).  For example, a diabetic could connect a blood-glucose monitor to a wireless web device, download data to a diabetes-management company's server, and receive guidance concerning his next meal.  (*Id.* col. 3 ll. 14-20).

The second embodiment enables implementation of a "health or lifestyle management plan" by allowing "[v]arious health parameters, such as those relating to nutrition or exercise, [to] be entered into a health monitoring device" and to be wirelessly communicated to a server. (*Id.* col. 3 ll. 6-11).  In this embodiment, the system "may be employed to monitor the physiologic status of a healthy subject while eating, exercising, or performing other activities." (*Id.* col. 3 ll. 34-36).  For example, an individual following an exercise program could attach a

wireless web device to an exercise machine, send data from that machine over the Internet to the server of a health and fitness company, and receive personalized responses from that company. (*Id.* col. 3 ll. 21-27).

## II.    **Legal Standard**

The construction of claim terms is a question of law, which may in some cases rely on underlying factual determinations. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325-26 (2015); *Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning.  The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  *Id.* at 1313.  Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at 1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

### A.    **The Words of the Claim**

The claim construction analysis normally begins with the claims themselves.[2]  The

---

[2] In *Phillips*, the Federal Circuit discredited the practice of starting claim-construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the

claims of a patent "define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (quoting *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, it is the arrangement of the disputed term in the claims that is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term." *Phillips*, 415 F.3d at 1314. For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another. *See id.* In addition, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

## B.    The Specification

"The claims, of course, do not stand alone." *Id.* "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (internal citations and quotation marks omitted). For that reason, the specification

---

construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314.

must always be consulted to determine a claim's intended meaning.  The specification "is always highly relevant to the claim construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."  *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention."  *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315-17 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))).  "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess."  *Phillips*, 415 F.3d at 1316.  It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor."  *Id.*  Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification.  *See On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharm. USA, Inc.,* 347 F.3d 1367, 1371 (Fed. Cir. 2003))).

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim."  *Id.* at 1323.  A patent's "claims, not specification embodiments, define the scope of patent protection."  *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Innova/Pure Water*, 381 F.3d at 1117 ("[E]mbodiments appearing in the written description will not be used

to limit claim language that has broader effect.").  In particular, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."  *Phillips*, 415 F.3d at 1323.  This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments."  *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms."  *Id.*  "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction."  *Id.* at 1316 (quoting *Renishaw*, 158 F.3d at 1250).

### C.   The Prosecution History

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning.  The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent."  *Id.* at 1317.  "Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent."  *Id.*  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.*

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Id.*  As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express

surrender of subject matter" to disavow claim scope during prosecution.  *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. International Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)).

> **D.**     **Extrinsic Evidence**

Extrinsic evidence consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).  It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean."  *Id.* at 1319. However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance.  *See id.* at 1318-19.  Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion.  *Id.* at 1319.

**III.**   **Analysis**

There are six disputed terms in the patents:

| Patent & Claims | Term | Plaintiff's construction | Defendant's construction |
|---|---|---|---|
| **The '007 Patent Claims 1, 21** | "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" | a processor (and equivalents thereof) that determines any of the following from a series of time stamped waypoints obtained by said GPS receiver during an exercise session: elapsed distance of an athlete; current or average speed of an athlete; current or average pace of an athlete<br><br>35 U.S.C. § 112, ¶ 6<br><br>**Function:** computing athletic performance feedback data [as construed above as elapsed distance of an athlete, current or average speed of an athlete, and current or average pace of an athlete] from the series of time stamped waypoints obtained by said GPS receiver<br><br>**Structure:** a processor and equivalents thereof (*see, e.g.*, Fig. 6, col. 5 ll. 36-40 and col. 9 ll. 31-35)<br><br>**Not indefinite.** | 35 U.S.C. § 112, ¶ 6<br><br>**Function:** computing elapsed distance, current and average speeds and paces, calories burned, miles remaining and time remaining from the series of time stamped waypoints obtained by said GPS receiver. Col.7:45-48.<br><br>**Structure:** a processor and smart algorithm. Fig. 6, Col.7:45-48, 7:52-56.<br><br>**Indefinite.** No algorithm disclosed to perform the full scope of the claimed function. |
| **The '007 Patent Claim 7** | "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" | a processor (and equivalents thereof) that suspends said computing when a speed of the athlete is below a predetermined threshold and resumes said computing when a speed of the athlete is not below said predetermined threshold<br><br>35 U.S.C. § 112, ¶ 6<br><br>**Function:** suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold (as construed above)<br><br>**Structure:** a processor and equivalents thereof (*see, e.g.*, Fig.6, col. 5 ll. 36-40 and col. 9 ll. 31-35.)<br><br>**Not indefinite.** | 35 U.S.C. § 112, ¶ 6<br><br>**Function:** suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold<br><br>**Structure: Indefinite.** No structure disclosed that performs the claimed function. |

| Patent & Claims | Term | Plaintiff's construction | Defendant's construction |
|---|---|---|---|
| The '233 Patent Claim 1 | "governing information transmitted between the first personal device and the second device" | controlling the transmission of information between the first personal device and the second device | No construction necessary. |
| The '233 Patent | "first personal device" | No construction necessary.<br><br>Alternatively: a device for private use by a person | personal medical device |
| The '233 Patent Claims 1, 13, 15, 16 | "wireless communication" | an over-the-air communication (*e.g.*, using radiofrequency (RF), infrared, or optical techniques) | No construction necessary. |
| The '377 Patent | "indicating a physiologic status of a subject" | No construction necessary. | indication of a subject's current physiological state |

