UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| PHILIPS NORTH AMERICA LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Civil Action No.** |
| v. ) | **19-11586-FDS** |
| ) | |
| FITBIT, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

MEMORANDUM AND ORDER ON
<u>DEFENDANT'S MOTION TO DISMISS</u>

SAYLOR, C.J.

This is an action for patent infringement.  Plaintiff Philips North America LLC has sued

defendant Fitbit, Inc., asserting claims under 35 U.S.C. § 271 for infringement of three patents of

which Philips is the owner and assignee.  The patents at issue concern technology related to

connected-health products, such as wearable fitness trackers.

Fitbit has moved to dismiss the complaint for failure to state a claim upon which relief

can be granted.  It contends that each asserted patent is directed to patent-ineligible subject

matter under 35 U.S.C. § 101.

For the following reasons, that motion will be denied.

I.      <u>Background</u>

A.      <u>Factual Background</u>

The facts are stated as set forth in the complaint unless otherwise noted.

1.      <u>The Parties</u>

Philips North America LLC is a Delaware limited liability company based in

Massachusetts.  (Second Am. Compl. ¶ 12).  It develops, among other things, connected-health

technologies and related products, such as wearable fitness trackers that monitor and analyze

personal health and fitness information.  (*Id.* ¶¶ 2, 4-7, 12, 24-25).  Its patent portfolio includes

more than 60,000 patents.  (*Id.* ¶ 8).  It licenses its patented technologies to companies in the

connected-health field.  (*Id.* ¶¶ 6, 8).

Fitbit, Inc. is a Delaware corporation based in Massachusetts.  (*Id.* ¶ 13).  It develops,

manufactures, and sells connected-health products.  (*Id.* ¶¶ 13, 29-30).

## 2.     Patents in Suit

The second amended complaint alleges that Fitbit infringes three patents owned by

Philips:  U.S. Patent No. 6,013,007 ("the '007 patent"), U.S. Patent No. 7,088,233 ("the '233

patent"), and U.S. Patent No. 8,277,377 ("the '377 patent").[1]  The patents concern technology

related to connected-health products, including GPS/audio athletic training, security mechanisms

for transmitting personal data, wearable-technology products, and handling interrupted

connections.  (*Id.* ¶¶ 9, 12, 37).

### a.     The '007 Patent

The '007 patent is titled "Athlete's GPS-Based Performance Monitor."  ('007 patent at

Title).  The patent concerns applying "Global Positioning System (GPS) technology for the

personal performance monitoring of outdoor athletes, . . . and providing the athlete with real-time

performance feedback and optional long-term trend analysis."  (*Id.* col. 1 ll. 8-13)  It identifies

"a need for a portable GPS unit that is small and light enough to be carried or worn by an

---

[1] The original complaint alleged that Fitbit infringes a fourth patent:  U.S. Patent No. 6,976,958 ("the '958 patent").  Philips has since withdrawn its allegations of infringement of that patent.  The Court will therefore not address Fitbit's motion to the extent that it seeks dismissal of the claim of infringement of that patent.

outdoor athlete which incorporates real-time athletic performance algorithms for continuously monitoring the athlete's progress and reporting his/her progress periodically during the exercise session." (*Id.* col. 1 ll. 59-64)  According to the patent, "[r]eal-time audio reports would assist and motivate the athlete to improve his/her performance without any visual distractions" and "[a]n integrated radio can provide the athlete with entertainment." (*Id.* col. 1 ll. 64-67).

The patent states that "the GPS-based performance monitor and feedback device of the present invention can be used to provide an outdoor athlete with continuous, consistent, and accurate real-time performance feedback, independent of his/her outdoor location in the world." (*Id.* col. 9 ll. 63-67)  It further states that "[t]he data presentation method of using an audio module eliminates the exclusive use of large, power-consuming, cumbersome, and visually distracting displays and leaves the athlete free to concentrate on his/her exercise, safety, and surroundings." (*Id.* col. 9 l. 67; *id.* col. 10 ll. 1-4).

The patent provides for, among other things, a "portable feedback system providing regular updates on an athlete's performance" comprising:

- a global positioning system GPS receiver for obtaining a series of time-stamped waypoints;

- means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver; and

- means for presenting the athletic performance feedback data to an athlete.

