UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| PHILIPS NORTH AMERICA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 19-11586-FDS |
| FITBIT LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF DECISION AND ORDER
ON DEFENDANT FITBIT, INC.'S MOTION TO COMPEL
CERTAIN OF MR. ARIE TOL'S EMAIL COMMUNICATIONS**

January 27, 2022

DEIN, U.S.M.J.

## I. INTRODUCTION

The plaintiff, Philips North America LLC ("Philips"), researches and develops numerous technologies, including connected-health and related products such as wearable fitness trackers that monitor and analyze personal health and fitness information.  It maintains a patent portfolio that consists of more than 60,000 patents, including patents pertaining to connected health technologies.  On July 22, 2019, Philips brought this action against Fitbit LLC ("Fitbit"),[1] a company that develops, manufactures, markets and sells connected health products.  By its Second Amended Complaint, Philips claims that Fitbit has infringed and continues to infringe upon three of its U.S. patents.  Fitbit denies liability and has asserted counterclaims against Philips for declaratory judgment of non-infringement and invalidity.

---

[1] Fitbit recently changed its name from Fitbit, Inc. to Fitbit LLC.  (See Docket Nos. 226 & 227).

The matter is presently before the court on "Defendant Fitbit, Inc.'s Motion to Compel the Production of Certain of Mr. Arie Tol's Email Communications" (Docket No. 198), by which Fitbit is seeking an order compelling Philips to produce email communications that were sent or received by one of the plaintiff's employees, Mr. Arie Tol ("Mr. Tol"), and have been withheld on the basis of attorney-client privilege and/or the work product doctrine.  Mr. Tol is a Dutch Patent Attorney and the Principal Licensing Counsel for the intellectual licensing division of Philips' parent company in the Netherlands where he works.  However, he is not admitted to the Dutch bar and is not a licensed attorney-at-law.  At issue is whether, under these circumstances, Philips is entitled to rely on the attorney-client privilege to withhold communications reflecting legal advice provided and received by Mr. Tol.  Also at issue is whether Philips improperly relied on the attorney-client privilege to withhold communications containing business rather than legal advice, and whether Philips has met its burden of showing that documents withheld under the work product doctrine were prepared in anticipation of litigation or for trial.

After consideration of the parties' written submissions and oral arguments, and for all the reasons detailed below, Fitbit's motion to compel the production of Mr. Tol's emails is ALLOWED IN PART and DENIED IN PART.  Specifically, Phillips cannot assert the attorney-client privilege over Mr. Tol's communications so Fitbit's motion to compel is ALLOWED to the extent Philips claims that the communications are privileged.  However, Philips has appropriately claimed work product protection with respect to Mr. Tol's emails so Fitbit's motion to compel is DENIED with respect to the communications over which Philips has asserted work product claims.

## II. FACTUAL AND PROCEDURAL BACKGROUND[2]

### Mr. Tol's Employment at Philips

The present dispute concerns email communications that were sent or received by Mr. Tol between June 2, 2015 and December 17, 2019.  (See Def. Ex. M; Tol Decl. ¶ 2).[3]  Mr. Tol is the Principal Licensing Counsel for the Intellectual Property & Standards ("IP&S") organization of Philips' parent company in the Netherlands, Koninklijke Philips N.V., where he has been employed since 1995.  (Id. ¶ 1).  He has been registered as a Dutch Patent Attorney since 2000 and has been registered as a European Patent Attorney since 2003.  (Id.).  However, it is undisputed that Mr. Tol is not an attorney-at-law and is not admitted to the bar for Dutch attorneys-at-law.  (See Def. Mem. (Docket No. 199) at 3; Hoyng Decl. ¶ 42 & n. 20-21).  It is this differing role between foreign patent attorneys and attorneys-at-law that raises the issue whether the attorney-client privilege should apply.

---

[2] The facts are derived from the following materials submitted by the parties in connection with Fitbit's motion to compel: (1) the exhibits attached to the Declaration of David J. Shaw in Support of Fitbit, Inc.'s Motion to Compel the Production of Certain of Mr. Arie Tol's Email Communications (Docket No. 200) ("Def. Ex.__"); (2) the Declaration of Arie Tol ("Tol Decl."), which is attached as Exhibit 1 to the Plaintiff's Opposition to Fitbit, Inc.'s Motion to Compel (Docket No. 210); (3) the Declaration of Willem A. Hoyng ("Hoyng Decl."), which is attached as Exhibit 2 to the Plaintiff's Opposition to Fitbit's Motion to Compel (Docket No. 210); (4) the exhibits attached to the Declaration of David J. Shaw in Support of Fitbit, Inc.'s Reply in Support of its Motion to Compel the Production of Certain of Mr. Arie Tol's Email Communications (Docket No. 214) ("Def. Supp. Ex. __"), including the Declaration of Mr. Frits W. Gerritzen ("Gerritzen Decl."), which is attached as Exhibit 1 thereto; (5) the Declaration of Willem A. Hoyng ("Supp. Hoyng Decl."), which is attached as Exhibit 1 to the Plaintiff's Sur-Reply in Opposition to Fitbit, Inc.'s Motion to Compel the Production of Certain of Mr. Arie Tol's Email Communications (Docket No. 220); and (6) the documents attached as Exhibit A ("Def. Supp. Ex. A") to Fitbit's Status Report Regarding Fitbit's Motion to Compel Certain Emails of Mr. Arie Tol (Docket No. 233).

[3] In his Declaration, Mr. Tol stated that Fitbit is seeking discovery of communications that Mr. Tol sent or received "between June 2, 2014 and December 17, 2019[.]"  (Tol Decl. ¶ 2).  The record demonstrates that the 2014 date is a typographical error and that the communications in dispute date from June 2, 2015 through December 17, 2019.  (See, e.g., id. ¶ 4; Def. Ex. M).

In connection with his employment at Philips, Mr. Tol is primarily responsible for selling and licensing patents.  (Def. Ex. E at 12-14).  He also provides advice on matters concerning intellectual property, including advice on early-stage business activities and opportunities for the company.  (Id. at 14-18).  Additionally, since 2015, Mr. Tol has been involved in evaluating whether Fitbit and Garmin products infringe certain of Philips' patents relating to activity trackers or "fitness trackers."  (Tol Decl. ¶ 4).  He currently serves as the primary Patent Attorney at Philips with responsibility for managing the company's enforcement of patents in that field against both Fitbit and Garmin.  (Id.).

<u>Philips' Notices of Infringement to Fitbit and Garmin</u>

According to Mr. Tol, Philips' approach to licensing its patents "almost always starts with identifying infringers of Philips's patent rights in anticipation of having to enforce those patent[s] in court."  (Id. ¶ 3).  As Mr. Tol describes the process:

> the beginning of such licensing activities ... first involves identifying products that infringe Philips's patents, and working up a case against the accused infringer. Next, Philips puts the infringer on notice of their infringement in view of pursuing enforcement actions for damages and/or an injunction against the infringers.  Depending on the patent rights at issue, this may include an enforcement action in one or more of the United States, Europe, or Asia (or anywhere in which Philips's patent rights may be enforced).  While Philips is of course willing to enter into licensing discussion upon providing notice of infringement in order to settle disputes with accused infringers, the focus throughout is to develop and enforce Philips's patent rights through legal action as necessary.

(Id.).

Mr. Tol claims that this was the approach that Philips followed with respect to Fitbit and Garmin.[4]  (Id.).  Thus, in 2015, Philips began evaluating whether certain Fitbit and Garmin products infringed on some of Philips' patents relating to activity trackers.  (Id. ¶ 4).  The work initially focused on reviewing and analyzing Philips' patent rights to determine which patents might be infringed by Fitbit and Garmin.  (Id. ¶ 5).  Mr. Tol and other Dutch Patent Attorneys, as well as American Patent Attorneys working for Philips, participated in this effort under the direction of Erik Pastink.  (Id. ¶¶ 4-5).  Mr. Pastink is a Dutch and European Patent Attorney who currently serves as Senior IP Counsel for Philips in the Netherlands and whose name appears on many of the communications that the plaintiff has withheld from production.  (Id. ¶ 5 & Ex. 1.A thereto; Def. Exs. A, K, M).  Mr. Tol contends that a significant number of those communications concern the pre-suit analysis and enforcement activities that Philips' Attorneys conducted with respect to Fitbit and Garmin.  (See Tol Decl. ¶¶ 16-22, 24-26, 29-33, 39).

