**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

PHILIPS NORTH AMERICA LLC,

                Plaintiff,

       v.

FITBIT, LLC,

                Defendant.

Civil Action No. 1:19-cv-11586-FDS

**MEMORANDUM IN SUPPORT OF DEFENDANT FITBIT, LLC'S MOTION
FOR SUMMARY JUDGMENT OF INVALIDITY OF
<u>U.S. PATENT NO. 8,277,377 UNDER 35 U.S.C. § 101</u>**

███████████

## TABLE OF CONTENTS

Pages

I.      INTRODUCTION ............................................................................................1

II.     LEGAL STANDARDS ...................................................................................2

        A.      Summary Judgment ...................................................................2

        B.      Invalidity Under § 101 ..............................................................2

III.    STATEMENT OF UNDISPUTED MATERIAL FACTS .................................4

IV.     ARGUMENT.................................................................................................6

        A.      The Asserted Claims Are Directed To An Abstract Idea .........................6

        B.      The Asserted '377 Patent Claims Do Not Supply An Inventive Concept ..............8

                1.      Utilizing A Back-End Server Was Not Inventive.......................................8

                        a.      The Claims Do Not Provide An Enhanced User Interface
                                Or Increased Computing Capacity Or Processing Power..............10

                        b.      The Claims Do Not "Eliminate Location Based Restraints".........11

                        c.      The Alleged Elimination Of Location Based Restraints Did
                                Not Lead To The Outcomes Dr. Martin Posits..............................14

                2.      Downloading An Application Was Not Inventive.....................................15

        C.      Case Law Supports Fitbit's Request For Summary Judgment ..............................18

V.      CONCLUSION..............................................................................................20

███████████

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.,*
 882 F.3d 1121 (Fed. Cir. 2018).............................................................................................. 3

*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC,*
 967 F.3d 1285 (Fed. Cir. 2020)........................................................................................ 8, 17

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986)................................................................................................................ 2

*Becton Dickinson & Co. v. C.R. Bard, Inc.,*
 922 F.2d 792 (Fed. Cir. 1990).............................................................................................. 2

*Berkheimer v. HP Inc.,*
 881 F.3d 1360 (Fed. Cir. 2018)............................................................................................. 4

*BSG Tech LLC v. Buyseasons, Inc.,*
 899 F.3d 1281 (Fed. Cir. 2018).................................................................................... 3, 10, 16

*CardioNet, LLC v. InfoBionic, Inc.,*
 816 F. App'x 471 (Fed. Cir. 2020) .................................................................................... 7, 20

*Cellspin Soft, Inc. v. Fitbit, Inc.,*
 927 F.3d 1306, 1316 (Fed. Cir. 2019)................................................................................... 3

*Celotex Corp. v. Catrett,*
 477 U.S. 317 (1986)................................................................................................................ 2

*Content Extraction & Transmission LLC v. Wells Fargo Bank, National Ass'n,*
 776 F.3d 1343 (Fed. Cir. 2014)............................................................................................. 7

*Diamond v. Diehr,*
 450 U.S. 175 (1981)........................................................................................... 3, 10, 17

*Electric Power Grp., LLC v. Alstom S.A.,*
 830 F.3d 1350 (Fed. Cir. 2016).................................................................................. 7, 16, 18

*Exergen Corp. v. Brooklands Inc.,*
 No. 12-12243-DPW, Dkt. 124 (D. Mass. Aug. 28, 2015) ................................................... 4

*Iverson v. City Of Boston,*
 452 F.3d 94 (1st Cir. 2006)................................................................................................... 2

███████████

## TABLE OF AUTHORITIES (cont'd)

**Pages**

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)..................................................................................................... 2

*Monsanto Co. v. Syngenta Seeds, Inc.*,
    503 F.3d 1352 (Fed. Cir. 2007)........................................................................................ 13

*Palomar Tech., Inc. v. MSRI Sys., LLC*,
    No. 18-10236-FDS, Dkt. 772 (D. Mass. May 28, 2020) .................................................... 20

*PerkinElmer, Inc. v. Intema Ltd.*,
    496 Fed. Appx. 65 (Fed. Cir. 2012)................................................................................... 20

*Trs. of Columbia Univ. in City of New York v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016).......................................................................................... 13

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
    874 F.3d 1329 (Fed. Cir. 2017)..................................................................................... 10, 17

*Union Carbide Corp. v. Am. Can Co.*,
    724 F.2d 1567 (Fed. Cir. 1984)........................................................................................... 2

**Statutes**

35 U.S.C. § 101 ............................................................................................................ 2, 4, 17, 20

35 U.S.C. § 112 ..................................................................................................................... 4, 13

35 U.S.C.§ 102 ........................................................................................................................... 17

**Rules**

Fed. R. Civ. P. 56(a) ................................................................................................................ 2, 4

Fed. R. Civ. P. 56(c) .................................................................................................................... 2

Local Rule 56.1 ............................................................................................................................ 4

## I.    INTRODUCTION

U.S. Patent No. 8,277,377 (the "'377 patent") contains routine claim elements that were combined, piecemeal, in a routine way to distinguish the prior art used by the patent examiner to reject the claims at least five times during prosecution, on multiple grounds each time. (*See, e.g.,* Ex. 8[1] at 1549-54, 1621-34, 1679-87, 1737-45, 1831-43.)  As a result, these conventional claim elements make up claims that are directed to an abstract idea and supply no inventive concept.

