# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**PHILIPS NORTH AMERICA LLC,**          )
                                        )
**Plaintiff,**                          )
                                        )        **Civil Action No.**
**v.**                                  )        **19-11586-FDS**
                                        )
**FITBIT LLC,**                         )
                                        )
**Defendant.**                          )
_____)

## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT

**SAYLOR, C.J.**

This is an action for patent infringement.  Plaintiff Philips North America LLC has sued

defendant Fitbit LLC, asserting claims under 35 U.S.C. § 271 for infringement of three patents of

which Philips is the owner and assignee.  The patents at issue concern technology related to

connected-health products, such as wearable fitness trackers.  The scope of the case has been

narrowed to Claims 1, 4, 5, 6, 9, and 12 of Patent 8,277,377 ("the '377 patent").[1]

The parties have cross-moved for summary judgment.  Philips has moved for partial

summary judgment of direct infringement by Fitbit's customers and on the ground that the patent

is not rendered obvious based on prior art.  Fitbit has moved for summary judgment of

noninfringement, invalidity, and lack of joint or induced infringement.  The parties have also

---

[1] In addition to the '377 patent, this case originally concerned infringement of three other patents owned by Philips:  U.S. Patent Nos. 6,013,007 ("the '007 patent"); 7,088,233 ("the '233 patent"); and 6,976,958 ("the '958 patent").  Philips has since withdrawn its allegations of infringement of the '958 patent.  The Court's claim-construction order rendered invalid all asserted claims of the '007 patent.  And proceedings related to the '233 patent are stayed pending any appeal of the PTAB decision.  Therefore, only the '377 patent is currently at issue.

filed several motions to strike.  For the following reasons, Fitbit's motion for summary judgment of invalidity will be granted, and the remaining motions for summary judgment and motions to strike will be denied as moot.

## I.    Background

The following facts are undisputed except as otherwise noted.

### A.    Factual Background

#### 1.    The Parties

Philips North America LLC is the owner of several patents concerning connected-health technologies.  ('377 patent).  Fitbit LLC develops, manufactures, and sells connected-health products.

#### 2.    The '377 Patent

The '377 patent is titled "Method and Apparatus for Monitoring Exercise with Wireless Internet Connectivity."  ('377 patent at Title).  It concerns "monitoring of living subjects."  (*Id.* col. 1 ll. 35-36).  More particularly, it concerns "health-monitoring of persons where measured or input health data is communicated by a wireless device to and from a software application running on an internet-connected server and where the same may be studied and processed by the software application, a health professional, or the subject."  (*Id.* col. 1 ll. 36-41).

The patent provides for a "method and apparatus . . . for wireless monitoring of exercise, fitness, or nutrition by connecting a web-enabled wireless phone to a device which provides exercise-related information, including physiological data and data indicating an amount of exercise performed."  (*Id.* at Abstract).  It further provides that "[a]n application for receiving the exercise-related information and providing a user interface may be downloaded to the web-enabled wireless phone from an internet server" and that "[t]he exercise-related information may be transmitted to an internet server, and the server may calculate and return a response."  (*Id.*).

The patent identifies two "complementary" systems that embody the invention.  (*Id.* col. 2 l. 64).  The first embodiment "may be employed to manage the disease state or condition of a patient" by "employ[ing] a health monitoring device."  (*Id.* col. 2 ll. 66-67; *id.* col. 3 ll. 1-2). That device would provide data by a wireless connection "for processing via the internet[,] including a review by a physician or other health care professional if required."  (*Id.* col. 3 ll. 3-5).  For example, a diabetic could connect a blood-glucose monitor to a wireless web device, download data to a diabetes-management company's server, and receive guidance concerning his next meal.  (*Id.* col. 3 ll. 14-20).

The second embodiment enables implementation of a "health or lifestyle management plan" by allowing "[v]arious health parameters, such as those relating to nutrition or exercise, [to] be entered into a health monitoring device" and to be wirelessly communicated to a server. (*Id.* col. 3 ll. 6-11).  In this embodiment, "the system may be employed to monitor the physiologic status of a healthy subject while eating, exercising, or performing other activities." (*Id.* col. 3 ll. 33-36).  For example, an individual following an exercise program could attach a wireless web device to an exercise machine, send data from that machine over the Internet to the server of a health and fitness company, and receive personalized responses from that company. (*Id.* col. 3 ll. 21-27).

The claimed priority date for the '377 patent is December 17, 1999.

As the litigation has progressed, the claims have narrowed to encompass only Claims 1, 4, 5, 6, 9, and 12 of the '377 patent.  The parties agree that Claim 1 is a method claim and the only remaining independent claim in this case.  (*Id.* col. 13).  Claims 4, 5, 6, 9, and 12 are method claims that depend, directly or indirectly, on Claim 1.  (*Id.* cols. 13-14).  Claim 1 is as follows:

3

1.  A method for interactive exercise monitoring, the method comprising the steps of:

>    a.  downloading an application to a web-enabled wireless phone directly from a remote server over the internet;

>    b.  coupling the a [sic] web-enabled wireless phone to a device which provides exercise-related information;

>    c.  rendering a user interface on the web-enabled wireless phone;

>    d.  using the application, receiving data indicating a physiologic status of a subject;

>    e.  using the application, receiving data indicating an amount of exercise performed by the subject;

>    f.  wherein at least one of the data indicating a physiologic status of a subject or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise-related information, and wherein the data indicating a physiologic status of a subject is received at least partially while the subject is exercising;

>    g.  sending the exercise-related information to an internet server via a wireless network;

>    h.  receiving a calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information; and

>    i.  using the application, displaying the response.