(Dkt. No. 80-1).[3]

## A.   The '007 Patent

### 1.   "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver"

| Term | Plaintiff's construction | Defendant's construction |
|---|---|---|
| "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" | a processor (and equivalents thereof) that determines any of the following from a series of time stamped waypoints obtained by said GPS receiver during an exercise session: elapsed distance of an athlete; current or average speed of an athlete; current or average pace of an athlete<br><br>35 U.S.C. § 112, ¶ 6<br><br>**Function:** computing athletic performance feedback data [as construed above as elapsed distance of an athlete, current or average speed of an athlete, and current or average pace of an athlete] from the series of time stamped waypoints obtained by said GPS receiver | 35 U.S.C. § 112, ¶ 6<br><br>**Function:** computing elapsed distance, current and average speeds and paces, calories burned, miles remaining and time remaining from the series of time stamped waypoints obtained by said GPS receiver. Col.7:45-48.<br><br>**Structure:** a processor and smart algorithm. Fig. 6, Col.7:45-48, 7:52-56.<br><br>**Indefinite.** No algorithm disclosed to perform the full |

---

[3] Fitbit's proposed constructions for the two '007 terms change, without explanation, across the three claim-construction charts that the parties have submitted.  (*See* Dkt. Nos. 65-1, 68-1, 80-1).  It is also worth noting that both parties make slight tweaks to how they describe their proposed constructions in their briefs.  The changes appear to be more stylistic than substantive.  For that reason, the Court will use the parties' final claim-construction chart, with minor formatting edits.

| Term | Plaintiff's construction | Defendant's construction |
|---|---|---|
| | **Structure:** a processor and equivalents thereof (*see, e.g.*, Fig. 6, col. 5 ll. 36-40 and col. 9 ll. 31-35)<br><br>**Not indefinite.** | scope of the claimed function. |

The first term disputed by the parties is "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver." That term appears in Claims 1 and 21 of the '007 patent. For example, Claim 1 recites the following:

> A portable feedback system providing regular updates on an athlete's performance, comprising:
>
> > a global positioning system GPS receiver that obtains a series of time-stamped waypoints;
> >
> > *means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver*; and
> >
> > means for presenting the athletic performance feedback data to an athlete.

('007 patent col. 11 ll. 9-17 (emphasis added)).

The parties agree that the term is governed by 35 U.S.C. § 112, ¶ 6, which addresses "means-plus-function" claims.[4] The statute provides as follows:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

35 U.S.C. § 112, ¶ 6. "In enacting this provision, Congress struck a balance in allowing patentees to express a claim limitation by reciting a function to be performed rather than by reciting structure for performing that function, while placing specific constraints on how such a

---

[4] The America Invents Act, Pub. L. 112-29, 125 Stat. 284 (2011), updated § 112 to letter the paragraphs and insert references to joint inventors. *See id.* § 4(c). That amendment took effect on September 16, 2012, and applies to any patent application filed on or after that date. *See id.* § 4(e). The '007 patent is subject to the earlier version of § 112. The Court will therefore refer to the subsection governing "means-plus-function" limitations as § 112, ¶ 6.

limitation is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015). "Permitting an applicant to use a broad means expression for claiming a functional limitation provided that the specification indicates what structure constitutes the means for performing the claimed function is often referred to as the '*quid pro quo*' for the convenience of employing § 112, ¶ 6." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 948 n.1 (Fed. Cir. 2007).

Construction of a means-plus-function limitation is a two-step process. Courts must first "determine the claimed function." *Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1311 (Fed. Cir. 2012) (quoting *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006)). They must then "identify the corresponding structure in the written description of the patent that performs the function." *Id.* (quoting *Applied Med. Res. Corp.*, 448 F.3d at 1332). "If the patentee fails to disclose [an] adequate corresponding structure, the claim is indefinite." *Williamson*, 792 F.3d at 1351-52.

Here, the parties dispute both (1) the meaning of the phrase "athletic performance feedback data" as it is used in the claimed function and (2) whether a corresponding structure that performs the claimed function is adequately disclosed in the patent.

### a.   Claimed Function

The parties agree that the claimed function is "computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver." They dispute, however, how to interpret the phrase "athletic performance feedback data" within that description.

Defendant contends that the phrase includes "elapsed distance, current and average speeds and paces, calories burned, miles remaining, and time remaining." (Def. Mem. at 2).

Plaintiff first contends that the phrase includes only "elapsed distance of an athlete," "current or average speed of an athlete," and "current or average pace of an athlete." (Pl. Mem. at 5). The dispute therefore initially concerns whether "athletic performance feedback data" includes calories burned, miles remaining, and time remaining. In its responsive brief, however, plaintiff tempers its position. It states that it "would not object to including 'miles remaining' and 'time remaining' to its proposed construction" because "those items would be derivative of calculating elapsed distance and speed." (Pl. Resp. at 2-3). The dispute thus boils down to whether "athletic performance feedback data" includes "calories burned."