(*Id.* col. 2 ll. 56-67)  It further provides for a "system for comparing an athlete's performance with the performance of other athletes" comprising the same components plus "a modem for transmitting the athletic performance feedback data to a remote computer for comparison with athletic performance feedback data of other athletes." (*Id.* col. 2 ll. 65-67; *id.* col. 3 ll. 1-10).

b.   **The '233 Patent**

The '233 patent is titled "Personal Medical Device Communication System and Method." ('233 patent at Title).  It generally concerns a "bi-directional personal and health-wellness provider communication system."  (*Id.* col. 1 ll. 21-23).  More particularly, it concerns "a personal communication system suitable for use with children, vulnerable adults (such as those in assisted living situations), and more specifically, medically distressed persons and those in whom a[] personal medical device has been deployed, for medical testing, and for other life enhancements."  (*Id.* col. 1 ll. 23-28).

According to the patent, personal medical devices are devices that may either "monitor" or "provide" body functions.  (*Id.* col. 2 ll. 2-3, 5).  They may be used "to deliver drugs, heart defibrillation, or other treatment" or "to enhance wellness, test drug therapies, monitor patient health, deliver long-term care, or treat acute conditions."  (*Id.* col. 2 ll. 7-10).  They take "many forms" and may be "surgically implanted, strapped externally to the body, carried in a pocket, transported in a carrying case, or installed as a home appliance."  (*Id.* col. 1 ll. 63-67).

The patent describes "a device and method to couple with [personal medical devices] to provide wireless communication and locating functions."  (*Id.* col. 2 ll. 11-12).  Such communication may be used, among other things, "to provide health care professionals with access to information for remote diagnostic capabilities; to provide notification of acute conditions possibly requiring immediate assistance, transportation to a medical center, or remote treatment action; to provide a location information of mobile persons for caregivers; to notify responsible parties of the occurrence of a medical condition; and to provide remote intervention assistance by caregivers through verbal or visual interaction."  (*Id.* col. 2 ll. 14-22).

c.   **The '377 Patent**

The '377 patent is titled "Method and Apparatus for Monitoring Exercise with Wireless

4

Internet Connectivity." ('377 patent at Title).  It concerns "monitoring of living subjects."  (*Id.*
col. 1 ll. 35-36).  More particularly, it concerns "health-monitoring of persons where measured or
input health data is communicated by a wireless device to and from a software application
running on an internet-connected server and where the same may be studied and processed by
the software application, a health professional, or the subject."  (*Id.* col. 1 ll. 36-41).

The patent provides for a "method and apparatus . . . for wireless monitoring of exercise,
fitness, or nutrition by connecting a web-enabled wireless phone to a device which provides
exercise-related information, including physiological data and data indicating an amount of
exercise performed."  (*Id.* at Abstract).  It further provides that "[a]n application for receiving the
exercise-related information and providing a user interface may be downloaded to the web-
enabled wireless phone from an internet server" and that "[t]he exercise-related information may
be transmitted to an internet server, and the server may calculate and return a response."  (*Id.*).

The patent identifies two "complementary" systems that embody the invention.  (*Id.* col.
2 l. 64).  The first embodiment may be employed "to manage the disease state or condition of a
patient" by "employ[ing] a health monitoring device."  (*Id.* col. 2 l. 67; *id.* col. 3 ll. 1-2).  That
device would provide data by a wireless connection "for processing via the internet[,] including a
review by a physician or other health care professional if required."  (*Id.* col. 3 ll. 1-2).  For
example, a diabetic could connect a blood-glucose monitor to a wireless web device, download
data to a diabetes-management company's server, and receive guidance concerning his next
meal.  (*Id.* col. 3 ll. 14-20).

The second embodiment enables implementation of a "health or lifestyle management
plan" by allowing "[v]arious health parameters, such as those relating to nutrition or exercise,
[to] be entered into a health monitoring device" and to be wirelessly communicated to a server.

(*Id.* col. 3 ll. 6-11).  In this embodiment, the system "may be employed to monitor the physiologic status of a healthy subject while eating, exercising, or performing other activities." (*Id.* col. 3 ll. 34-36).  For example, an individual following an exercise program could attach a wireless web device to an exercise machine, send data from that machine over the Internet to the server of a health and fitness company, and receive personalized responses from that company. (*Id.* col. 3 ll. 21-27).