On February 17, 2016, Mr. Pastink sent a letter to Garmin on behalf of Philips IP&S.  (Tol Decl., Ex. 1.A).  Therein, Mr. Pastink formally notified Garmin that certain of its products and services in the field of activity trackers infringed upon one or more of Philips' U.S. patents and their foreign counterparts.  (Id.).  He also informed Garmin that Philips would be willing to discuss the terms and conditions of a non-exclusive, world-wide license under its patents, and that Philips wished to schedule a meeting with Garmin to discuss this matter "within two months" from the date of his letter.  (Id.).  Finally, Mr. Pastink stated that "[f]or good order's

---

[4] According to Mr. Tol, Philips focused on Fitbit and Garmin at the same time due to the similarities in their allegedly infringing products and an overlap in the patents that Philips is attempting to enforce against those entities.  (Tol Decl. ¶ 4).

sake, all Philips' rights in respect of the unauthorized use of the patents listed in Exhibit 1 [attached to the letter] remain formally reserved."  (Id.).

Subsequently, on October 10, 2016, Philips' Senior IP Counsel in the United States, Elias Schilowitz, sent a nearly identical letter to Fitbit.  (Tol Decl., Ex. 1.B).  Therein, Mr. Schilowitz informed Fitbit that he was writing on behalf of Philips IP&S and that "[t]his letter serves as formal notice that the Fitbit products and services as indicated and identified in Exhibit 1 [attached to the letter], as well as Fitbit products and services having equal or similar functionality, all infringe one or more Philips owned or controlled granted U.S. patents and their foreign counterparts."  (Id.).  Exhibit 1 lists 18 patents from nine different countries, including the United States, that are owned by the plaintiff. (Id.).  In the letter, Mr. Schilowitz also stated that Philips was willing to have a discussion with Fitbit regarding the terms and conditions of a non-exclusive, world-wide license under its patents, and he requested a meeting with the defendant to discuss the matter "within two months from the date of [his] letter." (Id.).  Finally, Mr. Schilowitz informed Fitbit that "[f]or good order's sake," Philips was formally reserving all of its rights with regard to the unauthorized use of the patents listed in Exhibit 1. (Id.).

### Philips' Infringement Litigation Against Garmin and Fitbit

Philips subsequently pursued discussions with Fitbit and Garmin regarding the possibility of resolving the parties' disputes through licensing arrangements.  (Tol. Decl. ¶ 8; see Def. Exs. C & D).  It also took steps to enforce its patent rights against those parties in court.  (Tol. Decl. ¶ 8).  On September 27, 2017, Philips filed a lawsuit against Garmin in Germany in which it alleged infringement of European Patent No. EP 1 076 806, and on October 27, 2017, Philips

filed a second lawsuit against Garmin in Germany in which it alleged infringement of European

Patent No. EP 1 247 229. (Id.).  Philips then filed lawsuits against Fitbit in Germany on

December 4, 2017 and December 12, 2017.  (Id.).  Therein, Philips asserted claims for

infringement of the same patents at issue in the Garmin actions.  (Id.).  Both of those patents

were listed in Exhibit 1 to Philips' October 10, 2016 notice letter to Fitbit.  (Id., Ex. 1.B).

        At about the same time when Philips was initiating litigation against Garmin and Fitbit in

Germany, Garmin brought a revocation proceeding against European Patent No. EP 1 076 806

in the United Kingdom ("UK").  (Id. ¶ 9).  Philips filed a counterclaim for infringement of that

Patent.  (Id.).  Garmin then brought a nullity proceeding in Germany against European Patent

No. EP 1 076 806 on January 25, 2018.  (Id.).  After the Patent was found to be valid and

infringed in the UK proceeding, Philips and Garmin settled the matter.  (Id. ¶ 10).  However, the

German litigation and nullity proceeding remained pending.  (Id.).

        During 2018 and 2019, Philips and Fitbit engaged in discussions regarding the possibility

of resolving their patent disputes, including settlement of the pending European litigation, by

entering into a licensing arrangement.  (See Def. Ex. D).  According to Mr. Tol, Philips also

continued to evaluate potential infringement claims against Garmin and Fitbit in the United

States and took steps to retain outside counsel for the purpose of filing litigation here.  (Tol

Decl. ¶ 11).  On July 22, 2019, Philips filed its initial complaint against Fitbit in this action and

filed a separate lawsuit against Garmin in the District Court for the Central District of California.

(Id. ¶ 12).  By its claims in this case, Philips alleges that Fitbit has infringed and is continuing to

infringe three of its patents, including U.S. Patent No. 6,013,007, U.S. Patent No. 7,088,233 and

U.S. Patent No. 8,277,377.  (Docket No. 112 ¶ 36 & Counts I-III).  Fitbit denies Philips' claims and

has asserted counterclaims against Philips for a declaratory judgment of non-infringement and invalidity with respect to each of the disputed patents.  (Docket No. 224).

Subsequently, on December 10, 2019, the plaintiff filed a complaint with the United States International Trade Commission ("ITC").  (Tol Decl. ¶ 13).  Therein, Philips asserted patent infringement claims against Fitbit and Garmin on a set of patents unrelated to the Patents-in-Suit.  (Id.).  The ITC declined to issue an exclusion order and Philips is appealing the matter to the Federal Circuit.  (Id.).

Discovery of Mr. Tol's Email Communications

During discovery in this case, Philips performed a search of Mr. Tol's email communications and produced 685 documents to Fitbit.  (See Def. Mem. at 4; Pl. Opp. Mem. (Docket No. 210) at 1).  Additionally, on March 23, 2021, Philips produced a privilege log, which included more than 500 emails that had been written or received by Mr. Tol and were withheld from production based on the attorney-client privilege and/or work product doctrine.  (Def. Ex. J).  Following a meeting between the parties to discuss Fitbit's concerns regarding portions of the privilege log, Philips agreed to produce some of the listed documents and update its log. (See Def. Mem. at 4).  Philips' produced a supplemental privilege log of Mr. Tol's emails on April 16, 2021.  (Def. Ex. A).  The supplemental log listed 464 emails that Philips continued to withhold from production on the grounds of attorney-client privilege and/or work product. (Id.).

Fitbit continued to challenge Philips' claims of privilege and/or work product protection over certain of Mr. Tol's emails.  (See Def. Ex. K).  As a result of the parties' discussions, Philips amended its privilege log a second time on May 28, 2021, and a third time on June 11, 2021.

(See Def. Exs. L & M).  In connection with this process, the plaintiff "addresse[d] certain ... [of

Fitbit's] requests for additional information for the listed entries and/or correct[ed] errors in

prior disclosures."  (Def. Ex. M at 1).  It also determined, "upon further review," to produce

additional documents that it initially withheld from discovery.  (Id.).  However, Fitbit maintained

its challenges to approximately 100 emails over which Philips continued to claim protection.

(See Tol Decl. ¶¶ 16-43).

The parties were unable to resolve their remaining disputes despite their continued

efforts to do so.  Consequently, Fitbit filed the instant motion to compel by which it is seeking

an order directing the plaintiff to produce certain of the documents listed in its privilege log on

the grounds that they are not entitled to protection under the attorney-client privilege or the

work product doctrine.  (Def. Mem. at 1).  During a hearing on the motion, this court instructed

the parties to make a further attempt to narrow the issues in dispute.  Philips has since

withdrawn its assertion of work product protection for three of Mr. Tol's emails and Fitbit has

withdrawn its motion to compel production of sixteen of Mr. Tol's emails.  (Docket No. 232 at 1;

Docket No. 233 at 2).  The parties' dispute over the remaining emails is now ripe for resolution

by this court.

Additional factual details relevant to this court's analysis are described below.

### III. <u>ANALYSIS</u>

Fitbit argues that it is entitled to discovery of the disputed emails for three reasons.

First, the defendant equates Mr. Tol with patent agents in the United States based on the fact

that he is not licensed as an attorney-at-law in the Netherlands.  Patent agents in the United

States are not attorneys but are authorized by Congress to engage in the practice of law before

the U.S. Patent and Trademark Office ("USPTO").  See In re Queen's Univ. at Kingston, 820 F.3d

1287, 1296-98 (Fed. Cir. 2016) ("Queen's") (describing practice of law by patent agents in the

United States).  The Federal Circuit has recognized a patent-agent privilege that shields

communications with non-attorney patent agents acting within the scope of their authority to

practice law before the USPTO.  Id. at 1302.  Fitbit argues that there is no basis, either in U.S. or

Dutch law, to apply an attorney-client or patent-agent privilege to "communications exclusively

between Dutch patent agents and other non-attorney employees who were not acting at the

direction and control of a licensed attorney, and related to matters other than representation

before a patent office[.]"  (Def. Mem. at 1).  Second, Fitbit argues that Philips improperly

invokes the attorney-client privilege for communications involving business advice, as opposed

to legal advice, such as communications relating to the potential licensing of Philips' patents.