This Court already determined that asserted claim 1 "is directed to the abstract concept of collecting, analyzing, and displaying exercise-related information" at *Alice* step one. (Dkt. 219 at 12.)[2]  Fitbit's expert, Dr. Paradiso, concluded that asserted claims 4, 5, 6, 9, and 12, which depend from claim 1, are drawn to the same abstract concept and Philips' expert, Dr. Martin, does not challenge that conclusion.

While the Court noted that at the 12(b)(6) "stage, it is enough to find [the '377] patent, coupled with the plausible allegations of the complaint, sufficiently indicates that" the asserted claims contain an inventive concept at *Alice* step two, the Court also noted that "those allegations may well prove to be unsupported" because discovery may "reveal that the claims of the '377 patent do not in fact reveal an inventive concept." (Dkt. 219 at 15.) That is exactly what happened.

Fact and expert discovery revealed that the allegations Philips relied upon to overcome Fitbit's Rule 12(b)(6) motion are unsupported.  The purported inventive concepts of the asserted claims are neither present in the claims nor inventive, but rather, are conclusory statements regarding conventional, routine, and well-understood applications in the art.  Thus, the asserted claims also fail *Alice* step two and Fitbit requests summary judgment of § 101 invalidity.

---

[1] All cited exhibits are attached to the Declaration of David J. Shaw, filed concurrently herewith.
[2] The briefing and ruling on Fitbit's Rule 12(b)(6) motion only addressed claim 1 because Fitbit's Rule 12(b)(6) motion argued that claim 1 is representative and Philips did not dispute that argument. (*See, e.g.,* Dkt. 219 at 9, n.3.) Fitbit reiterates that claim 1 is representative.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 795 (Fed. Cir. 1990). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant can succeed by citing to affirmative evidence or by showing that the non-movant cannot establish a genuine dispute. Fed. R. Civ. P. 56(c).

When the party seeking summary judgment demonstrates the absence of a genuine dispute over any material fact, the burden shifts to the non-movant to show that there is a genuine factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). But "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In fact, the court may not simply accept the non-movant's conclusory statement that a fact is "disputed." *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1571 (Fed. Cir. 1984). Thus, unlike the Rule 12(b)(6) stage, at summary judgment the non-movant must "demonstrate, through submissions of evidentiary quality, that a trial worthy issue persists." *Iverson v. City Of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

### B.    Invalidity Under § 101

An invention is generally patentable if it qualifies as a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. "[T]his provision contains an important implicit exception. Laws of nature, natural phenomena, and abstract ideas are not patentable."

2

*Mayo Collaborative Servs. v. Prometheus Labs.*, 566 U.S. 66, 70 (2012) (citing *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)). In *Alice*, the Supreme Court set forth the familiar two-step test "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice Corp.,* 573 U.S. at 217.

At step one, the court determines "whether the claims at issue are directed to one of those patent-ineligible concepts" that is so abstract as to "risk disproportionately tying up the use of [] underlying ideas." *Id.* (quoting *Mayo*, 566 U.S. at 73). If the answer is "yes," as it is here (*see* Dkt. 219 at 12), the court continues to step two. *Alice*, 573 U.S. at 217.

At step two, courts "examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 221 (quoting *Mayo*, 566 U.S. at 72, 80). In other words, courts ask "[w]hat else is there in the claims" beyond the abstract idea found at step one. *Mayo*, 566 U.S. at 77. An "inventive concept" is an "element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 218; *see also Cellspin Soft, Inc. v. Fitbit, Inc*., 927 F.3d 1306, 1316 (Fed. Cir. 2019) ("An inventive concept reflects something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'") (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc*., 882 F.3d 1121, 1128 (Fed. Cir. 2018)); *BSG Tech LLC v. Buyseasons, Inc*., 899 F.3d 1281, 1290 (Fed. Cir. 2018) ("Claim limitations that recite conventional, routine and well understood applications in the art are insufficient to supply an inventive concept.").

"When examining the individual elements [for an inventive concept], [courts] consider whether the elements of a claim are 'well-understood, routine, [or] conventional….'" *Exergen*

3

*Corp. v. Brooklands Inc.*, No. 12-12243-DPW, Dkt. 124 at 11 (D. Mass. Aug. 28, 2015) (quoting *Mayo*, 566 U.S. at 79). "When considering the claim as a whole, [courts] must consider the steps as an ordered combination to determine whether the claims add something to the [abstract concept] that is not present when the steps are considered separately." *Id.*

"Patent eligibility under 35 U.S.C. § 101 is ultimately an issue of law," even where it "contain[s] underlying issues of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). "When there is no genuine issue of material fact regarding whether the claim element or claimed combination is well-understood, routine, [and] conventional to a skilled artisan in the relevant field, this issue can be decided on summary judgment as a matter of law." *Id.* at 1368.

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

Fitbit presents the following numbered statement of undisputed material facts pursuant to Local Rule 56.1 and Federal Rule of Civil Procedure 56(a). Fitbit may present additional undisputed material facts or reply to Philips' allegations regarding Fitbit's statement of undisputed material facts in its reply brief, if appropriate.

1.     The '377 patent is the only remaining, non-stayed, asserted patent in this case. (*See, e.g.,* Dkt. 112 (Second Amended Complaint, asserting '007, '233, and '377 patents); Dkt. 212 at 12-21 (finding asserted '007 claims invalid as indefinite under 35 U.S.C. § 112); Dkt. 251 (stipulating to stay proceedings with respect to '233 patent given PTAB's final written decision that all asserted claims of the '233 patent are unpatentable).)

2.     '377 patent claims 1, 4, 5, 6, 9, and 12 are the only remaining asserted claims in this case. (*See, e.g.,* Ex. 2, ¶ 2.)