(*Id.* col. 13 ll. 23-47).

In its claim-construction order, the Court ruled that the phrase "indicating a physiologic status of a subject" would be construed according to its plain and ordinary meaning.  (Order at 34).

### 3.    The Accused Products

The accused products are the Fitbit Alta HR, Blaze, Charge 2, Charge 3, Inspire HR,

Ionic, Versa, Versa 2, and Versa Lite.[2]

## B.      Procedural Background

On July 22, 2019, Philips filed this action against Fitbit.  The second amended complaint asserts three counts of patent infringement under 35 U.S.C. § 271, involving the '007 patent (Count 1); the '233 patent (Count 2); and the '377 patent (Count 3).

On July 22, 2021, the Court issued its memorandum and order on claim construction.  In that decision, it concluded, among other things, that a means-plus-function claim term in the '007 patent—"means for computing athletic performance feedback data from the series of time-stamped waypoints obtained by said GPS receiver"—is indefinite under 35 U.S.C. § 112 for lack of corresponding structure for the claimed function.

Fitbit moved to dismiss the complaint for failure to state a claim upon which relief can be granted.  On August 10, 2021, the Court denied the motion to dismiss.  On August 24, 2021, Fitbit filed its answer and asserted six counterclaims, seeking declaratory judgments of invalidity and non-infringement.

Philips and Fitbit have now cross-moved for summary judgment.  Philips has moved for partial summary judgment of direct infringement by Fitbit's customers and a finding that the patent is not rendered obvious based on prior art.  Fitbit has moved for summary judgment of noninfringement, invalidity, and lack of joint or induced infringement.

The parties have also filed various motions to strike relating to the motions for summary judgment.  Philips has moved to strike portions of the expert report of Dr. Joseph A. Paradiso and Fitbit's expert rebuttal reports.  It has also moved to preclude the testimony of Dr. Paradiso

---

[2] The Court denied Philips's motion for leave to file supplemental infringement contentions to cover four new products:  the Charge 4, Versa 3, Inspire 2, and Sense.

on *Daubert* grounds.  Fitbit has moved to strike portions of the expert reports of Dr. Tom Martin and Dr. Michael P. Akemann.

## II.    <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a motion for summary judgment, the court must indulge all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks omitted).  The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.* at 256-57.

Because "[a] patent shall be presumed valid," 35 U.S.C. § 282, a defendant arguing invalidity must prove that defense by clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 102 (2011).  This heightened burden applies even at the summary judgment stage.  *See Anderson*, 477 U.S. at 254 ("[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.").  The Federal Circuit has indicated that this presumption applies with full force when

the invalidity challenge is brought under the "abstract ideas" exception to § 101.  *Cellspin Soft, Inc. v. Fitbit Inc.*, 927 F.3d 1306, 1319 (Fed. Cir. 2019) ("This presumption reflects the fact that the Patent and Trademark Office has already examined whether the patent satisfies 'the prerequisites for issuance of a patent,' including § 101.") (quoting *Microsoft Corp.*, 564 U.S. at 95-96).

**III.   Analysis**

    **A.   Invalidity under 35 U.S.C. § 101**

As noted, Fitbit has moved for summary judgment on the issue of invalidity under 35 U.S.C. § 101.

An invention is generally patentable if it qualifies as a "new and useful process, machine, manufacture, or composition of matter."  35 U.S.C. § 101.  However, "this provision contains an important implicit exception.  Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Mayo Collaborative Servs. v. Prometheus Lab'ys*, 566 U.S. 66, 70 (2012) (citing *Diamond v. Diehr*, 450 U.S. 175, 185 (1981)).  In applying that exception, a court "must distinguish between patents that claim the building blocks of human ingenuity and those that integrate the building blocks into something more."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217 (2014) (internal quotation marks omitted).

The framework for making that distinction involves a two-step process.  At step one, the court determines "whether the claims at issue are directed to one of those patent-ineligible concepts" that is so abstract as to "risk disproportionately tying up the use of [] underlying ideas."  *Alice*, 573 U.S. at 217 (quoting *Mayo*, 566 U.S. at 73).  If step one is answered affirmatively, the court continues to step two.  At step two, the court looks for an "inventive concept," namely "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself."

*Id.* at 217-18 (internal quotation marks and citation omitted).

### 1.    Representative Claim

As an initial matter, the Court must determine which claims of the '377 patent should be analyzed in order to resolve the pending motion.  The remaining claims at issue are Claims 1, 4, 5, 6, 9, and 12, and Fitbit contends that each asserted claim is invalid under § 101.  "Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018) (citing *Electric Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1352 (Fed. Cir. 2016); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1316 & n.9 (Fed. Cir. 2016)).

The parties have not agreed to treat any particular claim as representative, although Fitbit asks the Court to analyze Claim 1.  (Def. Invalid. Mem. at 1 n.2).  Philips has not presented any argument for the distinctive significance of any claim limitations other than those included in Claim 1.  Accordingly, the Court will assume that Claim 1 is representative.