Plaintiff contends that "calories burned" does not constitute a form of "athletic performance feedback data" because it is not data that provides feedback on an athlete's performance during an exercise session. "Information such as distance, speed and pace is the sort of information provided as feedback on an athlete's performance during an exercise session, while tracking calories has little to do with feedback on performance as opposed to being useful for weight management over time." (Pl. Mem. at 7). According to plaintiff, "the specification never contemplates calories being provided as feedback data during an exercise session, as opposed to tracking calories for some other purpose." (*Id.*).

That is not strictly true, however. The specification explicitly offers "calories burned" as one type of "performance data" calculated by the claimed system:

> During the exercise session, the GPS receiver module . . . continuously determines the athlete's geographical position and stores it in the memory . . . along with other information such as the date and time that each position was acquired. From these positions and times, *performance data* such as elapsed distance, current and average speeds and paces, *calories burned*, miles remaining, and time remaining are calculated.

('007 patent col. 7 ll. 41-48 (emphases added)). Plaintiff minimizes the significance of this passage by arguing that "calories burned" is included here as part of "performance data," but not

as part of "performance *feedback* data." (Pl. Resp. at 2). But that ignores the next sentence of the specification: "Based on this data, recommendations to increase or decrease level of effort to meet pre-set performance targets are then determined." ('007 patent col. 7 ll. 48-50). In other words, the specification specifically contemplates first calculating "calories burned" based on the GPS positions of an athlete and the time that each position was acquired, and then providing "recommendations" to the athlete based on that calculation so that the athlete may meet performance targets. Such recommendations plainly represent "feedback" based on calories burned. Thus, according to the specification itself, "calories burned" constitutes a form of "athletic performance feedback data" as that term is used in the patent.

The parties further dispute whether the claimed function—"computing athletic performance feedback data"—means that the corresponding structure must be capable of calculating *all* types of athletic performance feedback data identified by the specification or merely *any* type of such data. Defendant contends that it must be capable of calculating all types, because "[w]here there are multiple claimed functions, as we have here, the patentee must disclose adequate corresponding structure to perform all of the claim functions." (Def. Mem. at 6 (quoting *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343 n.2 (Fed. Cir. 2019)) (emphases omitted)). But the claim does not disclose multiple functions; instead, it identifies a single function that might yield multiple types of data as a result. If the function yields at least some "athletic performance feedback data," it falls within the plain language of the claim.

Accordingly, the term "computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" will be construed as "computing elapsed distance, current or average speeds or paces, calories burned, miles remaining, or time remaining from the series of time-stamped waypoints obtained by said GPS receiver."

16

### b.      Corresponding Structure

The Court next "must determine what structure, if any, disclosed in the specification corresponds to the claimed function." *Williamson*, 792 F.3d at 1351.

Defendant contends that the specification does not adequately disclose the corresponding structure because it does not provide an algorithm delineating how "athletic performance feedback data" is calculated.  That omission, according to defendant, renders the term indefinite. In response, plaintiff first contends that the specification adequately discloses the structure by identifying a central processing unit that uses memory and is connected to a GPS module.  It then contends that if any algorithm "beyond what is described by claims themselves were required," a person of ordinary skill in the art would understand that the specification adequately discloses such an algorithm because "all that is required . . . to implement the algorithm" is "a basic high school understanding of geometry and trigonometry."  (Pl. Mem. at 10).

As noted, the parties agree that the claimed function is "computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver."  The Federal Circuit has explained that "[i]n cases involving a computer-implemented invention in which the inventor has invoked means-plus-function claiming, . . . the structure disclosed in the specification [must] be more than simply a general purpose computer or microprocessor." *Aristocrat Techs. Australia Pty Ltd. v. International Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  In such cases, "the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm."  *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (quoting *WMS Gaming, Inc. v. International Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999)).  In other words, "the corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function *is* the algorithm disclosed in the specification."  *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1253

(Fed. Cir. 2005) (emphasis added).[5]

As a result, the structure first proposed by plaintiff—"a central processing unit (CPU) (a processor) that also utilizes memory and is connected to a GPS receiver module that provides geographical position information signals to the memory where such information is stored" (Pl. Mem. at 9)—is inadequate by itself to serve as the corresponding structure for the claimed function. The fact that the specification identifies components other than the processor on which it depends—namely, memory and a GPS module—makes no difference. It must instead disclose an algorithm that the processor uses to compute athletic performance feedback data.

The question then becomes whether the specification discloses such an algorithm. An algorithm is a "step-by-step procedure for accomplishing a given result." *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012) (quoting *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1385 (Fed. Cir. 2011)). It can be expressed by the specification "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Noah Sys.*, 675 F.3d at 1312 (internal quotation marks omitted).

Here, the specification does not disclose an algorithm. Instead, it simply provides that "performance data . . . are calculated" based on GPS "positions and times." ('007 patent col. 7 ll. 45-48).[6] Plaintiff suggests that the specification is nonetheless adequate. In its view, "a person

---

[5] Plaintiff does not contend that the means-plus-function term at issue here falls under the exception identified by the Federal Circuit in *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303 (Fed. Cir. 2011). In *Katz*, the court explained that processors alone—that is, processors without an algorithm—represent adequate corresponding structures for functions that "can be achieved by any general purpose computer without special programming." *Id.* at 1316. The Federal Circuit has subsequently explained that the *Katz* exception applies when the claimed functions are ones such as basic "processing, receiving, and storing" that are "coextensive" with the functions of a microprocessor itself. *See EON Corp. IP Holdings LLC v. AT&T Mobility, LLC*, 785 F.3d 616, 621-22 (Fed. Cir. 2015) (internal quotation marks omitted). Here, plaintiff's expert conceded that performing the claimed function requires special programming. (*See* Martin Dep. at 48-50).