### B.    Procedural Background

On July 22, 2019, Philips filed this action against Fitbit.  The second amended complaint asserts three counts of patent infringement under 35 U.S.C. § 271:  infringement of the '007 patent (Count 1); infringement of the '233 patent (Count 2); and infringement of the '377 patent (Count 3).

On July 22, 2021, the Court issued its Memorandum and Order on Claim Construction. In that decision, it concluded, among other things, that a means-plus-function claim term in the '007 patent—"means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver"—is indefinite under 35 U.S.C. § 112 for lack of corresponding structure for the claimed function.

Fitbit has moved to dismiss the complaint for failure to state a claim upon which relief can be granted.  It contends that each asserted patent is directed to patent-ineligible subject matter under 35 U.S.C. § 101.[2]

---

[2] Fitbit moved to dismiss the complaint before the second amended complaint was filed.  As noted, the second amended complaint withdrew Philips's claim of infringement of the '958 patent without amending the allegations concerning the other asserted patents.  The Court deemed Fitbit's motion and all related briefing as directed to the second amended complaint.

Fitbit has also moved for partial summary judgment as to the claim of infringement of the '007 patent.  It contends that the asserted claims of that patent are invalid as indefinite under 35 U.S.C. § 112.  That motion has been stayed pending further court order.

II.     **Legal Framework**

A.     **Legal Standard**

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences. *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

Whether a claim is drawn to patent-eligible subject matter under 35 U.S.C. § 101 is an issue of law. *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373 (Fed. Cir. 2016).  Courts have therefore occasionally decided the issue of § 101 patent-eligibility at the pleadings stage. *See, e.g.*, *Rothschild Digital Confirmation, LLC v. Skedulo Holdings Inc.*, 2020 WL 1307016, at *2 (N.D. Cal. Mar. 19, 2020).  But "like many legal questions," determining eligibility under § 101 can involve "subsidiary fact questions"—in particular, the second step of the *Alice*/*Mayo* test, which asks whether a patent's claims contain a sufficiently inventive concept. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  Thus,

7

while the Federal Circuit has held that "patent eligibility can be determined at the Rule 12(b)(6) stage," it has also cautioned that "[t]his is true only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Id.* at 1125.

B.    **Statutory Framework**

An invention is generally patentable if it qualifies as a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. However, "this provision contains an important implicit exception. Laws of nature, natural phenomena, and abstract ideas are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 70 (2012) (internal quotation marks and citations omitted). When applying that exception, a court "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more." *Alice Corp. v. CLS Bank Intern.*, 573 U.S. 208, 217 (2014) (internal quotation marks, alterations, and citations omitted).

The framework for making that distinction comprises two steps. At step one, the court determines "whether the claims at issue are directed to one of those patent-ineligible concepts" that is so abstract as to "risk disproportionately tying up the use of [] underlying ideas." *Id.* at 217 (quoting *Mayo*, 566 U.S. at 73). If the claims at issue are directed to a patent-ineligible concept, the court continues to step two. At step two, the court looks for an "inventive concept," namely "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217-18 (internal quotation marks, alterations, and citations omitted). If the claims lack an inventive concept, then the patent claims subject matter that is not patent-eligible, and the claims are therefore invalid.

III.   **Analysis**

A.   **The '377 Patent**

Claim 1 of the '377 patent recites a method for "interactive exercise monitoring."  ('377 patent col. 13 l. 23).  That method comprises (1) downloading an application to a wireless phone; (2) "coupling" that phone to a device that provides exercise-related data; (3) receiving data "indicating a physiologic status of a subject" and the amount of exercise performed by the subject; (4) wirelessly transmitting the exercise-related data to a server; (5) receiving a response from the server that is calculated based on that data; and (6) displaying the response on the application.  (*Id.* col. 13 ll. 25-47).[3]  In its Memorandum and Order on Claim Construction, the Court concluded that the term "indicating a physiologic status of a subject" will be given its plain and ordinary meaning.

1.   **Step One:  Patent-Ineligible Concept**

Defendant contends that the '377 patent is directed to the abstract idea of collecting and analyzing exercise-related data and presenting that data to a user.