(Id. at 1-2).  Third, Fitbit contends that Philips has failed to support its claims of work product

for communications dating as far back as 2015 -- four years before it filed its complaint in this

case -- because it has not shown that it had a reasonable expectation of litigation in 2015 or at

any other time before initiating the instant lawsuit.  (Id.).  For the reasons that follow, this court

finds that Philips has failed to establish that any of the disputed emails are protected by the

attorney-client or patent agent privilege regardless of whether U.S. or Dutch law applies.

However, Philips has shown that the emails over which it claims work product protection were

prepared in anticipation of litigation and have been properly withheld from production.

[10]

A. **Challenge to Philips' Claim of Attorney-Client Privilege**

    i. **Choice of Law**

The threshold issue raised by Fitbit's motion to compel communications that Philips has withheld pursuant to the attorney-client privilege is whether U.S. or foreign privilege law governs the parties' dispute. Fitbit argues that this court should apply U.S. law to determine whether the attorney-client privilege protects the disputed email communications while Philips suggests that Dutch law should govern the privilege analysis with respect to at least some of Mr. Tol's emails or portions thereof. (See Def. Mem. at 7; Pl. Opp. Mem. at 4; Pl. Sur-Reply Mem. (Docket No. 220) at 5 n.6). This court finds that a handful of the documents must be governed by the Dutch law, while the remaining emails are subject to the law of the United States. In the end, however, the result is the same because Philips has failed to establish that the emails are privileged under the law of either country.

<u>The Relevant Test</u>

The parties agree that the appropriate test for determining whether U.S. or foreign privilege law applies in this case is the so-called "touching base" test. (Def. Mem. at 5-6; Pl. Opp. Mem. at 4). Courts in this District have defined this test as follows:

> [i]f ... a communication has nothing to do with the United States or ... only an incidental connection to this country, the privilege issue will be determined by the law of the foreign nation. If, however, the communication has more than an incidental connection to the United States, the court will undertake a more traditional analysis and defer to the law of privilege of the nation having the most direct and compelling interest in the communication or, at least, that part of the communication which mentions the United States. Such interest will be determined after considering the parties to and the substance of the communication, the place where the relationship was centered at the time of the communication, the needs of the international system, and whether the application of foreign privilege law would be "clearly inconsistent with important

policies embedded in federal law." *Golden Trade[, S.r.L. v. Lee Apparel Co.]*, 143 F.R.D. [514,] 521 [S.D.N.Y. 1992].

VLT Corp. v. Unitrode Corp., 194 F.R.D. 8, 16 (D. Mass. 2000).  See also United States v. McLellan, No. 16-cr-10094-LTS, 2018 WL 9439896 at **1-2 (D. Mass. Jan. 19, 2018) (adopting the touching base test as articulated in VLT Corp. v. Unitrode Corp.).

As a general matter, "communications relating to legal proceedings in the United States, or that reflect the provision of advice regarding American law, 'touch base' with the United States and, therefore, are governed by American law, even though the communication may involve foreign attorneys or a foreign proceeding." Gucci Am., Inc. v. Guess?, Inc., 271 F.R.D. 58, 65 (S.D.N.Y. 2010).  "Conversely, communications regarding a foreign legal proceeding or foreign law 'touch base' with the foreign country." Id.  Additionally, courts have concluded that the country with "the predominant interest is either the place where the allegedly privileged relationship was entered into or the place in which that relationship was centered at the time the communication was sent." Anwar v. Fairfield Greenwich Ltd., 982 F. Supp. 2d 260, 264 (S.D.N.Y. 2013) (quoting Astra Aktiebolag v. Andrx Pharms., Inc., 208 F.R.D. 92, 98 (S.D.N.Y. 2002)).

### Application of the "Touching Base" Test

The record establishes that five of the disputed emails, consisting of document numbers 58, 59, 82, 208 and 209 on Philips' privilege log, must be governed by Dutch law because they have no more than an incidental connection, if any, to the United States.  (See Def. Ex. M; Tol Decl. ¶¶ 25, 32, 35).  As described by Mr. Tol in a Declaration submitted in support of Philips' opposition to the instant motion, each of these five emails consists of correspondence between Mr. Tol and one or more Dutch Patent Attorneys (as well as, in one instance, a Philips research

[12]

engineer) and reflects an analysis or discussion of certain of Philips' patents.  (Tol Decl. ¶¶ 25, 32, 35).  None of the patents discussed in the emails are U.S. patents and none of the patents are at issue in any of the litigation that Philips has brought against Fitbit and Garmin in the United States or elsewhere.  (Id.).  Therefore, the question whether these documents are privileged must be determined by the law of the foreign nation, which in this case is the Netherlands where Mr. Tol and the other parties to the communications are located and where the relationship between Philips and its Dutch Patent Attorneys was entered.  See VLT Corp., 194 F.R.D. at 16 (if "a communication has nothing to do with the United States ... the privilege issue will be determined by the law of the foreign nation."); Golden Trade S.r.L., 143 F.R.D. at 521 (noting that the "process of referring to the law of the place where the allegedly privileged relationship was entered into is ... well recognized" in case law).

The record also supports the conclusion that the emails described paragraphs 20, 27 and 33 of Mr. Tol's Declaration touch base with the Netherlands and should be governed by Dutch privilege law as well. [5]  According to Mr. Tol, these emails reflect communications that he had with other Dutch Patent Attorneys and relate, at least in part, to Philips' analysis and pre-suit investigation of potential patents to assert against Fitbit and Garmin.  (Tol. Decl. ¶¶ 20, 27, 33).  While Philips indicates that these documents address U.S. as well as foreign patents, there is no specific evidence linking the communications to the United States or implicating the interests of any country outside the Netherlands.  (See id.; Pl. Opp. Mem. at 4).  Accordingly, this court finds that even if these emails have more than an incidental connection to the United

---

[5] The emails described in paragraphs 20, 27 and 33 of Mr. Tol's Declaration correspond to entry numbers 26, 28, 65-66 and 144 on Philips' privilege log.  (Tol Decl. ¶¶ 20, 27, 33).

States, the Netherlands has the most direct and compelling interest in the communications and

that Dutch privilege law should apply.  See Cadence Pharms. v. Fresenius Kabi USA, LLC, 996 F.

Supp. 2d 1015, 1019 (S.D. Cal. 2014) ("[i]n the context of patent law, courts [applying the

touching base test] often look to the law of the country where legal advice was rendered");

Anwar, 982 F. Supp. 2d at 265 (finding that Magistrate Judge could correctly conclude that

communications touched base with the Netherlands where "[t]he Netherlands [wa]s the

jurisdiction where the relationship between [the defendant and its unlicensed in-house

attorney] was entered into and the place in which that relationship was centered at the time of

the communications at issue.").

This court finds that the remaining emails over which Philips is claiming privilege, which

consist of the emails described in paragraphs 16-19, 21-24, 26, 29-31, 34, 37, 39 and 41-43 of

Mr. Tol's Declaration, should be governed by the law of the United States.[6]  It is undisputed

that U.S. law applies in this case.  With respect to these particular emails, it is undisputed that

they involve, at least in part, the enforcement of U.S. patents or contract issues under U.S. law.[7]

(See Def. Mem. at 7; Pl. Opp. Mem. at 4).  Accordingly, these documents have more than an

---

[6] The communications described in paragraphs 16-19, 21-24, 26, 29-31, 34, 37, 39 and 41-43 of Mr. Tol's
Declaration correspond to the following documents listed in Philips' privilege log: 3-4, 19-21, 24, 30-31,
35-37, 42-43, 46-48, 60-64, 71-73, 79, 155-56, 299, 349-50, 408, 412-31, 433, 437-38, 440-41, 443, 451,
458-60, 463-64.

[7] While Philips agrees that these communications "arguably 'touch base' with the United States because
they involve the enforcement of a U.S. Patent or a contract dispute under U.S. law," it notes that "other
aspects of the same communication[s] would not [touch base with the United States] because they
relate to the enforcement of non-U.S. patents." (Pl. Opp. Mem. at 4).  However, Philips has failed to
identify the specific communications to which its argument refers or to present evidence showing that
the interests of the Netherlands or some other country outweigh the United States' interests in the
communications.  (See id. at 4-5).  In any event, this issue does not need to be addressed further
because, as detailed infra, Philips has failed to show that any of Mr. Tol's emails are privileged.