3.     '377 patent claim 1 is a method claim and the only remaining asserted independent claim in this case. (*See, e.g.,* Ex. 2, ¶ 2 (listing asserted claims); Ex. 3 at cls. 1, 4, 5, 6, 9, 12.)

4.     '377 patent claims 4, 5, 6, 9, and 12 are each method claims that depend, directly

4

or indirectly, from claim 1.  (Ex. 3 at cls. 4, 5, 6, 9, 12.)

5.      Philips' claimed priority date for the '377 patent is December 17, 1999.  (*See, e.g.,* Ex. 1 at 55:13-16; ¶ Ex. 3 at 1.)

6.      The '377 patent "employs conventional, 'off-the-shelf' components."  (Dkt. 219 at 13; *see also* Ex. 3, 2:37-40; Ex. 13 at 39:25-40:14, 45:16-47:24, 51:19-54:10, 183:10-21.)

7.      The device which provides exercise related information of claim 1 is a generic, known component.  (Ex. 3, 2:59-3:42, 4:19-22, 5:55-6:3, 12:63-13:1; Ex. 13 at 198:6-199:3.)

8.      The web-enabled wireless phone of claim 1 is a generic, known component.  (Ex. 3, 3:52-65; Ex. 14 (discussing and picturing conventional cell phones); Ex. 13 at 194:9-13.)

9.      Coupling the web-enabled wireless phone to a device which provides exercise-related information in claim 1 uses generic, known techniques.  (Ex. 3, 3:66-4:18, 6:14-28, 10:63-12:49; Ex. 13 at 201:13-18.)

10.      Downloading and using the application to render the user interface, receive data, and display the response in claim 1 use generic, known techniques.  (Ex. 3, Abstract, 3:14-26, 3:44-51, 4:43-5:3, 5:10-12, 8:3-12, 9:6-9, 9:22-10:61; Ex. 13 at 195:6-9, 195:12-15, 197:19-22, 199:4-7, 199:10-13, 202:20-24, 205:8-12, 215:9-12, 215:13-17.)

11.      Sending exercise-related information to an internet server and receiving a calculated response from the internet server in claim 1 uses generic, known techniques.  (Ex. 3, 6:39-44, 7:46-64; Ex. 13 at 215:18-216:8.)

12.      A calculation performed by the server based on the exercise-related information in claim 1 uses generic, known techniques.  (Ex. 3, 8:13-44, 9:22-10:61; Ex. 13 at 216:9-17.)

13.      The server(s) in claim 1 are generic, known components.  (*See, e.g.,* Ex. 3 (never describing or claiming any specialized server structure or function); Ex. 13 at 215:18-19, 216:7-

17 ( ███████████████████████████████████████████████████.)

14.     The '377 patent's named inventor, Dr. Roger J. Quy, described the ██████████ of the '377 patent and its provisional application as:

(Ex. 13 at 30:8-32:4 ( ██████████████ ), 45:16-47:24, 51:19-54:10, 183:10-21.)

15.     Dr. Martin admitted that the asserted claims encompass embodiments where the web-enabled wireless phone is coupled, *via a wired connection*, to stationary exercise equipment such as a treadmill. (Ex. 1 at 132:11-133:9; *see also* Ex. 3, cls. 1, 3, 4, 5, 6, 9, 12.)

## IV.     ARGUMENT

With respect to *Alice* step one, this Court has already found that independent claim 1 is directed towards an abstract concept. (Dkt. 219 at 12.) Dependent claims 4, 5, 6, 9, and 12 are no different, and Dr. Martin does not dispute Dr. Paradiso's opinion that they are directed to the same abstract concept as claim 1. With respect to *Alice* step two, Dr. Martin does not opine that any one element of the claims is inventive, but rather the ordered combination of elements is inventive.

Thus, the only remaining question for the Court to decide is whether the asserted claims' ordered combination of conventional, off-the-shelf components and known, generic technology and processes provides any inventive concept. The answer is no, because the alleged inventive concepts to which Dr. Martin points are neither found in the claims nor inventive.

### A.     The Asserted Claims Are Directed To An Abstract Idea

The Court found that '377 patent claim 1 is directed to "the abstract concept of collecting, analyzing, and displaying exercise-related information." (Dkt. 219 at 12.) Fitbit's expert, Dr. Paradiso, agreed with this conclusion, and opined that claims 4, 5, 6, 9, and 12 are drawn to the same abstract concept. (Ex. 15 at ¶¶ 377-385; *compare* Ex. 3, cl. 1 *with* Ex. 3, cls. 4, 5, 6, 9, 12.)

In particular, claims 4, 5, and 6 merely specify the particular transmission medium used by the web-enabled wireless phone to receive exercise-related information. (Ex. 15 at ¶¶ 377-379.) Claim 4 just specifies that the transmission medium includes generic wired and wireless connections, claim 5 specifies a known infrared connection or radio frequency communication protocol including a short-range wireless transmission scheme, and claim 6 specifies the known IEEE 802.11 protocol or short-wavelength radio transmission in the ISM band of 2400-2480 MHz. (Ex. 3, cls. 4, 5, 6.) Dr. Paradiso opined that these connections were well-known and Dr. Martin did not dispute this opinion. (Ex. 15 at ¶¶ 285-309, 347-352, 377-379; Ex. 9, ¶¶ 199-284.)