### 2.    Step One:  Patent-Ineligible Concept

The Court must first determine if the claims in question are "directed to" a patent-ineligible abstract idea.[3]  Fitbit contends that the '377 patent is directed to the abstract idea of collecting and analyzing exercise-related data and presenting that data to a user.

Because "[a]t some level, all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas," *Alice*, 573 U.S. at 217 (internal quotation marks

---

[3] For the sake of simplicity, the Court will use the term "abstract idea" to describe non-patentable subject matter, although the label is imprecise and the prohibition also extends to matters such as "laws of nature" and "natural phenomena."  *See Mayo,* 566 U.S. at 70.

and citation omitted), "it is not enough to merely identify a patent-ineligible concept underlying the claim; [the court] must determine whether that patent-ineligible concept is what the claim is directed to." *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) (internal quotation marks and citation omitted).  In pursuing that inquiry, "the claims are considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015).  Although "the specification may . . . be useful in illuminating whether the claims are 'directed to' the identified abstract idea . . . any reliance on the specification in the § 101 analysis must always yield to the claim language." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 767-69 (Fed. Cir. 2019) (internal citations omitted).

Delineating the bounds of the "abstract ideas" category has proved somewhat elusive.  At one end of the spectrum, the case law makes clear that algorithms and mathematical formulas expressing "fundamental truths" are squarely within the realm of unpatentable abstract ideas. *See Alice*, 573 U.S. at 218 (citing *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972); *Parker v. Flook*, 437 U.S. 584, 594-95 (1978)).  However, abstract ideas are not limited to "preexisting, fundamental truths that exist in principle apart from any human action." *Id.* at 220 (internal quotation marks omitted).  A patent merely covering an application of an otherwise general practice, even a complex practice, may be directed to an abstract idea. *See, e.g., Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (holding that "[t]he concept of hedging [financial transactions]" was a patent-ineligible "abstract idea, just like the algorithms at issue in *Benson* and *Flook*").

No clear boundaries have been drawn around the category of ineligible abstract ideas.  In fact, the Supreme Court has rejected the creation of categorical rules for determining patent-

ineligible subject matter.  *See Bilski*, 561 U.S. at 609 (refusing to conclude that business-process

claims at issue were categorically unpatentable).  Instead, courts "have found it sufficient to

compare claims at issue to those claims already found to be directed to an abstract idea in

previous cases."  *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016); *see also*

*Alice*, 573 U.S. at 221 ("[W]e need not labor to delimit the precise contours of the 'abstract

ideas' category in this case.  It is enough to recognize that there is no meaningful distinction

between the concept of risk hedging in *Bilski* and the concept of intermediated settlement at issue

here.  Both are squarely within the realm of 'abstract ideas' as we have used that term.").  Claim

1 of the '377 patent must therefore be placed in context within the case law.

The decision in *Electric Power Group, LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed. Cir.

2016) is analogous.  There, the court explained that claims reciting concepts of "collecting,"

"analyzing," and "presenting" data—either individually or collectively—"fall into a familiar

class of claims" directed to patent-ineligible concepts:

> Information as such is an intangible.  Accordingly, we have treated *collecting*
> information, including when limited to particular content (which does not change
> its character as information), as within the realm of abstract ideas.  In a similar
> vein, we have treated *analyzing* information by steps people go through in their
> minds, or by mathematical algorithms, without more, as essentially mental
> processes within the abstract-idea category.  And we have recognized that merely
> *presenting* the results of abstract processes of collecting and analyzing
> information, without more (such as identifying a particular tool for presentation),
> is abstract as an ancillary part of such collection and analysis.

*Id.* at 1353-54 (internal citations omitted; emphases added).

The claims at issue in *Electric Power* recited receiving, analyzing, and displaying power-

grid data.  *See id.* at 1351-52.  The court found that they were directed to an abstract idea because

"[t]he advance they purport to make is a process of gathering and analyzing information of a

specified content, then displaying the results, and not any particular assertedly inventive

technology for performing those functions."  *Id.* at 1354.  They "focused on the combination of

those abstract-idea processes," which rendered the claims directed to patent-ineligible concepts. *Id.*

The same can be said about Claim 1 of the '377 patent.  It recites a series of steps comprising gathering data (by "downloading" an application to a wireless phone, "coupling" that phone to a device that provides exercise-related data, and "receiving" data concerning the physiologic status of the subject and the amount of exercise performed by the subject); analyzing that data (by wirelessly "sending" the exercise-related data to a server and "receiving" a response from the server that is calculated based on that data); and showing the results (by "displaying" the response from the server).  ('377 patent col. 13 ll. 25-47).  In other words, it recites nothing more than the collection, analysis, and presentation of information, which have been found—individually and collectively—to be abstract concepts.  *See Electric Power*, 830 F.3d at 1353-54 (collecting cases).  It does not recite "inventive technology for performing those functions."  *Id.* at 1354.

Accordingly, the Court finds that Claim 1 of the '377 patent is directed to the abstract concept of collecting, analyzing, and displaying exercise-related information.

### 3.    **Step Two:  Inventive Concept**

Having concluded that Claim 1 is directed to an abstract idea, the asserted claim must be examined for a sufficiently "inventive concept" to "transform" the abstract idea into a "patent-eligible application."  *Alice*, 573 U.S. at 221.