[6] Nor do the claims themselves adequately disclose the underlying structure. It may be true, as plaintiff contends, that "[w]here . . . a means-plus-function term recites its own underlying structure, no further analysis into

of ordinary skill in the art would understand that the specification *does disclose* an algorithm for computing various forms of elapsed distance, current and average speed, and current and average pace from a series of GPS waypoints—*that is the algorithm*." (Pl. Mem. at 10 (second emphasis added)). It reasons that "[a] person of ordinary skill would understand this as a sufficient algorithmic disclosure because all that is required is a basic high school understanding of geometry and trigonometry to implement the algorithm." (*Id.*).

In support of that argument, plaintiff relies on the Federal Circuit's decision in *Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp.*, 841 F.3d 1334 (Fed. Cir. 2016). There, the court concluded that a means-plus-function claim was not indefinite even though the specification did not explicitly identify Ohm's law, a formula that allows for the calculation of impedance based on voltage and current, as part of the disclosed algorithm. *Id.* at 1344-45. The specification stated "[t]he system of the present invention provides for . . . measurement of different voltages and currents . . . in response to commands and data changes . . . ." *Id.* at 1345. The court noted that "[b]oth parties' experts testified that a person of ordinary skill would know to apply Ohm's law to voltage and current to yield impedance values." *Id.*

Notwithstanding that conclusion, the same court also invalidated certain claims for failure to disclose an algorithm. *Id.* at 1344. The specification at issue apparently stated that a microprocessor would implement a "logarithmic conversion" algorithm to generate certain data. The court found that was not sufficient to disclose an algorithm, even though "a person of ordinary skill in the art would know of potential [] functions to implement." *Id.* According to

---

support in the specification is necessary." (Pl. Resp. at 5). But the relevant claims in the cases on which plaintiff relies include detailed stepwise algorithms by which the claimed functions are performed. *See Typemock, Ltd. v. Telerik, Inc.*, 2018 WL 4189692, at *6 (D. Mass. Aug. 31, 2018); *Signal IP v. American Honda Motor Co.*, 2015 WL 5768344, at *40 (C.D. Cal. Apr. 17, 2015); *Gemalto S.A. v. HTC Corp.*, 2012 WL 2505745, at *23 (E.D. Tex. June 28, 2012). The claim language here—"means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver"—includes no such algorithm.

the court, "this does not create structure in the patent where there was none to begin with." *Id.*
(citing *Triton Tech of Texas, LLC v. Nintendo of America, Inc.*, 753 F.3d 1375, 1379 (Fed. Cir.
2016)).

Unfortunately, the majority opinion in *Alfred E. Mann* did not explain its reasoning, or
the basis for the distinction, in any detail.  As the dissent pointed out, "[t]he experts for both
sides agreed that logarithmic conversion is well-known, and that persons of skill in the field of
the invention would understand the description of the logarithmic conversion in the claimed
system." *Id.* at 1350.  That was not enough to save those claims.  But the majority also
concluded that persons of skill in the relevant field would understand to apply Ohm's law to the
other claim to complete the necessary algorithm, even though Ohm's law was not mentioned,
and even though the nature of the claimed algorithm was not readily apparent from the
specification.  Indeed, the dissent observed that the majority found claims invalid for
indefiniteness "upon new and ill-defined requirements for patent specifications that are
unrealistic and unnecessary, adding burdens and pitfalls with no benefit to anyone." *Id.* at 1351.

In any event, the differing outcomes in *Alfred E. Mann* appear to be based on the
distinction between (1) no algorithm at all and (2) an incompletely described algorithm that can
be understood and completed by a person of skill in the art.  If no algorithm at all is provided, the
fact that the missing information could be readily supplied by a person of skill in the art is not
enough.

That distinction is buttressed by opinions prior to *Alfred E. Mann*.  The Federal Circuit
had previously held that "the skilled artisan's knowledge is irrelevant" if no algorithm is
disclosed.  *EON Corp.*, 785 F.3d at 624 (citing *Noah Sys.*, 675 F.3d at 1313).

> [O]ur case law regarding special purpose computer-implemented means-plus-
> functions claims is divided into two distinct groups:  First, cases in which the

specification discloses no algorithm; and second, cases in which the specification does disclose an algorithm but a defendant contends that disclosure is inadequate. Where the specification discloses no algorithm, the skilled artisan's knowledge is irrelevant.  Where the specification discloses an algorithm that the accused infringer contends is inadequate, we judge the disclosure's sufficiency based on the skilled artisan's perspective.

*Id.* at 623-24 (internal quotation marks and citations omitted).  "The question . . . is whether the specification contains a sufficiently precise description of the 'corresponding structure' to satisfy section 112, paragraph 6, not whether a person of skill in the art could devise some means to carry out the recited function."  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1385 (Fed. Cir. 2009).