The Federal Circuit has "repeatedly held" that "collecting, analyzing, and displaying data" are "abstract concepts."  *CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 475 (Fed. Cir. 2020) (citing *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, National Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014)).  In *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir. 2016), the court explained that claims reciting those concepts—either individually or collectively—"fall into a familiar class of claims" directed to patent-ineligible concepts:

---

[3] Defendant contends that claim 1 of the '377 patent is representative.  It is unclear whether plaintiff agrees. It does not respond to that specific contention; instead, at the outset of its opposition brief, it states that each claim of the asserted patents "must be analyzed individually, and in the context of Philips' well-pled allegations."  (Pl. Opp. at 3).  For present purposes, the Court will assume that claim 1 is representative.

Information as such is intangible.  Accordingly, we have treated *collecting* information, including when limited to particular content (which does not change its character as information), as within the realm of abstract ideas.  In a similar vein, we have treated *analyzing* information by steps people go through in their minds, or by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category.  And we have recognized that merely *presenting* the results of abstract processes of collecting and analyzing information, without more (such as identifying a particular tool for presentation), is abstract as an ancillary part of such collection and analysis.

*Id.* at 1353-54 (internal citations omitted; emphases added).

The claims at issue in *Electric Power Group* recited receiving, analyzing, and displaying power-grid data.  *See id.* at 1351-52.  The court found that they were directed to an abstract idea because "[t]he advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions."  *Id.* at 1354.  They "focused on the combination of those abstract-idea processes," which rendered the claims directed to patent-ineligible concepts. *Id.*

The same can be said about claim 1 of the '377 patent.  It recites a series of steps comprising gathering data (by "downloading" an application to a wireless phone, "coupling" that phone to a device that provides exercise-related data, and "receiving" data concerning the physiologic status of the subject and the amount of exercise performed by the subject); analyzing that data (by wirelessly "sending" the exercise-related data to a server and "receiving" a response from the server that is calculated based on that data); and showing the results (by "displaying" the response from the server).  ('377 patent col. 13 ll. 25-47).  In other words, it recites nothing more than the collection, analysis, and presentation of information, which have been found— individually and collectively—to be abstract concepts.  *See Electric Power*, 830 F.3d at 1353-54 (collecting cases).  It does not recite "inventive technology for performing those functions."  *Id.* at 1354; *see also Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1378, 1384-85 (Fed. Cir. 2019)

("[T]he claimed steps for calculating the P&L values . . . is nothing more than mere automation of manual processes using generic computers, which does not constitute a patentable improvement in computer technology. . . .  [T]he claims here fail because arranging information along an axis does not improve the functioning of the computer, make it operate more efficiently, or solve any technological problem." (internal quotation marks and citations omitted)); *CardioNet*, 816 Fed. App'x at 475 ("[T]he claims and specifications treat those steps as conventional processes, and therefore the claims cannot be said to require anything more than generic data analysis. . . .  [M]erely displaying data by conventional methods as part of a series of abstract steps is itself an abstract concept.").

The Federal Circuit's opinion in *Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 827 F.3d 1341 (Fed. Cir. 2016) underscores that conclusion.  There, the court considered claims that were directed to Internet-content filtering.  *See id.* at 1344-45.  The invention improved upon prior art by locating the filtering software at the server of the Internet service provider rather than on the local computer or on a local server.  *See id.*  Plaintiff here contends that the *Bascom* court "deferred at step one" and that "the claims at issue in *Bascom* could have been found to be non-abstract at *Alice* step one . . . ."  (Pl. Opp. at 16).

That is not so.  In fact, the *Bascom* court did not defer at step one; it expressly found that "the claims of the '606 patent are directed to filtering content on the Internet," that "filtering content is an abstract idea," and that "[a]n abstract idea on an Internet computer network or on a generic computer is still an abstract idea."  *Bascom*, 827 F.3d at 1348 (internal quotation marks omitted).[4]  Plaintiff's reliance on that decision, at least at step one, is therefore misplaced.  To

---

[4] The *Bascom* court did "defer . . . consideration of the specific claim limitations' narrowing effect for step two," *Bascom*, 827 F.3d at 1349, a step that would have been unnecessary if it did not conclude that the claims were directed to an abstract concept.

the extent that the claims of the '377 patent are—as plaintiff contends—"similar" to those at issue in *Bascom*, they are likewise directed to an abstract concept.

Plaintiff also relies on *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288 (Fed. Cir. 2016). But there, the court *assumed* that the relevant claim was directed to a patent-*ineligible* idea at step one, before concluding that it contained a saving inventive concept at step two. *See id.* at 1300.