"incidental connection to this country[.]" <u>VLT Corp.</u>, 194 F.R.D. at 16.  Moreover, the evidence shows that the United States is "the nation having the most direct and compelling interest in the communication[s] or, at least, that part of the communication[s] which mention[ ] the United States."  <u>Id.</u>  As Mr. Tol describes in his Declaration, these communications pertain to Philips' pre-suit investigation and analysis of the U.S. patents asserted against Fitbit in the instant litigation; advice relating to the preparation of Philips' October 10, 2016 notice letter to Fitbit, which was sent to Fitbit at its offices in the United States and accused Fitbit of infringing Philips' "U.S. patents and their foreign counterparts"; and legal advice and feedback from Philips' U.S. attorneys on issues relating to the enforcement of U.S. patents, amendments to a patent purchase agreement between Philips and an American inventor, and a contract dispute arising under U.S. law.  (Tol Decl. ¶¶ 16-19, 21-24, 26, 29-31, 34, 37, 39 and 41-43 & Ex. 1.B thereto).   The relevant case law supports the conclusion that these kinds of communications touch base with the United States.  <u>See</u>, <u>e.g.</u>, <u>Anwar</u>, 982 F. Supp. 2d at 264 (finding no error in Magistrate Judge's conclusion that communications touched based with the United States where they involved advice regarding American law and concerned litigation based in the United States); <u>Gucci Am., Inc.</u>, 271 F.R.D. at 66-7 (communications arising from investigations into alleged violations of U.S. trademarks, which ultimately gave rise to infringement actions in the United States and Italy, touched base with the United States and supported application of U.S. privilege law).  Therefore, American law will apply to determine whether these documents are privileged.

### ii.  **Application of U.S. Privilege Law**

All of Philips' claims in this case arise under federal patent law.  Therefore, the question

whether, under U.S. law, the emails described in paragraphs 16-19, 21-24, 26, 29-31, 34, 37, 39

and 41-43 of Mr. Tol's Declaration fall within the scope of the attorney-client privilege "must be

ascertained by reference to 'principles of [federal] common law as they may be interpreted ...

in the light of reason and experience.'"  In re Grand Jury Subpoena (Mr. S), 662 F.3d 65, 70 (1st

Cir. 2011) (quoting Fed.R.Evid. 501) (alteration in original).  Where, as here, the

communications at issue concern infringement and other substantive matters relating to patent

law, Federal Circuit law applies to determine whether those documents are discoverable.  See

In re EchoStar Commc'ns Corp., 448 F.3d 1294, 1298 (Fed. Cir. 2006) ("Federal Circuit law

applies when deciding whether particular written or other materials are discoverable in a

patent case, if those materials relate to an issue of substantive patent law." (quoting Advanced

Cardiovascular Sys. v. Medtronic, Inc., 265 F.3d 1294, 1307 (Fed. Cir. 2001)).  Moreover, "[t]he

burden of determining which communications are privileged ... rests squarely on the party

asserting the privilege[,]" which in this case is Philips.  Queen's, 820 F.3d at 1301.  Accord In re

Grand Jury Subpoena (Mr. S), 662 F.3d at 71.  ("It is clear beyond hope of contradiction that the

party seeking to invoke the attorney-client privilege must carry the devoir of persuasion to

show that it applies to a particular communication and has not been waived.").  For the reasons

that follow, this court finds that Philips has failed to satisfy its burden with respect to the

communications to which U.S. law applies.  Accordingly, this court finds that those documents

do not fall within the scope of the attorney-client privilege.

<u>Application of the Privilege to Foreign Patent Agents</u>

Fitbit argues that the Federal Circuit's decision in <u>Queen's</u> is controlling on the issue

whether, under American law, Mr. Tol's emails are privileged under the circumstances of this

case.  (<u>See</u> Def. Mem. at 8; Def. Reply Mem. (Docket No. 213) at 2-3).  <u>Queen's</u> was a case of

first impression in which the Federal Circuit "recognize[d] a patent-agent privilege extending to

communications with non-attorney patent agents when those agents are acting within the

agent's authorized practice of law before the [USPTO]."  <u>Queen's</u>, 820 F.3d at 1302.  Fitbit notes

that in connection with its decision, the <u>Queen's</u> court specifically "limited the scope of patent

agent privilege for advice rendered by U.S. patent agents not working at the direction of

attorneys-at-law to communications that are reasonably incident and necessary to

representation before the Patent Office."  (Def. Reply Mem. at 2 (citing <u>Queen's</u>, 820 F.3d at

1301)).  Fitbit also reasons that because Mr. Tol and the other individuals involved in the email

communications at issue in this case are "Dutch patent agents or non-attorney employees"

rather than attorneys-at-law, the communications are unrelated to representation before a

patent office, and there is no evidence that the individuals were acting under the direction of

licensed attorneys at the time the communications were made, Philips cannot withhold them

on the basis of the attorney-client privilege.  (Def. Mem. at 8-9).

While this court agrees that the patent-agent privilege recognized in <u>Queen's</u> should

apply to foreign Patent Attorneys like Mr. Tol who are not attorneys-at law, <u>Queen's</u> does not

end the inquiry.  <u>Queen's</u> involved patent agents who were registered to practice before the

USPTO.  <u>See</u> <u>Queen's</u>, 820 F.3d at 1290 (describing disputed documents as communications

between petitioners' employees and "registered non-lawyer patent agents").  Consequently,

the Federal Circuit had no opportunity to address the scope or existence of a privilege involving

foreign patent agents.  See  Knauf Insulation, LLC v. Johns Manville Corp., No. 1:15-cv-00111-

TWP-MJD, 2019 WL 4832205, at *4 (S.D. Ind. Oct. 1, 2019) (noting that Queen's "did not involve

foreign patent agents; accordingly, the Federal Circuit did not address the application of the

privilege to communications with foreign patent agents." (footnote omitted)).

　　　　The case law applying the patent-agent privilege recognized in Queen's to foreign

patent agents is sparse.  The parties have not cited any cases since Queen's, and this court has

found none, in which the Federal Circuit or another Circuit Court of Appeals has had an

opportunity to consider the scope of the patent-agent privilege when applied to a foreign

patent agent.  However, at least two federal district courts have addressed the issue.  In Knauf

Insulation, the District Court for the Southern District of Indiana relied on the Federal Circuit's

reasoning in Queen's to conclude that the patent-agent privilege applied to the plaintiff's

communications with its non-lawyer "patent attorney" to the extent the communications

"were made within the scope of [his] authority as a patent attorney in the [United Kingdom]."

Id. at *6.  The Indiana court, in reaching its conclusion, held in relevant part as follows:

> as long as the patent agent in question is subject to regulation in his or her own
> country analogous to being registered with the Patent Office in this country,
> applying U.S. privilege law to foreign patent agents means applying the patent-
> agent privilege to communications relating to services that the patent agent is
> permitted to provide in the patent agent's own country.  To hold otherwise
> would be contrary to the goal of protecting the client's reasonable expectation
> of privilege in its communications with its legal advisor.

Id. at *5.  Accordingly, "[t]he relevant inquiry" in Knauf Insulation was whether, at the time the

communications at issue were made, the foreign patent agent was acting within the scope of

his authority as a patent agent in his home country.  See Knauf Insulation, LLC, 2019 WL 4832205, at *5.

In a more recent case, the District Court for the District of Delaware reached a nearly identical conclusion.  In Align Tech., Inc. v. 3Shape A/S, Nos. 17-1646-LPS, 17-1647-LPS, 2020 WL 1873026 (D. Del. Apr. 15, 2020) (slip op.), the court determined that "the Federal Circuit would modify its In re Queen's test" to capture circumstances involving foreign non-attorney patent agents.  Align Tech., Inc., 2020 WL 1873026, at *2.  The court further ruled that the Federal Circuit would apply a test in which a party claiming patent-agent privilege could prevail on its claim by making one of two alternative showings.  Pursuant to the first alternative, which is relevant here,

> a patent-agent privilege could serve to shield certain communications between registered foreign patent agents and their clients from disclosure, if the party seeking protection could show ... that ... the communications at issue were made to or by patent agents acting within the scope of the authorized practice of law set out by the law of the foreign country (or by the regulations of a governmental entity similar to the USPTO) ....

Id. (quotations and punctuation omitted). [8]  Thus, the Align Tech. court, like the court in Knauf Insulation, found that a critical inquiry for determining whether a foreign patent agent's

---

[8] In Align Tech., the court held that as an alternative to showing that the communications in question were made or received by patent agents acting within the scope of their authority to practice law in their home country, a party could shield communications involving a foreign patent agent where the party could show that "the law of the foreign country at issue otherwise recognizes a patent-agent privilege that is broader than or otherwise in conflict with that recognized by United States courts, and the foreign communications at issue fall within the scope of that privilege."  Align Tech., Inc., 2020 WL 1873026, at *2.  However, the second alternative set forth in Align Tech. appears to be inconsistent with the touching base test, which requires application of American privilege law rather than foreign law when the United States has "the most direct and compelling interest in the communication[s] or, at least, that part of the communication[s] which mention[ ] the United States."  VLT Corp., 194 F.R.D. at 16.  Because the parties agree that the touching base test is applicable here, this court declines to adopt the second prong of the test articulated by the court in Align Tech.  In any event, as described below, Philips has not shown that Mr. Tol's emails fall within the scope of a patent-agent privilege recognized

communications were privileged was whether the patent agent was acting within the scope of his legal authority to practice law in his home country at the time the communications were made.