Similarly, claims 9 and 12 merely specify the type of generic, prior art "device which provides exercise-related information"—*i.e.,* a known, conventional, generic exercise machine (claim 9) or a known, conventional, generic sensor (claim 12). (Ex. 3, cls. 9, 12; Ex. 15 at ¶¶ 380-382.) Again, Dr. Paradiso opined that all of these devices were well-known and Dr. Martin did not dispute this opinion. (Ex. 15 at ¶¶ 336-341, 380-382; Ex. 9, ¶¶ 199-284.)

Dr. Martin also does not dispute the Court's conclusion that claim 1 is drawn to an abstract concept or Dr. Paradiso's opinion that claims 4, 5, 6, 9, and 12 are drawn to the same abstract concept. (Ex. 1 at 260:17-261:21; *see also* Ex. 9, ¶¶ 199-284.) Claims directed to collecting, analyzing, and displaying data are routinely found abstract. *See CardioNet, LLC v. InfoBionic, Inc.*, 816 F. App'x 471, 475 (Fed. Cir. 2020) (unpublished and non-precedential); *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014). Accordingly, the Court should hold that, like claim 1, '377 patent asserted claims 4, 5, 6, 9, and 12 are directed to the "abstract concept of collecting, analyzing, and displaying exercise-related information" (Dkt. 219 at 12) and proceed to *Alice* step two.

7

**B.      The Asserted '377 Patent Claims Do Not Supply An Inventive Concept**

The individual elements of claim 1 are generic known processes, implemented in generic, known devices operating in a conventional way.  (*See* Statement of Material Undisputed Facts ("SUF"), ¶¶ 6-13.)  In an attempt to save the claims, Dr. Martin posited two alleged inventive concepts—(1) performing computations utilizing a back-end server to remove "location based restraints" (Ex. 2, § VIII.B; Ex. 9, § VIII.G.2.a; Ex. 1 at 264:9-265:1), and (2) downloading an application to monitor exercise (Ex. 2, § VIII.C; Ex. 9, § VIII.G.2.b; Ex. 1 at 264:9-265:1). However, these concepts are not inventive, and their alleged advantages are untethered from the claims. *See, e.g., Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020) (unclaimed advantages over prior art are irrelevant to patent eligibility under *Alice*).

**1.      Utilizing A Back-End Server Was Not Inventive**

Dr. Martin claims that one "advantage" of the '377 Patent "includes providing 'significant application functionality on [a] back-end [server],' which freed up memory and processing capabilities on the front-end (the web-enabled wireless phone)."  (Ex. 2, ¶ 272 (quoting '377 Patent at 4:36-40); Ex. 9, ¶ 205.)  Thus, according to Dr. Martin, "as recited by the '377 Patent, memory became available on the [web-enabled wireless device] for other purposes, such as an enhanced user interface, computing capacity, or processing power."  (Ex. 2, ¶ 272 (citing '377 Patent at 4:32-42); *see also* Ex. 9, ¶ 205 (same).)  Dr. Martin only cites the '377 patent for this aspect of his expert reports—thus, Dr. Martin relies on the patent's unsupported claims and Philips relies on Dr. Martin's unsupported claims.  (*See* Ex. 2, ¶¶ 272-274; *see also* Ex. 9, ¶¶ 205-207.)

According to Philips and Dr. Martin, the back-end server functionality is found in claim elements 1.g and 1.h.  (Ex. 3, cl. 1.)  Thus, the back-end server functionality is:  (1) receiving exercise-related information, (2) performing a calculation based on the received information, and (3) sending the calculated response—*i.e.,* receiving data, performing a calculation, and sending the

result. This basic server functionality was known and understood in the prior art. (SUF, ¶ 11-13.)

The only named inventor of the '377 patent, Dr. Roger Quy, admitted that he did not invent

(*See* Ex. 13 at 195:9-

11, 215:18-216:17.)  Dr. Martin tacitly admits this as well.

As just one example, Dr. Paradiso opined that the prior art Hickman reference performed claim elements 1.g and 1.h using a computer, and it would have been obvious to perform those elements using a mobile phone instead. (*See* Ex. 15, ¶¶ 698-708.)  Dr. Martin does not dispute that Hickman discloses performing claim elements 1.g and 1.h using a computer. (*See* Ex. 1 at 273:10-23; *see also* Ex. 9, ¶ 126 (disputing only whether Hickman discloses element 1.a).)

As further examples, Dr. Paradiso collected several other exemplary prior art references disclosing "servers receiving data and performing calculations." (*See* Ex. 15, ¶¶ 310-317.)  One such prior art reference was the Marathon Man device, which was described in a Master's Thesis in 1998 by MIT student Maria Redin. (*See* Ex. 16 at 9:20-11:8 (authenticating Marathon Man thesis paper); Ex. 37 at 30 (Marathon Man thesis paper describing a server for San Francisco marathon that, among other functions, "received the data, saved it to a master log file, and created graphs [*i.e.*, performed calculations] at 5-minute intervals").)

Dr. Martin did not rebut that these exemplary references, including Marathon Man, show "servers receiving data and performing calculations" as Dr. Paradiso explained.  Rather, Dr. Martin argued that (1) the references do not "demonstrate that sending exercise related data over the Internet to back-end servers for further processing, and receiving and displaying calculated responses from such servers ***using an application on a web-enabled wireless phone*** was a well-understood, routine and conventional application" (Ex. 9, ¶ 280) and (2) the references are missing other elements of the asserted claims (Ex. 9, ¶¶ 281-284; *see id.* at ¶ 282 (arguing that Marathon

9

Man did not include a web-enabled wireless phone and did not display the calculated response to the runner on the same device that sent the data). The former—the narrow application of the abstract concept in the context of using an application on a web-enabled wireless phone—is irrelevant because even an allegedly narrow application of an abstract idea is still patent ineligible. *See BSG Tech*, 899 F.3d at 1287; *Electric Power Grp.*, 801 F.3d at 1354. The latter—the other alleged distinctions of claim 1 over Marathon Man—is irrelevant because "[t]he novelty of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond*, 450 U.S. at 188-89 (internal quotation marks omitted); *see also Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1340 (Fed. Cir. 2017).