That examination requires the court to "consider the elements of each claim both individually and as an ordered combination."  *Id.* at 217 (internal quotation marks and citation omitted).  The inquiry searches for "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself."  *Id.* at 217-18 (internal quotation marks and citation omitted).  "An inventive

11

concept reflects something more than the application of an abstract idea using 'well-understood, routine, and conventional activities previously known to the industry.'" *Cellspin*, 927 F.3d at 1316 (quoting *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018)). "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer*, 881 F.3d at 1368. Ultimately, "whether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Id.*

Philips contends that Fitbit has not shown that the ordered combination of elements in Claim 1 of the '377 patent was well-understood, routine, and conventional at the time of the invention. According to Philips (and its expert, Dr. Martin), Claim 1 includes two inventive concepts: (1) performing computations utilizing a back-end server to remove location-based restraints, and (2) monitoring exercise with an application downloaded to a web-enabled wireless phone. (Martin Report at 165).

According to Dr. Martin, the first alleged inventive concept is as follows:

The '377 Patent [ ] provided the inventive concept of offloading the data analysis to a server in wireless communication with a web-enabled wireless phone. By providing significant application functionality on the back end, less memory and processing capabilities became necessary on the WWD [wireless web device] (i.e., on the "front-end"). Thus, as recited by the '377 Patent, memory became available on the WWD for other purposes, such as an enhanced user interface, computing capacity, or processing power.

. . . [B]y eliminating the location-based restraints of prior art systems by arranging the data processing components such that the data analysis was offloaded to a server that was in wireless communication with a wireless web device, the '377 Patent also allowed for "wireless access to and from a wide variety of present medical or health-related instruments and devices, while maintaining the capability of connecting to future such devices." . . .

[T]his inventive concept allowed for "wireless health-monitoring to the level of accuracy previously achieved only by desktop so-called 'wired' computer systems." . . . Having a wireless system was a major advantage over the prior art

as this invention allowed for subjects to be monitored as they moved about freely
without the constraint of being tethered by a wire.

(*Id.* at 166-67).

Fitbit asserts that Claim 1 does not include the elimination of location-based restraints,

and, in fact, encompasses a wired connection.  It reasons that because some of Claim 1's

dependent claims (such as Claim 4) contemplate a wired connection, Claim 1 must be broad

enough to include wired connections as well.  Similarly, it points to Dr. Martin's opinion that the

wireless network in claim element 1.g includes wi-fi (with a wired router and short range), which

does not eliminate location-based restraints.

Fitbit further contends that utilizing a back-end server is not an inventive concept at all,

because the basic server functionality was known and understood in the prior art.  It also

contends that eliminating location-based restraints is not an inventive concept, as the background

of the invention contemplates existing systems that "allow[ed] a 'wireless' distance to be placed

between a health measuring unit and a remote monitoring system" and "used cellular telephone

technology to increase the wireless health monitoring range."  ('377 patent col. 2 ll. 23-28).

Finally, it asserts that Dr. Martin's opinion, without more, is insufficient to create a genuine issue

of material fact.

According to Dr. Martin, the second inventive concept is as follows:

[A]nother advantage of the '377 Patent included downloading an application to a
wireless web-enabled phone from a server. . . .  [F]unctionality of WWDs in [ ]
1999 was limited, in part, because WWDs had little memory and processing
capability, which consequently limited the capabilities of the WWD when used
alone.  However, the asserted claims allowed for the downloading of applications
to the WWD in connection with health monitoring devices to perform improved
data capture, sharing, and analysis functions without the need for complex
connections or expensive additional components. . . .

(Martin Report at 167).[4]

Fitbit contends that there is nothing inventive about the generic, known way an application is downloaded.  It points to prior art references identified by Dr. Paradiso that disclosed downloading an application from a remote server over the Internet.  It further asserts that Dr. Martin's argument that downloading an application "improved data capture, sharing, and analysis functions without the need for complex connections" is untethered from the claims and contradicted by the specification, which discusses adapter hardware with wired connections. Finally, it contends that Dr. Martin conflates § 102 novelty with § 101 subject-matter eligibility. (*See* Def. Invalid. Mem. at 17).

To resolve those disputes, the Court must look to the case law.  In its prior opinion on Fitbit's motion to dismiss, the Court primarily compared two Federal Circuit cases:  *Electric Power* and *Bascom*.  Those cases remain the principal guideposts here, although the Court now has the benefit of a complete evidentiary record on summary judgment.

In *Electric Power*, the Federal Circuit affirmed the granting of summary judgment based on § 101 subject-matter ineligibility where the claims at issue provided for collecting, analyzing, and displaying power-grid data.  840 F.3d at 1351-52.  The precise language of the claim offers a useful comparison here:

> A method of detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the interconnected electric power grid, the method comprising:
>
> receiving a plurality of data streams . . . ;
>
> receiving data from other power system data sources . . . ;

---

[4] It is unclear whether the second alleged inventive concept is "*monitoring* exercise with an application downloaded to a web-enabled phone," (*See* Pl. Opp'n at 15) or "*downloading* an application to a wireless web-enabled phone from a server."  (*See* Martin Report at 167).  Philips and its expert have asserted both inconsistently. In any event, that discrepancy does not change the outcome of the Court's decision.