Accordingly, and with some misgivings, the Court concludes that it is bound by the decision in *Alfred E. Mann* to find that the disclosure here is insufficient.  Although it appears that a reasonably bright high-school student could supply the missing formulas, the fact remains that the specification does not describe those formulas—or indeed describe any algorithm at all.  In other words, the algorithmic disclosure here is not simply inadequate; it is nonexistent.  As a result, even if a skilled artisan would readily understand the issue and supply the required algorithm, its absence from the specification renders the disclosure of the required structure inadequate.

Accordingly, the term "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" is indefinite under 35 U.S.C. § 112.[7]

---

[7] Beyond identifying the claimed function and corresponding structure, plaintiff proposes an overarching "narrative construction" for the entire disputed term.  (*See, e.g.*, Dkt. No. 80-1, at 2 ("a processor (and equivalents thereof) that determines any of the following from a series of time stamped waypoints obtained by said GPS receiver during an exercise session: elapsed distance of an athlete; current or average speed of an athlete; current or average pace of an athlete")).  Defendant does not offer an analogous overarching construction and contends that doing so is inappropriate.  Because the Court has concluded that the specification fails to identify the corresponding structure, it need not resolve whether an overarching construction is appropriate for means-plus-function limitations.

2.  <u>**"means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold"**</u>

| Term | Plaintiff's construction | Defendant's construction |
|---|---|---|
| "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" | a processor (and equivalents thereof) that suspends said computing when a speed of the athlete is below a predetermined threshold and resumes said computing when a speed of the athlete is not below said predetermined threshold<br><br>35 U.S.C. § 112, ¶ 6<br><br>**Function:** suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold (as construed above)<br><br>**Structure:** a processor and equivalents thereof (*see, e.g.*, Fig.6, col. 5 ll. 36-40 and col. 9 ll. 31-35.)<br><br>**Not indefinite.** | 35 U.S.C. § 112, ¶ 6<br><br>**Function:** suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold<br><br>**Structure: Indefinite.** No structure disclosed that performs the claimed function. |

The next disputed term is "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold." That term appears in Claim 7, which recites the following:

> A portable feedback system as recited in claim 1, further comprising *means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold.*

('007 patent col. 11 ll. 31-34 (emphasis added)). That claim depends on Claim 1, which the Court has found to be indefinite. The disputes concerning terms that appear in claims that depend on Claim 1 are therefore moot.

Accordingly, the Court will not construe "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold."

B.     **The '233 Patent**

1.     **"governing information transmitted between the first personal device and the second device"**

| Term | Plaintiff's construction | Defendant's construction |
|------|--------------------------|--------------------------|
| "governing information transmitted between the first personal device and the second device" | controlling the transmission of information between the first personal device and the second device | No construction necessary. |

The parties also dispute terms in the '233 patent.  The first dispute concerns the term "governing information transmitted between the first personal device and the second device." Claim 1 of the '233 patent recites the following:

A bi-directional wireless communication system comprising:

    (a)   a first personal device, the first personal device further comprising:

            (i) a processor,
            (ii) a memory;
            (iii) a power supply;
            (iv) at least one detector input; and
            (v) a short-range bi-directional wireless communications module;

    (b)   a second device communicating with the first device, the second device having a short-range bi-directional wireless communications module compatible with the short-range bi-directional wireless communications module of the first device; and

    (c)   a security mechanism *governing information transmitted between the first personal device and the second device*.

('233 patent col. 14 ll. 62-67; *id.* col. 15 ll. 1-12 (emphasis added)).  Plaintiff contends that the term should be construed as "controlling the transmission of information between the first personal device and the second device."  (Pl. Mem. at 16).   Defendant contends that no construction is necessary.

The dispute centers primarily on plaintiff's construction of the word "governing" to mean

"controlling."  Plaintiff and its expert note that the words, in this context, effectively mean the same thing.  (Pl. Mem. at 17-18 ("[T]he plain and ordinary meaning of the term 'govern' . . . means to control." (emphasis omitted)); Martin Dep. at 113 ("Yes, governing and controlling are synonymous.")).  According to plaintiff, construction is nevertheless necessary because "the claim element provides an additional level of security for controlling the transmission of information beyond what might be provided by any particular communications protocol used to effectuate transmission (but which does not control the transmission)."  (*Id.* at 16 (emphasis omitted)).  It points to Figure 5 as an example:



*FIG. 5*

('233 patent at Fig. 5).  In that example, the personal wireless device of a bystander acts as an intermediary between the personal medical device of the victim and the dispatcher.  Even though the bystander's device serves as an intermediary, its role is restricted.  For example, only responding medical personnel, and not the bystander, is allowed to send a command to the victim's personal medical device to dispense medication.  (*See id.* col. 11 ll. 47-67; *id.* col. 12 ll. 1-49 (describing data flow to and from personal medical device); *id.* col. 13 ll. 27-40 (noting

levels of access within the communications network)).  According to plaintiff and its expert, a restriction of that type requires a level of security that goes "beyond the communications protocols that might be utilized to implement a short-range wireless communication scheme" (Pl. Mem. at 17 (quoting Martin Decl. ¶ 30)) and that "specifically controls the transmission of information."  (*Id.* (citing Martin Decl. ¶¶ 31-32)).