Accordingly, the Court finds that claim 1 of the '377 patent is directed to the abstract concept of collecting, analyzing, and displaying exercise-related information.

## 2.  Step Two:  Inventive Concept

The Court must next examine the elements of claim 1 to determine whether it contains an "inventive concept sufficient to transform the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (internal quotation marks omitted).

That examination requires the court to "consider the elements of each claim both individually and as an ordered combination." *Id.* at 217 (internal quotation marks omitted). The inquiry searches for "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217-18 (internal quotation marks and alteration omitted). "An inventive concept reflects something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'" *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1316 (Fed. Cir. 2019) (quoting *Aatrix Software*, 882 F.3d at 1128). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

At this stage, it appears that the complaint plausibly alleges that the elements of claim 1

of the '377 patent, when considered collectively, contain an inventive concept sufficient to transform the abstract idea into a patent-eligible application. *Bascom* is again instructive. As noted, the court found that the relevant claims were directed to filtering content on the Internet, an abstract idea, at step one. *See Bascom*, 827 F.3d at 1348. Yet it further found that the claimed invention contained a saving inventive concept—"the installation of a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user"—at step two. *Id.* at 1350. It reasoned that "the patent describes how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content." *Id.* The "non-conventional and non-generic arrangement of known, conventional pieces" transformed "the abstract idea of filtering content into a particular, practical application of that abstract idea." *Id.* at 1350, 1352.

Here, the patent describes a method that employs conventional, "off-the-shelf" components in such a way that appears—at least on its face—to result in a technological advancement over prior art, allowing for expanded range and "full back-end server functionality with which to provide a wide range of interactive communication with the patient." ('377 patent col. 2 ll. 1-51). That method also appears to allow for "efficient processing of exercise related information . . . in real time" by receiving that information "at least partially while the subject is exercising" and by processing that information remotely on a server over the Internet. (Second Am. Compl. ¶ 110; '377 patent col. 13 ll. 35-47). In other words, like the inventions at issue in *Bascom*, the claimed inventions here appear to arrange the components to yield technological benefits, such as real-time processing of exercise-related data without location-based restraints. By doing so, it transforms the abstract idea of collecting, analyzing, and displaying information into a "particular, practical application of that abstract idea." *Bascom*, 827 F.3d at 1352; *see also*

*Amdocs*, 841 F.3d at 1301 (concluding that the claim contained a sufficient inventive concept where it "purposefully arranges the components in a distributed architecture to achieve a technological solution to a technological problem specific to computer networks").

That conclusion is bolstered by the allegations in the complaint. Quoting from the prosecution history of the patent, it alleges how the disclosed inventions improve upon the functionality of prior art:

> [T]he relatively small amount of memory and processing capability provided on a wireless phone in the 1990s, as compared to the present time, severely limited the functionality of applications running on the wireless phone, especially in terms of computing capacity, processing power, and user interface. In the current claimed systems, e.g., the application program downloaded from a server is thus designed to suit the constraints of the small display screens of a mobile phone. . . . By providing significant application functionality on the server, less memory and processing capabilities become necessary on the wireless phone; thus freeing memory and processing power for an interactive user interface and for receiving the exercise related data. The external application running on the internet server and external data storage were other examples of way employed to overcome the computing limitations of a mobile phone.

(Second Am. Compl. ¶ 109). It further alleges that a person of ordinary skill in the art would understand that the inventions offer several specific improvements over prior art:

- "allow[ing] for the efficient processing of exercise related information and data indicating physiologic status by the server in real time, thereby overcoming the limitations resulting from reliance on local processing capabilities" (*id.* ¶ 110);

- "eliminat[ing] the location-based restraints of prior art systems by arranging the data processing components such that the data analysis is offloaded to a server that is in wireless communication with a wireless web device" (*id.*); and

- "allow[ing] the downloading of applications in connection with health monitoring devices to perform improved data capture, sharing, and analysis functions without the need for complex connections or expensive additional components." (*Id.* ¶ 113).