Fitbit argues that the test articulated by the courts in Knauf Insulation and Align Tech. is inconsistent with the Federal Circuit's recognition, as stated in Queen's, that privileges must not be "lightly created nor expansively construed[.]"  (Def. Reply Mem. at 2 (quoting Queen's, 820 F.3d at 1295)).  While Fitbit acknowledges that Queen's did not explicitly address the question of a foreign patent-agent privilege, it argues that the Federal Circuit's cautious approach should preclude recognition of a foreign patent-agent privilege that is broader than the privilege for U.S. patent agents, and that any foreign patent-agent privilege should be confined to "advice rendered in the course of providing services explicitly authorized by Congress—those incident to representation before the Patent Office."  (Id. at 2-3).  This court disagrees and finds that the test adopted by the courts in Knauf Insulation and Align Tech. should apply in the instant case to determine whether Mr. Tol's communications are privileged under U.S. law.

The test set forth in Knauf Insulation and Align Tech. is entirely consistent with the Federal Circuit's reasoning in Queen's, where the court relied on the fact that Congress had authorized "non-attorney patent agents to engage in the practice of law before the Patent Office[.]"[9]  Queen's, 820 F.3d at 1298.  The Federal Circuit specifically limited the scope of the

_____

under Dutch law. Therefore, even if this test were to apply in the instant case, Philips would not be able to make the requisite showing.

[9] As the Knauf Insulation court found, the test it established for foreign patent agents is also consistent with privilege rules that have been adopted by the USPTO, which provide in relevant part that "[a]

privilege to communications that were made while the agents were acting within their authority as defined by Congress.  See id. at 1301 (explaining that "[r]egulations promulgated by the [USPTO] regarding the scope of a patent agent's ability to practice before the Office help to define the scope of the communications covered under the patent-agent privilege.").  The courts in Knauf Insulation and Align Tech. did not recognize a broader privilege for foreign patent attorneys.  They simply applied the Queen's court's reasoning to patent attorneys located in foreign countries.  Accordingly, the critical question for purposes of determining whether Mr. Tol's emails are privileged under U.S. law is whether Philips has shown that Mr. Tol was acting within the scope of his legal authority, as established under Dutch laws and regulations, at the time he was engaged in the disputed communications.

Whether Mr. Tol Was Acting Within
the Scope of His Authority to Practice Law

Fitbit contends that even if the Knauf Insulation test applies, Philips has failed to show that Dutch Patent Attorneys, who are not attorneys-at-law, are legally authorized to render the type of advice described in the emails over which Philips is claiming privilege in this case.  (Def. Reply Mem. at 3).  This court agrees that Philips has failed to meet its burden of proof.  Under the law of the Netherlands, "[a] Dutch patent [attorney] is a licensed professional admitted to practice before the Dutch Patent Office pursuant to the Dutch Patent Act ["DPA"] and the rules

---

communication between a client and a ... foreign jurisdiction patent practitioner that is reasonably necessary and incident to the scope of the practitioner's authority shall receive the same protections of privilege under Federal law as if that communication were between a client and an attorney authorized to practice in the United States[.]"  Knauf Insulation, LLC, 2019 WL 4832205, at *5.  Although those rules apply only to practice before the USPTO, it is noteworthy that they were "developed by 'the agency authorized by Congress to regulate patent[s],'" and that the PTO "determined that the patent-agent privilege should apply to foreign patent agents acting within the scope of their authority, however that may be defined in their home country."  Id. at *6. (quoting Queen's, 820 F.3d at 1310 (dissenting opinion)).

and regulations thereunder."  <u>Organon Inc. v. Mylan Pharms., Inc.</u>, 303 F. Supp. 2d 546, 546 n.1

(D.N.J. 2004).  Accordingly, Dutch Patent Attorneys are legally authorized to advise on,

negotiate and conduct applications before the Patent Office.  (Hoyng Decl. ¶ 52 & Ex. Z

thereto).  Moreover, pursuant to Article 80 of the DPA, which effectively codifies the Patent

Attorney's traditional role in providing technical expertise to the court in infringement and

nullity proceedings, Patent Attorneys in the Netherlands are authorized to appear and speak in

patent proceedings before the District Court of The Hague, the court with exclusive jurisdiction

over such proceedings, as long as an attorney-at-law remains responsible for conducting the

case.  (Hoyng Decl. ¶¶ 50-51 & n.28).  In this case, however, there is no evidence that Mr. Tol's

email communications were created in connection with a patent application process or any

proceedings before the Dutch Patent Office.  Nor is there any evidence that Mr. Tol was

participating in any proceedings before the District Court of The Hague at the time the

communications were made, or that his activities related to any such proceedings.

Philips argues that the "the authorized scope of work for a Dutch Patent Attorney"

extends beyond patent prosecution and appearances in court to include such matters as

"advising on patent scope beyond patent prosecution," and providing advice on potential

litigation and licensing agreements.  (Pl. Opp. Mem. at 11).  In support of its argument, Philips

relies on the Declaration of Willem A. Hoyng, an attorney-at-law and a professor of civil law in

the Netherlands whose expertise includes Dutch patent and intellectual property law.  (Hoyng

Decl. ¶¶ 1-3).  In his Declaration, Professor Hoyng states as follows with respect to the scope of

authority of Dutch Patent Attorneys:

> *In my experience*, a Dutch or European patent attorney's "capacity" includes (at
> least) the assistance in deciding whether to file a patent application, assistance

> in obtaining a patent application, the representation of clients in opposition proceedings, in court cases involving questions of infringement and invalidity and cases involving prior user rights and licenses, advising on and assisting with pre-suit analysis of (potential) infringement and invalidity and more general the scope or strength of the patent applications or issued patents, and assistance in negotiating patent transactions such as the transfer of patents or the grant of licenses.

(Id. ¶ 45 (emphasis added)).  Notably, however, Professor Hoyng has not cited any specific laws or regulations showing that Dutch Patent Attorneys are legally authorized to advise clients in connection with potential litigation or licensing matters, negotiate patent transactions, or provide legal assistance unrelated to patent prosecution or court appearances outside of the Dutch Patent Office or proceedings before the District Court of the Hague (under the authority of an attorney-at-law responsible for conducting the case).  Moreover, Professor Hoyng has not established that the "assistance" he has witnessed being provided by Dutch and European Patent Attorneys is related to legal, as opposed to business, advice.  As Fitbit argues in support of its motion to compel, Professor Hoyng's personal opinion that Dutch Patent Attorneys regularly perform work beyond the specific activities authorized by the DPA is inadequate to establish that those activities fall within the scope of a Patent Attorney's legal authority to engage in the practice of law.  See Align Tech., Inc., 2020 WL 1873026, at *3 (evidence showing that patent attorneys regularly perform work beyond patent prosecution was insufficient to show "the extent to which the law of Denmark authorizes [patent attorneys] to take certain actions that amount to the practice of law").

Professor Hoyng also relies on a 2003 amendment to the DPA, as well as opinions from Dutch legal scholars, to argue for a broader interpretation of the role of Dutch Patent

[23]

Attorneys.  (See Hoyng Decl. ¶¶ 43, 47-49).  The amendment, which became effective on May

1, 2003, added the following provision to Article 23b of the DPA:

> Unless otherwise under or pursuant to the law, a patent attorney or an
> individual working under such attorney's supervision, is obligated to observe
> confidentiality regarding all that of which the attorney becomes aware pursuant
> to his activities.  This obligation remains in force after termination of the relevant
> activities. [10]

 (Id. ¶ 43 (emphasis and quotation marks omitted) (quoting Article 23b(4) of the DPA)).  See

also Organon Inc., 303 F. Supp.2d at 546-47 (describing the 2003 amendment).[11]  As Professor

Hoyng describes in his Declaration, the legislative history regarding the amendment indicates

that the Dutch legislature "intended to align [a Patent Attorney's] duty of confidentiality with

[that of ] lawyers and patent attorneys internationally (including the U.S.)."  (Hoyng Decl. ¶ 47).