Thus, utilizing known, generic back end server functions does not supply an inventive concept. *See, e.g., BSG Tech*, 899 F.3d at 1290-91 ("If a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea.") (citing *Berkheimer*, 881 F.3d at 1370 (holding claims lacked an inventive concept because they "amount to no more than performing the abstract idea...with conventional computer components"); *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) (holding a claim lacked an inventive concept because it "simply recites the use of generic features...as well as routine functions...to implement the underlying idea")).

### a. The Claims Do Not Provide An Enhanced User Interface Or Increased Computing Capacity Or Processing Power

Dr. Martin opined that offloading data analysis to a back-end server made memory available on the web-enabled wireless device for other purposes, such as an enhanced user interface, computing capacity, or processing power. (Ex. 2, ¶ 272 (citing '377 Patent at 4:32-42);

see also Ex. 9, ¶ 205 (same).)  But none of these results are actually claimed.  The claims only specify a generic user interface—they do not posit any functions of that user interface, much less any "enhanced" functions.  (*See* Ex. 3, cl. 1.)  Worse, the claims say absolutely nothing about computing capacity or processing power.  (Ex. 3, cls. 1, 4, 5, 6, 9, 12.)

###### b.    The Claims Do Not "Eliminate Location Based Restraints"

Dr. Martin similarly opined that offloading data analysis to a server in wireless communication with a wireless web device eliminates "the location based restraints of prior art systems" which "allowed for 'wireless access to and from a wide variety of present medical or health-related instruments and devices, while maintaining the capability of connecting to future such devices.'"  (Ex. 2, ¶ 273 (purporting to quote '377 Patent at 3:52-57[3]); *see also* Ex. 9, ¶ 206 (same).)  Dr. Martin further opined that this alleged inventive concept:

> allowed for "wireless health-monitoring to the level of accuracy previously achieved only by desktop so-called 'wired' computer systems." '377 Patent, 4:27-29.  Having a wireless system was a major advantage over the prior art as this invention allowed for subjects to be monitored as they moved about freely without the constraint of being tethered by a wire.

(Ex. 2, ¶ 274; Ex. 9, ¶ 207.)  Dr. Martin again fails to tie these alleged outcomes to the claim limitations.  Rather, the claims include multiple embodiments tethering the user to a wired system.

Dr. Quy admitted that this ability to allegedly "move[] about freely without the constraint of being tethered by a wire" is                              (Ex. 13 at 30:8-32:4

(                              ), 45:16-47:24; *see also id.* at 51:19-54:10, 183:10-21.)

The Background of the Invention acknowledges that Dr. Quy's previous patents addressed the same alleged problems in the art as the '377 patent "as well as the need to reduce health care

---

[3] The quoted text does not appear in the cited portion of the '377 patent.

costs through providing educational health care information and interactive physiological monitoring in the home environment by means of a user-friendly, interactive system (see, e.g., U.S. Pat. Nos. 5,601,435, 6,144,837, and continuations thereof)." (Ex. 3, 2:1-7.) These prior systems used a "video game console, or a multimedia player using a conventional television screen as the display device to achieve a system which is simpler to use than systems based on a personal computer." (Ex. 3, 2:8-14.) Importantly, the Background of the Invention admits that prior art systems "allow a 'wireless' distance to be placed between a health measuring unit and a remote monitoring system" and "used cellular telephone technology to increase the wireless health monitoring range." (Ex. 3, 2:22-37.) Thus, neither of these concepts is inventive.

The primary advantage or difference between these prior art systems and the inventions claimed in the '377 patent, according to the '377 patent's specification, is that the prior art systems "are not designed to be used with 'off-the-shelf' wireless devices or health measuring equipment." (Ex. 3, 2:37–40.) Dr. Quy expressed a similar understanding, describing the the '377 patent and its provisional application as:

(SUF, ¶ 14.) In other words, Dr. Quy admitted that the —the only allegedly "new" aspect of the '377 patent was Thus, the named inventor himself acknowledged that —*i.e.,* what Dr. Martin refers to as —was not an inventive aspect of the '377 patent.

In any event, the claims of the '377 patent do not require the ability to "move[] about freely without the constraint of being tethered by a wire." Dr. Martin admitted that the asserted claims encompass embodiments where the web-enabled wireless phone is coupled, *via a wired*

*connection*, to stationary exercise equipment such as a treadmill. (SUF, ¶ 15.) In particular, as a matter of law, asserted claims 1, 4, 5, 6, 9, and 12 encompass wired, stationary devices that do not "eliminate location based restraints." Independent claims must be broad enough to encompass all embodiments disclosed in their dependent claims. *See, e.g., Trs. of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1370 (Fed. Cir. 2016). Claim 1 requires using the application on a user's web-enabled wireless phone to receive data indicating an amount of exercise performed by the subject from a device which provides exercise-related information. (Ex. 3, cl. 1 (elements 1.a, 1.b, 1.e); Ex. 1 at 120:14-22 (explaining that phone uses application to receive data).) Claim 3 depends from claim 1 and specifies that such data can be received from an exercise machine. (Ex. 3, cl. 3.) Claim 4 depends from claim 1 and specifies that such data can be received over a wired connection. (Ex. 3, cl. 4.) Claim 9 depends from claim 1 and specifies that such data can be received from several common, large, and relatively immobile exercise machines including a treadmill, a stepper, an exercise cycle, and a rowing machine. (Ex. 3, cl. 9.) Based on these dependent claims, claim 1 encompasses embodiments where the user's web-enabled wireless phone is tethered to large and relatively immobile exercise machines via a wired connection. And since dependent claims 4, 5, 6, 9, and 12 are not further limited to just wireless connections,[4] they too encompass embodiments where the user's web-enabled wireless phone is tethered to large and relatively immobile exercise machines via a wired connection. *See Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (discussing § 112, ¶ 4—dependent claims include all the requirements of the claims from which they depend). In short,