> receiving data from a plurality of non-grid data sources;
>
> detecting and analyzing events in real-time from the plurality of data streams from the wide area based on at least one of limits, sensitivities and rates of change . . . ;
>
> displaying the event analysis results and diagnoses of events and associated ones of the metrics from different categories of data and the derived metrics in visuals, tables, charts, or combinations thereof, the data comprising at least one of monitoring data, tracking data, historical data, prediction data, and summary data;
>
> displaying concurrent visualization of measurements from the data streams and the dynamic stability metrics directed to the wide area of the interconnected electric power grid;
>
> accumulating and updating the measurements from the data streams and the dynamic stability metrics, grid data, and non-grid data in real time . . . ; and
>
> deriving a composite indicator of reliability that is an indicator of power grid vulnerability and is derived from a combination of one or more real time measurements or computations of measurements from the data streams and the dynamic stability metrics . . . .

*Id.* at 1351-52.  The district court granted summary judgment on the ground of ineligibility, observing that the "most significant additional limitations . . . are those that limit the claim[s] to monitoring and analyzing data in the context of electric power grids."  *Id.* at 1352.

The Federal Circuit affirmed, finding that the patent failed at both steps one and two of *Alice*.  It reasoned as follows:

> [T]he claims do not go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology.  The claims, defining a desirable information-based result and not limited to inventive means of achieving the result, fail under § 101.

*Id.* at 1351.

Like *Electric Power*, Claim 1 is directed to the abstract concept of collecting, analyzing, and displaying information.  Again, for comparison, it provides:

A method for interactive exercise monitoring, the method comprising the steps of:

> downloading an application to a web-enabled wireless phone directly from a remote server over the internet;
>
> coupling the a [sic] web-enabled wireless phone to a device which provides exercise-related information;
>
> rendering a user interface on the web-enabled wireless phone;
>
> using the application, receiving data indicating a physiologic status of a subject;
>
> using the application, receiving data indicating an amount of exercise performed by the subject;
>
> wherein at least one of the data indicating a physiologic status of a subject or the data indicating an amount of exercise performed by the subject is received from the device which provides exercise-related information, and wherein the data indicating a physiologic status of a subject is received at least partially while the subject is exercising;
>
> sending the exercise-related information to an internet server via a wireless network;
>
> receiving a calculated response from the server, the response associated with a calculation performed by the server based on the exercise-related information; and
>
> using the application, displaying the response.

('377 patent col. 13 ll. 23-47).[5]

Here, the Court finds nothing to remove Claim 1 from the category of ineligible subject matter under § 101. The fact that the claim is further limited to interactive exercise monitoring "is, without more, insufficient to transform [it] into patent-eligible applications of the abstract idea at [its] core." *Electric Power*, 840 F.3d at 1354. Claim 1 does not require "an arguably inventive set of components or methods, such as measurement devices or techniques, that would

---

[5] The '377 patent refers both to a "wireless web device" and a "web-enabled wireless phone," noting that in one embodiment of the alleged invention, the wireless web device "is a web-enabled cellular phone." ('377 patent col. 3 ll. 58-59). Claim 1 refers to a "web-enabled wireless phone." (*Id.* col. 13 ll. 25-26).

generate new data." *Id.* at 1355.  Claim 1 also fails to provide "an arguably inventive device or technique for displaying information" or "an arguably inventive distribution of functionality within a network." *Id.*  It discloses no inventive technique for receiving, analyzing, or displaying the physiologic or exercise-related data.  Nor does it disclose a new method of calculating the response or receiving the calculated response.  Instead, Claim 1 "merely call[s] for performance of the claimed information collection, analysis, and display functions 'on a set of generic computer components' and display devices." *Id.* (quoting *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1349-52 (Fed. Cir. 2016)); *see also CardioNet, LLC v. InfoBionic, Inc.*, 2021 WL 5024388, at *6 (Fed. Cir. Oct. 29, 2021) (holding that patent did not disclose inventive concept where claim "recite[d] conventional components (a monitoring apparatus and monitoring station) performing the same type of conventional functions: collecting data, analyzing it with the T wave filter's mathematical calculations, and displaying it on the monitoring station"); *Affinity Labs of Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1265 (Fed. Cir. 2016) (finding no inventive concept where the "only limitations on the breadth of the result-focused, functional claims in this case are (1) that the application used by the cellular telephone must be wirelessly downloadable, and (2) that the cellular telephone must have a graphical user interface display that allows the user to select the regional broadcasting channel. Those additional limitations describe purely conventional features of cellular telephones and the applications that enable them to perform particular functions.").

Moreover, the alleged inventive concepts are not found in Claim 1.  "The § 101 inquiry must focus on the language of the Asserted Claims themselves, and the specification cannot be used to import details from the specification if those details are not claimed." *ChargePoint*, 920 F.3d at 769 (internal citations and quotation marks omitted); *see also American Axle & Mfg., Inc.*

*v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020) ("[F]eatures that are not claimed are irrelevant as to step 1 or step 2 of the *Mayo/Alice* analysis").