In light of that requirement, plaintiff contends that "[w]hile the specification may describe other forms of security that do not control the transmission of information (such as, for example, encryption), that is not what was intended by the language actually used in the claim." (*Id.*).  That contention relies exclusively on the declaration of plaintiff's expert, who in turn provides minimal explanation for—and cites to no evidence in support of—his opinion that encryption "does not govern or control [the] transmission [of information]."  (*See* Martin Decl. ¶ 33).  And that opinion appears to conflict with the specification and claims.  For example, the specification identifies several "possible embodiments of security," including "standard encryption algorithms."  ('233 patent col. 13 ll. 41-44).  And Claim 2 discloses a security mechanism that uses encryption.  (*Id.* col. 15 ll. 13-14 ("The system of claim 1, wherein the security mechanism encrypts the information.")).  Under such circumstances, where plaintiff's expert opinion is "conclusory and incomplete," "lack[s] any substantive explanation tied to the intrinsic record," and "appear[s] to conflict with the plain language of the written description," it "should not be afforded any weight."  *Philips North America LLC v. Garmin Int'l, Inc.*, No. 19-06301 (C.D. Cal. Aug. 28, 2020) (quoting *SkinMedica, Inc. v. Histogen, Inc.*, 727 F.3d 1187, 1209 (Fed. Cir. 2013)) (rejecting Philips's proposed construction).[8]

---

[8] To the extent that plaintiff's expert explains his opinion, he relies extensively on the embodiment in Figure 5.  (*See* Martin Decl. ¶ 33).  But the Federal Circuit has "repeatedly warned against confining the claims" to

Plaintiff's construction conflicts not only with the specification and Claim 2 but also with the plain language of the very term it is purportedly construing.  It transposes the words of that term in a way that changes precisely what the security mechanism is governing.  The claim recites a security mechanism that "govern[s] information" ('233 patent col. 15 l. 10), whereas plaintiff's proposed construction identifies a security mechanism that "govern[s] the transmission of information."  (Pl. Mem. at 16).  Plaintiff fails to identify any reason intrinsic to the patent that supports such a change.  Indeed, plaintiff's expert conceded that the change was "just based on English," rather than based on anything in the specification.  (Martin Dep. at 116).

In short, the Court finds no reason to construe the disputed term at this time.  At best, plaintiff's proposed construction is merely synonymous with the non-technical language already used in the claim; at worst, it materially changes the claim language in a way that is inconsistent with the specification and other claims and supported only by weak extrinsic evidence.

Accordingly, the term "governing information transmitted between the first personal device and the second device" does not require construction and will be given its plain and ordinary meaning.

### 2. "first personal device"

| Term | Plaintiff's construction | Defendant's construction |
| --- | --- | --- |
| "first personal device" | No construction necessary.<br><br>Alternatively: a device for private use by a person | personal medical device |

The next dispute concerns the term "first personal device."  That term appears throughout the claims of the '233 patent.  For example, as noted, Claim 1 recites the following:

---

"very specific embodiments of the invention."  *Phillips*, 415 F.3d at 1323.  In any event, it is unclear at this stage whether encryption could in fact be an appropriate security mechanism for the embodiment in Figure 5.

A bi-directional wireless communication system comprising:

> (a)   a *first personal device*, the first personal device further comprising:
>
>> (i) a processor,
>> (ii) a memory;
>> (iii) a power supply;
>> (iv) at least one detector input; and
>> (v) a short-range bi-directional wireless communications module;
>
> (b)   a second device communicating with the first device, the second device having a short-range bi-directional wireless communications module compatible with the short-range bi-directional wireless communications module of the first device; and
>
> (c)   a security mechanism governing information transmitted between the first personal device and the second device.

('233 patent col. 14 ll. 62-67; *id.* col. 15 ll. 1-12 (emphasis added)).  Defendant contends that the term should be construed to mean "personal medical device," while plaintiff maintains that no construction is necessary, or alternatively that it should be understood as "a device for private use by a person."

The title of the '233 patent is "Personal Medical Device Communication System and Method."  ('233 patent at Title).  A patent title is afforded some weight in the claim-construction process.  *See Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1003 n.2 (Fed. Cir. 2016) ("We have used the title of a patent to aid in claim construction.").  Likewise, the invention summary, which focuses exclusively on personal medical devices, is also afforded some weight.  *See, e.g.*, *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1397-98 (Fed. Cir. 2008).

More significantly, the remainder of specification reflects the title and invention summary.  For example, Figure 1 is a diagram "showing the overall structure of the system of the present invention."  (*Id.* col. 2 ll. 39-40).  That diagram shows "the interoperability of a personal medical device (PMD) 100 with a medical device interface (MDI) 200 and a network 400."  (*Id.* col. 3 ll. 12-14).  It identifies the device as a "personal medical device":



*FIG. 1*

('233 patent at Fig. 1).  "When a patent . . . describes the features of the 'present invention' as a whole"—as Figure 1 shows a "personal medical device" as part of the "present invention"—"this description limits the scope of the invention."  *Regents of University of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 936 (Fed. Cir. 2013) (quoting *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007)); *see also Trading Techs. Int'l Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1353-54 (Fed. Cir. 2010) ("This court takes some comfort against [the risk of improperly reading a preferred embodiment into the claim] from the inventors' use of the term 'the present invention' rather than 'a preferred embodiment' or just 'an embodiment.'").  Figures 4A-4F similarly show "various configurations of the system of *the present invention*," and the only device in these figures is "PMD 100" or "personal medical device 100".  ('233 patent col. 2 ll. 44-45 (emphasis added); *id.* at Figs. 4A-4F).