Defendant urges the Court to disregard these allegations.  It repeatedly directs the Court to decisions from the Federal Circuit that reject patentees' claims under 35 U.S.C. § 101 notwithstanding allegations in the relevant complaints that purportedly show patent eligibility. (*See, e.g.*, Def. Supp. Mem. at 2-4 (discussing *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528 (Fed. Cir. 2021); *Data Scape Ltd. v. W. Digital Corp.*, 816 F. App'x 461 (Fed. Cir. 2020); *Ubisoft Ent., S.A. v. Yousician Oy*, 814 F. App'x 588 (Fed. Cir. 2020); *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529 (Fed. Cir. 2020))).  Those decisions, however, support little more than the uncontroversial proposition that a court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Dropbox*, 815 F. App'x at 538 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

For example, in *Dropbox*, the Federal Circuit concluded that the relevant allegations offered "no more than a series of legal conclusion[s] about the § 101 analysis."  *Id.*

> Dropbox's allegations restate the claim elements and append a conclusory statement that "nothing in the specification describes these concepts as well-understood, routine, or conventional."  The allegations claim that each of the patents solves given technological problems, but never provide more support than a conclusory statement that "the inventions described and claimed . . . solved these problems," improved the art, "represented a significant advance over existing approaches[,] and were not well-known, routine, or conventional in the field" at the time of patenting.

*Id.* (internal citations omitted).  By contrast, the allegations in the complaint here are tied to the claims and specification and identify "how the specific techniques recited in the claims [are] inventive."  *Id.* (citing *Cellspin Soft,* 927 F.3d at 1317-18).

Of course, those allegations may well prove to be unsupported.  It is possible that discovery will reveal that the claims of the '377 patent do not in fact reveal an inventive concept. But that is a question for another day.  At this stage, it is enough to find that patent, coupled with the plausible allegations of the complaint, sufficiently indicates that they do.

Accordingly, the Court will deny the motion to dismiss to the extent that it seeks dismissal of the claim of infringement of the '377 patent.

**B.**     **The '233 Patent**

Claim 1 of the '233 patent recites the following:

A bi-directional wireless communication system comprising:

> (a)   a first personal device, the first personal device further comprising:
>
>> (i) a processor,
>> (ii) a memory;
>> (iii) a power supply;
>> (iv) at least one detector input; and
>> (v) a short-range bi-directional wireless communications module;
>
> (b)   a second device communicating with the first device, the second device having a short-range bi-directional wireless communications module compatible with the short-range bi-directional wireless communications module of the first device; and
>
> (c)   a security mechanism governing information transmitted between the first personal device and the second device.

('233 patent col. 14 ll. 62-67; *id.* col. 15 ll. 1-12).[5]  In its Memorandum and Order on Claim Construction, the Court concluded that the term "first personal device" should be construed as "first personal medical device."  It further concluded that the terms "wireless communication" and "governing information transmitted between the first personal device and the second device" would be given their plain and ordinary meanings.

**1.**     **Step One:  Patent-Ineligible Concept**

Defendant contends that the '233 patent is directed to the abstract idea of secure data transfer between devices.  It reasons that the claims recite nothing other than "generic devices,

---

[5] Defendant contends that claim 1 of the '233 patent is representative.  As with claim 1 of the '377 patent, it is unclear whether plaintiff agrees.  In any event, for present purposes, the Court will again assume that claim 1 is representative.

known wireless technology, and a result-focused security mechanism."  (Def. Mem. at 4 (internal quotation marks omitted)).

The Federal Circuit has emphasized that a claim must have the specificity sufficient "to transform [it] from one claiming only a result to one claiming a way of achieving it."  *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (collecting cases).  Here, the claims are directed to achieving a specific result—the secure transfer of data between two devices— rather than a way to achieve that result.  They fail to disclose improvements to the underlying components or process; instead, they disclose a system that results in the secure transfer of data without disclosing *how* that result is achieved.  That is insufficient at step one.  *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018) ("[A] claimed invention must embody a concrete solution to a problem having the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it." (internal quotation marks omitted)); *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (holding that patents were directed to an abstract idea because they "d[id] not claim a particular way of programming or designing the software . . . but instead merely claim[ed] the resulting systems"); *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1258 (Fed. Cir. 2016) (holding that claim was abstract where nothing in the claim was "directed to how to implement out-of- region broadcasting on a cellular telephone.  Rather, the claim [was] drawn to the idea itself." (emphasis omitted)).