Specifically, in an Explanatory Memorandum of Amendment, the Dutch legislature stated as

follows with respect to Article 23b(4) of the DPA:

> Second, it is provided that patent attorneys have a duty of confidentiality with
> respect to what comes to their knowledge by virtue of their work.  Lawyers and
> civil-law notaries also have such professional secrecy.  Moreover, such
> professional secrecy is customary internationally: both European patent
> attorneys and patent attorneys in the United States have such an obligation.  If
> the obligation were not to apply to Dutch patent attorneys, they could, under
> certain circumstances, be forced to disclose business-sensitive data, for example

---

[10] According to Fitbit's expert, Frits W. Gerritzen, the correct English translation of the first sentence of
Article 23b(4) to the DPA reads as follows: "Unless otherwise stipulated by law, a patent attorney or a
person working under his responsibility has a duty to keep confidential all information of which he
becomes aware *in the course of his work as such*."  (Gerritzen Decl. ¶ 5.5).  Because the different
translations by the parties' experts do not impact the outcome of the privilege issue, it is unnecessary to
reconcile or further address the conflicting language.

[11] In Organon, the District Court for the District of New Jersey ruled that the 2003 amendment to the
DPA codified "an existing privilege that had been recognized by the Dutch legal system through
implication and common practice[,]" and described the existing privilege as pertaining to documents
made within "the scope of the Dutch patent agents' traditional duties in applying for patents[.]"
Organon Inc., 303 F. Supp. 2d at 547, 551.

in a lawsuit, while patent attorneys from other countries would be exempt from
that obligation.

(Id. (emphasis and quotation marks omitted)).

What is missing from the record, however, is any evidence that the Dutch legislature
took steps to expand the legally authorized role of Patent Attorneys beyond their existing
activities. According to Fitbit's expert, Frits W. Gerritzen, under Article 23b(4) of the DPA, "a
Dutch patent attorney is obliged to observe confidentiality only regarding that information of
which the patent attorney becomes aware in the course of his or her work as a patent attorney
acting in that capacity." (Gerritzen Decl. 5.7). Even if the legislature intended to create an
evidentiary privilege for Patent Attorneys that is similar to the privilege for lawyers and patent
agents around the globe, there is no indication that it wished to expand the scope of a Patent
Attorney's legal authority or to create a privilege that is co-extensive with the attorney-client
privilege for attorneys-at-law. As Fitbit argues, while amendments to the DPA

> have acknowledged that Dutch patent agents may more generally assist with acts and
> proceedings before the Netherlands Patent Office and limited proceedings before the
> District Court of the Hague, the scope of a patent agent's licensure remains limited to
> those specific activities and, in particular, does not extend to the general context of
> litigation, which requires admission to the Netherlands bar as an advocaat.

(Def. Mem. at 10). Professor Hoyng's assertion that the amendment should be interpreted to
extend the ability of Dutch Patent Attorneys to engage in the practice of law is, without more
specificity or citations to persuasive authority, inadequate to establish that the authority of a
Patent Attorney, and the consequent privilege between a Patent Attorney and a client, is co-
extensive with that between a client and an attorney-at-law with respect to communications

outside the scope of a Patent Attorney's authority to practice law.[12]  Consequently, Philips has

failed to establish that Mr. Tol's emails were made within the scope of his authority as a Patent

Attorney in the Netherlands, and the documents to which U.S. law applies are not protected by

the attorney-client privilege.

### iii.  Application of Dutch Privilege Law

The next issue raised by Fitbit's motion to compel is whether the emails described in

paragraphs 20, 25, 27, 32, 33 and 35 of Mr. Tol's Declaration are privileged under Dutch law.

Fitbit argues that "the Netherlands does not recognize a privilege for patent agent

communications concerning topics other than proceedings before a patent office" and that

Philips' efforts to prove otherwise lack merit.  (Def. Mem. at 9-12).  This court agrees and finds

that Philips has not met its burden of proving that Dutch law establishes a patent attorney

privilege that would extend to the communications in dispute.  Therefore, its claim of privilege

under Dutch law must be denied.

Based on the record before this court, it does not appear that Dutch law recognizes a

privilege for Patent Attorneys engaged in matters beyond proceedings before the Dutch Patent

Office.  To date, the Supreme Court of the Netherlands has explicitly awarded a general right of

privilege to only four professions, including physicians, priests, civil law notaries and lawyers

admitted to the bar as attorneys-at-law, but has not expressly addressed whether such a

---

[12] Professor Hoyng's reliance on the opinions of Dutch legal scholars does not support a different conclusion with respect to the scope of a Patent Attorney's authority to practice law.  While these scholars have opined that the scope of a Patent Attorney's authority is "broader than simply providing assistance in drawing up and submitting a patent application" (see Hoyng Decl. ¶¶ 48-49), they have not established that "the legal authorization of Dutch patent agents extends to the activities at issue in the withheld communications – namely, providing legal advice with respect to U.S. patent litigation" and enforcement, as well as the other activities described above.  (Def. Reply Mem. at 4).

privilege should apply to Dutch Patent Attorneys as well.  (Gerritzen Decl. ¶ 5.4; Supp. Hoyng

Decl. ¶ 17).  The parties have identified only one case from a court in the Netherlands in which

the privilege of a Dutch Patent Attorney was at issue.  In Bruil v. Titan Int'l B.V., which was

decided in 1988 by the District Court of Zutphen, the court held that a Patent Attorney had no

right to be excused as a witness where his knowledge was obtained while he was providing

assistance with a licensing agreement rather than in connection with "[m]atters which are

entrusted to the patent attorney" in connection with the filing of a patent application.  Bruil v.

Titan Int'l, Jan. 5, 1988, NJ 1989, 563.  (Def. Supp. Ex. 2 at 12-13).  Moreover, the Bruil court

noted that "[w]here a patent agent goes beyond the scope of his specific work, which is to

assist in the application for a patent, it cannot be said that the performance of his duties in

respect of ancillary activities ... involves such a social interest in secrecy – even before the court

– that it must give way to the overriding interest in the discovery of the truth before the

courts."  (Id. at 13).  Thus, the Bruil court "implied, without expressly stating, that [a] privilege

applies to patent agents if their communications are 'within the scope' of a patent agent's

traditional function of applying for patents."  Organon Inc., 303 F. Supp. 2d at 549.

Mr. Gerritzen notes that while Bruil was decided before the DPA was amended to

include the confidentiality obligation for Dutch Patent Attorneys contained in Article 23b(4), it

remains "the only Dutch legal precedent on the scope of legal privilege for patent attorneys"

under Dutch law.  (Gerritzen Decl. ¶ 5.11).  Professor Hoyng, on the other hand, contends that

Bruil is not only outdated but also improperly decided.  (See Hoyng Decl. ¶¶ 54-55; Supp. Hoyng

Decl. ¶¶ 21-22).  This court does not find Professor Hoyng's arguments persuasive so as to

cause it to overrule Dutch law as it has stood for more than 30 years.

[27]

As described above, Professor Hoyng contends that due to the confidentiality obligations of a Patent Attorney under Dutch law, this court should conclude that a Patent Attorney's legal authority extends beyond prosecuting patents before the Patent Office and speaking in the District Court of The Hague, and that all communications between a Patent Attorney and his or her client should be deemed privileged.  (See Hoyng Decl. ¶¶ 40-45, 47-49, 51-53, 56).  However, as this court concluded above, Philips has failed to establish that a Patent Attorney's authority to practice law is so extensive.  Furthermore, Philips has failed to establish that any privilege should extend beyond a Patent Attorney's authorized scope of practice.[13]

The record before this court shows that under Dutch law, a claim of confidentiality is not equivalent to the absolute attorney-client privilege recognized under U.S. law.  As Mr. Gerritzen has attested, a privilege will only be recognized under Dutch law when the obligation of confidentiality outweighs the public interest in discovering the truth.  (Gerritzen Decl. ¶¶ 5.3, 8.2).  Specifically, as Mr. Gerritzen explains:

> An obligation of confidentiality can lead to privilege if it is unmistakably clear that the legislator [sic] has made this required balance of interest.  If this is not unmistakably clear, a balance of interests will have to be made on a case-by-case basis, which should be done by balancing the interests served by the obligation of professional secrecy against the important interest in discovering the truth in civil proceedings.  In the *Bruil v. Titan International* case, the Court seems to have made such a balancing of interest.  The Court concluded that even if the work of a patent attorney were to extend beyond patent prosecution, it would not result in a privilege of that same scope.

(Id. (emphasis in original; citations omitted); see also id.¶¶ 5.3, 5.8-5.10).

---

[13] Professor Hoyng also asserts that production of Mr. Tol's emails would be precluded under Dutch procedural rules because Fitbit has failed to meet the requirements necessary to obtain discovery of the documents under Dutch discovery rules, which provide for much less discovery than in the United States.  (See Hoyng Decl. ¶¶ 7-39).  However, Philips disclaims any suggestion that Dutch discovery rules apply to the present dispute so it is unnecessary to address them.  (Pl. Opp. Mem. at 17).