---

[4] Claim 5 depends from claim 4 and specifies a particular type of wireless connection, but does not exclude the wired connection embodiment of claim 4. (Ex. 3, cl. 5.) Similarly, claim 6 depends from claim 5 and specifies a particular type of wireless connection, but does not exclude the wired connection embodiment of claim 5 that carried through from claim 4. (Ex. 3, cl. 6.)

the "advantage" Dr. Martin touts is not required by the claims.

As another example, Dr. Martin opines that the "wireless network" of element 1.g can be either a Wi-Fi network or a cellular network.[5] (Ex. 1 at 139:20-141:14.) But a typical home Wi-Fi network uses a wired router and has a range of just approximately 50-100 yards. (*See, e.g.,* Ex. 1 at 140:11-16.) Thus, if Dr. Martin is correct that claim element 1.g encompasses Wi-Fi networks, then the asserted dependent claims must also encompass Wi-Fi networks. This is yet another reason why none of the '377 patent asserted claims eliminate location based restraints—because, in Philips and Dr. Martin's view, users are tethered to the short range of the Wi-Fi network.[6]

<strong>c. The Alleged Elimination Of Location Based Restraints Did Not Lead To The Outcomes Dr. Martin Posits</strong>

Further, Dr. Martin opined that the alleged elimination of location based restraints "allowed for 'wireless access to and from a wide variety of present medical or health-related instruments and devices, while maintaining the capability of connecting to future such devices'" (Ex. 2, ¶ 273 (quoting '377 Patent at 3:52-57); *see also* Ex. 9, ¶ 206 (same)) and allowed for "wireless health-monitoring to the level of accuracy previously achieved only by desktop so-called 'wired' computer systems" (Ex. 2, ¶ 274 (quoting '377 Patent at 4:27-29); Ex. 9, ¶ 207 (same).) Neither of these supplies an inventive concept.

With respect to wireless access, the '377 patent asserted claims use only known, generic methods of wireless connection. (*See, e.g.,* cls. 1, 4, 9, 12 (no specific wireless connection method), cl. 5 (specifying known, generic "infrared connection or radio-frequency communication

---

[5] The prior art "used cellular telephone technology to increase the wireless health monitoring range" (Ex. 3, 2:22-37), so using a cellular network is not inventive.

[6] Given the '377 patent's claim to eliminate location-based restraints and the wired nature and limited range of a Wi-Fi network, a Wi-Fi network is not within the plain meaning of "wireless network" in claim 1. However, Dr. Martin takes a contrary view, relying on a Wi-Fi connection to purportedly satisfy element 1.g.

████████████

protocol"), cl. 6 (specifying known, generic "IEEE 802.11 protocol or short-wavelength radio transmission in the ISM band of 2400-2480 MHz.").) Thus, irrespective of whether Dr. Martin's claim is true, these generic connections do not provide an inventive concept.

With respect to accuracy, there are two issues. First, the '377 patent asserted claims do not claim any specific accuracy level. (Ex. 3, cls. 1, 4, 5, 6, 9, 12; Ex. 1 at 263:1-5.) Second, if the accuracy level provided by the asserted claims was "previously achieved…by desktop so-called 'wired' computer systems" (Ex. 3, 4:27-29), it is unclear how it is inventive in the '377 patent.

### 2. Downloading An Application Was Not Inventive

Dr. Martin claims that a second "advantage" of the '377 Patent "included downloading an application to a wireless web-enabled phone from a server." (*See* Ex. 2, ¶ 275; *see also* Ex. 9, ¶ 208.) This, according to Dr. Martin, "improved data capture, sharing, and analysis functions without the need for complex connections or expensive additional components." (Ex. 2, ¶ 275; *see also* Ex. 9, ¶ 208.) Dr. Martin only cites the '377 patent in these paragraphs of his expert reports—Dr. Martin thus relies on the patent's unsupported claims and Philips relies on Dr. Martin's unsupported claims. (*See* Ex. 2, ¶ 275; Ex. 9, ¶ 208.)

This alleged inventive concept relates to element 1.a—"downloading an application to a web-enabled wireless phone directly from a remote server over the internet." (Ex. 3, cl. 1.)

There is nothing inventive about the generic, known way that the application is downloaded in claim 1. (SUF, ¶ 10.) Dr. Martin tacitly admits this as well.

For example, Dr. Paradiso collected several exemplary prior art references disclosing "downloading an application from a remote server over the internet." (*See* Ex. 15, ¶¶ 239-240.) One such reference was Hsu, U.S. Patent No. 6,587,684 filed on July 28, 1998, which describes:

> The packet switched network 22 enables the proxy gateway 20 to selectively connect the digital telephone 16 to at least one of 10 a plurality of different servers. Each server in the packet switched

███████████

network is configured for downloading a particular software for
activation or upgrading of a particular digital telephone service.

(*See* Ex. 17, 7:6-17.)