Here, the two alleged inventive concepts are set out in the specification, not the claim. Again, those concepts are (1) performing computations utilizing a back-end server to remove location-based restraints and (2) monitoring exercise with an application downloaded to a web-enabled wireless phone.  The specification discusses the state of the art and the purported improvements of the invention, including back-end servers:

> The interaction between a WWD and a back-end server may provide a major additional advantage in certain embodiments of the invention.  In particular, the relatively small amount of memory currently provided on a WWD as compared to a back-end server severely limits the functionality of applications running on the WWD, especially in terms of computing capacity, processing power, and user interface.  By providing significant application functionality on the back-end, less memory and processing capabilities become necessary on the WWD (i.e., on the "front-end").  Thus, memory may be used in the WWD for an enhanced user interface or for other purposes, according to user requirements.

('377 patent col. 4 ll. 30-42).  The specification also mentions the elimination of location-based restraints, noting that "[t]he invention allows wireless health-monitoring to the level of accuracy previously achieved only by desktop so-called 'wired' computer systems."  (*Id.* col. 4 ll. 26-29). For the second alleged inventive concept, the specification includes the following:

> In a method according to an embodiment of the invention, the patient connects to a specific Internet site and a software program, resident on a remote server located on the Internet, downloads an interactive user interface for that patient and an application for the measurement of the physiological data.  The software may also be downloaded to the WWD from a personal computer via a synchronization operation in known fashion.

(*Id.* col. 4 ll. 43-50).

The problem for Philips is that improvements in the specification can "create a factual dispute regarding whether the invention describes well-understood, routine, and conventional activities," only when "they are captured in the claims."  *Berkheimer*, 881 F.3d at 1369.  The

Federal Circuit's decision in *Berkheimer* is instructive.  There, the patent specification listed several alleged improvements in digital asset-management systems, including fewer redundancies, reduced storage requirements, and a so-called "one-to-many editing feature." *Id.* at 1369-70.  Those alleged improvements, however, were not included in all of the claims at issue. *Id.*  The Federal Circuit affirmed summary judgment of invalidity as to those claims that did "not recite any of the purportedly unconventional activities disclosed in the specification" and that amounted "to no more than performing the abstract idea of parsing and comparing data with conventional computer components." *Id.*  It vacated the district court's judgment, in part, but only with respect to claims that "contain[ed] limitations directed to the arguably unconventional inventive concept described in the specification." *Id.* at 1370.  Those claims recited "storing a reconciled object structure in the archive *without substantial redundancy*" and "selectively editing an object structure, linked to other structures to thereby *effect a one-to-many change* in a plurality of archived systems." *Id.* (emphases added).

It appears that Philips's argument is an attempt to analogize to *Bascom*, where the

Here, Claim 1 does not address an enhanced user interface, increased computing capacity, or greater processing power.  Rather, it only specifies a generic user interface, without regard to any "enhanced" functions.  And it does not mention computing capacity or processing power at all.  (*See* '377 patent col. 13).  Likely recognizing those hurdles, Philips attempts to recharacterize the claims.  It now asserts that Claim 1 is "directed to a network platform architecture" and that "the '377 patent is an improvement on the network platform and electronic performance and thus contains an inventive concept."  (Pl. Opp'n at 12, 14).[6]

It appears that Philips's argument is an attempt to analogize to *Bascom*, where the

---

[6] Fitbit responds that the theory was previously undisclosed and therefore waived.  Because the Court will grant summary judgment on the ground of lack of an inventive concept, it does not reach that issue.

Federal Circuit vacated the district court's dismissal of the complaint under § 101.  There, the claimed invention was "provid[ing] individually customizable filtering at the remote ISP server by taking advantage of the technical capability of certain communication networks."  *Bascom*, 827 F.3d at 1344.  The court held that the claims were directed to the abstract idea of filtering content, but the complaint plausibly alleged an inventive concept—a way to "improve an existing technological process."  *Id.* at 1351 (internal quotation marks and citation omitted).

Here, however, the so-called "improved network platform architecture" is not set forth in Claim 1.  Claim 1 recites a "method for interactive exercise monitoring," and is directed to the abstract concept of collecting, analyzing, and displaying exercise-related information.  ('377 patent col. 13 l. 23).  Claim 1 only vaguely refers to a generic "internet server," and says nothing at all about an improved network architecture.  When unclaimed improvements are put aside, it is clear that Claim 1 of the '377 patent lacks an inventive concept.

Philips nonetheless points to *Bascom's* holding that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  827 F.3d at 1350.  It is true that this Court considered *Bascom* as analogous authority in its opinion on Fitbit's motion to dismiss.  At that time—accepting the allegations of inventive concepts in the complaint as true—it appeared plausible that the '377 patent deployed off-the-shelf components in a way that resulted in a technological advancement over prior art.  As in *Bascom*, the Court found "nothing on this record that refutes those allegations as a matter of law or justifies dismissal under Rule 12(b)(6)."  *Id.* at 1352.