The specification in fact repeatedly describes embodiments by referring to the "personal medical device 100" or "PMD 100."  (*See, e.g.*, *id.* col. 3 ll. 19-59 (describing possible components of "PMD 100"); *id.* col. 4 ll. 11-44 (describing "various possible wireless

communication paths that may be used by the PMD 100 to connect to the long-range bi-
directional network 400"); *id.* col. 8 ll. 37-39 (describing interface where "the personal medical
device 100 is directly connected to a personal wireless device 500 that is manufactured as an
integrated unit").  "[W]hen a patent repeatedly and consistently characterizes a claim term in a
particular way, it is proper to construe the claim term in accordance with that characterization."
*GPNE Corp. v. Apple, Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) (internal quotation marks
omitted).

Plaintiff notes that the device is "also described as simply a 'personal device 100'" at
certain places in the specification.  (Pl. Mem. at 18).  That is true.  But the context in which the
term appears in that form makes clear that the specification is nonetheless referring to a personal
medical device.  For example, when the specification describes connections and routing paths
from the device and transmission to the device, it repeatedly uses the term "personal device
100," omitting the word "medical."  (*See* '233 patent col. 10 ll. 14-67; *id.* col. 11 ll. 1-45).  But
those sections are titled "Other Connections from the Personal *Medical* Device," "Routing Paths
from the Personal *Medical* Device," and "Transmission to the Personal *Medical* Device."  (*See
id.* col. 10 l. 13 (emphasis added); *id.* col. 10 l. 46 (emphasis added); *id.* col. 11 l. 1 (emphasis
added)).

Plaintiff alternatively contends that to the extent that construction is required, the term
should be derived from the common dictionary definition of "personal" and construed as "a
device for private use by a person."  (Pl. Mem. at 18).  It reasons that such a construction would
be "consistent with how the specification uses the term 'personal device' to describe a device
associated with a person, rather than an institution."  (*Id.*).  It may be correct to understand the
term as describing a device for "private use by person," as opposed to one for use by an

institution.  But such an understanding is not incompatible with limiting the term to personal

"medical" devices.  And, in any event, the weight afforded to the specification far exceeds that

afforded to common dictionary definitions.  *Compare Phillips*, 415 F.3d at 1315 ("[The

specification] is the single best guide to the meaning of a disputed term." (quoting *Vitronics*, 90

F.3d at 1582)), *with id.* at 1319 ("[E]xtrinsic evidence may be useful to the court, but it is

unlikely to result in a reliable interpretation of patent claim scope unless considered in the

context of the intrinsic evidence.").[9]

Accordingly, the term "first personal device" will be construed to mean "first personal

medical device."

### 3.    "wireless communication"

| Term | Plaintiff's construction | Defendant's construction |
|---|---|---|
| "wireless communication" | an over-the-air communication (*e.g.*, using radiofrequency (RF), infrared, or optical techniques) | No construction necessary. |

The next dispute related to the '233 patent concerns the term "wireless communication".

As noted, Claim 1 recites the following:

A bi-directional *wireless communication* system comprising:

(a)    a first personal device, the first personal device further comprising:

(i) a processor,
(ii) a memory;
(iii) a power supply;
(iv) at least one detector input; and
(v) a short-range bi-directional wireless communications module;

(b)    a second device communicating with the first device, the second

---

[9] Plaintiff further contends that defendant's proposed construction represents an attempt by it "to avoid infringement by arguing that its products are not 'personal medical devices' because they are not FDA approved." (Pl. Resp. at 16).  By adopting that construction, the Court takes no position here as to the merits of any such non-infringement argument.

device having a short-range bi-directional wireless communications
module compatible with the short-range bi-directional wireless
communications module of the first device; and

(c)    a security mechanism governing information transmitted between the
first personal device and the second device.

('233 patent col. 14 ll. 62-67; *id.* col. 15 ll. 1-12 (emphasis added)).[10]  Plaintiff contends that the

term should be construed as "an over-the-air communication (*e.g.*, using radiofrequency (RF),

infrared, or optical techniques)."  Defendant contends that no construction is required.

The term "wireless communication" is certainly not to be understood literally as

"communication without wires."  As plaintiff notes, that definition would encompass, among

other things, sending communication by mail.  But defendant does not propose such a

construction.  And of course, no person of ordinary skill in the art would understand the term to

mean as much.  *See Phillips*, 415 F.3d at 1313 ("[W]ords of a claim are generally given . . . the

meaning that the term would have to a person of ordinary skill in the art in question at the time of

the invention . . . ." (internal quotation marks and citations omitted)).