Plaintiff contends that the claims of the '233 patent are directed not to an abstract idea, but rather "to a system that includes an improved security mechanism for governing information transmitted between devices."  (Pl. Opp. at 18).  That contention finds little support in the claims or specification.  Claim 1 does not disclose improvements to the security mechanism; it merely

17

discloses a "bi-directional wireless communication system" comprising two devices and "a security mechanism governing information transmitted" between those devices.  ('233 patent col. 14 ll. 62-67; *id.* col. 15 ll. 1-12).  And the specification offers embodiments of the security mechanism that appear to use conventional security techniques.  (*Id.* col. 13 ll. 41-67 (identifying, among other things, "standard encryption algorithms" and "security keys" as "possible embodiments of security")).  It offers no apparent improvements to those mechanisms.

According to plaintiff, it is not only the disclosure of an improved security mechanism that makes the claims of the '233 patent directed to patent-eligible subject matter; it is also the fact that the security mechanism "improved functionality of monitoring devices by enabling monitoring of vital signs, and provided computer and network efficiency."  (Pl. Opp. at 20; *see also id.* at 19 ("[T]he '233 patent improved the interoperability of health monitoring devices with mobile devices and provided a type of security mechanism that was not present in prior art.")).  In plaintiff's view, the Federal Circuit has found similar "advancements in computer security" patent-eligible in cases such as *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299 (Fed. Cir. 2018).  (Pl. Opp. at 19-20).

The claims of the '233 patent are a far cry from those in *Finjan.*  There, the relevant claims disclosed a method of virus screening that "scans a downloadable and attaches the virus scan results to the downloadable in the form of a newly generated file: a 'security profile that identifies suspicious code in the received [d]ownloadable.'"  *Finjan*, 879 F.3d at 1304.  That security profile "include[d] information about potentially hostile operations produced by a 'behavior-based' virus," which was "distinguished from traditional, 'code-matching' virus scans that are limited to recognizing the presence of previously-identified viruses."  *Id.* (emphasis omitted).  The court found that the "behavior-based" virus scan disclosed in the patent

18

constituted "an improvement in computer functionality" because it "protect[ed] against previously unknown viruses as well as obfuscated code" and "enable[d] more flexible and nuanced virus filtering."  *Id.* (internal quotation marks omitted).

No such improvement to computer functionality is disclosed in the '233 patent.  It is true that it discloses a system that uses a "security mechanism" to "govern[] information transmitted" between two monitoring devices ('233 patent col. 15 ll. 10-12), and that use of that security mechanism allows for, among other things, varying levels of access to the monitoring devices across the communications network.  (*Id.* col. 13 ll. 27-40).  But it discloses no improvements concerning the operation of either the monitoring devices or the security mechanism that resemble the "behavior-based" virus scan in *Finjan*.

Furthermore, the dissimilarities between claim 1 of the '233 patent and the claims at issue in *Finjan* do not end there.  In *Finjan*, the claims recited "specific steps—generating a security profile that identifies suspicious code and linking it to a downloadable—that accomplish the desired result."  *Finjan*, 879 F.3d at 1305.  Again, no such steps, beyond the mere use of a "security mechanism," appear in claim 1 of the '233 patent.

Accordingly, the Court finds that claim 1 of the '233 patent is directed to the abstract concept of secure data transfer between devices.

### 2.   Step Two:  Inventive Concept

The Court next turns to step two to determine whether claim 1 contains a saving inventive concept that transforms the abstract idea into a specific application that is patent-eligible.  *See Alice*, 573 U.S. at 221 (internal quotation marks omitted).

The complaint alleges that "[t]he claims of the '233 patent were not well known, routine, or conventional at the time of the invention, nearly twenty years ago, and represent specific improvements over the prior art and prior existing systems and methods."  (Second Am. Compl.

19

¶ 78).  As noted, such conclusory allegations can be disregarded when considering the adequacy of the pleadings on a motion to dismiss.  *See, e.g.*, *Dropbox*, 815 F. App'x at 538 ("Dropbox's complaint asserts only conclusory allegations insufficient to survive a motion to dismiss.").