Professor Hoyng does not dispute that "the Dutch patent attorney's 'privilege' ... is not absolute and may in some cases be outweighed by the public interest in ascertaining the truth in court." (Hoyng Decl. ¶ 41). This renders the confidentiality obligation distinguishable from an evidentiary privilege such as the attorney-client or patent agent privilege. "The former is a professional's ethical obligation to his client; the later is an evidentiary privilege of nondisclosure." In re Rivastigimine Patent Litig., 239 F.R.D. 351, 357 (S.D.N.Y. 2006) (quoting In re Rivastigmine Patent Litig., 237 F.R.D. 69, 75 (S.D.N.Y. 2006)). Because a court can compel Dutch Patent Attorneys to disclose confidential communications in the course of legal proceedings, the right to assert a claim of confidentiality under the DPA is not analogous to the attorney-client or patent agent privilege and Philips has not shown that Mr. Tol's emails are privileged under Dutch law.[14] See id. at 358 (ruling that no absolute privilege comparable to the U.S. attorney-client privilege exists where foreign statutes contemplate disclosure if required by a court). Therefore, Philips has not shown that it is entitled to withhold any of Mr. Tol's emails from production under the law of the Netherlands.[15]

---

[14] In light of this court's conclusion that Philips has not met its burden to establish that the challenged communications are privileged under American or Dutch law, it is not necessary to address Fitbit's assertion that most of Mr. Tol's emails are not privileged because they relate to non-privileged business advice rather than legal advice. (See Def. Mem. at 12-15; Def. Reply Mem. at 8-9).

[15] While this court has not specifically addressed all of the arguments raised by the parties' experts in their Declarations, it has considered them in connection with the instant motion to compel.

**B.  Challenge to Philips' Claim of Work Product Protection**

Philips claims that most of Mr. Tol's emails, including emails dating back to July 2015, are also protected from discovery under the work product doctrine.[16]  That doctrine, which is "codified for the federal courts in Fed. R. Civ. P. 26(b)(3), is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  United States v. Adlman, 134 F.3d 1194, 1196 (2d Cir. 1998) (quoting Hickman v. Taylor, 329 U.S. 495, 510-11, 67 S. Ct. 385, 393-94, 91 L. Ed. 451 (1947)).  As provided under Rule 26(b)(3)(A), it "shields from discovery 'documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent.).'"  United States ex rel. Wollman v. Mass. Gen. Hosp., Inc., 475 F. Supp. 3d 45, 61 (D. Mass. 2020) (quoting Fed. R. Civ. P. 26(b)(3)(A)).  In support of its motion to compel the production of Mr. Tol's emails, Fitbit argues that Philips' assertion of work product is improper because it seeks to protect communications that were made more than four years before Philips filed this lawsuit in July 2019, and because "the communications appear to deal primarily with business advice rendered in the ordinary course" of Philips' licensing and other business practices "rather than in anticipation of litigation."  (Def. Mem. at 16-18; see also Def. Reply Mem. at 9-10).  Philips disputes Fitbit's characterization of Mr. Tol's emails and contends that "the materials for which [it] maintains work product protection were all prepared exclusively in anticipation of litigation and were not prepared for

---

[16] Philips claims work product protection over documents described in paragraphs 17-19, 21-22, 24-28, 30-33, 35, and 37-43 of Mr. Tol's Declaration.  (See Def. Ex. M; Tol Decl. ¶¶ 16-43; Pl. Supp. Submission (Docket No. 232) at 1,3).

some other business purpose (e.g. tax filings) in a manner that would render them discoverable." (Pl. Opp. Mem. at 9). Because Philips has shown that the communications at issue were prepared because of the prospect of future litigation, they are entitled to protection under the work product doctrine.

"Because the [work product] doctrine is procedural in nature, the rules of the forum court apply and it is therefore not subject to a choice of law analysis." Gucci Am., Inc., 271 F.R.D. at 73. Accordingly, Fitbit's challenge to Philips' claims of work product protection must be evaluated under the law of the First Circuit. As in the case of other privileges, "[t]he party seeking work product protection has the burden of establishing its applicability." In re Grand Jury Subpoena, 220 F.R.D. 130, 140 (D. Mass. 2004).

The critical issue raised by Fitbit's motion is whether Mr. Tol's emails were created "in anticipation of litigation" within the meaning of Fed. R. Civ. P. 26(b)(3). In State of Maine v. U.S. Dep't of the Interior, 298 F.3d 60 (1st Cir 2002), the First Circuit, in interpreting the phrase "in anticipation of litigation," adopted the standard applied by a number of other circuits holding that documents should be deemed to fall within the scope of Rule 26(b)(3) "if, 'in light of the nature of the document and the factual situation in the particular case, the document can be fairly said to have been prepared or obtained *because of* the prospect of litigation.'" Maine, 298 F.3d at 68 (emphasis in original) (quoting Adlman, 134 F.3d at 1202). The First Circuit emphasized that under this standard, a party is not required "to demonstrate that the withheld documents were created primarily for litigation purposes in order to claim the work-product privilege[.]" Id. See also Adlman, 134 F.3d at 1198 ("We believe that a requirement that documents be produced primarily or exclusively to assist in litigation in order to be protected is

at odds with the text and policies of [Rule 26(b)(3)].").  On the other hand, it explained that "the 'because of' standard does not protect from disclosure 'documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation[,]'" even if the documents would "aid in the preparation of litigation."  Maine, 298 F.3d at 70 (quoting Adlman, 134 F.3d at 1202).

Subsequently, in an en banc opinion, the First Circuit stated that it was reaffirming its decision in Maine and elaborated on the scope of the work product doctrine.  See United States v. Textron Inc. & Subsidiaries, 577 F.3d 21, 26, 29 (1st Cir. 2009) ("Textron").  Specifically, in Textron, the First Circuit explained that "the focus of work product protection has been on materials prepared for use in litigation, whether the litigation was underway or merely anticipated.  Id. at 29.  It went on to emphasize that "[t]he phrase used in the codified rule – 'prepared in anticipation of litigation or for trial' did not, in the reference to anticipation, mean prepared for some purpose other than litigation: it meant only that the work might be done *for* litigation but *in advance of* its institution."  Id.  Thus, as the First Circuit explained further:

> It is not enough to trigger work product protection that the *subject matter* of a document relates to a subject that might conceivably be litigated.  Rather, as the Supreme Court explained, "the literal language of [Rule 26(b)(3)] protects materials *prepared for* any litigation or trial as long as they were prepared by or for a party to the subsequent litigation."  *Federal Trade Commission v. Grolier Inc.*, 462 U.S. 19, 25, 103 S. Ct. 2209, 76 L. Ed. 2d 387 (1983) (emphasis added).  This distinction is well established in the case law.  *See, e.g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 138, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975).
>
> Nor is it enough that the materials were prepared by lawyers or represent legal thinking.  Much corporate material prepared in law offices or reviewed by lawyers falls in that vast category.  It is only work done in anticipation of or for trial that is protected.  Even if prepared by lawyers and reflecting legal thinking, "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes are not under the qualified immunity provided by this subdivision."  Fed. R. Civ. P. 26

advisory committee's note (1970).  *Accord Hickman v. Taylor*, 329 U.S. at 510 n.9,
67 S. Ct. 385 (quoting English precedent that "[r]eports ... if made in the ordinary
course of routine, are not privileged").

Id. at 29-30 (footnote omitted).

In the instant case, Philips has presented evidence from Mr. Tol in which he explained

that all of the documents over which Philips claims work product protection were made in

furtherance of preparing for the plaintiff's litigation against Fitbit and Garmin.  According to Mr.

Tol, beginning in 2015 he began to evaluate whether Fitbit and Garmin products infringed on

Philips' patents relating to fitness trackers in anticipation of enforcing those patents in court by

way of an injunction or a lawsuit for damages.  (Tol Decl. ¶¶ 3-4).  His focus throughout this

process was in developing a case against those entities so Philips would be able to enforce its

patent rights in court.  (Id. ¶ 3).  With respect to the specific emails at issue, Mr. Tol explained

that those communications pertain to Philips' pre-suit investigation against Fitbit and Garmin,

including an assessment of Philips' infringement claims; the drafting and preparation of notice

letters to Fitbit and Garmin, which Philips issued as part of its process of enforcing its patents

and preparing for litigation; Philips' potential settlement strategy with respect to its claims

against Fitbit and Garmin; and Philips' analysis, pre-suit investigation, and settlement strategy

relating to potential breach of contract claims.  (See id. ¶¶ 17-19, 21-22, 24-28, 30-33, 35, 37-

43).  This evidence is sufficient to show that the emails in question were prepared in

anticipation of litigation as part of a strategy to enforce Philips' patent rights against Fitbit and

Garmin in court and to aid in possible future litigation.  Therefore, it supports Philips' claim of

work product protection.