Dr. Martin did not dispute that these exemplary references, including Hsu, show
"downloading an application from a remote server over the internet"—rather, Dr. Martin argued
that (1) the references do not "demonstrate that downloading an application *for interactive
exercise monitoring* from a remote server *to a web-enabled wireless phone* was a well-
understood, routine and conventional application" (Ex. 9, ¶ 234 (emphasis added); *see also* Ex. 1
at 115:13-116:8; *see generally id.* at 113:11-116:20) and (2) the references are missing other
elements of the asserted claims (Ex. 9, ¶¶ 233-245; *see id.* at ¶ 236 (arguing that Hsu "does not
disclose downloading general-purpose user applications (such as for example for interactive
exercise monitoring) …").) Both contextual distinctions—whether the prior art in general or Hsu
in particular included downloading applications "to a web-enabled wireless phone" or "for
interactive exercise monitoring"—are irrelevant to the § 101 inquiry. *See, e.g., BSG Tech*, 899
F.3d at 1287 ("a claim is not patent eligible merely because it applies an abstract idea in a narrow
way"); *Electric Power Grp.*, 801 F.3d at 1354 (limiting claims to particular technological
environment is insufficient to create patent-eligible application of abstract idea).

Dr. Martin further claims that downloading an application "improved data capture, sharing,
and analysis functions without the need for complex connections or expensive additional
components." (Ex. 2, ¶ 275; *see also* Ex. 9, ¶ 208.) This is conclusory, untethered from the claims,
and in direct conflict with the specification's teaching that specialized adapter hardware (including
a "proprietary pin-out") may be required to connect the health monitoring device to the web-
enabled wireless phone. (Ex. 3, 10:65-12:25.) Dr. Martin ignores this section of the specification.

In addition, Dr. Martin never explains how downloading an application allegedly improved

16

data capture, sharing, and analysis functions, or what improvements resulted, given that downloading an application was routine and well-known in the prior art as described above. (Ex. 2, ¶ 275; Ex. 9, ¶ 208; SUF, ¶ 10.) Nor do the claims require any such improvement. (*See* Ex. 3, cls. 1, 4, 5, 6, 9, 12.) Dr. Martin also never explains what complex connections or expensive additional components were eliminated, or how such elimination results from downloading an application using a generic, known technique. (Ex. 2, ¶ 275; Ex. 9, ¶ 208; SUF, ¶ 10.) In fact, the claims do not exclude any such connection—rather, element 1.a does not specify any particular connection type at all and the specification describes a specialized connection. (Ex. 3, cl. 1 and 10:65-12:25.) Thus, these alleged improvements do not supply an inventive concept. *Am. Axle*, 967 F.3d at 1293 (unclaimed advantages irrelevant to patent eligibility).

Fourth, Dr. Martin conflates § 102 novelty with § 101 subject matter eligibility. Specifically, Dr. Martin opines that because the examiner withdrew a § 102 anticipation rejection over Mault and issued claim 1 after the applicant added element 1.a, that "demonstrates that downloading an application directly from a remote server to the web-enabled wireless phone was an inventive concept." (Ex. 2, ¶ 276; Ex. 9, ¶ 209.) The Federal Circuit has rejected such arguments: "[t]he novelty of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter." *Diamond*, 450 U.S. at 188-89 (internal quotation marks omitted); *see also Two-Way Media*, 874 F.3d at 1340. It is also an illogical leap to assume that because the examiner considered an element novel over one reference, the claim element provides an inventive concept in light of the entire universe of prior art—as explained above, it does not.

Thus, as with the known, generic back end server functions, utilizing a known, generic method of downloading an application also does not supply an inventive concept. *See, e.g., BSG*

*Tech,* 899 F.3d at 1290-91.

## C.  Case Law Supports Fitbit's Request For Summary Judgment

This is not the first case where generic claims such as these have been reviewed for § 101

patent ineligibility.  These prior cases demonstrate that the Court should grant Fitbit's request for

summary judgment.

For example, in *Electric Power Group*, the Federal Circuit affirmed summary judgment of

§ 101 patent ineligibility on grounds that could not be more on-point to the present case:

> [T]he claims do not go beyond requiring the collection, analysis, and
> display of available information in a particular field, stating those
> functions in general terms, without limiting them to technical means
> for performing the functions that are arguably an advance over
> conventional computer and network technology.  The claims,
> defining a desirable information-based result and not limited to
> inventive means of achieving the result, fail under § 101.

830 F.3d at 1351.  The representative claim in *Electric Power Group* included:  (1) multiple

elements requiring the receipt of data, analogous to receiving data in elements 1.d, 1.e, and 1.f of

claim 1 here; (2) elements directed to "detecting and analyzing events in real-time from the

plurality of data streams" including "dynamic stability metrics derived from analysis of the

measurements from the data streams" and "deriving a composite indicator of reliability…from a

combination of one or more real time measurements or computations of measurements from the

data streams and the dynamic stability metrics…," both of which are analogous to the calculation

of a calculated response in element 1.h here; and (3) "displaying concurrent visualization of

measurements from the data streams and the dynamic stability metrics…," analogous to displaying

the calculated response in element 1.i here.  *See id.* at 1351-52 (quoting representative claim).

The Federal Circuit held that the *Electric Power Group* claims were directed to the abstract

idea of "collecting information, analyzing it, and displaying certain results of the collection and

analysis."  *Id.* at 1353.  The court held that "[t]he advance [the claims] purport to make is a process

of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions. They are therefore directed to an abstract idea." *Id.* at 1354 (distinguishing cases where § 101 was satisfied; "the focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools").