However, the Court expressly reserved the question presented today.  Since then, Philips has narrowed its argument to two alleged inventive concepts.  With the benefit of discovery and further briefing, it is now clear that this case more closely resembles *Electric Power* rather than

*Bascom*.  Even when considering the claims in an ordered combination, they fail to identify a "specific application[ ] or improvement[ ] to technology."  *Id.* at 1350 (quoting *Research Corp. Techs. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010)).  Claim 1 merely recites the abstract idea of collecting, analyzing, and displaying exercise-related information on a set of generic computer components.  It does not "require an arguably inventive distribution of functionality within a network, thus distinguishing the claims at issue from those in *Bascom*." *Electric Power*, 830 F.3d at 1355; *see also Google LLC v. Sonos, Inc.*, 498 F. Supp. 3d 1138, 1153 (N.D. Cal. 2020) (noting that at step two, *Bascom* was distinguishable because "the desired result of filtering was achieved through a specific configuration"); *Affinity Labs*, 838 F.3d at 1265 (stating that the "specificity of the technical solution provided by the claims in *Bascom* stands in sharp contrast to the absence of any such specific technical solution in the claims [at issue]"); *ChargePoint*, 920 F.3d at 774-75 (finding no inventive concept and distinguishing *Bascom* where claims at issue "do nothing to improve how charging stations function; instead, the claims merely add generic networking capabilities to those charging stations and say 'apply it'"); *In re Salwan*, 681 F. App'x 938, 941 (Fed. Cir. 2017) (per curiam) (stating that "the claimed elements of a generic 'network,' 'computer program,' 'central server,' 'device,' and 'server for processing and transferring' are simply not enough to transform the abstract idea into a patent-eligible invention").

Instead, "the asserted claims describe only generic computer elements."  *See Intellectual Ventures*, 838 F.3d at 1316.  In comparing prior art, the specification acknowledges existing systems that "allow[ed] a 'wireless' distance to be placed between a health measuring unit and a remote monitoring system."  ('377 patent col. 2 ll. 23-25).  Other systems "used cellular telephone technology to increase the wireless health monitoring range."  (*Id.* col. 2 ll. 27-28).

According to the specification, the primary problem with those prior-art systems was "that they [were] not designed to be used with 'off-the-shelf' wireless devices or health measuring equipment," which the '377 patent purports to remedy.  (*Id.* col. 2 ll. 37-40); (*see also* Quy Dep. at 47) ("I put together a system based on off-the-shelf components, such as a wireless mobile phone . . . .").  But the inventor, Dr. Quy, did not invent any device listed in the '377 patent that provides exercise-related or physiological information.  (Quy Dep. at 198-99).  Those devices are known, generic components.  ('377 patent col. 2 ll. 59-60; *id.* col. 3 ll. 16, 37-41) (describing "a wide variety of present medical or health-related instruments and devices" including "a blood glucose meter" and "exercise machines" like an "electronic body weight scale," "blood pressure recorder," "heart rate monitor," or "treadmill").  Likewise, Dr. Quy did not invent any web-enabled wireless phone, server, or wireless network.  (Quy Dep. at 194, 195, 215-16).  They too are known, generic components.  ('377 patent col. 3 ll. 54-55) (discussing "'off-the-shelf' wireless devices").  The Court may properly consider "inventors' admissions on what they did not invent" in evaluating whether "elements of the asserted claims involved nothing more than that which is 'well-understood, routine, conventional activity.'"  *Innovation Scis., LLC v. Amazon.com, Inc.*, 2021 WL 2075677, at *7 (E.D. Tex. May 24, 2021) (quoting *Mayo*, 566 U.S. at 73, 79, 82).

The claims also utilize known, generic techniques.  To connect the web-enabled wireless phone to the device, the patent contemplates existing "wireless techniques, infrared (IR), microwaves, radio frequency (RF), e.g. Bluetooth or IEEE 802.11 protocols."  ('377 patent col. 4 ll. 13-15).  Dr. Quy did not invent any of those techniques.  (Quy Dep. at 201).  Nor did he invent using applications on web-enabled wireless phones; downloading applications from remote servers over the Internet; or rendering a user interface on web-enabled wireless phones.

(*Id.* at 195, 199).  The user interface itself is described generally in the specification, which notes that it "may vary widely in sophistication, e.g., from a simple data entry field to a full graphical user interface.  These applications may accept as inputs data from a sensor [ ] as well as from a manual input [ ]." ('377 patent col. 8 ll. 8-12).  The specification also describes downloading information to a wireless web device "via a synchronization operation using standard protocols . . . ."  (*Id.* col. 4 l. 67; *id.* col. 5 ll. 1-2).  As for the Internet server, the specification notes that "the protocols for data communication are known" and the invention "is not limited to any particular protocols."  (*Id.* col. 7 ll. 56-59).  It further specifies the following:

> [The wireless health-monitoring apparatus] is shown communicating wirelessly with the Internet.  In doing so, [it] generally sends a wireless signal to a base station [ ] (in known fashion) that is connected to a server [ ] that is in signal communication (in known fashion) with the internet.  Server [ ] communicates via a protocol (in known fashion) to Internet [ ], which also communicates via a protocol (in known fashion) to a server [ ] running an application [ ].