Instead, the dispute chiefly concerns whether "wireless communication" includes one

particular form of communication that does not use wires:  communication using the human

body—which of course does not contain wires—as a conductor.  In that kind of wireless

communication, human tissue is the means by which electrical signals are transmitted.  This

allows for communication without wires between an implanted device and a device outside, but

attached to, the body.  Prior art cited in the prosecution of the '233 patent explicitly contemplates

such communication:  "The [implanted medical device] may be equipped with a radio frequency

---

[10] In their Joint Claim Construction Chart, the parties note that the term also appears in Claims 13, 15, and
16.  The term that appears in those claims is "wireless communications" rather than "wireless communication."
There does not appear to be a material difference between the terms.

transmitter or receiver, or an alternate wireless communication telemetry technique or media which may travel through human tissue."  (Dkt. No. 72-4, at 7).

Plaintiff contends that the term "wireless communication" does not include communication that uses the human body to conduct electrical signals.  In its view, the term is limited to "over-the-air" communication, even though that limitation does not appear in the specification.  Instead, the specification states that wireless communication "may include, but is not limited to, infrared or radio frequency (RF)" and that "embodiments are contemplated . . . where infrared, optical, or other communication means are employed in conjunction with BLUETOOTH or BLUETOOTH-like wireless RF communication techniques."  (*Id.* col. 4 ll. 46-47, 63-67; *id.* col. 5 ll. 1-3).

In *Philips North America LLC v. Garmin International, Inc.*, No. 19-cv-06301 (C.D. Cal. Aug. 28, 2020), the court declined, at least at that time, to construe the same term in the same patent.  *Id.* at 15.  It reasoned that the specification's disclosure of embodiments that use surgically implanted devices, coupled with its failure to otherwise limit the possible forms of wireless communication, warranted rejecting plaintiff's proposed construction.  *See id.*

The Court sees no basis to deviate from that reasoning, at least on the present record.  It is true that the specification discloses several examples of "wireless communication," all of which contemplate over-the-air techniques.  But by its own terms, the specification does not limit the scope of the claims to the preferred embodiments that it discloses:  "The embodiments provided herein are not intended in an exclusive or limited sense . . . ."  ('233 patent col. 2 ll. 58-60).  Indeed, it specifically provides that "other suitable wireless communication standards and methods now existing or developed in the future are contemplated in the present invention."  (*Id.* col. 4 ll. 61-63).  The Court will therefore not construe the term "wireless communication" at this

time.

Accordingly, the term "wireless communication" does not require construction and will be given its plain and ordinary meaning.

**C.    The '377 Patent**

    **1.    "indicating a physiologic status of a subject"**

| Term | Plaintiff's construction | Defendant's construction |
|---|---|---|
| "indicating a physiologic status of a subject" | No construction necessary. | indication of a subject's current physiological state |

The final dispute concerns the term "indicating a physiologic status of a subject."  Claim 1 of the '377 patent recites the following:

A method for interactive exercise monitoring, the method comprising the steps of:

    a.    downloading an application to a web-enabled wireless phone directly from a remote server over the internet;

    b.    coupling the a [sic] web-enabled wireless phone to a device which provides exercise-related information;

    c.    rendering a user interface on the web-enabled wireless phone;

    d.    using the application, receiving data *indicating a physiologic status of a subject*;

    e.    using the application, receiving data indicating an amount of exercise performed by the subject;

    f.    wherein at least one of the data *indicating a physiologic status of a subject* or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise-related information, and wherein the data *indicating a physiologic status of a subject* is received at least partially while the subject is exercising;

    g.    sending the exercise-related information to an internet server via a wireless network;

    h.    receiving a calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information; and

i. using the application, displaying the response.

('377 patent col. 13 ll. 23-47 (emphases added)).  Defendant contends that the term is limited to an "indication of a subject's *current* physiological state."  (Def. Mem. at 19 (emphasis added)).  Plaintiff contends that no construction is necessary.

Defendant's attempt to insert a word into the term to limit its scope must be rejected.  It does not square with the other language in the claim.  Most notably, the claim provides that "the data indicating a physiologic status of a subject is received *at least partially* while the subject is exercising." ('377 patent col. 13 ll. 39-41 (emphasis added)).  "[A]t least partially while the subject is exercising" means that the data indicating a physiologic status of a subject might be received—at most partially—while the subject is *not* exercising.  The individual could be at rest, of course.  But it could also include past data (such as a baseline, or an average that encompasses past and current data).  In other words, the term requires only some current physiologic data.

The prosecution history on which defendant relies does not overcome the claim language. That history indicates that the examiner was concerned with potential overlap between "physiological data" and "exercise data" and that the applicant amended claims to respond to that concern.  (*See, e.g.*, Def. Mem. Ex. H, at 3; Def. Mem. Ex. J, at 4-5).  It does not, however, speak to any temporal restriction on that data.

Accordingly, "indicating a physiologic status of a subject" does not require construction and will be given its plain and ordinary meaning.

## IV. <u>Conclusion</u>

For the foregoing reasons, the disputed claim terms will be construed as follows:

1. "means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver" is indefinite for lack of corresponding structure for the claimed function;

34

2.      "means for suspending and resuming operation of said means for computing when a speed of the athlete falls below a predetermined threshold" will not be construed at this time;

3.      "governing information transmitted between the first personal device and the second device" will be given its plain and ordinary meaning;

4.      "first personal device" will be construed to mean "first personal medical device";

5.      "wireless communication" will be given its plain and ordinary meaning; and

6.      "indicating a physiologic status of a subject" will be given its plain and ordinary meaning.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  July 22, 2021                                       Chief Judge, United States District Court