But the complaint further alleges what plaintiff contends are technical improvements disclosed by the '233 patent.  It alleges that the patent discloses a "distributed personal health communication system" that solved problems of the prior art, including those related to the interoperability between wireless technologies and the security of data transfers.  (Second Am. Compl. ¶¶ 79, 83).  More specifically, it alleges that the implementation of wireless monitoring devices that use "detector[s]," which "sense[] body or physiological parameters such as motion, blood oxygen content, [or] heart function," as part of personal medical communication systems that include "security mechanism[s]" constitutes a "concrete and technological improvement[]" to such systems.  (Second Am. Compl. ¶ 85; '233 patent col. 15 l. 2).  According to the complaint, combining that monitoring device with the security mechanism "improve[s] functionality of monitoring devices by enabling remote monitoring of vital signs or other physiological parameters."  (Second Am. Compl. ¶ 87; *see also id.* ¶ 88).

At a minimum, those allegations border on the conclusory.  Nonetheless, for present purposes, it appears that the complaint plausibly alleges that the elements of the claims of the '233 patent, when considered in combination, contain an inventive concept sufficient to transform the claimed abstract idea into a specific patent-eligible application.  Again, discovery may well prove otherwise.  But at this stage, the Court must accept as true the complaint's non-conclusory allegations.  *See Aatrix Software*, 882 F.3d at 1128 ("There are factual allegations in the second amended complaint, which when accepted as true, prevent dismissal pursuant to Rule 12(b)(6).  Nothing in this opinion should be viewed as going beyond the Rule 12(b)(6) stage.

Summary judgment, for example, involves different standards than Rule 12(b)(6).").

Accordingly, the Court will deny the motion to dismiss to the extent that it seeks

dismissal of the claim of infringement of the '233 patent.

### C.    The '007 Patent

In its Memorandum and Order on Claim Construction, the Court concluded that the term

"means for computing athletic performance feedback data from the series of time-stamped

waypoints obtained by said GPS receiver" is indefinite under 35 U.S.C. § 112 for lack of

corresponding structure for the claimed function.  That term is employed in Claims 1 and 21 of

the '007 patent.  ('007 patent col. 11 ll. 13-15; *id.* col. 12 ll. 29-31).[6]  It appears that plaintiff has

asserted only those claims or claims that depend on those claims.[7]

Defendant has moved to dismiss the claim of infringement of the '007 patent for

ineligible subject matter under 35 U.S.C. § 101; it has not moved to dismiss that claim for

indefiniteness under 35 U.S.C. § 112.[8]  It has, however, moved for partial summary judgment as

to that claim on that basis.  As noted, that motion has been stayed pending further court order.

Under the circumstances, the Court will deny, without prejudice, the motion to dismiss to

---

[6] A similar term, omitting the word "athletic," appears in Claim 38.  ('007 patent col. 14 ll. 18-20 (claiming a "portable health monitoring and analysis system" comprising, among other things, "means for computing performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver")).

[7] The record before the Court is not entirely clear which claims of the '007 patent plaintiff asserts are infringed.  The complaint alleges that defendant "has infringed and continues to infringe at least claim 23 of the '007 patent . . . ." (Second Am. Compl. ¶ 49).  Defendant's memorandum in support of its motion to dismiss states that plaintiff alleges infringement of Claim 23.  Other portions of the record, however, suggest that plaintiff asserts more than that claim.  For example, defendant's motion for partial summary judgment states that plaintiff has asserted Claims 7 and 21-29 of the '007 patent.  In their initial Joint Claim Construction and Prehearing Statement, the parties note that plaintiff has "withdrawn its assertion of Claim 22 of the '007 Patent." (Dkt. No. 65, at 1 n.1).  And the slides presented by plaintiff at the hearing on the motion to dismiss indicate that plaintiff has asserted Claims 7, 21, 23, 24, 25, 26, 28, and 29.  It therefore appears that plaintiff has asserted some subset of Claims 7 and 21-29.  As noted, each of those claims either includes the indefinite term or depends on a claim that includes the indefinite term.

[8] In its memorandum in support of its motion to dismiss, defendant reserved the right "to contend that any 'means-plus-function' limitations [were] indefinite" during claim construction.  (Def. Mem. at 25 n.3).

the extent that it seeks dismissal of the claim of infringement of the '007 patent.

## IV.   **Conclusion**

For the foregoing reasons, defendant's motion to dismiss is DENIED.


**So Ordered.**

/s/ F. Dennis Saylor IV

F. Dennis Saylor IV

Dated: August 10, 2021                    Chief Judge, United States District Court