Fitbit's assertion that Philips' work product claims are undermined by the significant

delay between the start of its investigation in 2015 and the initiation of this lawsuit in 2019 is

unpersuasive in light of the evidence presented.  As an initial matter, the record demonstrates

that from the beginning of its pre-suit investigation and analysis, Philips focused on both

Garmin and Fitbit due to the similarities in their allegedly infringing products and the overlap in

the patents to be asserted against each company.  (Id. ¶ 4).  In 2016, Philips issued separate

letters to Garmin and Fitbit, notifying them of their alleged infringement of numerous patents

that had been issued in countries across the globe.  (Id. at Exs. 1.A & 1.B).  Given the range and

number of patents involved, it is hardly surprising that Philips' pre-suit investigation and

analysis was lengthy and time consuming.  Nor is it surprising that Philips waited until late 2017

to initiate litigation against Garmin and Fitbit in Germany.  (See id. ¶ 8).  Moreover, the

evidence demonstrates that Fitbit did not respond to Philips' October 10, 2016 notice letter

until April 21, 2017, and that the parties did not begin to engage in any substantive discussions

regarding Philips' infringement claims and the possibility of a licensing arrangement until at

least September 2017.  (See Def. Exs. B & C).  Two months later, on December 4, 2017 and

December 12, 2017, Philips filed its lawsuits against Fitbit in Germany.  (Tol Decl. ¶ 8).

Therefore, the record indicates that Philips had been preparing for litigation well before it had

an opportunity engage Fitbit in any serious licensing negotiations, and there is nothing

unreasonable, given the circumstances presented, about Philips' claim of work product

protection for documents dating back as early as June 2, 2015, even though Philips did not file

the present action against Fitbit until 2019.

Fitbit offers several reasons for its assertion that Philips is improperly claiming work

product over documents that were created in the regular course of business rather than in

anticipation of litigation, and it has asked that this court order the production of the documents or at least review them in camera to determine whether they were properly withheld from production.  This court finds Fitbit's effort to show that the emails were prepared in the ordinary course of Philips' business unpersuasive in light of the circumstances of this case. Therefore, Fitbit's request for an in camera review of the documents or an order compelling their production is denied.

First, Fitbit argues that in its original March 23, 2021 privilege log, Philips described many of the documents over which it was claiming work product protection as relating to licensing and negotiations, but that it changed those descriptions in subsequent versions of its log to indicate that the documents related to "threatened" litigation against Fitbit, potential litigation against Fitbit or its pre-suit investigation of Fitbit.  (Def. Mem. at 13-14).  Similarly, Fitbit notes that Philips has described some of the documents as pertaining to a patent purchase agreement which, according to Fitbit, constitutes "a business transaction carried out in pursuit of Philips's licensing enterprise." (Id. at 14).  While this court agrees that Philips' changes to the descriptions of Mr. Tol's emails created a genuine cause for concern, the record before this court shows that Philips has undertaken a significant effort to correct its privilege log, to remove any work product designations that are inappropriate (including work product designations for documents pertaining to the patent purchase agreement), and to produce documents that do not merit an assertion of privilege or work product protection.  (See, e.g., Pl. Supp. Submission at 1).  Philips' changes to the descriptions of the documents do not warrant further investigation at this time.

Fitbit's next argument is that "the corporate roles of the individuals involved in these

communications further suggests that they contain primarily business, rather than legal,

advice." (Def. Mem. at 15). In particular, Fitbit highlights the fact that Mr. Tol serves as Philips'

"Principal Licensing Counsel" and other individuals involved in the email communications are

responsible for the licensing of Philips' intellectual property. (Id. (citing Def. Ex. K)).

Additionally, Fitbit notes that "[m]any of the emails ... involve Philips's corporate officers and

employees who are not in-house counsel of any kind, again suggesting that the emails concern

Philips's commercial licensing efforts[.]" (Id.). This court finds that any concerns raised by

these facts are outweighed by other evidence supporting Mr. Tol's assertion that he was

assisting Philips in preparing for litigation against Garmin and Fitbit at the same time Philips was

exploring the possibility of licensing agreements. While Mr. Tol's primary responsibilities at

Philips involve licensing, Mr. Tol stated that he also serves as "the primary patent attorney

responsible for managing Philips's enforcement of patents [relating to activity trackers] against

Fitbit and Garmin." (Tol Decl. ¶ 4). He further stated that from the beginning of the

investigation into Garmin's and Fitbit's alleged infringement of Philips' patents, he and others at

the company were involved in creating a case against those companies in anticipation of

enforcing Philips' patent rights in court. (See id. ¶¶ 3-4). Additionally, Mr. Tol has provided

descriptions for each of the emails in dispute, along with the basis for Philips' claims that they

were prepared in anticipation of litigation. (See id. ¶¶ 16-43). Even more significantly, the

record shows that by the end of 2017, fewer than two years after Philips began its

investigation, Philips had filed two infringement actions against Garmin and two infringement

actions against Fitbit in Germany. (Tol Decl. ¶ 8). Accordingly, the evidence supports Mr. Tol's

claim that Philips engaged in an investigation against Garmin and Fitbit with an eye toward

filing litigation.

Nevertheless, Fitbit contends that Philips' claim that it anticipated litigation is inconsistent with contemporaneous communications between the parties during the period from 2016 to 2019, "wherein Philips sought to engage Fitbit in amicable licensing discussions rather than threatening litigation." (Def. Reply Mem. at 9). Again, this court disagrees. While the parties' communications reveal that Philips attempted to resolve its patent dispute with Fitbit through licensing negotiations, they also demonstrate that Philips had already sued Fitbit in Germany by the time the parties began engaging in any substantive discussions, and that the parties were viewing the negotiations as a means of achieving a resolution of the pending lawsuits. (See Def. Exs. C at 2-7 & D at 2-11). In particular, the evidence shows that Fitbit's "Lead IP Litigation Counsel" participated in the discussions with the aim of focusing "on potential resolution of the pending litigations." (Def. Ex. D at 5). Moreover, despite evidence showing that Mr. Tol characterized the parties' discussions as "business" and "commercial" discussions in some of his communications to Fitbit, the parties' communications demonstrate that the primary purpose of the negotiations was to resolve the parties' patent dispute, including the ongoing lawsuits. (See id. at 2-10). Therefore, the record indicates that the settlement of litigation and avoidance of further litigation was a significant component of the parties' licensing negotiations.

Fitbit's final argument is that "Philips's theory of work product protection is so broad that it encompasses any communication related to licensing, regardless of the specific purpose or factual context." (Def. Reply Mem. at 10). Nothing herein should be construed as a ruling or suggestion that the mere thought of potential litigation down the road is sufficient to warrant

[37]

work product protection.  However, under the facts of this case, and following Philips' extensive review of the documents for which it is claiming protection, this court finds that the remaining documents are properly classified as falling within the scope of the work product doctrine.  As described above, a determination as to whether a document has been prepared in anticipation of litigation must be made "in light of the nature of the document and the factual situation in the particular case[.]"  Maine, 298 F.3d at 68 (quoting Adlman, 134 F.3d at 1202).  To the extent Philips' contends that it "almost always" anticipates litigation as part of its approach to licensing its patents, such an argument is far too broad to justify application of the work product doctrine.  (See Tol Decl. ¶ 3 (describing Philips' approach to licensing as "almost always" starting "with identifying infringers ... in anticipation of having to enforce those patent[s] in court.").  However, as detailed above, Philips has also provided evidence of the circumstances surrounding its enforcement of its patents against Fitbit, as well as details regarding the basis for its decision to withhold the challenged emails from production.  Based on the evidence as a whole, this court concludes that the communications "can be fairly said to have been prepared or obtained *because of* the prospect of litigation."  Maine, 298 F.3d at 68 (quoting Adlman, 134 F.3d at 1202).  Accordingly, Fitbit's motion to compel is denied with respect to Philips' claims of work product protection.

## IV. <u>CONCLUSION</u>

For all the reasons described herein, "Defendant Fitbit, Inc.'s Motion to Compel the Production of Certain of Mr. Arie Tol's Email Communications" (Docket No. 198) is ALLOWED IN PART and DENIED IN PART.  Specifically, Phillips cannot assert the attorney-client privilege over Mr. Tol's communications so Fitbit's motion to compel is ALLOWED to the extent Philips claims

that the communications are privileged.  However, Philips has appropriately claimed work

product protection with respect to Mr. Tol's emails so Fitbit's motion to compel is DENIED with

respect to the communications over which Philips has asserted work product claims.

/ s / Judith Gail Dein

Judith Gail Dein
United States Magistrate Judge