The same is true here. This Court found that claim 1 is directed to "the abstract concept of collecting, analyzing, and displaying exercise-related information." (Dkt. 219 at 12.) That abstract concept is not implemented in any assertedly inventive technology. (SUF, ¶¶ 6-13.)

Moving to inventive concept, the Federal Circuit found "nothing sufficient to remove the claims from the class of subject matter ineligible for patenting"; "[m]ost obviously, limiting the claims to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core." *Electric Power Grp.*, 801 F.3d at 1354. Similarly here, one of Philips' core arguments is the claims are limited to the particular technological environment of interactive exercise monitoring.

The Federal Circuit then confirmed that the claims "do not even require a new source or type of information, or new techniques for analyzing it…they do not require an arguably inventive set of components or methods, such as measurement devices or techniques, that would generate new data…[t]hey do not invoke any assertedly inventive programming." *Id.* at 1355. Thus, the Federal Circuit held that "[m]erely requiring the selection and manipulation of information—to provide a 'humanly comprehensible' amount of information useful for users…does not transform the otherwise-abstract processes of information collection and analysis." *Id.* Similarly here, the claims use entirely known components and techniques to collect, analyze, and display exercise-related information, and do not involve any specialized components, including the web-enabled

wireless phone or server(s).  (SUF, ¶¶ 6-13.)

Finally, the Federal Circuit looked to the claims for "any requirements for *how* the result

is achieved," *Electric Power Grp.*, 801 F.3d at 1355 (emphasis original), holding:

> Nothing in the claims, understood in light of the specification,
> requires anything other than off-the-shelf, conventional computer,
> network, and display technology for gathering, sending, and
> presenting the desired information.  That is so even as to the claim
> requirement of "displaying concurrent visualization" of two or more
> types of information…even if understood to require time-
> synchronized display: nothing in the patent contains any suggestion
> that the displays needed for that purpose are anything but readily
> available.   We have repeatedly held that such invocations of
> computers and networks that are not even arguably inventive are
> "insufficient to pass the test of an inventive concept in the
> application" of an abstract idea.

*Id.* (collecting cases).   Again, the same is true here—the specification and named inventor

affirmatively state that the very point of the '377 patent is to implement known processes using

"off-the-shelf" components.  (SUF, ¶ 6; *see also* SUF, ¶¶ 7-13.)

Therefore, like in *Electric Power Group*, the asserted claims here fail § 101 scrutiny.  *See*

*also CardioNet, LLC v. InfoBionic, Inc.,* 2021 U.S. App. LEXIS 32392, at *13-17 (Fed. Cir. 2021)

(unpublished and non-precedential); *PerkinElmer, Inc. v. Intema Ltd.*, 496 Fed. Appx. 65, 72 (Fed.

Cir. 2012) (unpublished and non-precedential); *Palomar Tech., Inc. v. MSRI Sys., LLC*, No. 18-

10236-FDS, Dkt. 772 at 20 (D. Mass. May 28, 2020) ("nothing in the specification of the [patent]

discloses that any of the limitations within the dependent claims are at all inventive…the

limitations to physical components are expressly described in the specification as conventional.")

## V.    CONCLUSION

For the foregoing reasons, Fitbit respectfully requests that the Court grant Fitbit's motion

and find that claims 1, 4, 5, 6, 9, and 12 of the '377 patent are invalid under 35 U.S.C. § 101.

Dated: March 2, 2022

By: /s/ David J. Shaw
David J. Shaw (*pro hac vice*)
dshaw@desmaraisllp.com
DESMARAIS LLP
1701 Pennsylvania Ave., NW, Suite 200
Washington, D.C. 20006
Telephone: (202) 451-4900
Facsimile: (202) 451-4901

Leslie M. Spencer (*pro hac vice*)
lspencer@desmaraisllp.com
Karim Z. Oussayef (*pro hac vice*)
koussayef@desmaraisllp.com
Brian D. Matty (*pro hac vice*)
bmatty@desmaraisllp.com
Henry Ard (*pro hac vice*)
hard@desmaraisllp.com
Eric G. Speckhard
especkhard@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: (212) 351-3400
Facsimile: (212) 351-3401

Ameet A. Modi (*pro hac vice*)
amodi@desmaraisllp.com
DESMARAIS LLP
101 California Street
San Francisco, CA 94111
Telephone: (415) 573-1900
Facsimile: (415) 573-1901

Gregory F. Corbett (BBO #646394)
gcorbett@wolfgreenfield.com
Elizabeth A. DiMarco (BBO #681921)
edimarco@wolfgreenfield.com
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, MA 02110
Telephone: (617) 646-8000
Facsimile: (617) 646-8646

*Attorneys for Defendant Fitbit LLC*

21



## CERTIFICATE PURSUANT TO LOCAL RULE 7.1(A)(2)

The undersigned hereby certifies that counsel for Fitbit conferred with counsel for Philips and attempted in good faith to resolve or narrow the issues in dispute on February 28, 2022, but was unable to do so.

/s/ David J. Shaw
David J. Shaw

## CERTIFICATE PURSUANT TO LOCAL RULE 37.1

The undersigned hereby certifies that counsel for Fitbit has complied with the provisions of Local Rule 37.1.

/s/ David J. Shaw
David J. Shaw

## CERTIFICATE OF SERVICE

I certify that this document is being filed through the Court's electronic filing system, which serves counsel for other parties who are registered participants as identified on the Notice of Electronic Filing (NEF). Any counsel for other parties who are not registered participants are being served by first class mail on the date of the electronic filing.

/s/ Elizabeth A. DiMarco
Elizabeth A. DiMarco