(*Id.* col. 7 ll. 46-53).  As to the terms "response" and "calculate," the specification notes that both terms are "used generally."  (*Id.* col. 9 ll. 45-49).  Finally, the specification states that the "server then sends the response to the WWD [ ], where the response is displayed."  (*Id.* col. 9 ll. 42-44).[7]

Again, the Court is mindful that conventional, generic components can sometimes supply

---

[7] Philips has disputed whether those are known, generic components and techniques.  However, "not every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry."  *Berkheimer*, 881 F.3d at 1368; *see also Prism Techs. LLC v. T-Mobile USA, Inc*., 696 F. App'x 1014, 1017 (Fed. Cir. 2017) (concluding that claims recited "indisputably generic computer components," such as "authentication server," "access server," "Internet Protocol network," "client computer device," and "database"); *Intellectual Ventures I LLC v. Capital One Fin. Corp.,* 850 F.3d 1332, 1342 (Fed. Cir. 2017) (stating that "appl[ying] coined labels to conventional structures does not make the underlying concept inventive").  A genuine issue of material fact is not created from Philips's disputes merely because the specification or inventor did not use the term "generic."  The same is true for Dr. Martin's expert report.  "The mere existence in the record of dueling expert testimony does not necessarily raise a genuine issue of material fact."  *Mortgage Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1325-26 (Fed. Cir. 2016).  That is particularly true where, as here, "the court did not rely on them in its § 101 analysis.  Instead, in making its patent-eligibility determination, [it] looked only to the claims and specifications of the patents-in-suit."  *Id.* at 1325.

an inventive concept when they are combined in a nonconventional manner. *See Bascom*, 827

F.3d at 1350; *see also Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01

(Fed. Cir. 2016). However, that is not the case here. Fitbit has demonstrated that the

combination of components, as set forth in Claim 1, does not disclose any inventive concept.

Finally, the prosecution history of the '377 patent does not require a different result.

Philips's expert, Dr. Martin, made the following argument in his report:

> Following a final rejection, claim 1 of the '377 Patent was amended to require
> that the application be downloaded directly from a remote server . . . . These
> amendments led to the claims being allowed, and in the reasons for allowance, the
> examiner specifically noted that the prior art . . . failed to teach a direct
> connection with a remote server for downloading the application. . . . This further
> demonstrates that the '377 Patent provided an inventive concept by including the
> capability of downloading an application to a wireless web-enabled phone from a
> server.

(Martin Report at 167-68). However, "the allowance of certain claims in the prosecution of the

patent based on these limitations is not dispositive, as these allowances were based on novelty

and obviousness determinations under 35 U.S.C. §§ 102 and 103, not eligibility determinations

under § 101." *Interactive Wearables, LLC v. Polar Electro Oy*, 501 F. Supp. 3d 162, 183

(E.D.N.Y. 2020); *see also Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed.

Cir. 2016) ("Synopsys equates the inventive concept inquiry with novelty and contends that the

Asserted Claims contain an inventive concept because they were not shown to have been

anticipated by (35 U.S.C. § 102) or obvious over (35 U.S.C. § 103) the prior art."); *Affinity Labs*,

838 F.3d at 1263 n.3 ("As the eligibility finding does not turn on the novelty of using a user-

downloadable application for the particular purpose set out in the claims, there was no error in

the district court's not relying on Affinity's expert's testimony that it was a novel feature.").

Considering the elements of the claim both individually and as an ordered combination,

the '377 patent lacks the necessary inventive concept to "transform" the abstract idea into a

"patent-eligible application." *Alice*, 573 U.S. at 217, 221.  There is simply "nothing

unconventional about the 'ordered combination' that is not merely the sum of the parts." *Uniloc*

*USA, Inc. v. ADP, LLC*, 772 F. App'x 890, 900 (Fed. Cir. 2019).  For all those reasons, the '377

patent does not survive scrutiny under step two of *Alice.*

It should be noted that in a case involving the same patent, the Central District of

California recently addressed the question of whether the patent is invalid under § 101.  *See*

*Philips North America LLC v. Garmin Int'l, Inc. et al.*, No. 19-06301-AB-KS, slip op. (C.D. Cal.

June 8, 2022).  The court denied summary judgment as to invalidity, holding that there was a

genuine dispute of material fact as to whether Claim 1 recited an inventive concept:  "a

reasonable juror could find that Claim 1 recites the inventive concept of pairing the 'web-enabled

wireless phone' to a 'device which provides exercise-related information' so that the

'application' on the phone receives that data from the subject in real-time." *Id.* at 24.  It

reasoned that "the intrinsic evidence suggests that using a mobile device that had two-way

communication with the internet to collect, analyze, and display health and exercise-related data

in real-time was not routine or conventional at the time of the invention." *Id.* at 25.  However,

and as noted by Fitbit during oral argument, Philips does not rely on that purported inventive

concept to defeat summary judgment here, and that concept was not asserted by Philips's expert

in his report.  And in any event, the *Garmin* opinion did not attempt to reconcile or explain the

'377 patent's subject-matter eligibility in light of *Electric Power*.

In summary, the '377 patent contains a patent-ineligible abstract concept—collecting,

analyzing, and displaying exercise-related information—and the claims do not include a

sufficiently inventive concept to withstand an invalidity challenge.  Fitbit has therefore satisfied

its burden of proving invalidity by clear and convincing evidence, and summary judgment will

be granted in its favor and against Philips.

## IV.   <u>**Conclusion**</u>

For the foregoing reasons, U.S. Patent No. 8,277,377 claims subject matter that is not patentable under 35 U.S.C. § 101 and is therefore invalid.  The motion of defendant Fitbit LLC for summary judgment of invalidity is GRANTED.  The remaining motions for summary judgment and motions to strike are DENIED as moot.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated: September 1, 2022                    Chief Judge, United States District Court